| DISTRICT COURT, EL PASO COUNTY, COLORADO<br>Court address:  P.O. Box 2980<br>                        20 East Vermijo Ave.<br>                        Colorado Springs, CO 80901-2980<br>Phone Number: (719) 227-5192 | |
|---|---|
| PEOPLE OF THE STATE OF COLORADO,<br><br>vs.<br><br>Robert Rodarte,<br>Frankie Salazar,<br>Jose Salazar,<br>James Cisneros.<br><br>Defendants. | Court Use Only<br>Case Number  09CR753<br>                             09CR748<br>                             09CR818<br>                             09CR768<br><br>Division 15     Ctrm:  S203 |
| ORDER DENYING MOTION FOR RECONSIDERATION AND GRANTING STAY | |

This case arises from an incident which occurred on February 14, 2009 involving Rodarte, Cisneros, Frankie Salazar and Jose Salazar. As relevant to the issue before the Court, Rodarte has been charged with 7 counts of attempt to commit First Degree Murder, a class 2 felony, and one count of Conspiracy to commit First Degree Murder, also a class 2 felony. All of these eight counts have also been charged as crimes of violence. Because of the mandatory sentencing scheme involved, if Rodarte were to be convicted on all counts, he potentially could be sentenced to a minimum of 168 and a maximum of 424 years in prison. As related to the issues subject to this Order, James Cisneros, Frankie Salazar and Jose Salazar were charged with one count of Conspiracy to commit First Degree Murder with a sentencing enhancer of Crime of Violence. Because of this, Cisneros, Frankie Salazar and Jose Salazar are facing a mandatory minimum of 16 and a maximum of 48 years in prison. The case against Richard Dydell is not a subject of this Order as his case was previously removed to federal court.

## FACTUAL BACKGROUND

The charges in this case arise out of an incident which transpired on February 14, 2009. The Court has previously reviewed Attachment A to the Arrest Warrant and has considered evidence in a Proof Evident Presumption Great Hearing held on May 6, 2009 with respect to Rodarte. A Proof Evident Presumption Great hearing was held with respect to Cisneros on May 28, 2009 and with respect to Frankie Salazar on April 23, 2009. For purposes of this Order, the following facts are relevant:

Rodarte was working as a confidential informant with members of the Federal Bureau of Investigation's Southern Colorado Violent Gang Safe Streets Task Force. Rodarte was tasked with infiltrating what was believed to be a local drug trafficking organization, the Los Flamingos also referred to as the "Lingos." The Los Flamingos fall under the umbrella of a larger, nationally recognized Hispanic criminal street gang known as the Surenos.

1

EXHIBIT 1

A meeting occurred between Rodarte, James Cisneros, Frankie Salazar, Joey Salazar and Richard Dydell at a hotel on February 14, 2009. The hotel room was arranged and paid for by the FBI. The room was equipped with video and sound recording devices. During the meeting, the parties discussed an incident which had occurred on September 20, 2008. In this incident, Frankie Salazar was assaulted and robbed by three individuals: Jorge Perez (known as "Wicked"), Joseph Quintana (known as "Spider") and an unknown individual known as "Tricky." On September 20, 2008, these three individuals physically assaulted Frankie Salazar in the parking lot of a restaurant and robbed him of approximately $30,000 of narcotics. The event was discussed among the individuals in the hotel room and a retaliation against the individuals responsible for the assault on Frankie Salazar was discussed. Following the meeting at the hotel room, the individuals took a limousine to a strip bar where they spent some time and also drank more alcohol. On February 14, 2009, Rodarte was wearing a concealed audio recorder at the request of the FBI which did have the ability to transmit data. Prior to the meeting, Rodarte was instructed in its use and specifically how to start and stop recording.

Later in the evening of February 14, 2009, Rodarte, Cisneros and the Salazar brothers drove to a home located at 736 E. Cucharras Street in Colorado Springs, Colorado. The 736 E. Cucharras address was known by the Defendants in these cases to be the home of Jorge Perez. In route to the Cucharras Street address, Rodarte received a phone call from Task Force Officer Richardson. Officer Richardson is a Colorado Department of Corrections employee but was working on assignment with the Federal Bureau of Investigation. At the Proof Evident Presumption Great hearing, Officer Richardson testified he advised Rodarte in the conversation that Rodarte could not be involved in any violent incidents. The telephone conversation which occurred is somewhat vague. Officer Richardson knew Rodarte was in a pickup truck with three other suspected gang members. As such, Officer Richardson knew that Rodarte take could not say anything which would blow his cover. At the hearing, Officer Richardson testified Rodarte was attempting to make the conversation sound like he was talking to one of his other contacts.

As indicated, Rodarte was wearing a body recording device. The recording device was activated during the time all defendants were in the hotel room. The recording device was also working at various times in the afternoon and was activated while the defendants were driving to the 736 E. Cucharras address. As such, various conversations between the defendants which occurred in the truck were recorded. After arriving at the 736 E. Cucharras address, Rodarte approached the house. Rodarte went up to the front door and knocked on it. A woman answered the door. At that point, Rodarte asked if Jorge was home. The woman explained that Jorge was not home. Rodarte said to tell Jorge that Payaso was looking for him. Rodarte is also known by the name Payaso and has a tattoo of that name on his arm.

Rodarte returned to the pickup truck where further conversations occurred with the other defendants. Rodarte ultimately asked the other defendants for the "cueta" which is Spanish slang for "pistol." Rodarte returned to the front lawn of the house and fired eight shots into the house. All of these activities were recorded by Rodarte's body recording device. Rodarte can then be heard running from the scene and getting back into the truck where further conversations with the other defendants occurred. .

EXHIBIT 1

After the shooting occurred, police were called to the scene. Fortunately, no one in the home was injured. However, at the time of the shooting, the home was occupied by three adults ranging in age from 19 to 43 and four children ranging in age from seven months old to 17. Because of this, Rodarte was ultimately charged with seven counts of attempted commit first degree murder. Because of the discussions and activities involving the other defendants, Rodarte was also charged with one count of conspiracy to commit first degree murder. Cisneros, Frankie Salazar and Jose Salazar were charged with conspiracy to commit first degree murder.

Rodarte met with Officer Richardson later on the evening of February 14. At the time of the meeting, Rodarte turned over a handgun which he had received to Officer Richardson. The records indicate that the downloading of the audio and video recording devices reflecting the activities which occurred on February 14 was not done until February 17. The recordings were reviewed on February 18. At that time, a special agent for the FBI identified what he believed to be shots being fired. The remainder of the audiotape was then reviewed. It appears to be undisputed that there was no contemporaneous monitoring of the audio or video devices by the FBI on February 14. It also appears undisputed that the FBI did not otherwise monitor Rodarte's or the other defendants' activities on February 14.

## PREVIOUS ACTIVITES OF DEFENDANT RODARTE RELEVANT TO THE DISPOSITION OF THE ISSUES IN THIS CASE

Rodarte had previously worked as an informant for the FBI and had specifically worked with Officer Richardson. Those activities are the subject of the FBI's Motion to Reconsider. The Court has ordered the release of FBI records regarding Rodarte's activities in another jurisdiction. The Court believes a recitation of those activities is important for purposes of the record as this Court understands the FBI will seek review of this Court's Order either by removal to a Federal District Court or, perhaps, some sort of interlocutory appeal to the state appellate courts. In order to provide any reviewing court with an understanding of this Court's thought processes while still maintaining the integrity of the information, this Court will set forth a recitation of Rodarte's activities in their broadest form.

Prior to arriving in Colorado, Rodarte had worked as a confidential informant for the FBI in another jurisdiction. His assignment in the other jurisdiction involved obtaining intelligence on drug trafficking activities of the Surenos. Eventually, the local organization of the Surenos in the other jurisdiction had come to believe that its organization had been penetrated by a confidential informant. As a result of that, the leadership of the local Surenos organization in the other jurisdiction tasked Rodarte with killing the person they suspected to be the informant. Upon learning of his task, Rodarte had a communication with a member of the FBI team monitoring his activities. While it is not clear from the records, it is possible this communication was directly with Officer Richardson. Rodarte advised the FBI team that he had been tasked with killing a specific individual who was believed to be a confidential informant. Rodarte advised the FBI team that the particular individual needed to be removed from his location for his own safety and essentially needed to "disappear." As a result of this communication, the individual who was believed to be the confidential informant was removed from the area and the "hit" did not take place. The records reflect at least a portion of the investigation which involved Mr. Rodarte was closed when the head of the local chapter of the Surenos was killed in a shootout

EXHIBIT 1

with police in the other jurisdiction. The records also reflect Rodarte provided information to the FBI regarding potential penetration of a state and municipal police organization in the other jurisdiction by members of the Surenos. This information was provided by Rodarte as the FBI questioned how the Surenos had discovered the identity of the confidential informant.

The record also reflects Rodarte contacted Officer Richardson on December 7, 2008 to inform him that Cisneros was offering him a "present" of weapons. Upon learning of this, the FBI team was concerned that members of the Los Flamingos may have discovered Rodarte was working as a confidential informant. As such, members of the task force decided to maintain close proximity to Rodarte and monitor his activities. During the evening of December 7, 2008, Rodarte met with Cisneros. At that time, Cisneros provided Rodarte with two shotguns. Rodarte subsequently turned these weapons over to the FBI team.

The FBI objects to the release of materials which had previously been provided to the Court as a result of a subpoena duces tecum served on them by counsel for Cisneros. The Court performed an *in camera* inspection of these documents. The Court had previously ordered production of certain records regarding Rodarte that detailed Rodarte activities of February 14, 2009. The Court had also released certain information regarding Rodarte's activities on December 7, 2008. Upon initial review of those documents by the Court, the Court did not believe documents related to Rodarte's activities in the other jurisdiction would be relevant to Cisneros' defense. After a change in counsel for Rodarte, Rodarte's new counsel subsequently requested this Court review those documents to determine whether they would be relevant to any defense of Rodarte. As such, the Court conducted a second review.

## LEGAL ANALYSIS

In this case, Mr. Rodarte undertook activities when he knew his activities were being monitored by both video and audio by the FBI. Rodarte was given a body recording device and was shown how to operate it. He was shown how to turn it on and how to turn it off. Officer Richardson has previously testified that the device could be activated by Rodarte in such a fashion that someone in close proximity to Mr. Rodarte would not know whether a device had been activated or not. Portions of the videotape were played during the Proof Evident Presumption Great hearings for Rodarte, Cisneros and Frankie Salazar. Portions of the audio recording were also played for the Court during those hearings. Clearly, Rodarte would have known when his body recording device was transmitting as he is the individual that would have been activating it. Rodarte also received a telephone call from Officer Richardson in route to the shooting which occurred at 736 E. Cucharras. A conversation occurs in which Officer Richardson had enough information that he believed it was necessary to remind Rodarte that Rodarte could not engage in any violent or illegal activities.

Given Rodarte's previous experience as a confidential informant, Rodarte knew the FBI had removed a potential target from danger in the other jurisdiction after a communication from him and had closely monitored his activities on the evening of December 7, 2008 in order to prevent violence and insure the safety of Rodarte. The Court believes that, because of his prior activities with the FBI, Rodarte could argue he anticipated the FBI was going to undertake some action to prevent any violence at 736 E. Cucharras. In fact, Rodarte may have believed the action could

4

EXHIBIT 1

have been as simple as requesting a traffic stop of the truck by local law enforcement. As such, prior incidents in which violence was avoided because of communications by Rodarte to the FBI would be relevant to negate the "knowingly" element of the crime of Attempt to Commit Murder in the First Degree as well as the "intent" element of Conspiracy to Commit Murder in the First Degree. In essence, Rodarte's defense could be that Rodarte simply believed he was playing the part the FBI wanted him to play and he expected, based on his previous experiences with the FBI, that he would never have to go through with any violent act. Once law enforcement failed to intervene, as they had done on other occasions involving Rodarte, Rodarte could claim he had to go through with something in order to preserve his cover and for his own safety. As Officer Richardson was involved in the operations in Colorado as well as the other jurisdiction, he could properly be cross-examined regarding the similarities or differences in the operations. However, the Court understands that the FBI objects to dissemination of any information regarding those other operations and would prohibit its agents from testifying regarding those activities.

Defendants Cisneros and the Salazar brothers have also indicated they may pursue a defense of entrapment and, to a lesser extent, possibly choice of evils. Again, voice recordings of the activities in the truck which occurred while all of the defendants were in route to the 736 E. Cucharras address were played during a Proof Evident Presumption Great hearing for Cisneros. Defense counsel for Cisneros spent some time playing certain portions of the audiotape which suggests Cisneros may not have been in favor of the shooting prior to the time it occurred. There are also indications Cisneros attempted to dissuade Rodarte from committing the shooting on February 14, 2009. Documents which have already been released indicate that Rodarte's perceived position in the Surenos organization required others to provide a great deal of respect and deference to him. The Court anticipates the prosecution will attempt to introduce evidence regarding the hierarchical structure of the Surenos organization. Certainly, the Court has already received some testimony regarding that issue. The records sought to be protected by the FBI detail the manner in which, and the people by whom, Rodarte was introduced to Cisneros and the Salazar brothers as a member of the Surenos. In addition, to the extent Rodarte's activities in the other jurisdiction would reflect upon his status in the Surenos organization, i.e. he had previously been tasked with eliminating a perceived confidential informant, such activities would be fair cross-examination for Officer Richardson with respect to the degree of influence Rodarte would be able to exercise over Cisneros and the Salazar brothers. In essence, if Rodarte was perceived as a high ranking member of the Surenos, the issue of whether Cisneros or the Salazar brothers could have refused an order or "suggestion" by Rodarte would be a fair area of cross-examination for Officer Richardson. Based on the Court's review of the FBI documents regarding Rodarte's activities in the other jurisdiction, those activities could serve as a basis for Rodarte's "credentials" of Surenos authority. Without the information contained in the requested materials, defense counsel for Cisneros and the Salazar brothers may not even know what questions should be asked.

It has long been held that suppression by the prosecution of the evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. Brady v. Maryland, 373 U.S. 83 (1963). In Roviaro v. United States, 353 U.S. 53 (1957), the United States Supreme Court recognized a qualified governmental privilege not to disclose the identity of a confidential informant. This "informer's privilege" has been extended to recognize a qualified governmental privilege not to disclose sensitive investigative techniques. *See* United

EXHIBIT 1

States v. Van Horn, 789 F.2d 1492 (11th Cir. 1986). However, the "qualified privilege is subject to balancing the federal government's interest in preserving the confidentiality of sensitive law enforcement techniques against the requesting party's interest in disclosure." Commonwealth of Puerto Rico v. United States, 490 F.3d 50, 64 (1st Cir. 2007). The qualified privilege can be overcome by a sufficient showing of "need." United States v. Cintolo, 818 F.2d 980, 1002 (1st Cir. 1987). "A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require the disclosure and, if the Government withholds the information, dismiss the action." Roviaro, 353 U.S. at 60-61. In determining whether justification for an exception to the privilege exists, the court "must balance the interests undergirding the privilege against the accused's fundamental right to a fair trial, taking into account all relevant circumstances (including the nature of the crime charged, the contours of the defenses asserted, the available means of proving the charges and defenses, and the significance of the informant's roll.)" United States v. Pesaturo, 519 F.Supp. 177, 186 (D. Mass. 2007).

Applying the above factors to this case, the Court finds the materials must be released. As previously discussed, the information contained in the records goes directly to the presence of the "knowingly" and "intent" element of the charges pending against Rodarte. The background information regarding the manner in which Rodarte gained introduction to the remaining defendants also goes directly to potential defenses of those defendants. Finally, the credibility of Officer Richardson will be a hotly contested subject. Section IV (G) of the Colorado Department of Corrections Administrative Regulation 250-31RD (being released contemporaneously with this Order) discusses the supervision requirements of parolees who are used as confidential informants. Records contained in the FBI file which were signed by Rodarte contain similar language. Given the manner in which the events of February 14, 2009 transpired, the issue of whether the regulations were followed may be a proper subject of cross-examination for Officer Richardson.

The FBI cites Smith v. Cromer, 159 F.3d 875 (4th Cir. 1998), for the proposition that this Court does not have the authority to order the federal government to turn over documents in this case. In Smith, the defendant had been working as a confidential informant for the drug enforcement agency. Unrelated to his services as an informant for the DEA, the defendant engaged in the delivery of heroin to another individual in Maryland. The state court judge performed an *in camera* review of the defendant's CI file and found the information contained therein to be discoverable. The state court ordered the government to produce the file to the defendant's attorney. In response, the government removed the matter to federal district court, moved for a protective order and moved to quash the subpoenas. The Federal District Court found that the defendant had raised an insufficient basis to compel the government to disclose confidential information and that the defendant had alternative access to the information he sought. The court also found that the doctrine of sovereign immunity divested the district court of jurisdiction to enforce the subpoenas. In doing so, it reviewed 28 CFR §16.22(a) which provides that no employee of the Department of Justice shall be required to disclose any information relating to or based upon material contained in the files of the department "in any federal or state case or

manner in which the United States is not a party ..." "without prior approval of the proper Department official ..."

Unfortunately, Smith does not answer the precise question presented here. In Smith, the defendant was being prosecuted for activities unrelated to his work as a confidential informant for the DEA. In this case, Rodarte is being prosecuted for activities conducted while working as a confidential informant and while wearing a body recorder at the direction of the FBI which was activated at the time the actual events transpired. In addition, based upon the testimony presented to date, Rodarte is the only individual alleged to have pulled the trigger that fired the shots at the house located at 623 E. Cucharras. In this case, Officer Richardson has testified in his capacity as a federal agent overseeing the operation in which Rodarte was involved as a confidential informant. As such, Smith is factually distinguishable. While the Court agrees that the "United States" is not a named party in this case, agents of the United States will clearly play a pivotal role in presentation of the evidence against Rodarte. By choosing to place a federal law enforcement officer as the lead agent in this investigation, the FBI certainly understood that any subsequent prosecution would involve testimony from that officer. Further, by choosing the state jurisdiction instead of federal jurisdiction, the FBI should certainly have anticipated that its agent would testify in state court and may be subject to state court orders. The FBI just seems to be taking the position that it, rather than this Court, will determine what is relevant and what subjects its agents will testify on.

The Court is also troubled by the effect of 28 C.F.R. §16.22(a) as used in this case. A skeptic might argue the government could always avoid production of material by simply having a federal agency request a state agency file charges in a state court. 28 C.F.R. §16.22(a) suggests that if Rodarte were being prosecuted for this same crime in federal court, the regulation would not apply and the Federal Court would be required to undergo the same balancing analysis that this Court has conducted. After all, the investigatory privilege is not absolute. F.A.C., Inc. v. Cooperativa De Seguros De Vida, 188 F.R.D. 181 (D. Puerto Rico 1999). In addition, in reviewing Touhy regulations such as those invoked by the FBI in this case, the United States Supreme Court has recognized that "judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers." United States v. Reynolds, 345 U.S. 1, 9-10 (1953). If the Federal Court agreed with this Court's balancing analysis, the documents which this Court has ordered to be produced would also be required to be produced by the Federal Court. In short, all of the cases that have been cited by the FBI involve situations in which the government, or its agents, are being dragged into state court on an unrelated matter to testify. In this case, the FBI desires for its agents to testify regarding certain matters but not others. In refusing to allow production of the documents, there has been no showing that the FBI has even attempted an analysis pursuant to 28 C.F.R §16.26(c). That section allows for disclosure of the materials if the Justice Department determines the "administration of justice requires disclosure." Finally, neither 28 C.F.R. §16.22(a) nor any of the cases referenced by the government define what constitutes "prior approval." That is especially important in this case as an agent of the federal government, Officer Richardson, appears to have been given approval to release information under 28 C.F.R. §16.22(a). After all, Officer Richardson *has already testified* on three separate occasions. Presumably, he would not have testified unless there was approval. Assuming there was approval for Officer Richardson to testify, the materials of which he was aware that are related to the case should be discoverable.

EXHIBIT 1

For the reasons set forth above, this Court finds that the materials referenced regarding Rodarte's activities in another jurisdiction which are contained in his FBI files should be released. References to potential associates, family members and other individuals who are not related to this case will not be released. The report entitled "Quarterly SSA Source Report" dated "02/12/2009" is not subject to release. Finally, any information released in this case would be subject to the following protective order:

1.      Information contained in the documents may be discussed with clients but the documents themselves shall remain in the possession of the attorneys.

2.      The District Attorney will make copies of the documents and make them available to counsel through discovery as has otherwise been done in this case. No other copies are permitted except to the extent necessary to provide the information to retained experts.

3.      Information shall only be used for purposes of these cases only and shall not be used in other case. Information contained in the documents is not subject to public dissemination.

4.      The Court has reviewed a number of documents which provide identifying information regarding alleged associates of all of the defendants. With the exception of information related to the allegations which serve as the basis for the charges in these cases, none of this information is being provided.

5.      Information regarding drug smuggling into a prison is not subject to discovery.

6.      Information regarding an investigation into potentially illegal activities on the part of a county sheriff's office of this state is not subject to discovery.

Essentially all other documents regarding the activities of the FBI and gang task force operations are ORDERED released.

Counsel for Rodarte previously served a subpoena duces tecum on the Colorado Department of Corrections requesting it produce a copy of Administrative Regulation 250-31RD. This document is also ORDERED released to counsel in its entirety. However, while the Court understands that its contents may ultimately be used in cross-examination of law enforcement, the contents of the document are not to be shared with any Defendant absent further Order of the Court.

The FBI has requested a Stay of this Order to allow it to remove this matter to federal court for a determination of whether the documents should be produced. That STAY is GRANTED for a

EXHIBIT 1

9

period of seven days from this Order to allow the FBI to seek review of this Court's Order. As such, the documents will remain in the possession of the Court until December 15, 2009, at which time they will be released by the Court.

                        Done this 8th day of December, 2009.

                        */s/ Gregory R. Werner*
                        Gregory R. Werner
                        District Court Judge

EXHIBIT 1