1

```
 1   DISTRICT COURT
     EL PASO COUNTY, COLORADO
 2   270 South Tejon
     Colorado Springs, CO 80903
 3

 4   PEOPLE OF THE STATE OF COLORADO

 5   vs.

 6   JAMES CISNEROS

 7   Defendant:

 8                                    * FOR COURT USE ONLY *

 9
                                     Case No. 09 CR 768
10
                                     Division 15
11
     APPEARANCES:
12
     MS. TERRY SAMPLE, Reg. No. 33919
13   MS. JENNIFER VIEHMAN, Reg. No. 33163
     For the People
14
     MR. ROBERT GOFFI, FBI, Reg. No. 15012
15   MS. AMY PADDEN, U.S. Attorney's Office, Reg. No. 28372

16   MR. SHIMON KOHN, Reg. No. 31710
     For the Defendant, James Cisneros
17
     MS. CYNTHIA A. MCKEDY, Reg. 27409 and
18   MR. ERIC ANAYA, Reg. 35203
     For the Defendant, Robert Rodarte
19
     MS. PAT BEHAN, Reg. 15893 and
20   MS. CHARLOTTE ANKENY, Reg. 37861
     For the Defendant, Frankie Salazar
21
22              REPORTER'S TRANSCRIPT

23        The following proceedings were held September 9,

24   2009, before the HONORABLE GREGORY WERNER, Judge of the

25   District Court.
```

EXHIBIT 9

1          THE COURT:  09 CR 768, James Cisneros.

2          MR. KOHN:  Shimon Kohn appearing with Mr. Cisneros.

3    Mr. Cisneros appears in custody.

4          MS. SAMPLE:  Terry Sample and Jennifer Viehman on

5    behalf of the People.  Judge, there is also Bob Goffi and Amy

6    Padden from the U.S. Attorney's Office and from FBI.

7          MR. KOHN:  Judge, there are two co-defendants that

8    were here for the most part on the same issues this afternoon,

9    Mr. Salazar.  And Mr. Rodarte is not here.  However, he is here

10   with counsel, Ms. McKedy.

11         THE COURT:  I seem to recall the last time Ms. McKedy

12   waived his presence.

13         MS. MCKEDY:  I waived his presence, yes.

14         THE COURT:  Well, is it the same subpoena?

15         MR. KOHN:  No, judge.  We have three different

16   subpoenas.

17         THE COURT:  Let's deal with them one at time.  We

18   will deal with the Cisneros' subpoena first.

19         MS. KOHN:  Judge, we were going to -- Ms. Behan was

20   representing Mr. Salazar.  We are going to request to wait

21   until she got back.

22         THE COURT:  Let's have everybody have a seat.  We

23   will figure out how we are going to proceed.  We will wait for

24   Ms. Behan to come back.

25         Is there anyone else we can resolve quickly?

EXHIBIT 9

1        (Brief recess.)

2        THE COURT:  09 CR 768, James Cisneros.  Mr. Kohn, I

3   leave it up to you.  It looks like you already have your stuff

4   spread out there.  Leave it out there.  Have Mr. Cisneros sit

5   next to you.  That may be most comfortable for him in any

6   event.  We have Ms. Behan back.  We have Ms. McKedy and Mr.

7   Anaya.  We have Ms. Viehman and Ms. Sample.  Ms. Padden and Mr.

8   Goffi.  Did I miss anybody?

9        MR. BAIN:  Will Bain.

10        THE COURT:  Why are you here, Mr. Bain?

11        MR. BAIN:  I heard we are going to have a good time

12   this afternoon.

13        Ms. Behan SDT'd some city records, judge.

14        THE COURT:  Let's wade in.  I have got Mr. Cisneros.

15   And where are we on that?

16        MR. KOHN:  Judge, I don't think the Court has a copy

17   of the SDT that was served on the Department of Justice, FBI.

18   Does the Court?  If I may approach, judge?

19        THE COURT:  All right.

20        MR. KOHN:  It attaches also the Response.  I

21   apologize for the iced tea stain on it.  I looked for a clean

22   copy.

23        THE COURT:  That's all right.

24        MR. KOHN:  Judge, my preference would be to begin by

25   calling Special Agent Hunt.

EXHIBIT 9

25

1  some type of secrecy that would be violated or operation would

2  be compromised.

3          I would ask for an offer of proof from the government

4  as to exactly what it is they believe would be compromised by

5  releasing financial records of an investigation that, as far as

6  we all know, and couldn't possibly still be ongoing, is dead.

7  I don't understand what their privacy interest is in that,

8  other than just claiming general government immunity.

9          THE COURT:  I am not sure I agree with that.  In

10  large part because you know, everybody in this room knows, that

11  Mr. Rodarte was involved with a lot of people besides just the

12  people who have been charged in this case.  And, as a result of

13  that, I think that whether there is an ongoing investigation or

14  not, that will be relevant.

15          The other issue is that the cases, as nearly as I can

16  determine, do not draw the distinction or draw the line at when

17  charges were filed because it is conceivable or possible that

18  whatever method that was used in this case would be used in

19  some other case.  Unless I am failing to understand the

20  government's position.

21          MR. KOHN:  All we would ask for is an offer of proof

22  from the government as to Mr. Rodarte's involvement in this

23  case in El Paso County.  Why the funds -- why the information

24  on the funds that were distributed to Mr. Rodarte couldn't be

25  released with the privileges.  What the Federal national

EXHIBIT 9

 1    security interest is.  Why it is that their right to keep that

 2    private and confidential outweighs my client's right to

 3    confront his accusers.

 4             THE COURT:  We have already heard argument about some

 5    other individuals that may have been involved in this before

 6    Mr. Rodarte ever showed up in Colorado.  I think we need to --

 7    I don't think we need to go through that again.

 8             Any further offer of proof, Ms. Padden or Mr. Goffi?

 9             MR. GOFFI:  No, your Honor.

10             THE COURT:  My ruling stands.  Next issue.

11             MR. KOHN:  You want to me go again, judge?  Are you

12    sick and tired of hearing me yet?

13             THE COURT:  I am trying to figure out where we are.

14    We have the subpoena duces tecum that has resolved, as near as

15    I can determine.

16             What's the next issue?

17             MS. PADDEN:  May Agent Hunt be excused?

18             THE COURT:  As far as I am concerned.  Is Agent

19    Hunt -- are you under subpoena by anyone else, aside from Mr.

20    Kohn?

21             MR. HUNT:  No, your Honor.

22             THE COURT:  Mr. Kohn.

23             MR. KOHN:  No, judge.  That's fine.

24             MS. ANKENY:  I am, sorry.  Judge, we would just ask

25    that we can subpoena him and serve him again.  We are going to

EXHIBIT 9

1    be asking that Agent Hunt be present for the motions hearing on

2    I believe it's the 24th.

3              MR. KOHN:  I have subpoenaed him for that day, judge.

4              THE COURT:  All right.  Agent Hunt, do you agree to

5    return on September 24th?

6              AGENT HUNT:  Yes, your Honor.

7              THE COURT:  You may be released.

8              MR. KOHN:  Actually, we haven't even started my SDT

9    yet.  Number 1, the government complied with -- I received a

10   copy yesterday of the confidential informant guidelines.

11   Number 2, confidential human source policy manual.  This is a

12   manual, in addition to Federal guidelines, that the FBI uses.

13             THE COURT:  Stop there.  What is it?

14             MR. KOHN:  What is it?  To the best I can tell,

15   without reviewing it, it's a supplement to the guidelines.

16   It's more specification as to the amount that -- potentially

17   the amount that somebody has paid, what they need to do and how

18   they must run confidential informants, what they can do with

19   them, what they can't do with them.

20             THE COURT:  Mr. Goffi.

21             MR. GOFFI:  That's correct.  That document implements

22   the confidential human source policy manual.  It implements the

23   guidelines prior to the use of --

24             THE COURT:  Do you intend to produce that or --

25             MR. GOFFI:  That's a classified document.  Classified

EXHIBIT 9

1    at the secret level.

2            THE COURT:  Forget my ignorance, who classifies it at

3    the secret level?  Who does that exactly?  Who has that stamp?

4            MR. GOFFI:  A person with original classification

5    authority that is not in the Denver field office.

6            THE COURT:  That's Number 2.  Number 1 has been

7    produced.

8            Mr. Kohn.

9            MR. KOHN:  Judge, I understand it's confidential.

10   However, I think -- I don't think, I know FBI violated numerous

11   policies that they have in place under the CI guidelines and I

12   believe also under the confidential human source policy.

13           THE COURT:  I think you missed the issue.  It's not

14   confidential.  It's classified.  Unless you can show me a way

15   to have a state court get around a Federal classification of a

16   Federal document.

17           MR. KOHN:  Judge, if the Court believes that we are

18   entitled to it, the Court orders it released.  If they

19   respectfully decline, then there is sanctions.  Otherwise, they

20   can file the case in Federal court where they are more apt to

21   deal with this.  These issues come up on a daily basis.  Rather

22   than throwing this on a state prosecutor, without giving the

23   state prosecutor all of the evidence that's required and all

24   the exculpatory information.

25           THE COURT:  The issue of whether or not the Federal

EXHIBIT 9

1    government ultimately can proceed or not because of their

2    failure to produce certain evidence is up to me.  The question

3    still gets back to if this is classified, I have to be frank, I

4    don't even think I have the authority to order that it be

5    produced to me for in camera review to determine whether or not

6    it should be classified.

7              MR. KOHN:  I agree, judge.  But you do have authority

8    to state that our clients -- my client's specifically due

9    process right to confront his accuser, especially under the

10   theory of outrageous government conduct, requires that we have

11   an opportunity to review what their procedures are, to know

12   which procedures were violated, and how many of them were

13   violated, how egregious the violations are.

14             At that point if we don't have that, then the Court

15   can impose sanctions.

16             THE COURT:  Here is the problem that I am having, I

17   understand the zealous representation.  I don't have a problem

18   with it, frankly.  The problem that I have in this case is you

19   are looking, it appears to me at this point, that you are

20   looking for something which you hope is in there, thinking that

21   maybe there is a violation.  Which would result in an argument

22   of outrageous government conduct.  All of it has to deal with

23   Mr. Rodarte.

24             None of the evidence that I see or none of the

25   requests for evidence has to deal with substantive evidence

EXHIBIT 9

1    that pertains directly to Mr. Cisneros.  I suppose Ms. McKedy

2    may have a different view point because this may impact her

3    client.  I have no clue.  From Mr. Cisneros' standpoint, we are

4    not looking at anything that has to do with substantive

5    evidence that would be introduced to substantiate guilt or

6    innocence of Mr. Cisneros.

7              MR. KOHN:  That's not what we are looking for, judge.

8    We are looking for the outrageous government conduct offense

9    that focuses attention on the government's conduct, not on my

10   client --

11             THE COURT:  I understand that.

12             MR. KOHN:  We know that there were violations.  First

13   of all, we have some in the CI guidelines.  I will tell the

14   Court, frankly, that Mr. Rodarte, to the best of my knowledge,

15   and I have called his parole officer to confirm, was on state

16   parole at the time that he was recruited by the Federal

17   government.  And there is a specific subsection here that

18   requires prior -- I am not going read all of it under

19   subsection D1, "State or local prisoners, probationers,

20   parolees or supervised releases."  Basically it requires the

21   Federal government to get authorization from either the parole

22   officer, the state parole officer, or the Court or somebody

23   that's in charge of that that has the authority to give that

24   type of information.

25             And rather than doing that, they put a parolee on the

EXHIBIT 9

1    streets with lots of money, with guns, and drugs, and he ended

2    up shooting up a house.  We know there is a violation of

3    policies which rise to the level of outrageous government

4    conduct.  The question then becomes what other policies are

5    violated.  Were they supposed to monitor him after the

6    conversations that they heard, or that they saw, I guess,

7    without the headphone?

8              THE COURT:  That's a whole different --

9              MR. KOHN:  Should they have been monitoring them

10   closer?  What are the government's policies in monitoring?  And

11   were they lax in their supervision of their CI, a violent

12   convicted felon on state parole with access to guns, drugs and

13   lots of government money?

14             MS. PADDEN:  If I may, Mr. Kohn makes all of these

15   arguments without the specific guidelines.  He can argue that

16   the government acted in whatever way he wanted without the

17   specific guidelines.  These are secret documents.  They are

18   even a higher level of classification than other documents.

19   The defendant's right to discover these documents is not

20   unfettered.  He doesn't have an unfettered due process to

21   discover any documents out there.  He certainly does not have a

22   right to discover documents classified as secret by the Federal

23   government.

24             THE COURT:  The problem -- I disagree with your

25   argument.  Suppose, for instance, that there was a Federal

EXHIBIT 9

1    guideline, and again I am making this up, suppose there was a

2    Federal guideline that says, "One thing that you do not do is

3    send somebody out while wearing a body wire and you don't send

4    them out unless they are monitored."  If you set up a meeting

5    or if your CI sets up a meeting with someone else and they are

6    wired, then that is to be monitored on a -- that's to be

7    monitored on a live basis so that you know what's going on.

8    You can determine if anything is being planned there that

9    should not be planned.

10            Unless, let's suppose, that's a Federal guideline.

11   In fact, we all know, based on the facts, based on the

12   preliminary hearing, that didn't occur in this case.  Then Mr.

13   Kohn would be up there, instead of making a argument, he would

14   be up there going, "See, see in this Federal guideline, that is

15   the one they didn't follow.  What else didn't they do?  They

16   are not telling you about that.  We don't know about it."

17   That's what I see being different.

18            I am not sure, however, that it does get past the

19   secret classification of the document.  But I certainly

20   understand Mr. Kohn's argument, and frankly, I have to give it

21   a little bit more thought before I can rule.  I think, again,

22   probably we are going to come down to, it is not a sufficient

23   showing, under the Federal cases that I cited, that would get

24   past the privilege.  That's the problem.  The privilege is

25   there.  The question is, is there a sufficient showing to get

EXHIBIT 9

33

1    past the privilege?  This one is even further past the

2    privilege because it's a secret document.

3              I will mull that over.  Move to the next one.

4              MR. KOHN:  Judge, to respond to Ms. Padden.  The

5    outrageous government conduct is the totality of the

6    circumstances.

7              THE COURT:  I understand.

8              MR. KOHN:  The more information I have --

9              THE COURT:  I understand.

10             MR. KOHN:  I want to make a record on that.

11             THE COURT:  I understand.

12             MR. KOHN:  I have a few other things.  I have a total

13   of 11.  What I would like to do is turn it over to one of the

14   other attorneys.  I am sick and tired of being up here for a

15   few minutes, if that's okay with the Court.  I will turn it

16   over to either of the other attorneys.

17             THE COURT:  Hold on a second.

18             (Brief recess.)

19             THE COURT:  Let's re-call 09 CR 768, 09 CR 753, 09 CR

20   748 in no particular order.  That would be Mr. Cisneros, Mr.

21   Salazar and Mr. Rodarte.  It looks like we have everybody back

22   in place.

23             Next.

24             MS. BEHAN:  I think I have been nominated, judge.

25             THE COURT:  All right.

EXHIBIT 9

1          MS. BEHAN:  So I think there is one party that we

2     have not addressed.  So I wanted to try to do that and see if

3     we can at least let one individual go.  That is on the City

4     subpoena.

5          THE COURT:  Let's see where we are.  Is that the one

6     to the chief of police?

7          MS. BEHAN:  Yes, judge.  We had filed a motion

8     because in this joint task force that investigated this case

9     there was a huge component of that that was the City police

10    that had previously been with the COMMIT Team and who were now

11    working with the FBI under this joint task force.  We had

12    requested the underlying information that deals with that.

13         It's my understanding, and I just got this as we were

14    adjourning, there was a motion to quash the subpoena from the

15    City.

16         THE COURT:  Okay.

17         MS. BEHAN:  Although there is an individual who

18    stands, I believe, ready and has information or documents.  I

19    have subpoenaed them.  There is a response and what I would ask

20    is that maybe the Court could address that response and see

21    what we need to do with those records.

22         THE COURT:  Let me see what we have.  First of all,

23    where did Mr. Bain go?  You are hiding over there.  Step out,

24    Mr. Bain.  You have got a lot of stuff there.  It looks like

25    you are producing stuff over objection.

EXHIBIT 9

1          MR. BAIN:  Well, it was kind of a shotgun subpoena

2    duces tecum.  They have asked for a lot of police reports that

3    are already public records.  So we don't have an objection to

4    turning over those.  There is an MOU between the City and

5    whoever these other agencies that are involved.

6          THE COURT:  MOU.  What's that?

7          MR. BAIN:  Memorandum of understanding, which is also

8    pretty much a public record.  The only thing that's mildly

9    sensitive in here, we just ask the Court to go ahead and order

10   me to turn it over to Ms. Behan, are the criminal histories of

11   these various people.  They contain arrests that are not

12   normally falling under Rule 16.

13         THE COURT:  Would they be -- you say criminal

14   histories.  Is that something off of NCIC, something like that?

15         MR. BAIN:  The City's own database.  It is called

16   MNI.

17         THE COURT:  I will order that to be produced.

18         MR. BAIN:  I am turning those over to Ms. Behan.  She

19   can, perhaps, copy them.

20         MR. KOHN:  For the record on behalf of Mr. Cisneros,

21   we join in both Mr. Salazar's and Mr. Rodarte's subpoenas for

22   that.

23         THE COURT:  I figured that was coming.  Ms. McKedy.

24         MS. MCKEDY:  Mr. Rodarte joins in all of the

25   subpoenas that have been issued up to this point, judge.

EXHIBIT 9

1          THE COURT:  That's what I had thought.  Okay.  You

2    need to make however many copies.

3          MS. BEHAN:  I assume it would be -- does the Court

4    need a copy so the Court knows what is turned over as an

5    ongoing record?

6          THE COURT:  No.  No.  No.  As a matter of fact, the

7    records department would kill me if I did that.  No.  That's a

8    bad idea.  If it becomes an issue about something -- real

9    technically, the City had turned over what they think they

10   have.  The issue is not going to be about what they turned

11   over.  It's going to be an argument somewhere of, well, this

12   references some other document that they didn't turn over.  I

13   don't think I need to keep any of that record.

14         Is there anything that Mr. Bain -- is there anything

15   that was subpoenaed that the City objected to or did not

16   produce?

17         MR. BAIN:  Yes.  Does the Court have my motion to

18   quash?

19         THE COURT:  I do.

20         MR. BAIN:  Ms. Behan also SDT'd some information from

21   the gang database that CSPD keeps.  We are objecting to the

22   release of that.  I have got that material in a packet here.

23         THE COURT:  Let me start with grabbing that.  That

24   doesn't look near as bad as the last envelope.

25         MR. BAIN:  No.  Again, we are objecting for all the

EXHIBIT 9

1    that a flow of information is maintained.  And I haven't seen

2    any efforts on their part to expedite this.  And so I am

3    concerned about that.  In my efforts, and there are specific

4    sections that talk about in materials are believed to be held

5    by other government personnel, and obligations that are again

6    imposed on the local District Attorney, and again, I haven't

7    seen any efforts.  The only efforts that I have seen in trying

8    to get the due process and the discovery issues met are defense

9    counsel's.

10            So can the Court give me guidance on if it's Rule 16

11   and the issues on confrontation and what is relevant are

12   different than what might be admissible at trial and so they

13   would be broader.  The discovery process is an investigative

14   issue also.  So I am requesting not just what would be

15   admissible in court on confrontation, I believe most of this

16   will be.  But on the scope that Colorado state law says I am

17   entitled to under Rule 16.

18            THE COURT:  I can short circuit this argument because

19   I issued an order long ago that indicated that this case was

20   going to be governed by Rule 16.  I understand it is being

21   prosecuted by the State.  And all of the State's witnesses or

22   nearly all of the State's witnesses are Federal agents or

23   Federal personnel who are not subject to my jurisdiction.  That

24   doesn't make any difference to me.  I have jurisdiction over

25   the door.  Which means that if they don't do what they are

EXHIBIT 9

1    supposed to do under Rule 16, they don't have to worry about

2    coming through that door because they won't.

3           Now, that may mean that the People have witnesses

4    that won't be able to testify.  But that's the People's

5    problem.  But it's not any different than any other case.

6    Except that there are some privileges that apply in this case

7    which may not necessarily apply to the State case such as one

8    of the documents was referenced as being classified as secret.

9    As far as I understand, and we have had more than one

10   proceeding on this, and forgive me, I am confused because I

11   have had more on others than just Mr. Salazar, but the

12   conversation went along the lines of, if the Federal government

13   wants this case prosecuted and wants their people to testify,

14   they have to abide by Rule 16 as nearly as they can, within the

15   structures of complying also with Federal law, taking out

16   Federal law issues as we get there.

17          MS. BEHAN:  Okay.

18          THE COURT:  My thought is to deal with the subpoena

19   duces tecum.  I don't think it's appropriate to put you in the

20   position of arguing whether or not -- can I have your

21   attention, please?  I don't think it's important or I don't

22   think it's appropriate to require you to argue whether or not

23   you have produced the things that you requested from the

24   Federal government now because you haven't seen them.  I think

25   that we are back on the 24th, 23rd, whatever it is.

EXHIBIT 9

52

1          MS. BEHAN:  We are set for most of the day on the

2    24th.

3          THE COURT:  I remember it's a Thursday.  Whenever we

4    come back, then we have issues then.  Once we made it through

5    them --

6          MS. BEHAN:  Again for guidance, on the request we had

7    received documentation but not what items we were requesting

8    they deem privilege and what privilege they are relying on.

9    Could we get an order from the Court as to what's been provided

10   I believe what they believe has been needed to be provided.  I

11   am assuming is what was sent to me, if I had to guess, there

12   are issues that deal with -- that they are claiming they did

13   not provide.  And what I was asking is if we could be provided

14   for the 24th an itemization on what items they specifically did

15   not provide because they believe it's privileged and the

16   privilege they are relying on.  We can respond instead of

17   learning for the first time.

18         THE COURT:  I assume that's possibly coming.

19         MS. PADDEN:  There is a cover letter with the

20   documents from Mr. Goffi that explains what documents are being

21   produced, what request numbers there were.  No responsive

22   documents then what documents are not being produced.

23         THE COURT:  That should be fine.  That should be

24   enough.

25         MS. BEHAN:  On the documents that they are saying are

EXHIBIT 9

1   not being produced, I haven't looked at the letter.  Maybe it's

2   addressed.  Does it reference what they are relying on for the

3   reason that it's not their authority?

4           THE COURT:  Citation of authority.

5           MS. PADDEN:  There is a citation CFR.

6           MS. BEHAN:  We can address it on the 24th.  Thank

7   you.

8           THE COURT:  I don't have a copy of that.  Can I get a

9   copy of the letter?

10          MR. GOFFI:  We mailed copies of our letter and

11  responses to the Court and to the defense that issued the

12  subpoena.

13          THE COURT:  To me.

14          MR. GOFFI:  We addressed letters to the clerk of El

15  Paso County, Division 15.

16          THE COURT:  When did you send them?

17          MR. GOFFI:  Fed Ex'd them out Friday afternoon.

18          THE COURT:  It probably isn't in the file yet.

19          MS. BEHAN:  I think, judge, I think it's the letter

20  that was attached to the discovery but mailed to me and then

21  the cover letter does start with the Clerk of the El Paso

22  County Court.

23          THE COURT:  I will look for that.

24          MS. BEHAN:  Is the Court ordering us to -- so I know

25  my obligations -- to make sure that there is copies for all

EXHIBIT 9

54

1    parties?

2              THE COURT:  Yes.  Whoever gets the subpoena, if

3    someone else requests that, we will need to make copies for

4    them.

5              MS. ANKENY:  As far as what's been happening, Mr.

6    Kohn, has subpoenaed and it has been released to us in

7    discovery that's what's going to continue to happen then.  We

8    don't need to make copies on ourself to go through discovery if

9    the DA has already received it.

10             MR. KOHN:  The Federal government sends everything to

11   the DA, to me.  That's why it's been released in discovery.  My

12   concern, the City -- when the City provided a copy to the

13   District Attorney --

14             MS. ANKENY:  We can do that for the Federal one.

15             THE COURT:  Ms. McKedy, what's your preference?

16             MS. MCKEDY:  I want it all, judge.

17             THE COURT:  That part I understand.

18             MS. ANKENY:  We need to take care of the City.

19             MS. MCKEDY:  I thought everything that was coming was

20   going to the DA and Mr. Kohn and I was getting copies of that

21   up to this point.

22             THE COURT:  It sounds like the City is the only one

23   that hasn't done it.  Make a copy of whatever the City gave you

24   and make that available to everybody else.  It sounds like all

25   of the stuff that the Federal government has done was sent to

EXHIBIT 9

1   the DA which is available for you.  Is that right?

2        MS. SAMPLE:  Yes, judge.

3        THE COURT:  Are we done with Mr. Salazar?

4        MS. ANKENY:  We are waiting for the judge to do the

5   conflict hearing.

6        THE COURT:  Aside from that?  Mr. Kohn, are you

7   taking lessons here?

8        MR. KOHN:  No.  I am trying to.

9        THE COURT:  Court will call 09 CR 753 which is People

10  vs. Rodarte.

11        MS. MCKEDY:  Thank you, judge.

12        THE COURT:  I think we have the same issue because I

13  have a whole lot of stuff.

14        MS. MCKEDY:  I would like to start first with the

15  easiest one.  Did you receive anything from T Mobile?  I

16  subpoenaed Mr. Rodarte's phone records.

17        THE COURT:  From T Mobile.

18        MS. VIEHMAN:  I actually have all of that.  It has

19  not been released in discovery.  It is phone records from T

20  Mobile from January 1st, 2009, to February 25, 2009.

21        THE COURT:  I have nothing from T Mobile.

22        MS. MCKEDY:  They were personally served at their

23  corporate headquarters.  I am anticipating that I will receive

24  that information from the DA.

25        MS. VIEHMAN:  Yes.

EXHIBIT 9

1        THE COURT:  The date that she gave you, does that

2    sound like the dates you were looking for?

3        MS. MCKEDY:  Yes.

4        MS. VIEHMAN:  More than she was asking for.

5        MS. MCKEDY:  More than actually I was looking for,

6    judge.  That takes us to the next phone records.  I did

7    subpoena to the Federal government requesting the phone records

8    of TFO Richardson.  Who throughout the discovery reports that

9    he has several phone conversations with Mr. Rodarte during this

10   event and after this event and the following day.

11       The response I get back is, this is not a Federally

12   issued cell phone.  They are not going to provide that

13   information.  I am asking their court to order the DA to find

14   out the phone number, find out the provider, and provide that

15   information to me so I can subpoena it.  I have no other way of

16   obtaining that information, judge.

17       THE COURT:  Say that again.  It's not a Federally

18   issued cell phone?

19       MS. MCKEDY:  Not issued by the Department of Justice.

20   It's not.

21       THE COURT:  They don't know who it is that it's

22   through.

23       MS. PADDEN:  TFO Richardson is not a Federal

24   employee.  It's my understanding.

25       THE COURT:  That's right.

EXHIBIT 9

1          MS. PADDEN:  FBI has nothing.

2          MS. MCKEDY:  That's where the confusion is.  This is

3   a joint task force with the Federal government working.

4          THE COURT:  He was CSPD.

5          MS. MCKEDY:  I am asking that information be

6   provided.

7          THE COURT:  He was not CSPD.

8          MS. SAMPLE:  He is a task force officer assigned to

9   the Safe Streets Task Force.  He actually works for the

10  Department of Corrections, Inspector General's Office.  They

11  could go that route.

12         MS. MCKEDY:  Here is the issue, they are going to

13  rely on him testifying about phone calls that come in and are

14  made by him and made to him by my client.

15         THE COURT:  I am not saying you don't get that.  I

16  think that is relevant.

17         MS. MCKEDY:  They are saying, "You get it, Ms.

18  McKedy."  They want to bring the information about the phone

19  calls in.  They are hiding behind layers of government here,

20  judge.  I am asking you to order them to provide me who the

21  provider is, what the cell phone number is.  I will be glad to

22  subpoena it.  This is a round about multi-step, multi-layers of

23  the government making a mockery of the state system here.

24  Hiding behind, oh, it's Federal when they are the ones

25  prosecuting the case.

EXHIBIT 9

1          THE COURT:  Ms. Sample.

2          MS. SAMPLE:  Judge, we don't have that information.

3    She has Mr. Rodarte's phone calls that were made on that time

4    and date.  So she will have that information of how many times

5    Mr. Rodarte called Mr. Richardson's phone and how many times

6    Task Force Officer Richardson called Rodarte's phone.  She has

7    that information without getting Officer Richardson's phone

8    records.

9          MS. MCKEDY:  That's not true.  I don't know what his

10   phone number is.  I don't know who the provider is.  I think

11   that is very important.  How am I to correlate the phone call

12   on Mr. Rodarte's records without having who he is calling?

13         THE COURT:  No.  I think that's fair.

14         MS. SAMPLE:  If I may, I know I received an e-mail

15   from Mr. Richardson regarding this SDT.  He has great concern

16   with your Honor releasing his information regarding his phone

17   number because, it's my understanding, that through his job he

18   can pay a little extra money, and this phone now becomes his

19   personal cell phone.  So he is concerned about releasing his

20   wife's number, his home number, his children's number, things

21   like that.

22         MS. MCKEDY:  I don't want anything but his phone

23   number of the phone he was using that day, the day before, and

24   during this investigation.

25         THE COURT:  The critical testimony here, I recall it

EXHIBIT 9

1   vividly, the critical testimony here was that during the time

2   that they are driving to the house Officer Richardson says that

3   he is talking with Mr. Rodarte on the cell phone and he says he

4   initiates the call.  And there is also testimony from Officer

5   Richardson that if he had a conversation with Mr. Rodarte, that

6   he couldn't be engaging in certain types of activity and those

7   kinds of things.  I think that that's discoverable.

8          MS. SAMPLE:  I guess, judge, my question would be, if

9   Ms. McKedy had the phone number of Mr. Richardson how she could

10  not then deduct which phone calls came from Mr. Richardson.

11         THE COURT:  That's what she is asking for, she

12  doesn't have the phone number.

13         MS. SAMPLE:  She wants to SDT his phone records.

14         MS. MCKEDY:  Phone records.  I need his phone record,

15  who the provider is, and how he is registered to use that

16  phone.

17         THE COURT:  Wait a minute.  How he is registered.

18  How does that --

19         MS. MCKEDY:  If I ask for that phone number, I have

20  to see who the person who owns that phone is.  That's how I

21  have to subpoena those phone records.

22         THE COURT:  Okay.

23         MS. SAMPLE:  My argument, judge, would be if she just

24  has the phone number she can go off Robert Rodarte's phone

25  records on when those phone calls were made, incoming and

EXHIBIT 9

1   outgoing.

2         MS. MCKEDY:  Judge, Mr. Rodarte's phone records may

3   have other phone calls that are made on there that I won't know

4   who they are.  If Mr. Rodarte is making phone calls to other

5   agents involved in this case, then those are going to be listed

6   there as well.  Is Mr. Richardson making phone calls elsewhere

7   in response to the phone calls that Mr. Rodarte is making to

8   continue the investigation?

9         If the Court recalls, or maybe this didn't come up in

10  all the preliminary hearings, there is authorization to use the

11  line for two more hours.  That call was made by Mr. Richardson.

12  I think if he is going to get up there and testify about phone

13  calls and we are supposed to take his word for it, there is

14  impeachment value, if those phone calls actually weren't made

15  or if he is making other phone calls along the same lines.

16        THE COURT:  Let's start with the easy question.  I

17  think that the DA does have the obligation in this case to

18  determine the phone number for Officer Richardson and to

19  provide that phone number to the defense.

20        Now, the other issues about whether or not Officer

21  Richardson was making other phone calls, I am not inclined to

22  go there.  I think that request is denied.  I am going to

23  allow -- you are going to have to get Officer Richardson's

24  phone number and give that to Ms. McKedy.  And I think so long

25  as the phone records that Ms. McKedy gets for Mr. Rodarte's

EXHIBIT 9

61

1    phone can show both his outgoing calls and to what number and

2    his incoming calls and from what number, that's all you have to

3    produce.

4             MS. MCKEDY:  Based on the information I received, I

5    assume I can file continued SDTs.

6             THE COURT:  I am not limiting it.  That's what I am

7    doing it for now.  If it goes somewhere else or bleeds

8    somewhere else, we will have to take that up when and if we get

9    there.

10            MS. SAMPLE:  For the record, the records that will be

11   going to Ms. McKedy and all other parties does state the phone

12   number that is incoming or outgoing and the duration of that

13   phone call.

14            THE COURT:  That's Rodarte's phone records?

15            MS. SAMPLE:  Yes, judge.

16            THE COURT:  Okay.  All you need to do then is

17   identify which of those numbers is Officer Richardson's.

18            MS. SAMPLE:  Yes.

19            MS. MCKEDY:  I asked that the actual recording device

20   and all documentation pertaining to the operation of that

21   recording device, including reporting parameters and operating

22   instructions be provided to me.  Again, the government has said

23   that this is privileged information.

24            Relying on the cases that the Court cited earlier,

25   with regard to the balancing test, Mr. Rodarte is in a

EXHIBIT 9

1  different position than the rest of the defendants with regard

2  to this issue.  The identity of Mr. Rodarte, the government is

3  going to seek to establish his identity through this listening

4  device.  I think it is imperative to his defense and his due

5  process rights and his rights of confrontation to be able to

6  know how this device operates.

7          THE COURT:  Back up a moment because at the scene of

8  the shooting --

9          MS. MCKEDY:  Yes.  I don't know if the Court recalls,

10 but one of the witnesses says that there is one suspect and

11 there is a second suspect.  And they are going to try to

12 establish through the listening device the identity of my

13 client.  Judge, additionally, they are going to testify, I

14 believe, as they have in their discovery, that this was a

15 recording device and not capable of transmission, live

16 transmission.  And they are going to testify that Mr. Rodarte

17 knew that.  How they are going to bring that out, I don't know.

18 The argument is that he believed that it was a live recording,

19 and this kind of dovetails into another issue relating to his

20 CI file that I subpoenaed as well.

21         THE COURT:  Let me back up to make sure I understand

22 your argument.  Your argument is that the government is saying

23 that it was only a recording device and he knew that.

24 Conceivably the defendant could argue, no.  I thought it was a

25 live transmission device.

EXHIBIT 9

1          MS. MCKEDY:  Right.  They are going to testify, no,

2     it's a recording device.  I am stuck with that answer.  I don't

3     get to have an expert examine that.  I don't get to have any

4     information at this point to rebut that.  I think that's

5     incredible impeaching information.  I think it definitely goes

6     to Mr. Rodarte's state of mind and some of the lack of

7     government follow-through and activity that should have

8     occurred in this case.

9          MS. PADDEN:  Your Honor, this is what actually went

10    back to when Mr. Cisneros' counsel requested this listening

11    device that was used in the hotel room.  This device is what is

12    currently being used by the FBI and other agencies and active

13    law enforcement.  And giving one of those devices, making

14    that -- disclosing that would greatly enable criminal

15    defendants to thwart the use of that device.  They would know

16    how the device works, things like that.

17         Mr. Rodarte was actually wearing the device.  He

18    knows information about the device because he was actually

19    wearing it.  He can testify about what he believed the device

20    could and couldn't do.  There is no reason why he couldn't

21    provide that testimony.

22         MS. MCKEDY:  He has a Fifth Amendment Right not

23    incriminate himself.  I think I have the right to

24    cross-examine.

25         THE COURT:  Your issue is you want to be able to

EXHIBIT 9

1   cross-examine somebody without having to put your guy on the

2   stand.

3           MS. MCKEDY:  Exactly.

4           MS. PADDEN:  That goes back to sensitive law

5   enforcement.  That I think is privileged.

6           THE COURT:  I am there.

7           MS. MCKEDY:  It is a balancing test, judge.  I have

8   no other way to get that information.  I have no other way to

9   confront this information.  I basically have to take the answer

10  they give me because they are the only ones that have the

11  information.

12          THE COURT:  Motion is denied for a number of reasons.

13  First of all, I am relying upon United States versus Van Horn

14  789 F.2d 1492 and also Commonwealth of Puerto Rico vs. United

15  States 490 F.3d 50.  And United States vs. Cintolo,

16  C-i-n-t-o-l-o, 818 F.2d 980.  As I understand the defense

17  argument, the issue is not what you knew, not actually what was

18  the case, but what the defendant believed.

19          In this instance the defense argument would be that

20  the defendant believed that the device acted in such a fashion.

21  Whether it actually acted in a fashion or not is not

22  necessarily relevant to the defendant's belief because the

23  device could, in fact, be that it was a recording device and

24  not a live listening device.  And the defendant could still

25  take the position that, "I believed it was a live listening

EXHIBIT 9

1    device."  It would not change that circumstance.

2             In addition, I don't believe that looking at or

3    weighing the balance -- I am sorry, I don't believe balancing

4    the need for the information in this case outweighs the

5    privilege.  I do understand in this case that there may be an

6    issue as to ultimate identification of the defendant when the

7    trigger was pulled because that's really sort of the issue.

8    But the ultimate -- as in United States versus Van Horn, the

9    ultimate question that whether the voice identifications of the

10   defendant were correct, was given to the jury and appellants

11   were allowed to explore and argue the possibility of

12   misidentification in front of the jury, this would be similar

13   to that.

14            The defendant in this case, Mr. Rodarte, who has

15   unique knowledge of the particular device, he himself was

16   wearing and activating it would be able to make all of those

17   arguments in front of the jury.  I don't believe it overcomes

18   the privilege.  That motion is denied.

19            MS. MCKEDY:  Does the Court's ruling on that issue

20   prohibit my Cross-Examination of the agents in this case with

21   regard to operation of that device?

22            THE COURT:  I think we are going to have to take that

23   on a question by question basis.  I have issued an order before

24   that the device is to be identified only as a body listening or

25   body wire device.  I think that you weren't here for the

EXHIBIT 9

66

1    prelim.

2            MS. MCKEDY:  I wasn't.  The Court said they were

3    going to issue a written ruling.  I have not received that.

4            THE COURT:  That's my fault.  I apologize for that.

5            MS. MCKEDY:  I will be following up with that.  I

6    think body listening device is very misleading and will be

7    misleading to the jury.  I want some further clarification in

8    how I can describe that device.

9            THE COURT:  There were some questions that I allowed

10   because, if I recall correctly, Mr. Griffin asked some

11   questions generally along the lines of could this device be

12   activated in front of somebody without that person knowing.

13   Could recording start, something like that.  I thought those

14   questions were fair.  I still think those questions are fair.

15   I think I am going to take it on a case by case or a question

16   by question basis.  I guess the long and short is, I don't

17   know.

18           MS. MCKEDY:  I will file some additional motions with

19   regard to that, judge.  The last subpoena that I issued was for

20   the confidential informant file of Mr. Rodarte.  If the Court

21   is not inclined to grant that, based on my subpoena, then I am

22   going to ask to reset this out of the presence of the

23   co-defendants because I think that I have information that

24   could sway the Court's decision with regard to that.

25           THE COURT:  All right.  First of all, Ms. McKedy, one

EXHIBIT 9

1    of the things that -- I wanted to make sure.  I have a lot of

2    stuff that I can't tell if this is what it was that you

3    subpoenaed and were looking for.  I am going to give that to

4    you.  I am going to give that to you.  I am going to put you in

5    the same position that I did Ms. Behan.  I don't think it's

6    fair to require you to tell me whether it is or not right this

7    minute.

8              MS. MCKEDY:  Okay.

9              THE COURT:  If you think there is something that you

10   subpoenaed that they haven't produced, we can take it up on the

11   24th.

12             MS. MCKEDY:  I think they produced the CI file.

13             THE COURT:  I didn't look at that.  I don't know what

14   that is.  Is that the CI file?

15             MS. MCKEDY:  No.

16             THE COURT:  What's the position of the People with

17   respect to the -- I am sorry, somebody over here, the FBI or

18   the Department of Justice with respect to the CI file?

19             MR. GOFFI:  Your Honor, this is sensitive information

20   that we can't disclose at this proceeding.  She subpoenaed it

21   in its entirety.  We have gone with other defendants, document

22   by document, through that file.  And, if the Court desires, we

23   can do an in camera review of portions of the file.

24             MS. MCKEDY:  As I said, judge, I think there is

25   information in that file that I would not like to disclose in

EXHIBIT 9

1    front of the co-defendants at this point in time that I think

2    is imperative to the state of mind of the FBI agents on this

3    case and Mr. Rodarte during this event.

4              THE COURT:  Yes.  I see you being in a different

5    position because depending how he may have felt, in some other

6    case doing something else for somebody else, that may have some

7    impact on what he was doing here.  That's why I think you are

8    in a little bit of a different position.  To that extent I

9    don't know that that's going to be all that confidential

10   information because what you are saying is you don't want to

11   give up is what he gave you.  That's the hard part.

12             MS. MCKEDY:  I disagree.

13             THE COURT:  What I am saying is, if they are saying

14   that it's confidential because it has to do with investigation

15   that they are doing, let's assume that your guy is helping out

16   in some other investigation, he is a CI in some other

17   investigation, your guy knows that.  It's not giving up

18   something to you that you don't already know.

19             MS. MCKEDY:  Judge, I understand that.  But what I am

20   saying is that if this information goes directly to Mr.

21   Rodarte's state of mind, the agent's state of mind, their

22   actions --

23             MS. ANKENY:  He is agreeing.

24             THE COURT:  No.  I am agreeing.

25             MS. MCKEDY:  I know that eventually the co-defendants

EXHIBIT 9

1   will get this information.  I don't want this information out

2   while they are going back to the jail and this case is ongoing

3   and being I am six months from trial.

4           MS. SAMPLE:  So Ms. McKedy is aware of all your

5   Honor's orders, one of the orders was everything that we

6   receive, we must release to all parties.  So if Ms. McKedy

7   receives that information, we still have to release it to all

8   the co-defendants.

9           MS. MCKEDY:  That's why I am saying, I don't want to

10  make my argument and tell you what I am specifically looking

11  for in front of these co-defendants in case you deny it.

12          THE COURT:  I am with you.  Here is what we will do,

13  we will give you your own hearing date on that issue.  That's

14  appropriate.  The thing that all of us are going to have to

15  think about at some point in time though is that eventually,

16  likely, a lot of this is going to be public record as part of

17  the transcript somewhere.

18          MS. MCKEDY:  I understand that, judge.

19          THE COURT:  I think you are in a unique situation.  I

20  understand that.

21          MR. KOHN:  The Court is precluding other parties from

22  being present at that hearing because the way --

23          THE COURT:  We haven't gotten there yet.  I haven't

24  had a request from the defense or the prosecution.

25          MS. MCKEDY:  I am asking that, requesting that.  If

EXHIBIT 9

1    you deny the release of this information, and I have argued

2    with you I believe I know what it is, but I don't have the FBI

3    side of it, I believe I know what that information is, if you

4    deny that, then that's not discoverable information.  If you

5    allow it, then it is discoverable information.  So I am asking

6    for a closed hearing.  We are not joined, judge.  We are not

7    joined at this point.

8              THE COURT:  I am inclined to grant that.

9              MR. KOHN:  For the record, Mr. Cisneros would object.

10   He has the right to be present at all public hearings and all

11   hearings in a criminal case should be made public.  Other than

12   what is in camera review, which is going on in a few of the

13   sensitive areas that were covered here today.  On behalf of Mr.

14   Cisneros we would lodge an objection.

15             MS. BEHAN:  We would join in that objection.

16             THE COURT:  All right.

17             MS. BEHAN:  On behalf of Mr. Salazar.

18             THE COURT:  Right.  We are done.

19             MS. MCKEDY:  I need a date on that.

20             THE COURT:  Mr. Kohn, I think that's your cue.

21             MS. SAMPLE:  Could we get a date for Ms. McKedy when

22   it's going to be rescheduled for?

23             THE COURT:  Yes.  If you want -- the defendants are

24   not joined.  Frankly, I have had a number of hearings,

25   including this one, where all defendants are present simply for

EXHIBIT 9

1    convenience of the parties.  I have got a lot of lawyers and a

2    lot of other people.  If you want, we can try and do that.  We

3    are not going to be able to do it next week.  We have the 24th

4    which is already set aside.  I can do it at that time with just

5    Mr. Rodarte.

6               MS. MCKEDY:  What time, judge?

7               THE COURT:  It would be on the 24th.  We could do it

8    either some time in the morning or probably in the afternoon

9    like 1:30.

10              MS. MCKEDY:  I could do that, knowing it would be a

11   closed hearing.  I would again waive Mr. Rodarte's presence.

12              THE COURT:  All right.  Everybody else is going to be

13   here anyway.  That's convenient for everybody I think on this

14   side any way.

15              Mr. Kohn.

16              MR. KOHN:  A couple of minor issues before we get

17   back into this.  I have requested discovery from my client's 93

18   CR case which is a criminally negligent homicide.  I know the

19   District Attorney doesn't want to turn it over.  I don't have a

20   problem with them not turning it over.  But as long as we get a

21   stipulation that that case is not going to be used or any of

22   his prior cases are not going to be used as any of the elements

23   of predisposition for the entrapment defense.  That's my

24   concern.

25              The only reason I bring it up now on the motions date

EXHIBIT 9

72

1   is because if they are planning on using that, there are

2   further motions that need to be filed.  I need to review

3   discovery on it immediately.

4           THE COURT:  You look confused.  I am too.

5           MS. SAMPLE:  Judge, the reason I am confused is I

6   thought we were going to address this at the motions hearing.

7   I am not prepared to address this.

8           THE COURT:  That's fine.  Okay.  We will decide it at

9   the motions hearing.

10          MR. KOHN:  Okay.  Judge, the next thing that I am

11  requesting is complete unedited, unredacted copies of initial

12  suitability reports and recommendations, and abbreviated ISRR,

13  for Mr. Rodarte, including all suitability reviews, all

14  continuing suitability records or reports and recommendations,

15  abbreviated ISRR, all documentation regarding Rodarte's

16  suitability inquiry status.

17          Now, I put the request consistent pursuant to CI

18  guidelines as far as section and chapter.  However, apparently

19  guidelines have changed.  However, they still have the same

20  requirements.  My understanding is they may not have the same

21  names and might not be someplace in the guidelines.  What I am

22  asking for, judge, is the Federal government at some point

23  before they sign up a CI, they do a search, a background

24  search.  They look at all the information.  They kind of weigh

25  the pros and the cons.  Then they make a decision as to whether

EXHIBIT 9

1    they are going to use this person as a CI.

2              This is all information that we are entitled to as

3    far as the confidential informant.  It's direct substantive

4    evidence for the entrapment defense and outrageous government

5    conduct.  And it's impeachment evidence of what I imagine FBI

6    agents, special agents, the TFO will be testifying to.

7              THE COURT:  Has that been produced, Mr. Goffi?

8              MR. GOFFI:  No, your Honor.

9              THE COURT:  Is there an objection to producing it?

10             MR. GOFFI:  Your Honor, the current guidelines in

11   place require -- we call it administrative documentation

12   regarding the opening of informants.  That documentation

13   discloses what we consider important to know about informants,

14   the course of evaluating them and tasking them.  There is also

15   required documentation about periodically evaluating

16   informants.  That's all covered by the subpoena.

17             Again, we view that as sensitive information that we

18   wouldn't want to be made public because then people who want to

19   come to us as possible informants, would mislead us with what

20   they are capable of doing.  In our letter in response to his

21   subpoena we did propose presenting that to the Court in camera

22   for your review to determine if there was anything relevant or

23   exculpatory in that administrative documentation.

24             THE COURT:  Start there.  Just submit that for an in

25   camera review.  I will take a look at that.  I am somewhat

EXHIBIT 9

1    inclined to believe that you just submit this for in camera

2    review.  I will figure out what I am going to do there.

3            Next.

4            MR. KOHN:  I have one more point on that.  I

5    understand the Court is going to review it.  My preference is

6    for them to release directly the discovery to us.  One of the

7    issues, I don't even know what the report is, if I could ask

8    Mr. Goffi what the title of this report is so I can

9    appropriately address it on the record.

10           MR. GOFFI:  This is an SAC authorization for Rodarte

11   as an informant to engage in otherwise illegal activity.  This

12   was turned over in response to a statement by the Court at the

13   previous hearing saying that the defendant was entitled to a

14   quote, unquote service agreement.  There was no such -- we

15   don't have a service agreement per se form file.  On the last

16   four pages of that document are admonishments that were read to

17   Mr. Rodarte that he signed off on.

18           THE COURT:  That was an issue that we have had here a

19   lot.

20           MR. GOFFI:  With respect to when we have what could

21   possibly be considered a service agreement where we go into

22   that with Mr. Rodarte, what our mutual understandings are about

23   what he can and can't do, that's why that document was

24   produced.

25           THE COURT:  Okay.

EXHIBIT 9

1          MR. KOHN:  Judge, if I may suggest, and I am not sure

2     if the Court already did this with Ms. McKedy or Ms. Viehman,

3     but if they can turn over the entire CI file to the Court.

4     This has been going, with the various hearings that we have

5     been having, it's like pulling teeth.  The government denies

6     that any such document exists.  Then when some information

7     turns up that such documents do exist, they are like, well,

8     yeah, they do exist but they are privileged.  I don't know what

9     I need to ask for without going through old guidelines.

10          THE COURT:  I disagree with counsel's framing of the

11     argument.  I don't think that that's the way that it's gone.

12     Let me ask, first of all, how thick is the file?

13          MR. GOFFI:  I think you can -- you could review the

14     file in 45 minutes.

15          THE COURT:  Let's do that.  Let's have the file

16     produced.  I will look at it in camera.  It will not be

17     available to anyone else.  Then I will take a look at it and we

18     can --

19          MR. GOFFI:  Can I produce it myself and/or Agent

20     Hunt?

21          THE COURT:  I am sorry?

22          MR. GOFFI:  Can I propose myself or Agent Hunt be

23     with you?  I don't know that you would be able to understand

24     our bureauese or bureaucratic paperwork.  Maybe I could offer

25     an explanation on why this is sensitive.  If it's not --

EXHIBIT 9

1          THE COURT:  I am not inclined to do that for the same

2     reason that I wasn't inclined to allow Mr. Bain to talk to me

3     ex parte either.  What I will do is, I will allow that if there

4     are issues though, if there are issues about whether I think a

5     document should be -- here is what I am going to do.  If there

6     are issues, what I will do is, I will look at the file.  I will

7     try to make a determination as to what should be released, what

8     usually -- when I review this stuff there is some you go,

9     "Yeah, that should be."  There is other stuff clearly that

10    shouldn't be.  Then there is stuff that you look at, you go, "I

11    don't know."

12         What I will do, I will issue an order.  Bate's stamp

13    the file when you send it down to me -- and hold on.  Let me

14    get all the way through.  If you Bate's stamp the file when you

15    send it down to me, I can say I am going to release these pages

16    or these portions of these pages.  I will issue that in an

17    order.  You will have an opportunity to say, this is why we

18    don't think we should release those pages or those portions.

19    Go ahead.

20         MR. GOFFI:  You envision a photocopy of the entire

21    file being submitted to you?

22         THE COURT:  Right.

23         MR. GOFFI:  I was thinking in terms of I would hand

24    deliver it and wait outside in another room while you did this.

25         THE COURT:  No.  No.  Because I have to maintain part

EXHIBIT 9

1    of the file for the appellate record.  I don't have a choice

2    because I have to see, like with these, if I say this is stuff

3    that was given by Mr. Bain if I say, "Okay.  Nobody gets any of

4    this," it gets put in a file folder which is labeled,

5    "Restricted access.  Opened by court order only."  It's not

6    given to anybody but another judge.  But it is maintained for

7    purposes of appeal.

8           So that if anybody here says that in my infinite

9    wisdom I got it wrong, the appellate court can look at what it

10   was that I looked at and say, "Yeah, he got it right."  I don't

11   have a choice but to maintain a record for purposes of appeal.

12   You can't just bring something down to me and I say, "Okay, I

13   am looking at this.  No.  I am not giving that."  Then the

14   Court of Appeals said, "What was it that you didn't give?  We

15   don't have a copy of what it was that you didn't give."  They

16   say they should have gotten it.

17          MR. GOFFI:  Okay.

18          THE COURT:  Does that make sense?

19          MR. GOFFI:  Yes.

20          MR. KOHN:  Judge, I want to make further record on

21   that.  Again, I already cited all parties refer to directly one

22   of the findings in proving Mr. Rodarte as a CI is -- this is

23   under Page 4, or Page 4 of 3 of the agreement that was just

24   referenced by Mr. Goffi, the following points were considered

25   in making that determination.  It lists issues that were

EXHIBIT 9