Exhibit 10

| | |
|---|---|
| DISTRICT COURT, EL PASO COUNTY, COLORADO<br>270 S. Tejon Street<br>Colorado Springs, Colorado 80903 | FILED IN THE DISTRICT AND COUNTY COURTS OF EL PASO COUNTY, COLORADO<br><br>AUG 14 2009<br><br>M.V. PERRY<br>CLERK OF COURT |
| THE PEOPLE OF THE STATE OF COLORADO,<br><br>Plaintiff,<br><br>v.<br><br>JAMES CISNEROS,<br><br>Defendant. | |
| | ▲   COURT USE ONLY   ▲ |
| Attorneys for Special Agent Robert Goffi:<br>DAVID M. GAOUETTE<br>U.S. Attorney<br>AMY L. PADDEN, 28372*<br>Assistant U.S. Attorney<br>1225 Seventeenth Street, Suite 700<br>Denver, CO 80202<br>(303) 454-0100<br>Fax: (303) 454-0408<br><br>*Counsel of Record | Case No.:   2009CR768 |
| **SUPPLEMENT TO MOTION TO QUASH SUBPOENA *DUCES TECUM*** | |

COMES NOW Robert Goffi, Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, through the United States Attorney for the District of Colorado, and provides this supplement to its motion to quash, in part, the subpoena *duces tecum* sent to Special Agent Goffi on June 30, 2009.

    1.    On or about June 30, 2009, defense counsel sent Robert Goffi a subpoena in the above-captioned matter, requesting the production of certain documents in the possession of the FBI to take place in this Court on July 23, 2009. On the return date, this Court heard argument regarding the production of documents sought from the FBI.

    2.    During those proceedings, the Court requested additional briefing regarding the documents sought in the following category of the subpoena: Information that would identify the surveillance equipment that was used by FBI agents in an adjoining hotel room to monitor the activity in a room in which Mr. Rodarte was present. Therefore, the FBI provides this supplemental brief on that issue.

EC
AH

3.      As explained in the motion to quash, the United States Department of Justice's *Touhy* regulations, by virtue of the Supremacy Clause, prevent any state court from enforcing a subpoena against federal agencies and officers.  Here, however, the discovery at issue is also covered by the law enforcement investigative techniques privilege and thus, even without consideration of the *Touhy* issues, the defense would not be entitled to discover this information.  Thus, the Court should deny the defense's request for information regarding sensitive law enforcement techniques.

4.      The U.S. Supreme Court recognized the law enforcement privilege in *Rovario v. United States*, 353 U.S. 53 (1957).  In that case, the Court found that a request for the disclosure of the identity of a confidential informant "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense.  Whether a proper balance renders non-disclosure erroneous must depend on the particular circumstance of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id*. at 62.

5.      The purpose of the privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *United States v. Myerson (In re Dep't of Investigation)*, 856 F.2d 481, 484 (2d Cir. 1988).  The party seeking documents protected by the law enforcement privilege has the burden to establish a sufficient need for the documents. *Collins v. Shearson/American Express, Inc.,* 112 F.R.D. 227, 228 (D.D.C. 1986) (copy provided as Exhibit A).  Relevance alone does not establish a need. *Id*. at 229-30.  Further, Congress has expressly recognized the need to protect this type of information in the context of the Freedom of Information Act.  That Act expressly exempts from disclosure information that would disclose techniques and procedures for law enforcement investigations. *See* 5 U.S.C. § 552(b)(7)(E).

6.      A number of courts have addressed the extent to which a criminal defendant may discover information regarding sensitive investigative techniques, such as those at issue here.  In a case very similar to this one, the Eleventh Circuit found that the defense was properly denied access to information regarding the type of microphone used during electronic surveillance and the place where it was hidden. *United States v. Van Horn*, 789 F.2d 1492 (11th Cir. 1986) (copy provided as Exhibit B).  In that case, which involved the prosecution of a large marijuana conspiracy ring, the defense argued that it should be entitled to information regarding the microphone used to conduct surveillance and regarding where it was placed in order to present a defense that the voices on the tapes could have been distorted and therefore misidentified. *Id*. at 1508.  The Eleventh Circuit found that the law enforcement privilege "applies equally to the nature and location of electronic surveillance equipment.  Disclosing the precise locations where surveillance devices are hidden or their precise specifications will educate criminals regarding how to protect themselves against police surveillance." *Id*.  The court concluded that the defense had not overcome the

2

privilege because the defense had not shown any necessity for disclosure and was able to argue the possibility of misidentification without the requested information. *Id.*

7.     Other federal courts, in addition to the Eleventh Circuit, have recognized this privilege and denied a criminal defendant access to information about sensitive law enforcement techniques on that basis. *See e.g., Puerto Rico v. United States*, 490 F.3d 50, 63-64 (1st Cir. 2007) (citing cases applying privilege in various contexts) (copy provided as Exhibit C); *Harley v. United States*, 682 F.2d 1018, 1020 (D.C. Cir. 1982) (finding privilege existed to protect location of police surveillance post and affirming trial court's ruling that location would not be disclosed) (copy provided as Exhibit D). For the same reasons, Mr. Cisneros' request for the type, model, and other technical information about the surveillance equipment used by the FBI should be denied.

8.     Here, Mr. Cisneros seeks to argue that testimony by the law enforcement officers that they did not have headphones for the surveillance equipment with them on the night at issue is not credible. He plans to argue that the officers in fact heard Mr. Rodarte in the next room and knew that Mr. Rodarte was somehow entrapping Mr. Cisneros. As in *Van Horn*, Mr. Cisneros can argue this defense without specific information about the make and model of the surveillance equipment used by the FBI. Mr. Cisneros has not made any showing that specific technical information about the equipment is necessary for his entrapment defense. On the other hand, the FBI, though Special Agent Goffi, demonstrated, in response to the subpoena and at the hearing, that the disclosure of this information would be detrimental to the FBI's continued use of this equipment and would significantly interfere with ongoing and future investigations. The information the defense seeks is therefore protected by the federal law enforcement privilege.

9.     Colorado courts have also recognized a law enforcement privilege under state law, and have interpreted it in a similar manner as federal courts have interpreted the federal privilege. *See, e.g., People v. District Ct. in and for County of Pueblo*, 904 P.2d 874, 877 (Colo. 1995) (en banc) (recognizing privilege "to maintain anonymity of persons who furnish law enforcement officers with information relating to crimes"; citing cases). As the Colorado Supreme Court held in the context of the informer privilege, the defendant must establish a "reasonable basis in fact to believe the informant is a likely source or relevant and helpful evidence essential to the determination of guilt or innocence" to meet his burden to overcome the privilege. *Id.* at 877 (emphasis added; internal citation omitted). The possibility that the information may be used for impeachment "does not establish the defendants' need for disclosure of the informant's identity" nor does the defendant's unsupported assertion of need. *Id.* at 877, 879. *See also People v. Martinez*, 51 P.3d 1029, 1032 (Colo. Ct. App. 2002) ("An accused is not entitled to the disclosure of the informant based upon the bare assertion that his or her defense requires it, or upon mere speculation about the information the informant might have supplied."), *reversed in part on other grounds*, 69 P.3d 1029 (Colo. 2003) (en banc). Thus, even if the federal privilege did not apply, this information is also privileged under state law.

10.     For the reasons set forth above, the defense is not entitled to discover the sensitive law enforcement techniques that it seeks—*i.e.*, details regarding the type of surveillance equipment used.  Discovery of this information is barred both by the Department of Justice's *Touhy* regulations and by privilege.

WHEREFORE, the FBI and SA Goffi respectfully request that this Court quash in part the subpoena as set forth in their motion to quash and deny the defense access to information regarding the type of surveillance equipment used.

DATED:  August 13, 2009          DAVID M. GAOUETTE

U.S. Attorney


Amy L. Padden, 28372
Assistant U.S. Attorney

Attorneys for SA Robert Goffi and the FBI

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2009, I served a copy of the foregoing by U.S. Mail to the following:

Counsel for Plaintiff:

Terry Samples
El Paso District Attorney's Office
105 E. Vermigo
Colorado Springs, CO 80903

Counsel for Defendant:

Shimon Kohn
2 N. Cascade Avenue, Suite 550
Colorado Springs, CO 80903

Counsel for the FBI:

Robert Goffi
Chief Division Counsel
1961 Stout Street, Room 1823
Denver, CO 80294

U.S. Attorney's Office

Exhibit A

Westlaw.

112 F.R.D. 227
**(Cite as: 112 F.R.D. 227)**

C

United States District Court,
District of Columbia.

Wayne E. COLLINS, II, et al., Plaintiffs,
v.
SHEARSON/AMERICAN EXPRESS, INC., De-
fendant.
**Misc. No. 85-0260.**

Oct. 22, 1986.

Investors who had brought commodities fraud suit
moved to compel Commodity Futures Trading
Commission to produce documents on investigation
of individual allegedly involved in conspiracy. The
District Court, Harold H. Greene, J., held that docu-
ments were excepted from disclosure under law en-
forcement investigatory files privilege.

Motion denied.

West Headnotes

**Privileged Communications and Confidentiality**
**311H** ⟜**358**

311H Privileged Communications and Confidenti-
ality
    311HVI Public Officers and Records
        311Hk358 k. Investigatory or Law Enforce-
ment Records. Most Cited Cases
        (Formerly 170Ak1600(4), 170Ak1600.3)
Documents of Commodity Futures Trading Com-
mission relating to its investigation of an individual
allegedly involved in conspiracy to defraud in-
vestors were excepted from disclosure to investors
in their lawsuit pursuant to privilege for law en-
forcement investigatory files, as Commission asser-
ted that disclosure could harm an investigation in
process, while investors made only weak showing
that they needed the documents or that, if so, they

were unavailable elsewhere.
**\*228** Nathan S. Bergerbest, G. Lindsay Simmons,
Cotten, Day & Doyle, Washington, D.C., Charles F.
Brega, Stuart N. Bennett, Mark L. Ross, Roath &
Brega, Denver, Colo., for plaintiffs.

Susan C. Ervin, Commodity Futures Trading
Com'n, Washington, D.C., for Commodity Futures
Trading Com'n.

MEMORANDUM ORDER

HAROLD H. GREENE, District Judge.

Plaintiffs have asked the Court to compel the Com-
modity Futures Trading Commission to produce
documents pursuant to a subpoena duces tecum.
According to plaintiffs, these documents may help
to prove that Shearson/American Express, Inc.,
conspired with a Thomas D. Chilcott in a form of
commodities fraud known as a "Ponzi game." [FN1]
For the reasons stated below, the motion will be
denied.

> FN1. The underlying litigation for which
> these documents are sought is *Collins v.*
> *Shearson/American Express, Inc.,* No.
> 82-C-280 (D.Colo.). Plaintiffs assert an ur-
> gent need for these documents by Novem-
> ber 3, 1986, their pretrial date in the Color-
> ado litigation.

Plaintiffs are Colorado residents who invested some
$5 million with Chilcott between 1974 and 1981.
Chilcott later was investigated by the Commission
and convicted of violating federal securities and
commodities laws. In 1982, plaintiffs sued Shear-
son in the U.S. District Court for the District of
Colorado, alleging that the company conspired with
Chilcott in his fraud scheme. It is in connection
with the prosecution of that case that plaintiffs

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

112 F.R.D. 227
**(Cite as: 112 F.R.D. 227)**

served a subpoena duces tecum on the Commission, demanding that it produce documents relating to its investigation of Chilcott and his companies.

In its opposition, the Commission asserts a number of privileges including the attorney-client privilege, the work product doctrine, and the deliberative processes privilege. However, the Commission relies most heavily on the privilege for law enforcement investigatory files.

Both parties agree that the leading case in this Circuit on this matter is *Friedman v. Bache Halsey Stuart Shields, Inc.,* 738 F.2d 1336 (D.C.Cir.1984). The *Friedman* court explained that when a government agency asserts its "qualified common-law privilege" for law enforcement investigatory files under Fed.R.Civ.P. 26(b), the agency must offer more than a pro forma claim of privilege for all documents requested. Instead, it bears the burden of asserting its privilege in a "deliberate, considered and reasonably specific manner." *Friedman,* 738 F.2d at 1342. The court further stated that the official claiming the privilege must examine the documents personally and must state specifically the rationale for the assertion of the privilege. Once the agency asserts its privilege property, the party seeking the documents has the duty to demonstrate the need for disclosure. The court must then weigh the competing interests. *Id.*[FN2]

> FN2. The *Friedman* court suggested ten factors for consideration in this balance. These are: (1) the extent to which disclosure will thwart government processes by discouraging citizens from giving the government information; (2) the impact on those who give information of having their identities disclosed; (3) potential chill on governmental self-evaluation and program improvement; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the information is an actual or potential defend-

ant in any criminal proceeding; (6) whether the investigation is complete; (7) whether intradepartmental disciplinary proceedings may arise from the investigation; (8) whether plaintiff's suit is brought in good faith; (9) availability of the information elsewhere; and (10) the importance of the information to plaintiff's case. *Friedman,* 738 F.2d at 1342-43.

**\*229** The first question to be considered thus is whether the Commodities Futures Trading Commission has examined these documents and made specific objections to their disclosure. Affidavits filed by the Commission demonstrate that it clearly has met its burden in this regard. For example, Thomas B. Goodbody, a supervisory attorney with the Commission's Division of Enforcement, has personally reviewed or supervised all parts of the Commission's files that may be responsive to plaintiffs' requests. Other affidavits also provide a picture of thorough and comprehensive review by the Commission. Moreover, the responsible employees of the Commission have made specific claims of privilege and have supported those claims with specific reasons. For example, the Second Declaration of Karen Matteson explains that disclosure of a transcript of testimony by an individual who performed accounting work for Chilcott would not only discourage other citizens from relaying information to the government, but might also harm this witness' employment prospects. All the evidence leads the Court to conclude that the Commission has not taken its examination and analysis of these documents lightly.

To be sure, the Commission's determination of privilege does not bind the Court. Rather, the Court must examine the Commission's reasons for nondisclosure and weigh them against plaintiffs' need for the documents.

The problem is that plaintiffs have made a very weak showing of any such need. Plaintiffs claim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

112 F.R.D. 227
**(Cite as: 112 F.R.D. 227)**

that some of the material in these documents is un-available from other sources because discovery in the Colorado litigation closed on October 15, 1985. But all that proves is that plaintiffs' "urgent need"-if such a need exists-is largely a result of their own inaction. Although the Colorado action had been pending for some three years, plaintiff waited until just before the discovery deadline to serve the broad subpoenas at issue here. Further, plaintiffs have also resisted the Commission's at-tempts to expedite document review by refusing to narrow their discovery request. The Commission, on the other hand, has acted responsibly and con-scientiously and has released certain of the docu-ments. Further, the Commission has not argued, despite plaintiffs' assertion otherwise, that its priv-ilege to these documents is in any way "absolute;" to the contrary, it has correctly pointed out that plaintiffs have not even attempted to take advantage of some of the possible alternate sources for this in-formation.[FN3]

> FN3. One particular request by plaintiffs is telling. In their "Supplement to Response to Sur Reply," plaintiffs attempted to show that the Commission has acted irrespons-ibly in protecting the deposition transcript of a Ross Bagully; plaintiffs claim to have received the document from another source. As the Commission points out, however, it asserted a privilege to this tran-script only in regards to portions that re-veal "names and business transactions of customers *other than plaintiffs.*" The Com-mission specifically authorized release of other portions, but plaintiff apparently made no attempt to review the particular document.

Moreover, plaintiffs confuse the required showing of need for documents with an easier showing of relevance. They urge that "[a]ny evidence which ... hints at the nature of Chilcott's scheme or defend-ant's participation is relevant to the subject matter

of the pending motion."[FN4] This undoubtedly is true and might suffice to gain access to documents in routine discovery. When an agency properly claims that documents are privileged, however, the Court, *230 as noted above, must look beyond the issue whether the documents sought are simply rel-evant. If that were the only test, the rules of priv-ilege would be relatively meaningless-especially since discovery normally extends not only to relev-ant matter but also to material that may lead to the discovery of relevant matter. The *Friedman* court's discussion of privilege supports this distinction, by calling for an inquiry into "the degree of the litig-ant's need to obtain [the documents] from the gov-ernmental agency or officer claiming the privilege." *Friedman,* 738 F.2d at 1341. Relevance is not enough.

> FN4. Memorandum in Reply to the Oppos-ition of Commission to Plaintiffs' Motion to Compel at 12.

In the instant case, the balance between govern-mental privilege and plaintiffs' need is clearly struck in favor of nondisclosure. Despite plaintiffs' expressed doubts, the Commission has asserted that disclosure of these papers could harm an investiga-tion in process, could harm particular witnesses and stifle witnesses in general, and very often would have no bearing whatsoever on plaintiffs' inquiry. On the other side of the scales, plaintiffs have made only a weak showing that they need these docu-ments or that, if so, the documents are unavailable elsewhere.

For the reasons stated, it is this 22nd day of Octo-ber, 1986

ORDERED that plaintiffs' motion to compel dis-covery be and it is hereby denied.

D.D.C.,1986.
Collins v. Shearson/American Exp., Inc.
112 F.R.D. 227

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

112 F.R.D. 227
**(Cite as: 112 F.R.D. 227)**

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

date

Exhibit B

Westlaw.

789 F.2d 1492                                                                          Page 1
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

☞

United States Court of Appeals,
Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marion VAN HORN, Scott Bertelsen, Gary
Balough, Dennis Kay, Robert Van Horn, Dennis
Cason, Thomas Sikes, John Crosby Bertelsen,
Joseph William Campbell, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
William Joseph HARVEY, a/k/a Billy, Defendant-
Appellant.
**Nos. 83-5102, 84-5138.**

May 23, 1986.
As Amended on Denial of Rehearing and Rehearing
En Banc July 25, 1986.

Defendants were convicted in the United States
District Court for the Southern District of Florida,
Sidney M. Aronovitz, J., 560 F.Supp. 1040, of vari-
ous charges stemming from marijuana importation
and distribution ring, and they appealed. The Court
of Appeals, Kravitch, Circuit Judge, held that: (1)
affidavit in support of electronic surveillance order
was sufficient under Title III; (2) omission of page
from affidavit showing that Government intended
to disclose prior state wiretap did not mandate sup-
pression of subsequently intercepted communica-
tions; (3) severance of trials from that of another
defendant was not required on basis of compelling
prejudice; (4) defendants were not entitled to dis-
closure of type of microphone and location of mi-
crophone from which electronic surveillance was
made; and (5) evidence supported convictions of
conspiracy to make false statements.

Affirmed.

See also, D.C., 544 F.Supp. 189.

West Headnotes

**[1] Telecommunications 372 ☞1468**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public
Officers
            372k1464 Application or Affidavit
                372k1468 k. Necessity; Inadequacy of
Other Procedures. Most Cited Cases
            (Formerly 372k516)
To meet necessity requirement for electronic sur-
veillance under Title III, affidavit need not show a
comprehensive exhaustion of all possible investig-
ative techniques, but must simply explain retroact-
ive or prospective failure of several techniques that
reasonably suggest themselves. 18 U.S.C.A. §
2518(1)(c).

**[2] Telecommunications 372 ☞1468**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public
Officers
            372k1464 Application or Affidavit
                372k1468 k. Necessity; Inadequacy of
Other Procedures. Most Cited Cases
            (Formerly 372k516)
Affidavit met necessity requirement for electronic
surveillance under Title III of office of defendant
suspected of masterminding marijuana importation
and distribution ring, as affidavit set forth numer-
ous facts showing that ordinary surveillance tech-
niques had been attempted and had failed. 18
U.S.C.A. § 2518(1)(c).

**[3] Telecommunications 372 ☞1472**

372 Telecommunications

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1471 Conduct and Duration of Surveillance
372k1472 k. In General. Most Cited Cases
(Formerly 372k519.1, 372k519)
Under Title III, district court is not required to terminate a surveillance whenever it receives a report of no progress. 18 U.S.C.A. §§ 2510-2520, 2518(1)(c).

**[4] Telecommunications 372 ⟜1476**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1476 k. Reports; Delivery and Sealing. Most Cited Cases
(Formerly 372k527)
Progress reports district court requested in authorizing electronic surveillance were not required by Title III, but were ordered at discretion of district judge; thus, import of progress reports was also a matter within discretion of district court. 18 U.S.C.A. § 2518(6).

**[5] Telecommunications 372 ⟜1466**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1464 Application or Affidavit
372k1466 k. Probable Cause. Most Cited Cases
(Formerly 372k515)
District court was within its discretion in determining that information in affidavit justified 30 days of

electronic surveillance of office of defendant suspected of masterminding marijuana importation and distribution ring, as it set forth continuing criminal enterprise, operating over long period of time; thus, affidavit set out probable cause as required under Title III. 18 U.S.C.A. § 2518(1)(b)(i).

**[6] Telecommunications 372 ⟜1466**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1464 Application or Affidavit
372k1466 k. Probable Cause. Most Cited Cases
(Formerly 372k515)
Defendant's temporary absence did not negate probable cause showing required for electronic surveillance, under Title III, of defendant's office on suspicion of masterminding marijuana importation and distribution ring, as FBI stated in its progress reports that it believed defendant would return shortly, and affidavit set forth three other employees of defendant's business as possible conspirators who could have been overheard in office even during defendant's absence. 18 U.S.C.A. § 2518(1)(b)(i).

**[7] Telecommunications 372 ⟜1479**

372 Telecommunications
372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
372X(B) Authorization by Courts or Public Officers
372k1479 k. Review of Proceedings; Standing. Most Cited Cases
(Formerly 372k530)
District court was not clearly erroneous in finding that FBI did not know that defendant was a named target of state Title III wiretap authorization, thereby supporting conclusion that had such in-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

formation been disclosed in federal electronic surveillance application, it would have met requirement of Title III that previous applications for surveillance be disclosed. 18 U.S.C.A. § 2518(1)(e).

**[8] Criminal Law 110 ☞394.3**

110 Criminal Law
   110XVII Evidence
     110XVII(I) Competency in General
       110k394 Evidence Wrongfully Obtained
         110k394.3 k. Wiretapping or Other Interception. Most Cited Cases
Suppression is not mandated by inadvertent noncompliance with Title III requirement that prior applications for electronic surveillance be disclosed. 18 U.S.C.A. § 2518(1)(e).

**[9] Criminal Law 110 ☞394.5(4)**

110 Criminal Law
   110XVII Evidence
     110XVII(I) Competency in General
       110k394 Evidence Wrongfully Obtained
        110k394.5 Objections to Evidence
         110k394.5(4) k. Presumptions and Burden of Proof. Most Cited Cases
Party seeking suppression on basis that affidavit in support of search warrant omitted something bears burden of showing omission was more than negligent.

**[10] Telecommunications 372 ☞1467(1)**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
     372X(B) Authorization by Courts or Public Officers
       372k1464 Application or Affidavit
         372k1467 Competency of Information; Hearsay
          372k1467(1) k. In General. Most Cited Cases
   (Formerly 372k514.1, 372k514)

Omission, from affidavit in support of electronic surveillance under Title III, of information of state wiretap on phone of an individual who was alleged participant in defendant's drug ring, did not require district court to infer recklessness so as to render affidavit insufficient under Title III's disclosure section, as that information, contained on missing page of affidavit, was referred to in subsequent progress reports, and there was no evidence that government agents failed to proofread or otherwise properly examine the affidavit. 18 U.S.C.A. §§ 2510-2520, 2518(1)(e).

**[11] Telecommunications 372 ☞1473**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
     372X(B) Authorization by Courts or Public Officers
       372k1471 Conduct and Duration of Surveillance
         372k1473 k. Scope; Minimization. Most Cited Cases
   (Formerly 372k520)
Agents complied with requirement for electronic surveillance under Title III that the surveillance be properly minimized, as logs and testimony supported conclusion that agents ceased monitoring conversations they determined to be nonpertinent to alleged drug ring, and defendants produced no evidence of specific conversations which agents should not have monitored. 18 U.S.C.A. §§ 2510-2520, 2518(5).

**[12] Telecommunications 372 ☞1474**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
     372X(B) Authorization by Courts or Public Officers
       372k1471 Conduct and Duration of Surveillance

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

372k1474   k.   Extension.   Most   Cited
Cases
    (Formerly 372k514.1, 372k514)
That district judge who authorized initial electronic
surveillance under Title III was outside district
when he executed order extending wiretap did not
invalidate   the   extension.   18   U.S.C.A.   §§
2510-2520, 2518(3).

**[13] Telecommunications 372 ☞1474**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public
Officers
            372k1471 Conduct and Duration of Sur-
veillance
                372k1474   k.   Extension.   Most   Cited
Cases
    (Formerly 372k514.1, 372k514)
Florida law authorizes surveillance for marijuana
offenses, and thus government's application for ex-
tension of electronic surveillance order under Title
III was not tainted by referring to state wiretap. 18
U.S.C.A.   §§   2510-2520,   2516(2);   West's   F.S.A.   §
934.07.

**[14] Telecommunications 372 ☞1473**

372 Telecommunications
    372X Interception or Disclosure of Electronic
Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public
Officers
            372k1471 Conduct and Duration of Sur-
veillance
                372k1473   k.   Scope;   Minimization.
Most Cited Cases
    (Formerly 372k520)

**Telecommunications 372 ☞1474**

372 Telecommunications
    372X Interception or Disclosure of Electronic

Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public
Officers
            372k1471 Conduct and Duration of Sur-
veillance
                372k1474   k.   Extension.   Most   Cited
Cases
    (Formerly 372k520)
Continuing approval of district court which author-
ized electronic surveillance under Title III met re-
quirement of statute's judicial approval limitation,
which prevents incidental interception of conversa-
tions for which government has shown no probable
cause, as authorizing judge received both progress
reports and applications for extension, they de-
scribed nature of conversations being intercepted,
and authorizing judge twice extended the surveil-
lance after reviewing conversations and determin-
ing   that   they   were   properly   intercepted.   18
U.S.C.A. §§ 2510-2520, 2517(5).

**[15] Criminal Law 110 ☞394.3**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k394 Evidence Wrongfully Obtained
                110k394.3 k. Wiretapping or Other In-
terception. Most Cited Cases
No special approval is required before submission,
to state courts, of application to use state evidence
under section of Title III providing for judicial ap-
proval for use of evidence obtained through a state
wiretap. 18 U.S.C.A. §§ 2510-2520, 2517(5).

**[16] Criminal Law 110 ☞394.3**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k394 Evidence Wrongfully Obtained
                110k394.3 k. Wiretapping or Other In-
terception. Most Cited Cases
State judge, in authorizing federal agents to use

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

Page 5

evidence obtained through state wiretap, complied with section of Title III requiring judicial approval, as state judge expressly found that interceptions related to federal interceptions were "intercepted incidentally," and, as same judge who had authorized state wiretap, was in a position to know whether state agents had properly executed state wiretap. 18 U.S.C.A. §§ 2510-2520, 2517(5).

**[17] Criminal Law 110 ☞394.3**

110 Criminal Law
   110XVII Evidence
     110XVII(I) Competency in General
       110k394 Evidence Wrongfully Obtained
         110k394.3 k. Wiretapping or Other Interception. Most Cited Cases
Delay of five months by federal agents in requesting state judge to authorize their use of evidence obtained through state wiretap was timely under Title III section. 18 U.S.C.A. § 2517(5).

**[18] Criminal Law 110 ☞394.3**

110 Criminal Law
   110XVII Evidence
     110XVII(I) Competency in General
       110k394 Evidence Wrongfully Obtained
         110k394.3 k. Wiretapping or Other Interception. Most Cited Cases
Use of testimony of witness implicated in state evidence used to obtain federal indictment against defendant did not violate Title III section requiring judicial approval of use of state wiretap evidence, as his testimony came from personal knowledge rather than from a surveillance. 18 U.S.C.A. §§ 2510-2520, 2517(3), (5).

**[19] Criminal Law 110 ☞394.3**

110 Criminal Law
   110XVII Evidence
     110XVII(I) Competency in General
       110k394 Evidence Wrongfully Obtained
         110k394.3 k. Wiretapping or Other In-

terception. Most Cited Cases
State circuit judge was authorized, under Florida law and thus under Title III, to approve federal agents' use of state wiretap evidence. 18 U.S.C.A. §§ 2510-2520, 2510(9)(b), 2517(5); West's F.S.A. § 934.02(8).

**[20] Criminal Law 110 ☞622.7(6)**

110 Criminal Law
   110XX Trial
     110XX(A) Preliminary Proceedings
       110k622 Joint or Separate Trials of Codefendants
         110k622.7 Grounds for Severance or Joinder
           110k622.7(6) k. Antagonistic Defenses; Hostility. Most Cited Cases
     (Formerly 110k622.2(6))
Antagonistic defenses may satisfy compelling prejudice standard for severance, but only if defenses are irreconcilable and mutually exclusive.

**[21] Criminal Law 110 ☞622.7(6)**

110 Criminal Law
   110XX Trial
     110XX(A) Preliminary Proceedings
       110k622 Joint or Separate Trials of Codefendants
         110k622.7 Grounds for Severance or Joinder
           110k622.7(6) k. Antagonistic Defenses; Hostility. Most Cited Cases
     (Formerly 110k622.2(6))
First defendant's defense did not result in compelling prejudice to remaining defendants so as to justify severance of their trials in prosecution for various charges stemming from marijuana importation and distribution ring, notwithstanding that first defendant's counsel did admit that his client was likely guilty of some crime, as focus of her arguments was that individual which masterminded alleged ring was primary culprit, the alleged master-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

Page 6

mind did not go to trial, and neither first defendant nor remaining defendants introduced evidence at trial.

**[22] Indictment and Information 210 ☜124(1)**

210 Indictment and Information
    210VI Joinder
        210k124 Joinder of Parties
           210k124(1) k. In General. Most Cited
Indictment showed common goal of systematic and repeated importation and distribution of large amounts of marijuana, and overlapping participation by various defendants; therefore, there was no misjoinder of defendant in counts alleging conspiracy to import marijuana and a count alleging conspiracy to possess marijuana with intent to distribute; those counts set forth a single conspiracy in which defendant was a member.

**[23] Privileged Communications and Confidentiality 311H ☜360**

311H Privileged Communications and Confidentiality
    311HVI Public Officers and Records
        311Hk360 k. Classified Information; State Secrets; Military Secrets. Most Cited Cases
    (Formerly 110k627.5(6))
There is a qualified government privilege not to disclose sensitive investigative techniques.

**[24] Telecommunications 372 ☜1477**

372 Telecommunications
    372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public Officers
           372k1477 k. Notice and Disclosure to Parties. Most Cited Cases
    (Formerly 372k528)
Government's qualified privilege not to disclose sensitive investigation techniques applies equally to

nature and location of electronic surveillance equipment.

**[25] Criminal Law 110 ☜627.6(1)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
        110k627.5 Discovery Prior to and Incident to Trial
           110k627.6 Information or Things, Disclosure of
           110k627.6(1) k. In General. Most Cited Cases
Defendants, charged with participation in marijuana importation and distribution ring, failed to show necessity of disclosure by government of type of microphone used in electronic surveillance, and where microphone was hidden.

**[26] Criminal Law 110 ☜627.8(2)**

110 Criminal Law
    110XX Trial
        110XX(A) Preliminary Proceedings
        110k627.5 Discovery Prior to and Incident to Trial
           110k627.8 Proceedings to Obtain Disclosure
           110k627.8(2) k. Time When Disclosure Is Permitted. Most Cited Cases
That government delayed until eighth week of trial to request that defendants provide voice exemplars did not prejudice defendants, and thus did not render the request untimely.

**[27] Criminal Law 110 ☜394.4(9)**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
        110k394 Evidence Wrongfully Obtained
           110k394.4 Unlawful Search or Seizure
           110k394.4(9) k. Arrest or Stop, Search Incidental To; Validity of Stop or Arrest.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

Most Cited Cases

**Criminal Law 110 ☜412.1(3)**

110 Criminal Law
   110XVII Evidence
      110XVII(M) Declarations
         110k411 Declarations by Accused
            110k412.1 Voluntary Character of
Statement
               110k412.1(3) k. Illegality of Deten-
tion. Most Cited Cases
Evidence seized during an unlawful arrest, or state-
ments made by person unlawfully arrested while in
custody, are products of arrest and will be sup-
pressed; evidence with only a loose causal connec-
tion to an illegal arrest, however, will not be sup-
pressed.

**[28] Criminal Law 110 ☜394.3**

110 Criminal Law
   110XVII Evidence
      110XVII(I) Competency in General
         110k394 Evidence Wrongfully Obtained
            110k394.3 k. Wiretapping or Other In-
terception. Most Cited Cases
Conversations of defendant's coconspirators regard-
ing his arrest were not the product of that illegal ar-
rest, and thus wiretap evidence of the conversations
about the arrest was admissible, as causal connec-
tion between the arrest and statements was broken by
intervening acts of third parties.

**[29] Criminal Law 110 ☜40**

110 Criminal Law
   110II Defenses in General
      110k40 k. Condonation and Settlement. Most
Cited Cases
By using evidence of defendant's prior arrest for
state marijuana charges, Government did not viol-
ate agreement in which Government agreed not to
pursue any criminal or civil liability arising out of
event in return for defendant's agreement to forfeit

a vessel to the United States, as Government did
not agree to never use the arrest as evidence in a
prosecution for subsequent criminal activity.

**[30] Conspiracy 91 ☜47(6)**

91 Conspiracy
   91II Criminal Responsibility
      91II(B) Prosecution
         91k44 Evidence
            91k47 Weight and Sufficiency
               91k47(3) Particular Conspiracies
                  91k47(6) k. Fraud Upon Gov-
ernment. Most Cited Cases
Evidence supported finding that defendants agreed
to make false statements to the FBI relevant to their
alleged participation in drug importation ring,
thereby supporting their convictions of conspiracy
to make false statements. 18 U.S.C.A. § 1001.

**[31] Fraud 184 ☜68.10(1)**

184 Fraud
   184III Criminal Responsibility
      184k68.10 Fraud on Government
         184k68.10(1) k. In General; False State-
ments or Entries. Most Cited Cases
A statement is material, for purposes of offense of
making false statement, if it has a natural tendency
to influence, or to be capable of affecting or influ-
encing a governmental function; statement need not
have exerted actual influence, so long as it had ca-
pacity to do so. 18 U.S.C.A. § 1001.

**[32] Fraud 184 ☜68.10(4)**

184 Fraud
   184III Criminal Responsibility
      184k68.10 Fraud on Government
         184k68.10(4) k. Materiality and Effect.
Most Cited Cases
Statements made to FBI by coconspirator of main
target of FBI investigation into drug importation
ring were material for purposes of offense of mak-
ing false statements, as record indicated that FBI

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

was interested in using third party to obtain information about their main target, and misstatements defendant agreed to make would have misled FBI about main target's relationship with third party. 18 U.S.C.A. § 1001.

[33] Fraud 184 ☞68.10(1)

184 Fraud
    184III Criminal Responsibility
      .184k68.10 Fraud on Government
        184k68.10(1) k. In General; False Statements or Entries. Most Cited Cases
"Exculpatory no" exception to offense of making false statement does not apply when a person attempts to affirmatively mislead a government investigation.

[34] Fraud 184 ☞68.10(1)

184 Fraud
    184III Criminal Responsibility
      184k68.10 Fraud on Government
        184k68.10(1) k. In General; False Statements or Entries. Most Cited Cases
"Exculpatory no" exception to offense of making false statements did not apply to defendant's statements to FBI about main target of FBI investigation into drug importation, as defendant did not simply agree to deny personal wrongdoing, but to mislead the FBI about their main target. 18 U.S.C.A. § 1001.
*1495 Richard Harris, Neil Karadbil, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee in 83-5102.

Paul D. Lazarus, Nurik, O'Donnell & Lazarus, Lauderdale, Fla., for Scott Bertelsen.

David Goodhart, Goodhart & Rosner, Paul M. Rashkind, Miami, Fla., for Thomas Sikes.

Paul M. Rashkind, Miami, Fla., for J.C. Bertelsen.

Ronald A. Dion, Entin, Schwartz, Dion & Sclafani, North Miami Beach, Fla., for M. Van Horn, R. Van

Horn, Dennis Kay, Dennis Cason, Gary Balough, Scott Bertelsen & Joseph William Campbell.

James J. Hogan, Miami, Fla., George Robert Blakey, Notre Dame Law School, Notre Dame, Ind., for defendants-appellants.

Neil Karadbil, Ft. Lauderdale, Fla., Jon May, Linda Collins Hertz, Richard Kamp, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee in 84-5138.

Appeals from the United States District Court for the Southern District of Florida.

Before FAY and KRAVITCH, Circuit Judges, and HENLEY [FN*], Senior Circuit Judge.

        FN* Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

KRAVITCH, Circuit Judge:

Ten different defendants challenge their convictions under various charges stemming from a marijuana importation and distribution ring.[FN1] The ring, masterminded by appellant William Joseph Harvey, operated between 1978 and 1982. Harvey ran the operation from his office at the Delray Towing Service, a business he owned in Delray Beach, Florida. The organization used speedboats to transport marijuana from large freighters into the United States, and then distributed the marijuana.

        FN1. Appellant Harvey went to trial before the district court judge based on a stipulated trial transcript and was convicted. The remaining appellants went to trial and were convicted by a jury.

*1496 There is no contention that the evidence was not sufficient to show the participation of all of the appellants in the conspiracy. The prosecution,

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

however, relied on evidence obtained by electronic surveillance of Harvey's office at Delray Towing. All of the appellants challenge the legality of the surveillance and contend that the evidence should not have been admitted. The district court conducted an evidentiary hearing and, after long and careful consideration, denied the appellants' motion to suppress the evidence. *United States v. Harvey,* 560 F.Supp. 1040 (S.D.Fla.1982). The propriety of this decision is the main focus of this appeal.

## I. ADMISSIBILITY OF THE ORAL INTERCEPT EVIDENCE

*Background*

On October 17, 1980, the government applied to the district court for an order authorizing interception of oral communications in Harvey's office at Delray Towing. The application was supported by an affidavit of Stephen Gillman, an Assistant United States Attorney, and Harold C. Copus, an agent of the Federal Bureau of Investigation (FBI). On October 20, the district court entered an order authorizing interception for thirty days; the district court entered orders extending the interception period on November 20 and again on December 19. The listening device functioned from October 24, 1980 until January 19, 1981.

The district court's authority to authorize the electronic surveillance involved in this case is found in Title III of The Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. §§ 2510-2520. Title III sets forth numerous requirements the government must meet before surveillance may be authorized, 18 U.S.C. § 2518(1), the findings the district court must make, 18 U.S.C. § 2518(3), and requirements for the district court's authorization order. 18 U.S.C. § 2518(4). Title III contains its own exclusionary rule under which the appellants all have standing to challenge the surveillance. 18 U.S.C. § 2518(10). The appellants raise numerous potential

deficiencies in the district court's authorization.

A. Necessity of Electronic Surveillance Under 18 U.S.C. § 2518(1)(c).

An application for interception must contain

a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too danger- ous.

18 U.S.C. § 2518(1)(c). Appellants contend that the two affidavits supporting the government's October 17, 1980, application are little more than "boilerplate." They argue that alternative investigative techniques were available, namely, ordinary surveillance, execution of a search warrant of Delray Towing, an undercover "sting" operation, and a grand jury investigation with immunity for witnesses.

[1][2] The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed. *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974); *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. *United States v. Alonso,* 740 F.2d 862, 868 (11th Cir.1984), *cert. denied,* 469 U.S. 1166105 S.Ct. 928, 83 L.Ed.2d 939 (1985); *United States v. Hyde,* 574 F.2d 856, 867 (5th Cir.1978). Judged by these standards, we believe the affidavit in this case was sufficient.

With respect to the utility of ordinary surveillance techniques, Agent Copus' affidavit sets forth numerous facts showing that they had been attempted

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

and had failed. The affidavit also explains the failures. The affidavit states that surveillance of actual marijuana off-load operations was impossible because of anti-surveillance techniques employed by Harvey. These techniques included use of a helicopter, night scopes and listening devices, and central*1497 command of the various small vessels from a larger vessel. In addition, it is obvious that the government was not seeking to catch one or two small vessels with marijuana, but to expose the entire conspiracy. The affidavit also sets forth the reasons why surveillance of the headquarters at Delray Towing was impossible. According to the affidavit, to the west of Delray Towing was the city dump; to the east a parking lot for a night club that was frequented by members of the ring and owned by Harvey's father; to the north a garage, to which agents could not obtain access without disclosing the investigation; to the south, the nearest point from which surveillance could be conducted was a half mile away. Harvey also conducted security procedures at Delray Towing; indeed, one attempt at surveillance from a building approximately one-half to one mile away was discovered by Harvey. Finally, the affidavit states that even if ordinary surveillance were practical, it could only lead to evidence that members of the conspiracy were meeting, and not to direct evidence of criminal activity.

The affidavit explained that a search of the premises at Delray had been considered and rejected because it was not believed that there was sufficient physical evidence there to reveal the entire conspiracy or to successfully prosecute its members.

With respect to a "sting" operation, the affidavit indicates that the informants upon which the government was relying feared for their lives because of threats from Harvey. The affidavit also states that government agents had tried and failed to gain introduction to Harvey. The affidavit asserts that such attempts would endanger the lives of undercover agents and informants. Appellants contend that the affidavit is incredible in this respect because the FBI had informants with knowledge of the conspiracy. The contention is frivolous: that the informants may have known of the conspiracy does not mean Harvey would have trusted them. Moreover, the affidavit explained that these persons feared for their lives.

Agent Copus' affidavit further states that he had discussed the possibility of a grand jury investigation with the Assistant United States Attorney. The affidavit explains that such an investigation was rejected because the necessary witnesses were members of the conspiracy and would not voluntarily testify, and that it had been impossible to determine the roles of various members of the conspiracy in order to judge who should be afforded immunity.

With respect to the danger to informants posed by either a sting operation or a grand jury investigation, we note that the affidavit asserts that one informant directly refused to testify out of fear, another source relayed death threats that Harvey had made against potential informants, another witness had been beaten and received death threats, one member of the conspiracy was left at a hospital with bullet wounds which he refused to explain and another person was threatened with death. The affidavit therefore presents a pattern of threats and a presence of danger to witnesses and agents. This existence of danger is one of the justifications for electronic surveillance. 18 U.S.C. § 2518(1)(c). The appellants argue that the fears alleged in the affidavit are belied by the fact that witnesses testified at trial. Again, this contention is frivolous; that witnesses were willing to testify in court after the FBI had broken the conspiracy and arrested its members does not indicate that they would have been willing to do so at the time the surveillance was requested.

Appellants' final contention with respect to necessity is that the district court improperly relied on Agent Copus as an expert witness. This contention

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

is difficult to understand. The district court's authorization order does not state that its decision was based on any expert opinion of Agent Copus, and as discussed above, the affidavit set forth numerous factual matters rather than expert opinion. The appellants cite no authority that an application for oral interception *must* be based on an expert opinion. In any event, the affidavit indicates that Agent Copus had five years experience as an FBI agent, with two years of specialization in narcotics; the district court clearly would have been within its *1498 discretion had it chosen to rely on Copus as an expert.

B. Probable Cause under 18 U.S.C. § 2518(1)(b).

An application must include

a full and complete statement of the facts and circumstances ... including (i) details as to the particular offense that has been, is being, or is about to be committed.

18 U.S.C. § 2518(1)(b)(i). The offense set forth in the application was a RICO conspiracy. 18 U.S.C. §§ 1961-68. The affidavit lists an organization with a leader, various lieutenants, and workers. The organization was headquartered at Delray Towing, and had a continuing business of importing and distributing marijuana. The appellants' contentions that the affidavit did not establish probable cause that there had been an agreement to commit two predicate RICO acts, 18 U.S.C. § 1961(5), and that the affidavit did not set forth probable cause that there was a RICO enterprise, 18 U.S.C. § 1961(4), require no further discussion in light of the facts already discussed. *See United States v. Bascaro,* 742 F.2d 1335, 1342-43 (11th Cir.1984) (marijuana offenses may be predicate acts for RICO charge), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 3477, 3488, 87 L.Ed.2d 613 (1985); *United States v. Pepe,* 747 F.2d 632, 659-60 (11th Cir.1984) (RICO conspiracy requires that defendant agree to commit the two predicate acts and be aware that others have

done so); *United States v. Hewes,* 729 F.2d 1302, 1310-11 (11th Cir.1984) (definition of RICO enterprise), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). In addition, the affidavit demonstrated an ongoing enterprise operated out of Harvey's office; thus there was probable cause to believe that the surveillance would yield incriminating evidence.[FN2]

> FN2. The appellants contend that the FBI was not authorized to conduct surveillance in connection with narcotics offenses. Our conclusion that the affidavit set forth probable cause of a RICO violation, which the appellants admit the FBI was authorized to investigate, obviates consideration of this issue.

The appellants urge that even if probable cause existed at the time of the application, the district court should have terminated the surveillance when no incriminating conversations were intercepted during the first days of the wiretap. The appellants argue that the district court should have shut down the surveillance upon receipt of the reports indicating no progress in the investigation. They cite two reasons why probable cause no longer existed: at the time of the November 12, 1980, progress report, no relevant conversations had been obtained and the latest information on Harvey was sixty-six days old; and after the surveillance began the agents learned that Harvey was out of town.

[3][4][5] In our view a district court is not required to terminate a surveillance whenever it receives a report of no progress. First, the progress reports the district court required in this case were not mandated by the statute, but were ordered at the discretion of the district judge. 18 U.S.C. § 2518(6). Accordingly, the import of the progress reports was also a matter within the discretion of the authorizing district court. *See United States v. Iannelli,* 477 F.2d 999, 1002 (3d Cir.1973), *aff'd on other grounds,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

616 (1975). In authorizing the thirty days of surveillance, the district court determined that there was probable cause to believe relevant communications would be intercepted within the thirty day period. 18 U.S.C. § 2518(3)(b). The proper time to consider whether the information in the affidavit had become stale would be at the end of the thirty days when the government reapplied. 18 U.S.C. § 2518(1)(f). The district court was clearly within its discretion in determining that the information in the affidavit justified thirty days of surveillance. The affidavit set forth a continuing criminal enterprise, operating over a long period of time. *See Scott v. United States,* 436 U.S. 128, 140-42, 98 S.Ct. 1717, 1724-26, 56 L.Ed.2d 168 (1978) (investigations of large, complex conspiracies justify a greater scope of surveillance); *1499United States v. Bascaro,* 742 F.2d 1335, 1345-46 (11th Cir.1984) (staleness of evidence considered liberally in cases involving large drug conspiracies due to their protracted and continuous nature), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). Accordingly, the fact that the most recent information would have been two months old at the end of the period does not indicate that probable cause did not exist.

[6] Furthermore, Harvey's temporary absence, reported to the district court, did not negate the probable cause. First, the FBI stated in its progress reports that it believed Harvey would return shortly.[FN3] Second, the affidavit set forth three other employees of Delray Towing as possible conspirators, and these persons could have been overheard in the office even during Harvey's absence.[FN4]

FN3. The October 29, 1980, progress report stated that Harvey was expected back that day. The November 4, 1980, progress report stated that the principals were "maintaining a low profile" due to arrests by state officials, but were expected back shortly. Accordingly, there is no factual

basis in the record for appellants' contention that current probable cause did not exist.

FN4. Appellants contend this is contrary to the record because the record indicates all meetings were called by Harvey. We disagree. The affidavit indicated other employees of Delray were involved in the conspiracy. It is reasonable to infer they might converse in Harvey's office even in Harvey's absence.

C. Showing of Previous Applications for Electronic Surveillance Under 18 U.S.C. § 2518(1)(e).

The application for electronic surveillance must include

a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such application.

18 U.S.C. § 2518(1)(e). Prior to the federal surveillance, the Boca Raton, Florida Police Department had obtained authorization for a state Title III wiretap on the phone of Robert Jernigan, one of the members of the drug ring. The federal agents learned of the state wiretap on October 14, 1980. Harvey was one of the named targets of the state wiretap. The state wiretap was not disclosed in the October 17, 1980 application for surveillance. In considering the motion to suppress, the district court found that the government had intended to disclose the wiretap, but that a page of the application, (page 21C) had been inadvertently omitted. 560 F.Supp. at 1070. The district court also found that the FBI agents did not know at the time that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

Harvey was a target of the state investigation.

[7] The appellants argue that, even including page 21C, the application did not contain "a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application." They argue that the agents knew that Harvey was a named target of the state Title III. The district court, after a hearing on the motion to suppress, found otherwise, 560 F.Supp. at 1073, and appellants must show these findings to be clearly erroneous. Appellants focus on testimony of government agents that they knew about the state wiretap, and that they knew that Harvey had been intercepted. That Harvey might have been intercepted is an obvious inference from the existence of the wiretap, as the application set forth a believed criminal relationship between Harvey and Jernigan. The agents, however, clearly testified that they did not know Harvey had been named on the state application, and the district court chose to believe this testimony. The agents further testified that they did not learn whether Harvey had actually been intercepted. The district court also relied on testimony that the FBI agents did not attempt to learn the details of the state investigation because they feared tainting their own evidence if the state investigators had committed any illegalities, found the state investigators uncooperative, and thought the state investigators were after *1500 Jernigan rather than Harvey. We hold that the district court's finding that the FBI did not know that Harvey was a named target of the state Title III is not clearly erroneous. Accordingly, had page 21C been included, the application would have met the disclosure requirement.FN5

> FN5. Because the agents did not "know" Harvey was named on the state Title III application, we need not consider whether a failure to completely satisfy the requirements of section 2518(1)(e) would mandate suppression.

[8] We must consider, therefore, what standard applies to an inadvertent omission of material required by section 2518(1)(e). Title III's exclusionary rule applies to communications that have been "unlawfully intercepted." 18 U.S.C. § 2518(10)(a). The Supreme Court has ruled that not all failures to satisfy the statutory requirements of Title III render an interception "unlawful." *United States v. Donovan,* 429 U.S. 413, 438, 97 S.Ct. 658, 673, 50 L.Ed.2d 652 (1977). In *Donovan,* the Court held that a violation of the requirement that the application identify all those likely to be overheard, 18 U.S.C. § 2518(1)(b)(iv), did not mandate suppression because the requirement did not play a central role in the decision to authorize surveillance. The Supreme Court found a difference between those requirements of the application that pertain to the determination the district judge must make to authorize the surveillance (section 2518(3)(a-d)) and the remaining requirements for the application. The determinations the authorizing judge must make relate to the probable cause and necessity requirements. The disclosure of prior wiretaps does not relate to the legal determination the judge must make. Accordingly, inadvertent noncompliance with the section 2518(1)(e) disclosure requirement does not mandate suppression. Our conclusion is consistent with the only other circuit we know to have considered the question since the Supreme Court's decision in *Donovan. See United States v. Abramson,* 553 F.2d 1164, 1169-70 (8th Cir.), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977).FN6

> FN6. Appellants contend that *Abramson* is in conflict with *United States v. Bellosi,* 501 F.2d 833 (D.C.Cir.1974). *Bellosi,* however, was decided before the Supreme Court's decision in *Donovan,* and we find it unpersuasive.

> Appellants contend that the omission of page 21C also relates to the section 2518(1)(c) necessity showing. They ar-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

gue that section 2518(1)(c) requires a "full and complete statement" of prior investigative efforts, and that therefore *any* omission of a prior investigative effort requires suppression. We disagree. Such a reading of section 2518(1)(c) would render section 2518(1)(e) superfluous; section 2518(1)(e) requires that the application disclose all prior electronic surveillance "known" to the officer. Hence, appellant's "strict liability" interpretation of section 2518(1)(c) is contrary to the statutory language. We therefore analyze the omission of page 21C in the context of section 2518(1)(e). In any event, the existence of the prior state wiretap, which did not yield evidence to arrest Harvey, made the surveillance neither more nor less necessary. *See United States v. Donovan,* 429 U.S. 413, 438, 97 S.Ct. 658, 673, 50 L.Ed.2d 652 (1977) (suppression of electronic surveillance required only if interception was "unlawful").

[9][10] The appellants also claim that the omission of page 21C was a constitutional violation, requiring dismissal under *Franks v. Delaware,* 438 U.S. 154, 171-72, 98 S.Ct. 2674, 2684-85, 57 L.Ed.2d 667 (1978). *Franks* only applies, however, to intentional or reckless omissions from an affidavit. *Id.* Affidavits supporting warrants are presumed valid, and the party seeking suppression bears the burden of showing the omission was more than negligent. *Id.* at 171, 98 S.Ct. at 2684; *United States v. Martin,* 615 F.2d 318, 327-29 (5th Cir.1980). The district court found that the omission was inadvertent. The appellants contend that this finding is clearly erroneous, arguing that the omission itself raises an inference of recklessness, and that the government must then prove that the omission was not reckless. We disagree. There may be cases in which the district court may infer recklessness from an omission,

but we do not believe it was required to do so in this case. *See Franks,* 438 U.S. at 171, 98 S.Ct. at 2684 (party seeking suppression must prove omission was more than negligence); *Martin,* 615 F.2d at 329. The record demonstrated that the government had intended to include page 21C, as the material was referred to in subsequent *1501 progress reports. A government agent filing an affidavit has a duty to ensure that the affidavit has been carefully assembled, but that does not mean that if a page slips out the agent has been reckless. Here, there is not even any evidence that the government agents failed to proofread or otherwise properly examine the affidavit. We hold that the findings of the district court are not clearly erroneous. Accordingly, because the omission was not shown to be reckless, we need not address the implications of *Franks* for Title III cases.

D. Whether the Surveillance Was Properly Minimized as Required by 18 U.S.C. § 2518(5).

Every authorizing order must require that the surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). The authorizing order at issue contained such a requirement. The district court found that the monitoring agents had made a good faith effort to minimize, and that they had in fact reasonably minimized interception. 560 F.Supp. at 1075-76.

The appellants contend that the agents did not minimize. They do not rely on evidence that nonpertinent conversations were monitored; rather they rely upon the practices the agents used and the supervision of the district court. They note that the agents violated their own guidelines for minimization. The practices appellants criticize are as follows. The application stated that the agents would minimize by suspending monitoring whenever voice identification indicated that the conversants were not the principals, and that agents would coordinate their

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

monitoring with surveillance of Delray Towing to ensure that some of the principals were inside when monitoring was done. The agents found voice identification difficult during the early stages of the monitoring, and did not coordinate their monitoring with normal surveillance. The Assistant United States Attorney instructed the agents to tape record all monitored conversations, but in fact the agents only recorded conversations they believed incriminating. They also monitored during times they knew Harvey was out of town.

The Supreme Court discussed the principles for reviewing claims that agents failed to minimize Title III surveillance in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). The Court first made clear that the motives, or good faith, of the monitoring agents was simply not an important consideration. 436 U.S. at 138-39, 98 S.Ct. at 1723-24. Rather, the question is whether the agents' monitoring was reasonable in light of all the facts and circumstances of the case. The Court cited several factors in *Scott,* including the number of nonpertinent conversations intercepted, the location of the surveillance, and the nature of the investigation. *Id.* at 139-40, 98 S.Ct. at 1724-25.

In the current case, therefore, we place little weight on the fact that the agents deviated somewhat from the conditions in the application. Although the practices employed by the agents are a consideration, we are more concerned with whether the agents in fact monitored nonpertinent conversations. In any event, the practices employed were reasonable. With regard to the voice identification issue, we note that in the early stages the agents were dealing with what they believed to be a large conspiracy with many of the members still unidentified. Accordingly, they could hardly use voice identification alone to guide their monitoring. *See Scott,* 436 U.S. at 141, 98 S.Ct. at 1725 (voice identification may be impossible during initial stages of a conspiracy investigation). Indeed, one of the goals of the surveillance was to identify additional

conspirators. As far as coordination with normal surveillance, we have already discussed the difficulties of such surveillance in this case. We have also already discussed the effect of Harvey's absence; there were other members of the conspiracy who may have been overheard in the office, and the agents expected Harvey to return. *Scott,* 436 U.S. at 140-41, 98 S.Ct. at 1724-25 (when bug is located in place frequented by conspirators rather than public, wider monitoring is justifiable).

**\*1502** The appellants also urge that the authorizing district judge's failure to terminate the surveillance upon receipt of reports of no progress indicates the surveillance was not minimized. Again appellants miss the mark. The progress reports reveal no pertinent conversations, but do not show that the agents were unduly monitoring nonpertinent conversations.

[11] We turn to the key issue, whether in fact the agents unreasonably monitored nonpertinent conversations. The district court found, on the basis of the agents' testimony and their monitoring logs, that the agents ceased monitoring conversations they determined to be nonpertinent. The logs and testimony do in fact support the district court's conclusion. Most important, the appellants have produced no evidence of specific conversations which the agents should not have monitored. Because the appellants cite no evidence contradictory to the district court's findings of fact, we must accept them as not clearly erroneous. We therefore hold the agents complied with the minimization requirements.

E. Validity of the November 20 order Extending the Authorization for Another 30 Days.

Appellants claim that the extension of surveillance was without probable cause, again focusing on whether the elements of a RICO conspiracy were shown. The contentions have been adequately dis-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

Page 16

cussed above. We note, however, that the probable cause was boosted by the interception of pertinent conversations on November 18 and 19, tending to confirm the existence of the conspiracy.

[12] Appellants also challenge the extension on the ground that the authorizing judge was outside the district when he executed the order. The authorizing judge, a judge of the Southern District of Florida, was in the Middle District of Florida at the time. As a judge of the Southern District, the judge had the power to authorize surveillance conducted within that district. 18 U.S.C. § 2518(3). Appellants cite no authority for their contention that district courts may not authorize surveillance conducted within their territorial jurisdiction if the judge happens to be physically outside the jurisdiction. Nor is there any reason to deny district judges such power. Indeed, such authority has traditionally been recognized. *See, e.g., United States v. Strother,* 578 F.2d 397 (D.C.Cir.1978).

Appellants also urge that the government's application for the November 20 extension was tainted because it referred to the state wiretap, arguing that the state wiretap was invalid because Florida law does not permit wiretapping for investigation of marijuana offenses.

[13] Florida law authorizes surveillance for marijuana offenses; hence we reject appellants' contention that the state wiretap was invalid. Appellants' argument is based on a difference between the language of the state and federal wiretapping statutes. The federal statute authorizes investigations of "dealing in narcotic drugs, marijuana or other dangerous drugs." 18 U.S.C. § 2516(2). The state law, however, refers only to "narcotics or other dangerous drugs." Fla.Stat.Ann. § 934.07. According to appellants the state omitted "marijuana" in order to exclude marijuana offenses from electronic surveillance. Appellants cite nothing in either the legislative history or Florida decisions to support this contention. In fact the state likely omitted "marijuana"

because it believed it redundant in light of the inclusion of "dangerous drugs." The Florida courts have not directly addressed the issue, but they have referred to marijuana as a dangerous drug, and have affirmed convictions for marijuana offenses on the basis of wiretap evidence. *See, e.g., State v. Manning,* 379 So.2d 1307 (Fla.Dist.Ct.App.1980) (affirming use of electronic surveillance evidence in marijuana case); *Hamilton v. State,* 366 So.2d 8 (Fla.1978) (marijuana a dangerous drug). Accordingly, we hold that the state electronic surveillance law includes marijuana offenses and the state wiretap therefore was valid.

***1503** F. Compliance with Disclosure Requirement of 18 U.S.C. § 2517(5) with respect to the Federal Surveillance

The application and authorization orders for the surveillance in this case designated, among others, the following sections: 21 U.S.C. §§ 841(a), 846, and 18 U.S.C. § 1962(c-d). Appellant Harvey was indicted under 21 U.S.C. § 848, 952(a) & 963. Harvey contends that the variance between the application and the indictment invoked the requirement of section 2517(5) that the government obtain prior approval before disclosing the evidence. Section 2517(5) provides:

When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

Harvey urges that the charges in the indictment were for "offenses other than those specified in the order of authorization or approval," and that the government revealed evidence to the grand jury without obtaining judicial approval.

The government responds that (1) the application set forth probable cause of the existence of the violations charged in the indictment and that the mere failure to include statutory citations does not mean that the offenses were "other than those specified," and (2) that the use of the evidence was in effect approved by the authorizing court, which viewed progress reports and extended the surveillance.

Congress adopted section 2517(5) because it "wished to assure that the Government does not secure a wiretap authorization order to investigate one offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization order are lacking." *United States v. Campagnuolo*, 556 F.2d 1209, 1214 (5th Cir.1977). In this case it is clear that no "subterfuge" occurred. The government uncovered the very conspiracy it identified in its original application, and the conspiracy was conducting the very activities listed; the government simply charged Harvey under a different statute than the one set forth in the application. The government argues with some force that requiring approval under section 2517(5) would simply elevate form over substance.

[14] We hold, however, that regardless of whether the government was required to seek judicial approval, the continuing approval of the authorizing district court, after it had been apprised of the conversations intercepted, meets the judicial approval requirement.[FN7] The purpose of the judicial approval limitation is to prevent incidental interception of conversations for which the government has

shown no probable cause; the statute does not ensure that a defendant is charged only with the crimes set forth in the application. In considering whether the judicial approval required by the statute has occurred, courts must keep in mind this purpose. *Cf. United States v. Campagnuolo*, 556 F.2d 1209, 1214 (5th Cir.1977). Courts thus have considered the section 2517(5) approval requirement flexibly, and have held that the court need not have approved of the new charges as long as it has approved of the collection of the evidence supporting those charges. *See* *1504*United States v. Masciarelli*, 558 F.2d 1064, 1067-69 (2d Cir.1977) (section 2517(5) approval impliedly made by authorizing judge who extended surveillance after being told of evidence supporting charges not asserted in application); *United States v. Tortorello*, 480 F.2d 764, 782-83 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Here, the authorizing judge received both progress reports and applications for extension, and these described the nature of the conversations being intercepted. The authorizing judge twice extended the surveillance. Accordingly, he reviewed the conversations which the government had been intercepting, and determined that they were properly intercepted. This suffices to meet section 2517(5) requirement.

> FN7. Because we hold that the judicial approval requirement was satisfied in this case, we do not consider whether the government is correct in arguing that the indictment did not charge "offenses other than those specified in the order of authorization." 18 U.S.C. § 2517(5). *See, e.g., United States v. Brodson,* 528 F.2d 214 (7th Cir.1975); *United States v. Daly,* 535 F.2d 434 (8th Cir.1976); *see also infra* note 8.

G. Compliance with 18 U.S.C. § 2517(5) with Respect to Use of Evidence from the State Wiretap

Appellants complain that the government used

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

evidence obtained through the state wiretap without obtaining proper or timely approval as required by section 2517(5). The federal agents learned of the existence of a state wiretap on October 14, 1980. They did not obtain approval to use the evidence until August 1982. The approval was from the Florida circuit judge who had authorized the state surveillance. The appellants raise several arguments in support of their claim that the approval was improper and untimely; none of the arguments requires extensive discussion.

[15] Appellants maintain that the application to use the state evidence was not properly approved because section 2516(1) requires approval from an attorney general or assistant attorney general. Section 2516(1) does not apply to an application to a state judge for approval; it applies only to applications submitted to a "Federal judge of competent jurisdiction." Such authorization does not allow further monitoring, but simply allows use of conversations already intercepted. We hold that no special approval is required before submission of section 2517(5) applications to state courts.

[16] The appellants further claim that the state judge's authorization was invalid because there is no indication that he made the finding "that the contents were otherwise intercepted in accordance with the provisions of this chapter," required by section 2517(5). They note that the government's application made no effort to show that the communications were properly intercepted. The state judge expressly found that the interceptions related to the federal charges were "intercepted incidentally." This was the same judge who had authorized the state wiretap, and accordingly he was in a position to know whether the state agents had properly executed the state wiretap. The finding that the conversations were intercepted incidentally makes complete sense as both the state and federal agents were investigating violations of marijuana laws. Appellants cite no evidence contrary to this finding.

[17] Section 2517(5) requires that applications for approval be made "as soon as practicable." Appellants insist that the government learned of the state wiretap on October 14, 1980, and that it should not have waited until August 9, 1982, to obtain approval. We hold that the government's request was timely. In considering the timeliness issue, we must keep in mind the purpose of section 2517(5), to prevent subterfuge. *United States v. Vento*, 533 F.2d 838, 855 (3rd Cir.1976). We reiterate that the federal and state investigators were investigating precisely the same activity, and there is no hint that the state wiretap was a subterfuge to generate evidence for federal charges. Moreover, although the federal agents learned of the existence of the state wiretap in October 1980, they did not learn the *contents* until March 1982. Accordingly, the delay was only five months. Finally, the appellants have not shown any prejudice from the delay. *Vento*, 533 F.2d at 855; *United States v. Southard*, 700 F.2d 1, 30-31 (1st Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).[FN8]

> FN8. Because we find that the government did not violate 2517(5), we need not consider under what situations, if any, such a violation would mandate suppression. *See Vento*, 533 F.2d at 855 (suggesting no suppression for 2517(5) violations).

*1505 [18] According to the appellants, however, the agents used the information from the state wiretap to obtain the indictment against Harvey, and use of the evidence before obtaining the approval violated section 2517(5). The evidence cited by appellants is testimony by Darryl Falls, a witness who was implicated in the state evidence. Appellants argue that the testimony was the fruit of the state wiretap, and that therefore approval was required prior to use of the testimony. We disagree. Section 2517 enumerates three situations in which use or disclosure of intercepted communications is permissible. 18 U.S.C. § 2517(1-3). By its terms, the requirement of approval for use of evidence set

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

forth in section 2517(5) applies only to use of the evidence under section 2517(3). Section 2517(3) concerns disclosure of the communication or evidence derived from the communication while testifying under oath. The testimony of coconspirator Falls obviously came from personal knowledge rather than from the surveillance; he did not disclose any evidence obtained from the surveillance and his testimony was therefore not within section 2517(3). Nor did any other witness before the grand jury relay the contents of any conversations intercepted in the state wiretap or any other evidence discovered by the witness as a result of the state wiretap. Accordingly, section 2517(5) approval was not necessary before the grand jury proceeding.

[19] Finally, the appellants challenge the authority of the state circuit judge to enter the approval order. Section 2517(5) requires approval by "a judge of competent jurisdiction." The statute includes the following within the definition of a judge of competent jurisdiction:

a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire or oral communications

18 U.S.C. § 2510(9)(b). The approving judge, a Florida circuit judge, is authorized to enter such orders under Fla.Stat.Ann. § 934.02(8).

For the foregoing reasons, the order of the district court denying the motion to suppress is AFFIRMED.

II. TRIAL ISSUES

A. Severance

The appellants who went to trial all claim that they were entitled to a severance from the trial of Gainer Jernigan. Unlike the other defendants, Jernigan was charged with a continuing criminal enterprise viola-

tion under 21 U.S.C. § 848. The appellants point out that in order to avoid conviction under 21 U.S.C. § 848, counsel for Jernigan adopted a strategy of admitting involvement in a conspiracy, but denying that Jernigan played a key role. According to appellants this strategy prejudiced their defense.

Claims of severance are governed by familiar principles. Persons indicted together ordinarily should be tried together. A motion for severance is a matter within the sound discretion of the district court. "To establish an abuse of discretion the defendant must demonstrate that without severance he was unable to receive a fair trial and that he suffered compelling prejudice against which the trial court could offer no protection." *United States v. Magdaniel-Mora*, 746 F.2d 715, 718 (11th Cir.1984).

[20] Antagonistic defenses may satisfy the compelling prejudice standard, but only if the defenses are "irreconcilable and mutually exclusive." *Id.* In *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir.1978), a prosecution for possession of an unregistered weapon, the two defendants took the stand and each testified that the other had possessed the weapon. The court stated that "[e]ach was the government's best witness against the other," and found compelling prejudice. 581 F.2d at 492. Mere hostility between defendants, however, does not meet the compelling prejudice standard. In *United States v. Vadino*, 680 F.2d 1329, 1334-35 (11th Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983), one defendant argued entrapment, and admitted most of the matters asserted by the prosecution; the court ruled that such a defense did not result in *1506 compelling prejudice to the other defendants. *See also United States v. Mota*, 598 F.2d 995, 1000-01 (5th Cir.1979) (defense of insanity not irreconcilable with codefendant's defense of noninvolvement),*cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).

[21] Compelling prejudice did not exist in this case.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

Jernigan's counsel did admit that Jernigan was likely guilty of some crime; however, the focus of her arguments was that *Harvey* was the primary culprit, and that Jernigan was simply a small player in Harvey's gang. Harvey did not go to trial; appellants, therefore, hardly can argue compelling prejudice. Appellants point to only two incidents in which Jernigan's counsel implicated other defendants. First, in the course of a cross-examination regarding a phone call between appellant Cason and Jernigan, counsel asked questions concerning whether Jernigan had been giving orders to Cason. These questions simply tended to exonerate Jernigan from the continuing enterprise charge while not further implicating Cason. In her closing, counsel referred to Jernigan as "a glorified Buck Van Horn." Although a statement comparing one defendant's guilt to another's is hardly desirable, it did not result in compelling prejudice. The statement presented no evidence or argument in favor of convicting Van Horn; moreover, a jury could accept counsel's basic argument that Jernigan was simply one of many workers without necessarily finding that Van Horn, or any of the other defendants, was guilty.

We also note that neither Jernigan nor any of the appellants introduced evidence at trial. It would be unusual to find compelling prejudice from a codefendant's defense when that defense did not entail presentation of evidence. *See United States v. Magdaniel-Mora,* 746 F.2d 715, 718 n. 3 (11th Cir.1984). Finally, the trial court gave explicit curative instructions during counsel's closing argument, instructing the jury to consider the guilt or innocence of each defendant separately. Accordingly, we find that the appellants have not met the compelling prejudice standard and that the district court was within its discretion in denying a severance.

### B. Misjoinder of Appellant Sikes

Appellant Sikes contends that he was misjoined under Federal Rule of Criminal Procedure 8(b). The indictment contained twenty-three counts. The first two counts were continuing criminal enterprise charges against Jernigan and Harvey under 21 U.S.C. § 848. Count III alleged a conspiracy to import marijuana. Count IV alleged a conspiracy to possess marijuana with intent to distribute. The remaining counts alleged various substantive violations of the marijuana laws. Sikes was named only in the conspiracy counts. The conspiracy counts included seventy-one overt acts, and named Sikes in only four of them. Sikes argues that he was misjoined because the conspiracies alleged in Counts III and IV are actually multiple unrelated conspiracies, and because the substantive counts are all unrelated to his participation.

The overt acts contained in the conspiracy counts showing participation of Sikes were discussions between Harvey and Sikes on November 18, 1980. Harvey, Sikes, and codefendant Dennis Kay discussed future marijuana off-loads, and division of profits from past sales; Harvey asked Sikes to take possession of 20,000 pounds of marijuana; Harvey and Sikes discussed a payment to a supplier; Sikes told Harvey that codefendant John Bertelsen had recently paid Sikes $125,000. The other overt acts refer to separate episodes of importation, in which Sikes is not named.

[22] We conclude that Counts III and IV set forth a single conspiracy, in which Sikes was a member. This court has decided numerous cases involving claims of multiple conspiracies, and some simple principles are relevant. A coconspirator need not participate in every phase of the venture. Nor need a conspirator be aware of all of the participants. Three factors support a finding of a single conspiracy: common goal, common scheme, and overlapping participants. *United States v. Brito,* 721 F.2d 743, 747 (11th Cir.1983). The hallmark of a single conspiracy is "a regularized*1507 pattern of activity involving a significant continuity of membership and directed toward a common goal." *United*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

*States v. Darby,* 744 F.2d 1508, 1542 (11th Cir.1984). The indictment here shows a common goal of systematic and repeated importation and distribution of large amounts of marijuana. The indictment shows overlapping participation by the various defendants. The indictment shows a common scheme of off-loading and distribution. With specific reference to Sikes, it shows his knowledge of both off-loading and distribution, his knowledge of other members of the conspiracy, and knowledge of past, present and future activities of the conspiracy. Accordingly, Sikes was properly joined in Counts III and IV.[FN9]

> FN9. Since this case was briefed, the Supreme Court decided *United States v. Lane,* 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), holding that misjoinder is subject to the harmless error doctrine. As we have decided that joinder was proper, we need not consider prejudice.

Sikes also argues that the substantive counts, in which he was not named, were improperly joined with the conspiracy counts. A defendant need not be named in all counts of the indictment. If the substantive charges in which the defendant is not named all arise out of the same conspiracy then joinder is proper. *See, e.g., United States v. Phillips,* 664 F.2d 971, 1016 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *United States v. Corbin,* 734 F.2d 643, 649 (11th Cir.1984) (proper test is whether charges arise out of "series of acts or transactions" as shown by "substantial identity of facts or participants"). All of the substantive counts relate to the marijuana importation and distribution activities of the conspiracy. We have already determined that the indictment set forth a single conspiracy, in which Sikes was a member. Accordingly the conspiracy counts were not misjoined with the substantive counts.

**C. Revelation of the Location and Type of Surveillance Equipment Employed**

Despite numerous requests, the district court would not allow the appellants to discover either the type of microphone used in Harvey's office, or where the microphone was hidden. The appellants contend that consequently they were deprived of the right to confront the witnesses against them. The government resisted such revelations on the ground that they would adversely affect future criminal investigations. It asks us to recognize a privilege not to disclose the location and type of equipment used in surveillance unless the defendant demonstrates that such information is relevant and helpful to the defense.

[23] We recognize a qualified government privilege not to disclose sensitive investigative techniques. In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court acknowledged the existence of an "informer's privilege." The Court stated that the government has a privilege to withhold the identity of persons who furnish information of violations of law to the police, reasoning that the privilege furthered effective law enforcement by encouraging citizens to come forward with relevant information. 353 U.S. at 59, 77 S.Ct. at 627. The privilege must give way, however, where the informant's identity or knowledge is "relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60-61, 77 S.Ct. at 627-28.

The District of Columbia Circuit has applied the *Roviaro* privilege to surveillance locations. *See United States v. Harley,* 682 F.2d 1018, 1020-21 (D.C.Cir.1982); *United States v. Green,* 670 F.2d 1148 (D.C.Cir.1981). In *Green,* a police officer using binoculars observed the defendant committing a drug transaction. The defendant wished to identify the precise location of the officer's observation post. The court ruled that the information was privileged:

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

Page 22

Just as the disclosure of an informer's identity may destroy his future usefulness in criminal investigations, the identification of a hidden observation post will likely destroy the future value of that location for police surveillance. The revelation of a surveillance location might *1508 also threaten the safety of police officers using the observation post, or lead to adversity for cooperative owners or occupants of the building. Finally, the assurance of nondisclosure of a surveillance location may be necessary to encourage property owners or occupants to allow the police to make such use of their property.

670 F.2d at 1155. *Green* was decided in the context of a motion to suppress; the District of Columbia Circuit extended the privilege to trial testimony in *Harley*. In *Harley* two officers observed a drug transaction, one using binoculars, the other videotaping it with a zoom lens. Again, the defendants attempted to learn the precise viewing location. The court held that the defendant's right to confront witnesses was not violated in light of the government's interest in keeping its surveillance post secret, and the defendant's failure to show a need for the evidence. 682 F.2d at 1020-21. In considering the defendant's need, the court reasoned that the jury could judge the observer's ability to identify by seeing the video tapes made from the surveillance spot, and from testimony of the approximate distance. *See also United States v. Crumley,* 565 F.2d 945, 950-51 (5th Cir.1978) (government need not reveal where "track sheet" identifying vehicle parts was hidden unless defendant shows need).

[24] We hold that the privilege applies equally to the nature and location of electronic surveillance equipment. Disclosing the precise locations where surveillance devices are hidden or their precise specifications will educate criminals regarding how to protect themselves against police surveillance. Electronic surveillance is an important tool of law enforcement, and its effectiveness should not be unnecessarily compromised. Disclosure of such in-

formation will also educate persons on how to employ such techniques themselves, in violation of Title III.

The privilege will give way if the defendant can show need for the information. In this case the appellants contend that the information was necessary to demonstrate that the voices on the tapes could have been distorted, resulting in improper voice identifications. They insist that testimony of Agent Copus and their own expert witness indicated that the location of the microphone could have resulted in distortion.

[25] The district court conducted an in camera hearing to review the government's assertion of privilege and held a hearing on the appellants' claim of necessity. We agree with the district court that the information was privileged and that the defendants did not demonstrate necessity. There was testimony that the voices *could* have been distorted by the way the microphone was hidden. The district court, however, listened to Agent Copus, who was monitored from Harvey's office during the course of the investigation and was able to compare Agent Copus' voice on the tapes with his actual voice and determine that the voice had been accurately recorded. The appellants were allowed to examine the tapes, and were informed that the transmission was by air rather than wire. The ultimate question of whether the voice identifications of the appellants were correct was given to the jury and the appellants were allowed to explore and argue the possibility of misidentification in front of the jury. Accordingly, we agree with the district court's finding that necessity was not shown in this case.

We stress that the necessity determination requires a case by case balancing process, and that we have established no fixed rules about the discoverability of electronic surveillance techniques in criminal cases. *See Roviaro v. United States,* 353 U.S. 53, 60, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957); *United States v. Harley,* 682 F.2d 1018, 1020

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

Page 23

(D.C.Cir.1982).[FN10]

> FN10. The appellants also contend that the Classified Information Procedures Act, 18 U.S.C. app. iv., applies to the information they sought. Appellants are wrong. The district court did not find that the information was classified, nor do appellants provide any reason why it should have. *See* 18 U.S.C. app. iv § 1 (defining classified information); *United States v. Panas.* 738 F.2d 278, 285-86 (8th Cir.1984).

**\*1509 D. Timeliness of the Government's Request for Voice Exemplars**

During the eighth week of trial, the government requested that the appellants provide voice exemplars, to be played before the jury in order to confirm the identifications. Appellants Sikes and Bertelsen concede that the government had the right to compel the defendants to give exemplars, *see United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), but argue that the government's request came too late.

The appellants contend that the district court's standing discovery order required the government to disclose its intention to seek voice exemplars. That order, requiring the government to disclose statements of the appellants within its "possession, custody, or control," parallels the requirements of Rule 16. According to appellants, because the government had the authority to compel exemplars, the exemplars were within its control and the government was bound to disclose that it intended to seek them. This argument is absurd. The discovery order applied to statements the government had, not statements that it could have had.

[26] In any event, the appellants have shown no prejudice from the government's delay. They complain that they had become committed to the defense of improper identification, but they provide

no alternative theory of defense which they could have presented had they known the government intended to seek voice exemplars. Indeed, in light of the contents of the tapes, improper identification appears to have been the most logical defense.

**E. Admissibility of Intercepted Conversations Referring to Bertelsen's Arrest**

Appellant John Bertelsen was arrested for loitering and prowling near a Coast Guard Station on October 1, 1980. Numerous other members of the conspiracy were also arrested on that day. The state Title III wiretap on Jernigan's phone intercepted conversations about the arrests, the various charges, and obtaining releases and included mention of Bertelsen's arrest. The government has conceded that the arrest of Bertelsen was unlawful. Bertelsen claims, therefore, that the conversations about the arrest should have been excluded, and that the government should not have been allowed to argue that the conversations demonstrated Bertelsen's connection with the conspiracy.

[27][28] We hold that the conversations of Bertelsen's coconspirators regarding his arrest were not the product of the illegal arrest. Evidence seized during an unlawful arrest, or statements made by the person unlawfully arrested while in custody, are products of the arrest and will be suppressed. Evidence with only a loose causal connection to an illegal arrest, however, will not be suppressed. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). The mere existence of a "but for" causal connection does not mandate suppression. *Dunaway v. New York,* 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *United States v. Bailey.* 691 F.2d 1009, 1013 (1982), *cert. denied,* 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983). In this case, the causal connection was broken by the intervening acts of third parties. The challenged evidence is not a statement made by Bertelsen, but statements made about

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
**(Cite as: 789 F.2d 1492)**

Page 24

Bertelsen by third parties. Accordingly, the evidence was not the fruit of the illegal arrest and suppression was not required.

### F. Use of Prior Similar Act Evidence Against Campbell

[29] Appellant Campbell complains that the government used similar act evidence against him in violation of a prior agreement. The evidence demonstrated that Campbell had been arrested and convicted on state marijuana charges in 1978. After the conviction, Campbell and the federal government entered into an agreement in which the government agreed not to pursue any criminal or civil liability arising out of the event; Campbell agreed to forfeit a vessel to the United States.

The use of evidence of the prior arrest did not violate the agreement. The government*1510 agreed not to pursue any charges for the events leading to the arrest. The government did not agree to never use the arrest as evidence in a prosecution for subsequent criminal activity.

### G. Sufficiency of the Evidence with Respect to Convictions Under 18 U.S.C. § 1001

Appellants Marion Van Horn and Gary Balough were convicted of conspiracy to make false statements in violation of 18 U.S.C. § 1001. The appellants contend that there was insufficient evidence to prove that they agreed to make false statements, that the false statements were not material, and that the "exculpatory no" exception to section 1001 applies.

### Agreement

[30] In considering the sufficiency of the evidence to convict we view the evidence in the light most favorable to the government, with all reasonable in-

ferences drawn in favor of the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). With respect to whether the appellants reached an agreement with Harvey to make false statements, the evidence is clear. The evidence disclosed that on several occasions Harvey and Van Horn discussed what Van Horn should say to the FBI and that Van Horn agreed to lie to the FBI about his connection with the conspiracy and about Harvey. Overt acts were committed in furtherance of the conspiracy: on November 21, 1980, Van Horn spoke with the FBI and told the agents that Harvey had instructed him to cooperate fully.

With respect to Balough, an intercepted conversation on November 18, 1980, provided sufficient evidence to convict. Harvey and Balough discussed what Balough should say to FBI investigators; in particular, they discussed how to portray Harvey's relationship with his girl friend Trudy Stalker. Harvey had given Stalker expensive gifts, which he feared would raise suspicion. Harvey and Balough agreed that Balough would tell agents that Stalker was a race car groupie, and that Harvey had not purchased gifts for her. They also discussed what Stalker was to say. An overt act was committed in furtherance of the conspiracy as Stalker spoke to FBI agents.

### Materiality

[31][32] A statement is material for the purposes of section 1001 if it has a " 'natural tendency to influence, or be capable of affecting or influencing, a governmental function.' " *United States v. Lopez,* 728 F.2d 1359, 1362 (11th Cir.1984) (quoting *United States v. McGough,* 510 F.2d 598, 602 (5th Cir.1975)), *cert. denied,* --- U.S. ----, 105 S.Ct. 112, 83 L.Ed.2d 56 (1984). The statements need not have exerted actual influence, so long as it had the capacity to do so. *Id.* The statement that the conspirators agreed to in this case were material. Har-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

789 F.2d 1492
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431
(Cite as: 789 F.2d 1492)

vey was the main target of the FBI investigation, and Van Horn agreed to mislead the FBI about Harvey. The record indicates the FBI was interested in using Stalker to obtain information about Harvey, and the misstatements Balough agreed to make would have misled the FBI about Harvey's relationship with Stalker.

*Exculpatory No*

[33] The "exculpatory no" exception to section 1001 was established in this circuit in *Paternostro v. United States*, 311 F.2d 298 (5th Cir.1962). There the court held that section 1001 did not cover negative exculpatory responses to questions propounded by an investigating agent during a conference not initiated by the interviewee. *Id.* at 309. The exception is based both on the purpose of the statute and the fifth amendment right against self-incrimination. The exception therefore does not apply when a person attempts to affirmatively mislead a government investigation. *United States v. Krause*, 507 F.2d 113 (5th Cir.1975) (defendant used "aggressive action" to mislead NLRB investigation); *United States v. Bush*, 503 F.2d 813, 818 (5th Cir.1974) ("there is a valid distinction between negative exculpatory denial of a suspected misdeed and an affirmative representation of facts peculiarly within the knowledge of the suspect not otherwise obtainable by the investigator.").

*1511 [34] The discussions between Harvey and Van Horn do not simply show an intent that Van Horn deny wrongdoing, but an intent that Van Horn lead the FBI investigation away from Harvey. On November 18, Harvey and Van Horn discussed an upcoming FBI interview, and Van Horn's denial of knowledge of involvement by Harvey. On November 21, Van Horn reported to Harvey that he had told the FBI that Harvey wanted him to cooperate. On December 30, Harvey theorized to Van Horn that the FBI would offer Van Horn immunity. They also discussed a lawyer for Van Horn; Harvey

agreed to pay for one, but told Van Horn not to tell the FBI about it. Van Horn did not simply agree to deny personal wrongdoing, but to mislead the FBI about Harvey. Accordingly, the exculpatory no exception does not apply.

Similarly, the exculpatory no does not apply to Balough's agreement to lie on behalf of Harvey; Balough did not agree simply to deny connection with Harvey, but to affirmatively steer the FBI in the wrong direction.

For the reasons stated, the convictions are AFFIRMED.

C.A.11 (Fla.),1986.
U.S. v. Van Horn
789 F.2d 1492, 54 USLW 2633, 20 Fed. R. Evid. Serv. 431

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Exhibit C

Westlaw.

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

Page 1

**H**

United States Court of Appeals,
First Circuit.
COMMONWEALTH OF PUERTO RICO,
Plaintiff, Appellant,
v.
UNITED STATES of America; Alberto R.
Gonzales, Attorney General; Robert Mueller, Dir-
ector of the FBI; Rosa Emilia Rodriguez-Vélez,
U.S. Attorney for the District of Puerto Rico; and
Luis S. Fraticelli, Special Agent in Charge of the
FBI in Puerto Rico, Defendants, Appellees.
No. 06-2449.

Heard Jan. 11, 2007.
Decided June 15, 2007.

**Background:** In two separate cases, Puerto Rico
sued United States and federal officials for declar-
atory and injunctive relief, seeking to compel dis-
closure of materials requested through subpoenas
issued in connection with criminal investigations by
Puerto Rico Department of Justice (PRDOJ) into
activities of employees of Federal Bureau of Invest-
igation (FBI). After consolidating actions, the
United States District Court for the District of Pu-
erto Rico, José Antonio Fusté, Chief Judge, 2006
WL 2795576, dismissed certain claims and granted
summary judgment for United States on one claim.
Puerto Rico appealed.

**Holdings:** The Court of Appeals, Lipez, Circuit
Judge, held that:
(1) Puerto Rico did not have cause of action for
nonstatutory review of FBI's refusal to provide re-
quested materials;
(2) qualified privilege for information related to
law enforcement activities extends to law enforce-
ment techniques and procedures, and
(3) FBI did not act arbitrarily or capriciously when,
pursuant to qualified privilege for law enforcement

information, it refused to release requested materi-
als.

Affirmed.

Boudin, Chief Judge, and Shadur, District Judge,
each concurred and filed separate opinions.

West Headnotes

**[1] United States 393 ⊂⟩125(1)**

393 United States
    393IX Actions
        393k125 Liability and Consent of United
States to Be Sued
            393k125(1) k. Immunity from Suit in
General. Most Cited Cases
In all suits against the federal government, court
must first consider whether sovereign immunity
bars plaintiff's claim.

**[2] United States 393 ⊂⟩125(3)**

393 United States
    393IX Actions
        393k125 Liability and Consent of United
States to Be Sued
            393k125(3) k. Necessity of Waiver or
Consent. Most Cited Cases
As an attribute of sovereign immunity, the United
States and its agencies may not be subject to judi-
cial proceedings unless there has been an express
waiver of that immunity.

**[3] United States 393 ⊂⟩125(5)**

393 United States
    393IX Actions
        393k125 Liability and Consent of United
States to Be Sued
            393k125(5) k. Mode and Sufficiency of
Waiver or Consent. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

Waiver of United States's sovereign immunity by Administrative Procedure Act (APA) is for all equitable actions for specific relief against a federal agency or officer acting in an official capacity, and thus applies to any action, whether under the APA or not. 5 U.S.C.A. § 702.

**[4] Federal Courts 170B ☞1024**

170B Federal Courts
    170BX Territorial Courts; Puerto Rico
        170Bk1024 k. Puerto Rico. Most Cited Cases

**United States 393 ☞125(9)**

393 United States
    393IX Actions
        393k125 Liability and Consent of United States to Be Sued
            393k125(9) k. Nature of Action in General. Most Cited Cases
Puerto Rico's claim for nonmonetary relief against United States fell within waiver of United States's sovereign immunity under Administrative Procedure Act (APA). 5 U.S.C.A. § 702.

**[5] Federal Courts 170B ☞1024**

170B Federal Courts
    170BX Territorial Courts; Puerto Rico
        170Bk1024 k. Puerto Rico. Most Cited Cases

**United States 393 ☞127(1)**

393 United States
    393IX Actions
        393k127 Rights of Action Against United States or United States Officers
            393k127(1) k. In General. Most Cited Cases
Puerto Rico, which claimed that Federal Bureau of Investigation (FBI) acted outside scope of its legal authority, in violation of United States Constitution, when FBI withheld materials sought by Puerto Rico Department of Justice (PRDOJ) in connection with PRDOJ's criminal investigation of FBI employees, could vindicate its sovereign rights to enforce its criminal laws through review of FBI's actions available under Administrative Procedure Act (APA), and therefore Puerto Rico did not have cause of action for nonstatutory review, even though such review might have allowed it to obtain more favorable standard of review and circumvent certain APA procedural requirements. U.S.C.A. Const. Art. 6, cl. 2; 5 U.S.C.A. § 551 et seq.

**[6] States 360 ☞4.4(2)**

360 States
    360I Political Status and Relations
        360I(A) In General
            360k4.4 Powers Reserved to States
                360k4.4(2) k. Police Power. Most Cited Cases
Power of states to enact and enforce criminal laws is constitutional in nature.

**[7] Constitutional Law 92 ☞961**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
            92VI(C)1 In General
                92k960 Judicial Authority and Duty in General
                    92k961 k. In General. Most Cited Cases
When a party claims that a violation of its constitutional rights has occurred and it has no effective means other than the judiciary to enforce these rights, that party must be able to invoke the existing jurisdiction of the courts for the protection of its justiciable constitutional rights.

**[8] Constitutional Law 92 ☞961**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

Questions
    92VI(C)1 In General
        92k960 Judicial Authority and Duty in General
           92k961 k. In General. Most Cited Cases
When a state has asserted a right that is constitutional in nature, courts are bound by a strong presumption in favor of providing the state some vehicle for vindicating its rights.

**[9] Federal Courts 170B ☞192**

170B Federal Courts
    170BIII Federal Question Jurisdiction
        170BIII(C) Cases Arising Under Laws of the United States
           170Bk192 k. Particular Cases and Questions. Most Cited Cases
Nonstatutory review is available pursuant to the general federal question jurisdiction of the federal courts in situations in which Congress makes no specific choice of the court in which judicial review is to occur in the statute pursuant to which disputed agency action is taken, or in another statute applicable to it. 28 U.S.C.A. § 1331.

**[10] Administrative Law and Procedure 15A ☞656**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(A) In General
           15Ak654 Power of Legislature
               15Ak656 k. Absence of Statutory Provision for Review. Most Cited Cases
Nonstatutory review of federal agency action may occur only if its absence would wholly deprive the party of a meaningful and adequate means of vindicating its rights and Congress did not clearly intend to preclude review of agency's particular determination.

**[11] Federal Courts 170B ☞1024**

170B Federal Courts
    170BX Territorial Courts; Puerto Rico
        170Bk1024 k. Puerto Rico. Most Cited Cases
Subpoenas issued by Puerto Rico Department of Justice (PRDOJ) in connection with its criminal investigation of employees of Federal Bureau of Investigation (FBI) were in effect a request for information from an executive department, and thus properly treated as administrative demand for release of requested materials for purposes of review under Administrative Procedure Act (APA) of FBI's decision not to provide requested information. 5 U.S.C.A. § 706(2)(A).

**[12] Witnesses 410 ☞16**

410 Witnesses
    410I In General
        410k16 k. Subpoena Duces Tecum. Most Cited Cases
When a subpoena is issued to a non-party federal agency in conjunction with litigation in state court, the state court may not enforce the subpoena against the federal government due to federal sovereign immunity.

**[13] Administrative Law and Procedure 15A ☞763**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(D) Scope of Review in General
           15Ak763 k. Arbitrary, Unreasonable or Capricious Action; Illegality. Most Cited Cases
Court is deferential to agency's decision in applying arbitrary and capricious standard of review under Administrative Procedure Act (APA) to agency's refusal to comply with third-party subpoena. 5 U.S.C.A. § 706(2)(A).

**[14] Federal Courts 170B ☞1024**

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

170B Federal Courts
　170BX Territorial Courts; Puerto Rico
　　170Bk1024 k. Puerto Rico. Most Cited Cases
District court's decision, pursuant to Administrative Procedure Act (APA), not to overturn refusal by Federal Bureau of Investigation (FBI) to release materials requested by Puerto Rico Department of Justice (PRDOJ) in connection with PRDOJ's criminal investigation of FBI employees was subject to de novo review by Court of Appeals, given that district court, having been limited to the administrative record, was in no better position to consider agency's action. 5 U.S.C.A. § 706(2)(A).

[15] Privileged Communications and Confidentiality 311H ☜378

311H Privileged Communications and Confidentiality
　311HVI Public Officers and Records
　　311Hk378 k. Miscellaneous Privileges. Most Cited Cases
　(Formerly 410k216(1))
Regulations promulgated by federal agency, pursuant to Housekeeping Act, to establish conditions for disclosure of information do not create an independent privilege authorizing agency to withhold information; rather, they simply set forth administrative procedures to be followed when demands for information are received. 5 U.S.C.A. § 301.

[16] Federal Courts 170B ☜1024

170B Federal Courts
　170BX Territorial Courts; Puerto Rico
　　170Bk1024 k. Puerto Rico. Most Cited Cases
Compliance by Federal Bureau of Investigation (FBI) with its procedural regulations governing release of information did not justify FBI's withholding of materials requested by Puerto Rico Department of Justice (PRDOJ) in connection with criminal investigations. 5 U.S.C.A. § 301; 28 C.F.R. § 16.26(a)(1, 2), (b)(5).

[17] Privileged Communications and Confidentiality 311H ☜358

311H Privileged Communications and Confidentiality
　311HVI Public Officers and Records
　　311Hk358 k. Investigatory or Law Enforcement Records. Most Cited Cases
　(Formerly 410k216(1))
Qualified privilege protecting against disclosure of information related to law enforcement activities extends to law enforcement techniques and procedures, although privilege is subject to balancing of federal government's interest in preserving confidentiality of sensitive law enforcement techniques against requesting party's interest in disclosure. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

[18] Privileged Communications and Confidentiality 311H ☜1

311H Privileged Communications and Confidentiality
　311HI In General
　　311Hk1 k. In General. Most Cited Cases
　(Formerly 410k184(1))
Federal courts retain the power to develop common-law privileges on a case-by-case basis. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

[19] Privileged Communications and Confidentiality 311H ☜358

311H Privileged Communications and Confidentiality
　311HVI Public Officers and Records
　　311Hk358 k. Investigatory or Law Enforcement Records. Most Cited Cases
　(Formerly 170Bk1024)
In its action to compel disclosure by Federal Bureau of Investigation (FBI) of materials that it sought by subpoena, Puerto Rico waived any objection premised on district court's failure to use certain procedures to evaluate FBI's assertion of law

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

enforcement privilege, including in camera review and item-by-item balancing of interests implicated by privilege, by failing to request those procedures in district court.

|20] Privileged Communications and Confidentiality 311H ⚖358

311H Privileged Communications and Confidentiality
    311HVI Public Officers and Records
        311Hk358 k. Investigatory or Law Enforcement Records. Most Cited Cases
        (Formerly 170Bk1024)
By failing to object in district court, Puerto Rico waived objection to United States's reliance upon law enforcement privilege to justify its nondisclosure of materials that Puerto Rico sought through subpoenas, based upon government's disclosure of some of requested information in detailed, 200-page report.

|21] Privileged Communications and Confidentiality 311H ⚖358

311H Privileged Communications and Confidentiality
    311HVI Public Officers and Records
        311Hk358 k. Investigatory or Law Enforcement Records. Most Cited Cases
        (Formerly 170Bk1024)
By disclosing some of requested information in report, United States did not waive its right to assert law enforcement privilege as to certain materials that Puerto Rico requested through subpoenas in connection with criminal investigations.

|22] United States 393 ⚖52

393 United States
    3931 Government in General
        393k52 k. Criminal Responsibility of Officers, Agents, and Clerks. Most Cited Cases
Federal officials are generally granted Supremacy Clause immunity from state prosecution for actions

taken in the course of their official duties; however, such immunity is limited to actions that were reasonably necessary for the performance of the officials' duties. U.S.C.A. Const. Art. 6, cl. 2.

|23] Privileged Communications and Confidentiality 311H ⚖358

311H Privileged Communications and Confidentiality
    311HVI Public Officers and Records
        311Hk358 k. Investigatory or Law Enforcement Records. Most Cited Cases
        (Formerly 170Bk1024)
Federal Bureau of Investigation (FBI) did not act arbitrarily or capriciously when, pursuant to law enforcement privilege, it refused to release materials, including operation order, identifying information for agents involved in intervention, reports and recordings related to intervention, and wide array of information regarding FBI protocols and operating procedures, in response to subpoena that was issued by Puerto Rico Department of Justice (PRDOJ) in connection with PRDOJ's criminal investigation of intervention, notwithstanding Puerto Rico's sovereign interests in enforcing its criminal laws, given FBI's legitimate interest in maintaining secrecy of sensitive law enforcement techniques. 5 U.S.C.A. § 706(2)(A).

|24] Federal Courts 170B ⚖1024

170B Federal Courts
    170BX Territorial Courts; Puerto Rico
        170Bk1024 k. Puerto Rico. Most Cited Cases
Question of whether United States's motion to quash subpoena issued by Puerto Rico Department of Justice (PRDOJ) was final agency action, for purposes of judicial review under Administrative Procedure Act (APA), implicated statutory, rather than Article III, jurisdiction, and therefore difficulty of deciding that issue warranted bypassing of issue, by Court of Appeals, in favor of proceeding to more straightforward task of resolving the merits

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

Page 6

of Puerto Rico's challenge to government's refusal to provide requested information. U.S.C.A. Const. Art. 3, § 2, cl. 1; 5 U.S.C.A. § 704.

**|25| Privileged Communications and Confidentiality 311H ⟺358**

311H Privileged Communications and Confidentiality
   311HVI Public Officers and Records
      311Hk358 k. Investigatory or Law Enforcement Records. Most Cited Cases
      (Formerly 170Bk1024)

Materials requested by Puerto Rico in subpoena issued in connection with criminal investigation, including identifying information for two agents of Federal Bureau of Investigation (FBI), official photographs of those agents, and internal FBI protocols related to use of force and pepper spray, fell within scope of qualified privilege for law enforcement information, and therefore FBI did not act arbitrarily or capriciously in withholding such information. 5 U.S.C.A. § 706(2)(A).

*53 Salvador J. Antonetti-Stutts, Solicitor General, with whom Roberto J. Sánchez-Rámos, Secretary of Justice, Kenneth Pamias-Velázquez, Special Aide to the Secretary of Justice, Jorge R. Roig-Colón, Assistant Secretary of Justice, and Hiram A. *54 Meléndez-Juarbe, Legal Advisor to the Secretary of Justice, were on brief, for appellant.

Mark B. Stern, Civil Division, Department of Justice, with whom Peter D. Keisler, Assistant Attorney General, Rosa Emilia Rodriguez-Vélez, U.S. Attorney, Jonathan F. Cohn, Deputy Assistant Attorney General, and Alisa B. Klein, Civil Division, Department of Justice, were on brief, for appellees.

Before BOUDIN, Chief Circuit Judge, LIPEZ, Circuit Judge, and SHADUR, FN*Senior District Judge.

      FN* Of the Northern District of Illinois,

sitting by designation.

LIPEZ, Circuit Judge.

This case presents a novel question: does the Commonwealth of Puerto Rico have a nonstatutory cause of action, grounded in its sovereign authority under the Constitution, to obtain information from the Federal Bureau of Investigation ("FBI") in connection with a criminal investigation into the activities of FBI employees? We conclude that it does not. Instead, under the circumstances of this case, Puerto Rico must pursue the information it seeks under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Further, in keeping with persuasive authority from other circuits, we hold that the FBI may assert a qualified privilege to protect sensitive law enforcement techniques and procedures from disclosure. Having considered the application of that privilege in this case, we affirm the decision of the district court holding that the FBI did not err in withholding the requested information.

I.

This appeal involves two consolidated district court cases, Nos. 06-1306 and 06-1305,FN1 arising from subpoenas for FBI records issued by the Puerto Rico Department of Justice ("PRDOJ"). The relevant facts are largely undisputed; where disputes exist, we note them but find that they are immaterial to our disposition of the case.

      FN1. The events in No. 06-1306 occurred before those in No. 06-1305, so we will discuss No. 06-1306 first despite its higher docket number.

**A. Case No. 06-1306: Ojeda Subpoena**

In the 1970s, Filiberto Ojeda Ríos helped found the Macheteros, an organization that advocates inde-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

pendence for Puerto Rico through armed struggle against the United States government. In 1983, the Macheteros stole $7.1 million from a bank in Connecticut. The FBI apprehended Ojeda in 1985, and, during his arrest, Ojeda shot an FBI agent in the face, permanently blinding the agent in one eye. Ojeda was acquitted for assaulting the agent following a trial in Puerto Rico. He then skipped bail while on trial for bank robbery and was sentenced in absentia in 1992. Fifteen years later, in September 2005, the FBI attempted to apprehend Ojeda at his residence in Hormigueros, Puerto Rico. During this intervention, Ojeda shot two FBI agents and was himself fatally wounded.

The PRDOJ commenced an investigation into the intervention. On October 4, 2005, a PRDOJ prosecutor issued a subpoena pursuant to title 34, section 1476 of the Puerto Rico Code commanding then United States Attorney Humberto Garcia to produce materials including: (1) a copy of the "Operation Order" (a document establishing the plan or rules of engagement for the FBI intervention at Ojeda's residence);*55 (2) the name, rank, division, address, and telephone numbers of every person who participated in or made decisions regarding the intervention, as well as an organizational diagram showing these individuals' rank on the line of command; (3) various equipment, including, but not limited to, all bullet-proof vests, helmets, weapons, and vehicles involved in the intervention; (4) any inventory of the property occupied during the intervention; (5) copies of any expert reports relating to the intervention or Ojeda's death; (6) copies of any audio or video recordings of the events relating to the intervention; (7) copies of all photographs relating to the intervention; and (8) copies of any relevant general FBI protocols, including those relating to violent interventions and potentially deadly force. In subsequent correspondence, the PRDOJ explained that the requests related to a "criminal investigation" that it was conducting into Ojeda's death.

By letter dated October 17, the FBI declined to pro-

duce the requested materials, explaining that its internal regulations prohibited disclosure of records compiled for law enforcement purposes. The letter stated that the denial of the PRDOJ's request was a "final agency decision which may be reviewed by the United States District Court."

After further communications among the PRDOJ, FBI, and United States Attorney's Office, the U.S. Attorney indicated by letter dated November 9 that the FBI would allow the PRDOJ to examine some of the items listed in the subpoena, including the bulletproof vests, helmets, weapons, and vehicles used during the intervention and the photographs taken before, during, and after the intervention. The FBI stipulated that it would retain official custody of these items and that an FBI official would be present during the inspection.

The PRDOJ initially acceded to these terms, but subsequently reiterated the substance of its original demand in a letter dated January 20, 2006. The FBI refused this demand, again noting that its refusal constituted "final agency action." The PRDOJ filed suit in March 2006 to compel disclosure of the requested materials.

**B. Case No. 06-1305: 444 de Diego Subpoena**

Using information obtained from Ojeda's residence to establish probable cause, the FBI obtained a search warrant for a residential condominium located at 444 de Diego in San Juan, Puerto Rico. The FBI executed the warrant in February 2006, and a large group of protesters, reporters, and members of the general public gathered outside. The United States asserts that some of these individuals breached an established police line, and an FBI agent used pepper spray to keep people behind the line.

The PRDOJ issued subpoenas to U.S. Attorney Garcia and to Luis Fraticelli, Special Agent in Charge of the FBI San Juan Field Office, requesting

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

three categories of materials: (1) the name, rank, division, address, and telephone number of the two FBI agents who allegedly used pepper spray and whose photos were attached to the subpoena; (2) official photographs of these two FBI agents; and (3) internal FBI protocols relating to the use of force and pepper spray. The PRDOJ explained that the subpoenas were "part of the criminal investigation" of the PRDOJ into "the conduct of FBI agents during the execution of a search warrant" at 444 de Diego.

The FBI moved to quash the subpoenas in federal district court. After the PRDOJ indicated, at a hearing on March 2, that "it was actually evaluating other avenues through which to get the information about the federal agents, and that it *56 had no serious intention of enforcing the challenged subpoenas," the district court concluded that the subpoenas were "effectively mooted." The court thus withheld action on the motion to quash. Subsequently, on March 23, the PRDOJ filed suit to compel the release of the requested records.

**C. Proceedings Before the District Court**

Puerto Rico's complaint in No. 06-1306 sought a declaratory judgment recognizing its right "to conduct a full investigation into the events leading to the death of Mr. Ojeda Rios," and an order "permanently enjoining Defendants from withholding any information relevant to the Commonwealth's investigation and ordering Defendants to comply with the Commonwealth's requests and produce the subpoenaed information, objects and documents[.]" The complaint in No. 06-1305 sought identical relief with respect to Puerto Rico's "investigation into the events allegedly leading to the injury of members of the press and/or the public ... on February 10, 2006, due to the alleged use of excessive force (including the alleged use of pepper spray) by FBI agents[.]"

In each complaint, Puerto Rico articulated five causes of action which entitled it to its requested relief. First, it stated that the FBI's decisions were not premised upon any federal regulation or statute. Second, it stated that the FBI's decisions exceeded any authority granted by the Housekeeping Act, 5 U.S.C. § 301. Third, it asserted a nonstatutory cause of action to vindicate its constitutional sovereign authority to enforce its criminal laws by obtaining the requested information. Fourth, it contended that APA review was "unwarranted" because such review "would impose an undue burden on the exercise of sovereign criminal authority that would run afoul of the Tenth Amendment." Finally, Puerto Rico claimed that, even if reviewed under the APA, the FBI's decision to withhold the information was arbitrary, capricious, and an abuse of discretion.

The district court consolidated the cases, the United States moved to dismiss, and Puerto Rico filed a motion for summary judgment. After considering these motions, the district court concluded that Puerto Rico had failed to establish a basis for its requested relief. The court rejected Puerto Rico's first two causes of action, explaining that, although the FBI's internal regulations did not create a substantive right to withhold the information, the regulations incorporated federal common law establishing a privilege for law enforcement materials. The court also dismissed Puerto Rico's third cause of action, holding that Puerto Rico could not assert a nonstatutory cause of action, based on its sovereign right to enforce its criminal laws, to obtain the requested materials. The court thus concluded that Puerto Rico's request was subject to judicial review under the provisions of the APA, thereby rejecting Puerto Rico's fourth cause of action. Finally, on Puerto Rico's fifth and final cause of action, the court applied the APA's framework for review. Noting the FBI's interest in maintaining the confidentiality of sensitive law enforcement techniques, it found that the FBI's decision with respect to the Ojeda subpoena was neither arbitrary nor capricious. With

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

Page 9

respect to the 444 de Diego subpoena, the court concluded that there had been no final agency action, and thus the FBI's failure to release the information was not subject to judicial review. In sum, the court dismissed Puerto Rico's first through fourth causes of action, and, on the fifth cause of action, denied Puerto Rico's motion for *57 summary judgment and granted summary judgment to the United States.

This appeal ensued.

## II.

On appeal, Puerto Rico first contends that its sovereign right to enforce its criminal laws provides it with a nonstatutory cause of action to obtain the information it seeks from the FBI. It explains that, under our federal constitutional system, a state has a "judicially cognizable interest in the preservation of [its] own sovereignty," which includes its "ability to punish wrongdoers and enforce its criminal laws" and, more specifically, "to prosecute federal agents if they have acted unlawfully in carrying out their duties." FN2 Consequently, "any impermissible federal interference with such *constitutional* sovereignty is amenable to resolution by a federal district court under its equitable powers." Puerto Rico concludes that "[a] direct cause of action for equitable relief is the only avenue to properly vindicate a State's constitutional claim of sovereign[ ] authority to enforce its criminal laws."

> FN2. The parties agree that Puerto Rico is situated identically to a state for purposes of this appeal.

Although Puerto Rico acknowledges that agency decisions are normally reviewed under the APA, it argues that such review is inappropriate because: (1) "[i]t is unfounded to subject a State's sovereign penal authority to an administrative process that will be followed by an extremely limited form of judicial review"; (2) such review will place Puerto

Rico "in a worse position to obtain information than private parties" who can sue the federal government and request discovery under Federal Rule of Civil Procedure 26; and (3) APA review would allow the federal government to "commandeer[ ] state prosecutorial powers by deciding what information the State should consider in its investigations." FN3

> FN3. With respect to the "commandeering" issue, Puerto Rico does not develop its argument other than to cite to *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), which established that the federal government may not "commandeer" state governments by compelling state officials to enact or administer a federal regulatory program. In light of the lack of developed argumentation, we find it unnecessary to address this claim. *See Ryan v. Royal Ins. Co. of Am.,* 916 F.2d 731, 734 (1st Cir.1990)(explaining that issues "adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned").

[1][2][3][4] As in all suits against the federal government, we must first consider whether sovereign immunity bars this claim. "It is long settled law that, as an attribute of sovereign immunity, the United States and its agencies may not be subject to judicial proceedings unless there has been an express waiver of that immunity." *EPA v. Gen. Elec. Co.,* 197 F.3d 592, 597 (2d Cir.1999). The APA waives sovereign immunity under certain conditions:

A person suffering legal wrong because of agency action ... is entitled to judicial review thereof. An action in a court of the United States seeking re-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

Page 10

lief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.[FN4] This waiver is for " '*all* equitable actions for specific relief against *58 a Federal agency or officer acting in an official capacity,' " *Trudeau v. Fed. Trade Comm'n,* 456 F.3d 178, 186 (D.C.Cir.2006)(quoting *Sea-Land Serv., Inc., v. Alaska R.R.,* 659 F.2d 243, 244 (D.C.Cir.1981)), and thus " 'applies to any suit whether under the APA or not.' " *Id.* at 186 (D.C.Cir.2006)(quoting *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1328 (D.C.Cir.1996)); *see also Hostetter v. United States,* 739 F.2d 983, 985 (4th Cir.1984)("In section 702 Congress has waived the defense of sovereign immunity in such nonstatutory review cases in which nonmonetary relief is sought...."); *Jaffee v. United States,* 592 F.2d 712, 719 (3d Cir.1979)("By waiving sovereign immunity in suits for 'relief other than money damages,' the Congress sought to 'facilitate nonstatutory judicial review of Federal administrative action ....' " (citation omitted)).

> FN4. At least one court has held that a state qualifies as a "person" within the meaning of the APA, *see Md. Dep't of Human Res. v. Dep't of Health & Human Servs.,* 763 F.2d 1441, 1445 n. 1 (D.C.Cir.1985), and the government does not argue otherwise here.

[5] Although this persuasive authority indicates that sovereign immunity would pose no bar to Puerto Rico's claim for nonmonetary relief, the question remains whether Puerto Rico has the nonstatutory cause of action it invokes. In prior cases involving subpoenas issued by state entities, courts have held that the party requesting the subpoena must proceed under the APA. *Houston Bus. Journal, Inc. v. Of-*

*fice of Comptroller of the Currency,* 86 F.3d 1208, 1212 (D.C.Cir.1996)("[A] state-court litigant must request the documents from the federal agency pursuant to the agency's regulations.... If the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA."); *Edwards v. U.S. Dep't of Justice,* 43 F.3d 312, 316 (7th Cir.1994)("The subpoenas were in effect a request for information from an executive department.... The subpoena is treated as an administrative demand."(citations omitted)).

[6] Puerto Rico asserts, however, that its suit is an exception to this principle due to its constitutionally-based sovereign authority to enforce its criminal laws. It is uncontroverted that states may enact and enforce criminal laws, and that this power is constitutional in nature. As the Supreme Court explained in *Heath v. Alabama,* 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), "[t]he Constitution leaves in the possession of each State 'certain exclusive and very important portions of sovereign power.' Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code." *Id.* at 93, 106 S.Ct. 433 (quoting Federalist No. 9); *see also Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)( "The States possess primary authority for defining and enforcing the criminal law.... Federal intrusions into state criminal trials frustrate ... the States' sovereign power to punish offenders....").

[7][8] When a party claims that a violation of its constitutional rights has occurred and it has "no effective means other than the judiciary to enforce these rights, [that party] must be able to invoke the existing jurisdiction of the courts for the protection of [its] justiciable constitutional rights." *Davis v. Passman,* 442 U.S. 228, 242, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)(holding that a "cause of action for damages"

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

arises under *59 the Constitution when federal officers violate Fourth Amendment rights). Where, as here, a state has asserted a right that is constitutional in nature, "we are bound by a strong presumption in favor of providing the state some vehicle for vindicating its rights." *R.I. Dep't of Envtl. Mgmt. v. United States* ("*RIDEM* "), 304 F.3d 31, 41 (1st Cir.2002).

[9] In the context of agency action, parties occasionally invoke the principles of "nonstatutory review." Nonstatutory review is available pursuant to the general "federal question" jurisdiction of the federal courts under 28 U.S.C. § 1331 in situations where "Congress makes no specific choice of [the court in which judicial review is to occur] in the statute pursuant to which the agency action is taken, or in another statute applicable to it." *Five Flags Pipe Line Co. v. Dep't of Transp.,* 854 F.2d 1438, 1439 (D.C.Cir.1988). "The basic premise behind nonstatutory review is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires.*" *RIDEM,* 304 F.3d at 42. Thus, if "a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Reich,* 74 F.3d at 1327 (citing Clark Byse & Joseph V. Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L.Rev. 308, 321 (1967)). Puerto Rico claims that the FBI acted outside the scope of its legal authority in withholding the requested materials, in violation of the Constitution, and that the Constitution itself provides a basis for nonstatutory review of that violation.

[10] In *RIDEM,* we evaluated a similar claim for nonstatutory review that was "constitutional in scope." 304 F.3d at 41. There, the state of Rhode Island brought suit to assert that its sovereign immunity (a "constitutionally protected sovereign interest") entitled it to enjoin an administrative pro-

ceeding that the Department of Labor had initiated against it. *Id.* at 36. We noted that the Supreme Court has established two "critical factors [that] must be present to invoke nonstatutory review." *RIDEM,* 304 F.3d at 42. First, such review may occur only if its absence would " 'wholly deprive the party of a meaningful and adequate means of vindicating its ... rights.' " *Id.* (quoting *Bd. of Gov'rs of Fed. Reserve Sys. v. MCorp. Fin.,* 502 U.S. 32, 43, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991)). Second, "Congress must not have clearly intended to preclude review of the agency's particular determination." *Id.* at 42-43 (citing *Bd. of Gov'rs,* 502 U.S. at 44, 112 S.Ct. 459). We then applied these two factors and concluded that Rhode Island had a direct, nonstatutory cause of action to enjoin an administrative proceeding on the ground of sovereign immunity, even though the APA requires that parties exhaust their administrative remedies before seeking judicial review. *Id.* at 43. We explained that Rhode Island had no other avenue for vindicating its right to immunity from suit and that Congress had not explicitly precluded its action. *Id.* Moreover, we emphasized that "general equitable considerations" favored a nonstatutory action, including the fact that Rhode Island had claimed the violation of "a clear right that is constitutional in nature" and that its "immunity would be effectively lost absent judicial review." *Id.*

Puerto Rico's situation differs materially from that of Rhode Island in *RIDEM.* Critically, with respect to the first requirement for nonstatutory review, Puerto Rico does have a means of vindicating its rights *60 without nonstatutory review: the APA.[FN8] Within that judicial review framework, Puerto Rico may assert its sovereign interest in enforcing its criminal laws as a consideration in our review of the agency's decision. Thus, we cannot conclude that Puerto Rico's rights "would be effectively lost absent judicial review." *Id.* at 43 (citing *Morales v. Trans World Airlines,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)).

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

Page 12

Likewise, with respect to the second requirement, although Congress has not explicitly prohibited nonstatutory review in a case such as this, the existence of the APA as a means for reviewing the FBI's actions at least implies that nonstatutory review is inappropriate.

> FN5. Although *RIDEM* is the only case the parties have cited that involves a sovereign entity attempting to assert its constitutionally-based sovereign prerogatives, other cases support the notion that the absence of another avenue for the parties to vindicate their rights is a necessary condition for nonstatutory review. For example, in *Leedom v. Kyne,* 358 U.S. 184, 190-91, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), the Court held that the president of a union had a nonstatutory cause of action to file suit against the National Labor Relations Board to set aside the NLRB's certification, in violation of 29 U.S.C. § 159(b)(1), of a bargaining unit including both professional and nonprofessional employees. The Court explained that a critical factor in allowing the union president to bring suit despite the lack of explicit statutory authorization was that " 'absence of jurisdiction of the federal courts' would mean 'a sacrifice or obliteration of a right which Congress' has given professional employees, for there is no other means, within their control to protect and enforce that right." *Id.* at 190, 79 S.Ct. 180 (quoting *Switchmen's Union of N. Am. v. Nat'l Mediation Bd.,* 320 U.S. 297, 300, 64 S.Ct. 95, 88 L.Ed. 61 (1943)).

We recognize that nonstatutory review might have allowed Puerto Rico to obtain a more favorable standard of review and to circumvent certain of the APA's procedural requirements. However, in considering Puerto Rico's demand for a more favorable standard of judicial review on constitutional grounds, we must be mindful of the Supremacy Clause, which "is designed to ensure that states do not 'retard, impede, burden, or in any manner control' the execution of federal law." *New York v. Tanella,* 374 F.3d 141, 147 (2d Cir.2004)(quoting *McCulloch v. Maryland,* 17 U.S.(4 Wheat.) 316, 436, 4 L.Ed. 579 (1819)). We are not suggesting that the Supremacy Clause alone provides the basis for rejecting Puerto Rico's theory of a nonstatutory cause of action to obtain law enforcement information from the FBI. But Puerto Rico portrays its sovereign authority over law enforcement as paramount in the analysis. That cannot be so. The Supremacy Clause reminds us that the federal government also has a critical interest in carrying out its own law enforcement responsibilities. In most instances, federal and state law enforcement interests are complementary. However, when a state's interest in investigating the agents of a federal law enforcement entity arguably conflicts with that federal entity's need to protect certain information relating to law enforcement activities, Congress has provided a mechanism-the APA-for resolving these conflicts. Puerto Rico has not convinced us that this congressional choice was somehow constitutionally insufficient and hence Puerto Rico must have a nonstatutory cause of action to vindicate its law enforcement interests. To the contrary, for the reasons we have expressed, we conclude that the judicial review provided by the APA for the denial of information by a federal agency is compatible with Puerto Rico's sovereign authority under the Constitution for the enforcement of its criminal laws.

### III.

[11][12] Under the APA, we will overturn the FBI's decision not to release the *61 requested information only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The fact that Puerto Rico made its request for information in the form of a subpoena from the PRDOJ does not affect the nature of our review under the APA. The subpoenas

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

were "in effect a request for information from an executive department," and, consequently, "the subpoena[s] are treated as an administrative demand." *Edwards v. U.S. Dep't of Justice,* 43 F.3d 312, 316 (7th Cir.1994)(explaining that a subpoena initiates the administrative process); *see also* 28 C.F.R. § 16.21.[FN6]

> FN6. We note that, where a subpoena is issued to a non-party federal government agency in conjunction with litigation in state court, the state court may not enforce the subpoena against the federal government due to federal sovereign immunity, and the federal courts have consistently held that they lack jurisdiction to enforce the subpoena in cases where the government has removed the subpoena proceedings to federal court. *See Smith v. Cromer,* 159 F.3d 875, 879 (4th Cir.1998); *Houston Bus. Journal,* 86 F.3d at 1211-12; *Louisiana v. Sparks,* 978 F.2d 226, 235 (5th Cir.1992). Instead, courts have explained that, to obtain federal judicial review of a federal agency's refusal to release information, "a state-court litigant must request the documents from the federal agency pursuant to the agency's regulations," and that if "the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA." *Houston Bus. Journal,* 86 F.3d at 1212. Here, of course, the subpoena was not issued pursuant to any underlying litigation. However, the same principle-that a party wishing to obtain information from the federal government must file a request pursuant to the agency's regulations, and may seek judicial review only under the APA-applies in the present case as well.

[13][14] In applying the arbitrary and capricious standard of review, we are deferential to the agency's decision. In general, an agency's "choice of whether or not to comply with a third-party subpoena is essentially a policy decision about the best use of the agency's resources." *COMSAT Corp. v. Nat'l Sci. Found.,* 190 F.3d 269, 278 (4th Cir.1999). We review de novo the decision of the district court because that court, " 'limited to the administrative record, is in no better position to review the agency than the court of appeals.' " *Edwards,* 43 F.3d at 314 (quoting *Asarco, Inc. v. U.S. Envtl. Prot. Agency,* 616 F.2d 1153, 1161 (9th Cir.1980)).

In evaluating the FBI's decision, we take into account both that agency's internal regulations governing the release of material and the substantive law governing the law enforcement privilege.

**A. Regulations**

[15] Under the Housekeeping Act, 5 U.S.C. § 301, federal agencies may promulgate regulations establishing conditions for the disclosure of information. The Supreme Court upheld the validity of such regulations in *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 468, 71 S.Ct. 416, 95 L.Ed. 417 (1951), explaining that it is appropriate for the head of an agency "to prescribe regulations not inconsistent with law for 'the custody, use, and preservation of the records, papers, and property appertaining to' " the agency's business. Within the administrative review process, "[t]he regulations 'provide guidance for the internal operations of the [agency],' " but do not create a substantive defense to disclosure. *Kwan Fai Mak v. FBI,* 252 F.3d 1089, 1092 (9th Cir.2001)(quoting 28 C.F.R. § 16.21(d)). In other words, "the regulations do not 'create an independent privilege' authorizing the Department of Justice to withhold information." *Id.* (quoting *Exxon Shipping Co. v. U.S. Dep't of Interior,* 34 F.3d 774, 780 (9th Cir.1994)). Rather, they "simply set forth administrative*62 procedures to be followed when demands for information are received." *Id.*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

[16] Here, pursuant to the Housekeeping Act, the FBI has promulgated regulations explaining that, in deciding whether to release information, its officials should consider "[w]hether disclosure is appropriate under the rules of procedure governing the case" and "[w]hether [the] disclosure is appropriate under the relevant substantive law concerning privilege." 28 C.F.R. § 16.26(a)(1), (2). Situations in which disclosure will not be made include those where "[d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." *Id.* § 16.26(b)(5).

As we have explained, the *Touhy* regulations are only procedural, and do not create a substantive entitlement to withhold information. Thus, the FBI's compliance with the regulations cannot be a sufficient justification for withholding requested materials. Instead, our review of the reasonableness of the agency's decision focuses on the substantive law concerning privilege, to which we now turn.

**B. Law Enforcement Privilege**

The Supreme Court first recognized a qualified privilege for certain information related to law enforcement activities in *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). There, the Court explained that the government has a qualified privilege to withhold the identities of confidential informants. *Id.* at 59, 77 S.Ct. 623. Such a privilege "further[s] and protect[s][ ] the public interest in effective law enforcement," encouraging citizens to communicate their knowledge of crimes by preserving their anonymity. *Id.* The Court also noted that "[t]he scope of the privilege is limited by its underlying purpose. Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged." *Id.* at 60, 77 S.Ct. 623.

Since *Roviaro,* we have recognized a privilege for law enforcement materials in other circumstances. In *United States v. Cintolo,* 818 F.2d 980, 983-84 (1st Cir.1987), the FBI, with judicial authorization, had monitored conversations between the defendant and various confederates via hidden microphones placed within an apartment. The district court refused to allow the defense to question witnesses "concerning the precise location of the electronic surveillance devices" on the ground that such questioning would "jeopardize future criminal investigations." *Id.* at 1002. In upholding the district court's decision, we first noted that other circuits had found that the **privilege** could cover "sensitive **investigative techniques**." *Id.* We then recognized a qualified privilege for the "disclosure of confidential government surveillance information," explaining that "discoverability of this kind of information will enable criminals to frustrate future government surveillance and perhaps unduly jeopardize the security of ongoing investigations." *Id.* We emphasized that the privilege could be overcome by a sufficient showing of need, and thus concluded that courts must determine on a case-by-case basis whether a party has "demonstrated an authentic 'necessity,' given the circumstances, to overbear the qualified privilege." *Id.*

Other circuits have explicitly acknowledged a broader privilege for law enforcement materials. The D.C. Circuit has explained that the **privilege** for investigatory materials is "rooted in common sense as well as common law," noting that "law *63 enforcement operations cannot be effective if conducted in full public view" and that the public has an interest in "minimizing disclosure of documents that would tend to reveal law enforcement **investigative techniques** or sources." *Black v. Sheraton Corp. of Am.,* 564 F.2d 531, 542, 545 (D.C.Cir.1977). Similarly, in *In re Department of Investigation of the City of New York,* 856 F.2d 481 (2d Cir.1988), the Second Circuit explained:

[T]he law enforcement privilege [ ] has been recog-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

nized in the absence of a statutory foundation, and [ ] is largely incorporated into the various state and federal freedom of information acts. The purpose of this privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.

*Id.* at 483-84 (citations and footnotes omitted); *see also United States v. Amodeo,* 44 F.3d 141, 147 (2d Cir.1995)(citing *In re Dep't of Investigation* ). Most recently, the Fifth Circuit acknowledged "the existence of a law enforcement **privilege** beyond that allowed for identities of confidential informants" in a case involving documents containing "information about ongoing criminal investigations-including **investigative** leads, law enforcement methods and **techniques**, internal **investigative** memoranda, and identifying information relating to witnesses and law enforcement personnel, including undercover operatives." *In re U.S. Dep't of Homeland Sec.,* 459 F.3d 565, 569, 568 (5th Cir.2006). The court remanded for the district court to make an in camera determination regarding the privilege, noting that the rationale for such a privilege is "even more compelling now" because "in today's times the compelled production of government documents could impact highly sensitive matters relating to national security." *Id.* at 569.

Although Puerto Rico has not made a request for information under the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552,[FN7] the provisions of this statute also provide guidance in determining the appropriate scope of the privilege. The law enforcement exemption to FOIA shields from disclosure documents whose production would, inter alia, "interfere with enforcement proceedings" or "endanger the life or physical safety of any individual." *Id.* § 552(b)(7); *see also Ctr. for Nat'l Sec. Studies v. U.S. Dep't. of Justice.* 331 F.3d 918,

925-26 (D.C.Cir.2003)(explaining that, in enacting 5 U.S.C. § 552(b)(7)(A) " 'Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations' " (quoting *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 232, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978))).

FN7. The United States notes this omission but also acknowledged at oral argument that FOIA would not be an appropriate vehicle for all of the materials that Puerto Rico sought in its subpoena.

Puerto Rico argues that the law enforcement privilege, whatever its source and scope, must yield to a state's sovereign authority to investigate violations of its criminal laws. However, it cites no case supporting such a sweeping proposition.[FN8] **\*64** But the absence of such authority does not minimize the legitimate interests of Puerto Rico in securing information relevant to its criminal investigations. The important questions are how far the law enforcement privilege should extend and how, in the face of Puerto Rico's demand for information, the privilege should be applied in this case.

FN8. Puerto Rico offers one circuit court case involving an "intergovernmental privilege dispute" and suggests that the privilege is less compelling in such a situation. In *United States v. O'Neill,* 619 F.2d 222 (3d Cir.1980), the United States had moved to enforce a subpoena duces tecum against the Philadelphia Police Department. Although the court did comment that "[t]here is an anomaly in the assertion of a public interest 'privilege' by the City to justify withholding information from a federal Commission charged by Congress to investigate in the public interest the possible denial of equal protection by, inter alia, local government units," *id* at 230, its decision focused primarily on the fact that

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

the Police Department had not properly asserted the privilege and emphasized the lack of Supreme Court precedent supporting a "broad amorphous Government privilege" to protect "material relating to ongoing civil and criminal investigations," *id.* at 229.

[17][18] Given the persuasive authority from other circuits, the law enforcement exemption set forth in FOIA, and "the public interest in effective law enforcement," *Roviaro,* 353 U.S. at 59, 77 S.Ct. 623, we deem it appropriate to extend the privilege we previously recognized for "confidential government surveillance information," *Cintolo,* 818 F.2d at 1002, to "law enforcement techniques and procedures," *In re Dep't of Investigation,* 856 F.2d at 484.[FN9] Indeed, the justification we cited in *Cintolo*-that disclosing the location of surveillance information would jeopardize future surveillance operations-applies similarly to the information about techniques and protocols that Puerto Rico has requested here. Their disclosure would also jeopardize future criminal investigations. We emphasize that this qualified privilege is subject to balancing the federal government's interest in preserving the confidentiality of sensitive law enforcement techniques against the requesting party's interest in disclosure.[FN10] That balancing must be done with particular care in situations, such as this one, involving conflicts between the federal and state governments.

> FN9. Under Federal Rule of Evidence 501, federal courts retain the power to develop common law privileges on a case-by-case basis. *See United States v. Gillock,* 445 U.S. 360, 367, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980).

> FN10. Certain procedures, such as in camera review of the requested materials and particularized assertion of the relevant interests, may aid in a court's assessment of

these interests. We will discuss the applicability of such procedures in this case *infra* at Section IV.A.

Having recognized, in principle, a qualified privilege for law enforcement techniques and procedures, we turn now to the task of evaluating under the APA the FBI's response to the specific information requests of Puerto Rico.

## IV.

### A. Procedural Challenges

[19] Before we address the substance of the FBI's decision not to disclose the requested materials, we must resolve an array of procedural objections that Puerto Rico has raised to the assertion of privilege in the proceedings below. Puerto Rico first complains that the privilege was not properly invoked because the FBI did not submit an affidavit from the head of the agency, the district court did not perform an in camera review of the materials that were the subject of the subpoena, and the assertion of privilege was not accompanied by the FBI's item-by-item balancing of the harm to federal law enforcement interests and the necessity of the materials to Puerto Rico's investigation. The United States responds that Puerto Rico did not *65 raise these objections in the district court and therefore has waived them.

Before the district court, Puerto Rico stated, in its opposition to the United States' motion to dismiss, that "Defendants' failure to properly assert, at the time they decided not to disclose, the list of privileges that they now pretend to raise constitutes a waiver of all such privileges." In other words, Puerto Rico insisted that the United States could not offer reasons to the district court for withholding the information that it had not given to Puerto Rico when it denied the Commonwealth's demand for information. In its motion for summary judgment, Pu-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

erto Rico further contended that the decision not to release the materials was arbitrary and capricious

because it is premised exclusively on a regulation that does not create a privilege. Defendants' wholly conclusory assertion that disclosure of the information is not warranted under the regulations simply lacks any valid explanation for the denial. Defendants did not assert a substantive privilege for the Court to consider, or even offer a valid explanation for the refusal to disclose. Defendants did not even purport to substantiate or justify their denial with an analysis of the pertinent factors.

Puerto Rico did not, however, identify for the district court's consideration the specific procedures it now requests: an affidavit from the head of the FBI, an in camera review of the materials, and an item-by-item balancing of the interests at stake in disclosure of the materials.

We must also consider the manner in which the United States asserted the privilege. In its October 17, 2005 letter denying the request for information with respect to the Ojeda subpoena, the FBI explained that "[a] determination has been made not to disclose any of the information, objects and documents requested by the PRDOJ" because such disclosure "would involve the conditions enumerated in [28 C.F.R.] § 16.26(b)(5)." [FN11] With respect to the 444 de Diego subpoena, the United States' motion to quash explained that disclosure of the internal protocols "would reveal investigative and enforcement techniques" and that disclosure of the identities and official photographs of the FBI agents would violate their privacy rights and "pose a serious security threat."

> FN11. As noted, 28 C.F.R. § 16.26(b)(5) states that disclosure will not be made when it "would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforce-

ment proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired."

After Puerto Rico filed its complaint, the United States' motion to dismiss articulated further grounds for the assertion of the law enforcement privilege with respect to the materials requested in the Ojeda subpoena:

A person possessing these documents would learn, *inter alia*, how the FBI goes about capturing a fugitive who is believed to be dangerous, the number and types of personnel used by the FBI in such operations, the way the FBI collects evidence, the FBI's internal operating procedures in a variety of sensitive law enforcement settings, and the way in which law enforcement information (such as the location of Mr. Ojeda Rios) is gathered.

The United States further noted that most of the materials are also protected by the investigatory files privilege, and finally emphasized that the privacy interests of its agents favored nondisclosure of their names and other personal information. It made similar arguments with respect to *66 the materials requested in the 444 de Diego subpoena, explaining that "the release of internal FBI protocols ... would reveal law enforcement techniques" and that "[t]he release of the identity, rank, and division of the FBI agents could also reveal law enforcement techniques, by revealing the manner in which the FBI staffs these types of operations."

We acknowledge that the procedures Puerto Rico references for the first time on appeal may enhance the ability of a district court to evaluate fully and fairly the interests at stake in a case such as this. Judging these interests in the abstract seems problematic. Here, however, Puerto Rico failed to request before the district court the procedures it now specifies. This failure constitutes a waiver of any objection premised on the absence of those proced-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

ures. *See Persson v. Scotia Prince Cruises, Ltd.,* 330 F.3d 28, 33 (1st Cir.2003). Moreover, the circumstances here mitigate the risk that the absence of such procedures caused an unfair result. The United States clearly and repeatedly asserted the law enforcement privilege as its ground for refusing to disclose the requested information, and it articulated more specific reasons with respect to the various categories of materials. There was no mistaking the basis for the FBI's refusal to provide the information. Finally, as the United States explains, Puerto Rico requested broad categories of information (i.e., all internal FBI protocols relating to certain types of operations). Those generalities did not help Puerto Rico establish the "authentic 'necessity,' " *Cintolo,* 818 F.2d at 1002, for the information it sought.

[20][21] Puerto Rico also contends that the United States has waived any law enforcement privilege that may exist by disclosing some of the requested information in a detailed, two hundred page report.[FN12] Again, Puerto Rico failed to raise this objection before the district court, and again Puerto Rico has waived it.[FN13] In any event, the claim lacks merit. Courts have held in the context of executive privilege that "release of a document only waives these privileges for the document or information specifically released, and not for related materials." *In re Sealed Case,* 121 F.3d 729, 741 (D.C.Cir.1997); *see also Smith v. Cromer,* 159 F.3d 875, 880 (4th Cir.1998)(explaining that "disclosure of factual information does not effect a waiver of sovereign immunity as to other related matters"). This limited approach to waiver serves important interests in open government by "ensur[ing] that agencies do not forego voluntarily disclosing some privileged material out of the fear that by doing so they are exposing other, more sensitive documents." *In re Sealed Case,* 121 F.3d at 741.

> FN12. *See* U.S. Department of Justice, Office of the Inspector General, A Review of the September 2005 Shooting Incident In-

volving the FBI and Filiberto Ojeda Ríos, August 6, 2006, *available at* http:// www. usdoj. gov/ oig/ special/ s 0608/ full-report. pdf.

> FN13. Although the report was released after the parties filed their motions, Puerto Rico still had ample time to raise this issue before the district court. The court did not issue a ruling until September 26, 2006, nearly two months after the report was released. Indeed, the court cited the report in its opinion.

The United States has been reasonably forthcoming in releasing information related to the Ojeda intervention. The FBI allowed Puerto Rico to inspect bulletproof vests, helmets, weapons, and vehicles used during the intervention and the photographs taken before, during, and after the intervention. Moreover, the Office of the Inspector General also released a report detailing the findings of its investigation *67 into the intervention. *See supra* note 12. It would be illogical to punish the United States for its voluntary disclosure of these materials by also forcing it to disclose other information that it has deemed privileged.

Having found that Puerto Rico's procedural claims lack merit, we turn now to the substance of the FBI's decision to withhold the requested materials.

**B. Ojeda Subpoena**

The FBI refused to produce the materials specified in the Ojeda subpoena, which included the "Operation Order," identifying information for the agents involved in the intervention, reports and recordings related to the intervention, and a wide array of information regarding FBI protocols and operating procedures. As its basis for asserting the privilege with respect to this information, the United States explains that the requested materials include information about sensitive law enforce-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

Page 19

ment techniques that must remain confidential to allow the FBI to operate effectively.

As the district court explained, the disclosure of these materials would reveal

how the FBI goes about capturing a fugitive who is believed to be dangerous, the number and types of personnel used by the FBI in such operations, the way the FBI collects evidence, the FBI's internal operating procedures in a variety of law enforcement settings, and the way in which law enforcement information is gathered.

Disclosure of such information has the potential to thwart future FBI operations by publicizing the internal operations of that agency.

Given the qualified nature of the privilege, however, the critical question is whether Puerto Rico has shown a necessity for the information sufficient to overcome this qualified privilege. In favor of disclosure, Puerto Rico's chief argument is its interest in asserting its sovereign authority to investigate and prosecute its criminal laws. It explains that such authority is constitutional in nature, and thus deserves greater weight in our balancing calculus. It also emphasizes that no alternative means exists to obtain the information it seeks. Finally, Puerto Rico contends that an overbroad reading of the privilege is tantamount to granting federal officers immunity from even preliminary criminal investigations.

In response, the United States first explains that the balancing of interests typically takes place in the course of underlying criminal or civil litigation, in which the court must weigh the policy of the privilege against the particular litigation need of a party. Here, however, there is no underlying litigation; the "need" is Puerto Rico's assertion that the requested materials might be of aid to a criminal investigation. The United States also notes that the Department of Justice has already undertaken an in-

vestigation of the intervention and published a detailed report of its findings. Finally, in response to Puerto Rico's claim that failure to release the information would foreclose investigation of the officers, the United States emphasizes that federal officials are generally immune from state prosecution for actions performed within the scope of their official duties, and thus the privilege would merely reflect an existing immunity.

[22] With respect to this last point, the contentions of the parties deserve some elaboration. Courts have explained that "Supremacy Clause immunity governs the extent to which states may impose civil or criminal liability on federal officials for alleged violations of state law committed in the course of their federal duties." *68 *Wyoming v. Livingston,* 443 F.3d 1211, 1213 (10th Cir.2006). Such disputes "permit of no easy answers," but "the supremacy of federal law precludes the use of state prosecutorial power to frustrate the legitimate and reasonable exercise of federal authority." *Id.* Thus, federal officials are generally granted Supremacy Clause immunity from state prosecution for actions taken in the course of their official duties. *See, e.g., In re Neagle,* 135 U.S. 1, 75, 10 S.Ct. 658, 34 L.Ed. 55 (1890)(U.S. Marshal immune from state murder prosecution); *Livingston,* 443 F.3d 1211 (10th Cir.2006)(federal officials immune from state prosecution for trespass); *New York v. Tanella,* 374 F.3d 141, 142 (2d Cir.2004)(DEA agent who shot an unarmed suspect immune from state prosecution). However, such immunity is limited to actions that were "reasonably necessary for the performance of [the officials'] duties." *Livingston,* 443 F.3d at 1227-28. In the present situation, the privilege that the United States now asserts could conceivably extend beyond the scope of the immunity actually available to the officers if the privilege was used to withhold information about acts not taken in the course of their official duties.

[23] The sovereign interests at stake on both sides-Puerto Rico's interest in enforcing its criminal laws

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

Page 20

and the United States' interest in protecting the internal operations of the FBI-make our balancing of the interests particularly difficult in this case. We recognize that any decision will necessarily compromise one of these interests to some degree. On balance, however, we conclude that the FBI's decision not to release the requested materials was reasonable under the deferential standard of review prescribed by the APA. The FBI has a legitimate interest in maintaining the secrecy of sensitive law enforcement techniques.

We recognize that, in addition to general information about FBI protocols and techniques, Puerto Rico also has requested names and other personal information about individual FBI agents. Superficially, this identifying information seems distinct from information about FBI protocols and techniques involved in the shooting death of Ojeda. However, the individuals at issue are not suspected of criminal activity unrelated to the operation that implicates those protocols and investigative techniques. Obtaining this identifying information would allow Puerto Rico to interview the individuals in question. Inevitably, those interviews would involve inquiries relating to the FBI protocols and techniques that fall within the privilege.

Moreover, as the district court noted in its opinion, disclosing certain information about the agents "would reveal the number and types of personnel used by the FBI" to conduct operations such as the Ojeda intervention. If agents' names, official photographs and other personal information are made available, as requested by Puerto Rico, these agents will be less successful at conducting covert operations. Finally, courts have explained that "individuals, including government employees and officials, have privacy interests in the dissemination of their names. Public disclosure of the names of FBI agents and other law enforcement personnel ... could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs." *Massey v. FBI,* 3 F.3d 620, 624 (2d

Cir.1993) (citation omitted)(upholding the nondisclosure of FBI agents' names under Exemption 7 of FOIA); *see also Jones v. FBI,* 41 F.3d 238, 246-47 (6th Cir.1994)(holding that "federal law enforcement officials 'have the right to be protected against public disclosure of their participation in law enforcement investigations' " (quoting *69Ingle v. Dep't of Justice,* 698 F.2d 259, 269 (6th Cir.1983))); *Lesar v. U.S. Dep't of Justice,* 636 F.2d 472, 487 (D.C.Cir.1980)("As several courts have recognized, [FBI] agents have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives.").

We acknowledge Puerto Rico's argument that the FBI's decision to withhold the information raises the possibility that a federal agency may thwart state criminal proceedings against one of its own employees by refusing to disclose information that might lead to prosecution. That is a troubling possibility. As we have explained, although federal officials generally receive immunity from prosecution, such immunity obtains only when they are acting within the scope of official duties. The FBI's refusal to produce the requested materials may preclude a determination of whether the actions at issue here were within that scope.

However, other circumstances present here minimize the likelihood that wrongdoing was improperly concealed. First, the FBI acceded to some of Puerto Rico's requests for information, agreeing to allow Puerto Rico to inspect most of the physical evidence from the intervention and photographs of the premises taken before, during, and after the intervention. Moreover, the Office of the Inspector General ("OIG")-an entity entirely independent from the FBI-conducted a searching investigation of the events and made public a detailed two hundred page report of its findings. *See supra* note 12. In preparing the report, the OIG interviewed over sixty individuals, including all of the agents who planned, participated in, or had knowledge of the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

operation; reviewed thousands of pages of documents, including operation plans and orders, investigative files, intelligence reports, and FBI policies and procedures; reviewed forensic reports; and consulted with experts in tactical police operations. The report "identified a number of deficiencies in the FBI's conduct of the Ojeda surveillance and arrest operation" and made "ten recommendations dealing with these findings"; however, it "did not conclude that any of the actions of FBI officials constituted misconduct." We acknowledge that these safeguards are an imperfect substitute for Puerto Rico's ability to obtain information to conduct its own investigation; however, the availability of this substitute reinforces our conclusion that the FBI's decision to withhold the other materials was not arbitrary.

In sum, we find no error in the FBI's refusal to release the information Puerto Rico requested in the Ojeda subpoena.

## C. 444 de Diego Subpoena

[24] Under the APA, a party must obtain a "final agency decision" prior to seeking judicial review of an agency action. 5 U.S.C. § 704; *Bennett v. Spear,* 520 U.S. 154, 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Here, Puerto Rico served the 444 de Diego subpoena on the FBI on February 20, 2006. The FBI then filed a motion to quash the subpoena on February 28. Puerto Rico contends that this motion to quash the 444 de Diego subpoena was the equivalent of a final agency action, while the United States asserts that it was not.

In its opinion ruling in favor of the United States, the district court held that no final agency action had taken place. It explained that, at the March 2 hearing on the United States' motion to quash, Puerto Rico stated that "right now there is no intention to file any contempt proceedings" and that it "currently was going to be evaluating which is the next step in order to continue that investigation; if the step *70 is administrative, if it is federal judicial or if it is state judicial." The district court then advised Puerto Rico that it must exhaust its administrative remedies and obtain a final agency action in order to file suit. Puerto Rico's next action, however, was to file the complaint in this action on March 23. Consequently, the district court explained that Puerto Rico "has not submitted anything into the record indicating that the government made a final decision," implicitly holding that the motion to quash could not itself constitute a final agency action, and thus no final agency action had taken place.

The issue of whether the United States' motion to quash the subpoena was final agency action is a thorny one. Courts have held that "an agency's refusal to comply with a subpoena constitutes 'final agency action ... ripe for ... review under the APA.' " *Yousuf v. Samantar,* 451 F.3d 248, 251 (D.C.Cir.2006)(quoting *COMSAT Corp. v. Nat'l Sci. Found.,* 190 F.3d 269, 275 (4th Cir.1999)). Indeed, in *United States v. Williams,* 170 F.3d 431, 434 n. 4 (4th Cir.1999), "the government asserted and [the party requesting information] did not dispute that the United States Attorney's response to a subpoena constitutes final agency action for purposes of the APA."No court has held, however, that filing a motion to quash is the equivalent of a refusal to comply. Moreover, at the hearing on the motion to quash, Puerto Rico's acknowledgment that it was exploring other avenues of obtaining the materials it had requested, including administrative avenues, suggests that Puerto Rico itself did not believe that it had obtained final agency action.

The issue of whether there was final agency action implicates the jurisdiction of the federal courts, and such final action is normally a prerequisite to judicial review. *Cobell v. Kempthorne,* 455 F.3d 301, 304 (D.C.Cir.2006). However, we have held that cases exist in which we may exercise "hypothetical jurisdiction"-that is, cases "in which we may-and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

Page 22

should-bypass the jurisdictional question" because the jurisdictional issue is complex but the outcome on the merits is straightforward. *See, e.g., Royal Siam Corp. v. Chertoff,* 484 F.3d 139, 141 (1st Cir.2007). In exercising such hypothetical jurisdiction, "we have distinguished between Article III jurisdiction (which may never be bypassed) and statutory jurisdiction (which may occasionally be bypassed)." *Id.* Here, the question of whether there has been final agency action is one that implicates statutory, rather than constitutional, jurisdiction. *See Air Brake Systems, Inc. v. Mineta,* 357 F.3d 632, 638 (6th Cir.2004)("[T]he jurisdictional question here is one of statutory interpretation: [was there] 'final' agency action for which no other adequate judicial remedy exists?"); *Ciba-Geigy Corp. v. EPA,* 801 F.2d 430, 442 (D.C.Cir.1986)(discussing "the statutory jurisdictional issue of whether [there was] 'final agency action' "). Thus, given the difficulty of the jurisdictional issue here, we conclude that it is appropriate to bypass that issue and proceed to the more straightforward task of resolving the merits.

[25] The materials requested by Puerto Rico in the 444 de Diego subpoena are substantially similar to the materials already discussed with respect to the Ojeda subpoena: (1) the name, rank, division, address, and telephone number of two FBI agents; (2) an official photograph of each of the two FBI agents; and (3) internal FBI protocols relating to the use of force and pepper spray. These materials fall within the scope of the law enforcement privilege for the same reasons that the names and personal information of FBI agents and the internal FBI protocols requested*71 in the Ojeda subpoena fell within that privilege, and Puerto Rico has offered no more compelling reasons for disclosure in the case of the materials requested in the 444 de Diego subpoena. Thus, assuming that Puerto Rico obtained final agency action with respect to its request for these materials, the FBI was neither arbitrary nor capricious in withholding such information.

V.

After careful review, we conclude that Puerto Rico cannot assert a nonstatutory cause of action, grounded in its constitutional sovereign authority to enforce its criminal laws, to obtain the materials it seeks. Instead, we find Puerto Rico's request for these materials subject to review under the APA. Moreover, we hold that a qualified privilege applies to the law enforcement materials Puerto Rico has requested here: sensitive law enforcement protocols and techniques and the names and other personal information of the FBI agents involved in the two operations. In light of this privilege and the applicable *Touhy* regulations, we conclude that the FBI's response to the Ojeda subpoena and the 444 de Diego subpoena was neither arbitrary nor capricious. Thus, the judgment of the district court is *affirmed.*

*So ordered.*

BOUDIN, Chief Judge, concurring.
It has been long settled that the United States cannot be sued, either in federal court or in any state forum, unless it has waived sovereign immunity. *Lehman v. Nakshian,* 453 U.S. 156, 160, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981). States and comparable entities are treated no differently than any other litigant. Indeed, the lower courts have repeatedly held that, absent a waiver, the United States cannot be forced to obey a subpoena issued by a state court, state grand jury, or state legislative committee.[FN14]

FN14. *See, e.g., United States v. Williams,* 170 F.3d 431, 433 (4th Cir.), *cert. denied,* 525 U.S. 854, 120 S.Ct. 135, 145 L.Ed.2d 115 (1999); *In re Elko County Grand Jury,* 109 F.3d 554, 556 (9th Cir.), *cert. denied,* 522 U.S. 1027, 118 S.Ct. 625, 139 L.Ed.2d 606 (1997) (sovereign immunity bars enforcement of state grand jury subpoena of federal official); *Houston Bus. Journal, Inc. v. Office of the Comptroller of the*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

*Currency,* 86 F.3d 1208, 1212 (D.C.Cir.1996); *State of La. v. Sparks,* 978 F.2d 226, 234-35 (5th Cir.1992); *Boron Oil Co. v. Downie,* 873 F.2d 67, 71 (4th Cir.1989); *United States v. McLeod,* 385 F.2d 734, 751 (5th Cir.1967); *United States v. Owlett,* 15 F.Supp. 736, 742 (M.D.Pa.1936).

Puerto Rico's lawsuit in federal court, seeking to enforce the state's demand for a turnover of documents and exhibits belonging to or in the custody of the FBI, is itself barred by sovereign immunity unless it falls within an exception-which normally must be created by Congress. This is not an instance of discovery in aid of a federal lawsuit to which the United States has otherwise consented (*e.g.,* a Tucker Act suit against the United States) or to which it is otherwise susceptible to discovery (*e.g.,* a federal criminal prosecution).

So far as Puerto Rico is asserting an implied exception to federal sovereign immunity for state criminal investigations, the proposition is without case support and is at odds with a catalogue of cases. *See* note 14, *above.* Puerto Rico is free to conduct criminal investigations. It is not free to bring a federal or state lawsuit to obtain by court process, at the behest of a state agency, documents and exhibits its controlled by the United States, unless Congress has so provided.

The United States has waived sovereign immunity in a number of different statutes, including the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (2000) (certain *72 torts), the Tucker Act, *id.* § 1346(a) (contracts), and the Freedom of Information Act, 5 U.S.C. § 552 (2000) (access to many documents). Puerto Rico does not invoke the FOIA, presumably because one of its exceptions limits requests for criminal investigative materials.[FN15] 5 U.S.C. § 552.

FN15. The Freedom of Information Act

excepts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, ... (D) could reasonably be expected to disclose the identity of a confidential source ..., (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7).

This leaves Puerto Rico with the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. The APA can be viewed both as a residual waiver of sovereign immunity permitting judicial review of federal action-though not an award of damages-where there is no other prescribed remedy; and as a federal cause of action where an agency acts contrary to law or in a manner that is arbitrary or irrational (unless the matter is one committed to agency discretion by law, *id.* § 701(a)(2)). *See* H.R. Rep. 94-1656, at 4-12 (1976).

Puerto Rico points to no law requiring the turnover of the materials it seeks. So far as Puerto Rico asserts its own sovereign interest in law enforcement, this interest creates no cause of action-state or federal-that permits Puerto Rico to constrain the United States. *See* U.S. Const. Art. VI, cl. 2; *McCulloch v. Maryland,* 17 U.S.(4 Wheat.) 316, 436, 4 L.Ed. 579 (1819) ("the states have no power ... to retard, impede, burden, or ... control" the execution of federal powers); *cf. In re Neagle,* 135 U.S. 1, 75, 10 S.Ct. 658, 34 L.Ed. 55 (1890).

Congress has authorized each agency to create

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

490 F.3d 50
490 F.3d 50
(Cite as: 490 F.3d 50)

housekeeping regulations governing the use of its "records, papers, and property," 5 U.S.C. § 301, and the Department's pertinent regulations forbid disclosure of any information where

[d]isclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired,

unless the "administration of justice requires disclosure." 28 C.F.R. § 16.26(b)(5), (c). Yet the Department's regulations, by their explicit terms, create no substantive rights in litigants, 28 C.F.R. § 16.21(d), and so create no legal obligation enforceable under the APA.

This leaves Puerto Rico, at best, with an APA suit to challenge agency action as arbitrary and capricious. Some courts have recognized an action under the APA to challenge the reasonableness of the agency's action in withholding documents.[FN16] Whether this is a plausible claim-given the explicit treatment of document requests under the FOIA-might be debated. But the present case would turn out the same way even if such an *73 APA claim survived the precept *lex specialis derogat legi generali. In re Lazarus,* 478 F.3d 12, 19 (1st Cir.2007).

> FN16. "If the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA." *Houston Bus. Journal,* 86 F.3d at 1212. *See also COMSAT Corp. v. Nat'l Sci. Found.,* 190 F.3d 269, 274 (4th Cir.1999); *Williams,* 170 F.3d at 434; *Edwards v. U.S. Dep't of Justice,* 43 F.3d 312, 316-17 (7th Cir.1994); *Boron Oil,* 873 F.2d at 71; *cf. Gen. Elec.,* 197 F.3d at 598-99, *modified on reh'g,* 212 F.3d at 690.

There is nothing arbitrary or capricious about the Department's policy of refusing to reveal "records compiled for law enforcement purposes" that would "disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." 28 C.F.R. § 16.26. The Department's legitimate interest is self-evident and is reflected in both the FOIA categorical exception, *see* note 15, *above,* and in judicial recognition of a law enforcement privilege, *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

Nor did the Department act arbitrarily or capriciously in applying its general policy in this case. As the district court found, the materials sought by Puerto Rico and withheld by the Department would reveal the identities of FBI agents, "how the FBI goes about capturing a fugitive who is believed to be dangerous, the number and types of personnel used by the FBI in such operations, the way the FBI collects evidence, the FBI's internal operating procedures in a variety of law enforcement settings, and the way in which law enforcement information is gathered." [FN17]

> FN17. These materials included the "operation order" relating to the FBI raid on Ojeda's residence; the identities and photographs of the agents involved in the raid and those responsible for using pepper spray; information gathered during the FBI's occupation of Ojeda's residence; copies of expert reports, photographs, and recordings related to the raid; and internal protocols concerning violent and arrest interventions and use of force.

That in this case the materials might be protected under the federal law enforcement privilege is icing on the cake, but the Department's action would be reasonable even without the privilege. When the United States tries a defendant in its own courts, no issue of sovereign immunity is presented: disclosure obligations depend on federal criminal rules and

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

490 F.3d 50
490 F.3d 50
**(Cite as: 490 F.3d 50)**

precedents and, ordinarily, material in government hands must be produced in response to such requirements or a defense subpoena *unless* privileged.

By contrast, when Puerto Rico is seeking materials in an action not otherwise properly in federal court, the United States has no independent obligation to turn over government materials regardless of whether they are privileged; at most, it must avoid action that is arbitrary and capricious and can do so on the basis of a reasonable general policy. The Department's refusal to release the information in this case was not arbitrary and capricious and that is the end of the matter.

SHADUR, District Judge, concurring.

In this instance the thoughtful opinions by Judge Lipez and Chief Judge Boudin put me in mind of the old saw about the politician who says of a controversial issue, "Some of my friends are in favor of X, and some of my friends are in favor of Y, and I'm in favor of my friends." Both opinions reach the same destination, albeit by different routes, and at the end of the day I share their common conclusion that the Commonwealth's legitimate interest in pursuing a possible criminal prosecution cannot override the legitimate policy concerns of the United States, as the ultimate sovereign, in not unduly exposing its own law enforcement techniques and personnel against its wishes.

In that respect Congress has permissibly acted to limit judicial review of those policy concerns to the standards applicable under the APA, and the Commonwealth has not surmounted the high hurdle that statute prescribes. Hence I concur in the *74 conclusion reached in each of the two opinions.

C.A.1 (Puerto Rico),2007.
Commonwealth of Puerto Rico v. U.S.
490 F.3d 50

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

Exhibit D

Westlaw.

682 F.2d 1018                                                                        Page 1
682 F.2d 1018, 221 U.S.App.D.C. 69, 11 Fed. R. Evid. Serv. 64
**(Cite as: 682 F.2d 1018, 221 U.S.App.D.C. 69)**

☞

United States Court of Appeals,
District of Columbia Circuit.
UNITED STATES of America
v.
Stanley HARLEY, Appellant.
UNITED STATES of America
v.
Stanley HARLEY, Appellant.
**Nos. 81-1510, 81-2173.**

Argued March 18, 1982.
Decided July 16, 1982.

Defendant was convicted in the United States District Court for the District of Columbia, June L. Green, J., for distribution of a controlled substance, and he appealed following district court's denial of his motion for a new trial. The Court of Appeals, Bork, Circuit Judge, held that: (1) in prosecution in which the only issue at trial was identification and in which jury was shown videotape of the transaction which showed the view the officers in the surveillance post had, district court properly sustained Government's objection, which was based on surveillance location privilege, to cross-examination of an investigator in which defendant asked the location of an apartment used as a police surveillance post where defendant made no attempt to demonstrate a need for the evidence or that alternative methods were available, and (2) Government's failure to introduce any evidence before the grand jury that the substance which defendant allegedly sold to undercover narcotics officer was, in fact, heroin did not render evidence insufficient to support grand jury's probable cause finding that defendant distributed or possessed heroin.

Affirmed.

West Headnotes

**[1] Privileged Communications and Confidentiality** 311H ☜➔359

311H Privileged Communications and Confidentiality
    311HVI Public Officers and Records
        311Hk359 k. Surveillance Positions and Locations. Most Cited Cases
        (Formerly 410k216(1))
In prosecution for distribution of a controlled substance in which the only issue at trial was identification and in which jury was shown videotape of the transaction which showed the view the officers in surveillance post had, surveillance location privilege precluded cross-examination of an investigator concerning the location of an apartment used as a police surveillance post where defendant made no attempt to demonstrate a need for the evidence or that alternative methods were unavailable.

**[2] Privileged Communications and Confidentiality** 311H ☜➔359

311H Privileged Communications and Confidentiality
    311HVI Public Officers and Records
        311Hk359 k. Surveillance Positions and Locations. Most Cited Cases
        (Formerly 410k216(1))
Surveillance location privilege, like informer's privilege, applies at trials and is to be applied through a balancing test controlled by the fundamental requirements of fairness.

**[3] Privileged Communications and Confidentiality** 311H ☜➔359

311H Privileged Communications and Confidentiality
    311HVI Public Officers and Records
        311Hk359 k. Surveillance Positions and Locations. Most Cited Cases

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

682 F.2d 1018

Page 2

682 F.2d 1018, 221 U.S.App.D.C. 69, 11 Fed. R. Evid. Serv. 64

**(Cite as: 682 F.2d 1018, 221 U.S.App.D.C. 69)**

(Formerly 410k216(1))

A defendant seeking to learn location of a police surveillance post should ordinarily show that he needs the evidence to conduct his defense and that there are no adequate alternative means of getting at the same point; degree of the hardship he establishes must then be weighed by trial judge against the policies underlying the surveillance location privilege.

**|4| Indictment and Information 210 ☞17**

210 Indictment and Information
   210III Formal Requisites of Indictment
      210k17 k. Form and Contents in General. Most Cited Cases

**Indictment and Information 210 ☞56**

210 Indictment and Information
   210V Requisites and Sufficiency of Accusation
      210k56 k. Constitutional Requirements as to Accusation. Most Cited Cases
An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits and Fifth Amendment requires nothing more. U.S.C.A.Const.Amend. 5.

**|5| Indictment and Information 210 ☞10.2(8)**

210 Indictment and Information
   210II Finding and Filing of Indictment or Presentment
      210k10 Finding of Grand Jury
         210k10.2 Evidence Supporting Indictment
            210k10.2(8) k. Particular Offenses in General. Most Cited Cases
Government's failure to introduce any evidence before the grand jury that the substance which defendant allegedly sold to undercover narcotics officer was, in fact, heroin did not render evidence insufficient to support grand jury's probable cause finding that defendant distributed or possessed heroin.

**[6] Indictment and Information 210 ☞196(1)**

210 Indictment and Information
   210XIV Waiver of Defects and Objections
      210k195 Waiver
         210k196 Objections to Indictment or Information
            210k196(1) k. In General. Most Cited Cases
Defendant waived challenge to sufficiency of evidence to support grand jury's probable cause finding that he distributed or possessed heroin where defendant failed to raise such challenge prior to trial at the time set by the trial court. Fed.Rules Cr.Proc. Rule 12(b)(2), 18 U.S.C.A.

**[7] Criminal Law 110 ☞1038.2**

110 Criminal Law
   110XXIV Review
      110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
         110XXIV(E)1 In General
            110k1038 Instructions
               110k1038.2 k. Failure to Instruct in General. Most Cited Cases
In prosecution on drug charge in which defense twice impeached police officer with inconsistent statements he had given to grand jury, trial court did not commit plain error in failing to instruct jury that evidence of the fact of prior inconsistent statements could be considered as exculpatory even though the content of those statements was not exculpatory where defendant did not request such an instruction or object to the instructions given.

**\*1019 \*\*70** Appeal from the United States District Court for the District of Columbia (Criminal No. 81-0006).R. Kenly Webster, Washington, D. C. (appointed by this Court), for appellant.

Helen M. Bollwerk, Asst. U. S. Atty., Washington, D. C., with whom Stanley S. Harris, U. S. Atty., John A. Terry, Michael W. Farrell and James R.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date

682 F.2d 1018

682 F.2d 1018, 221 U.S.App.D.C. 69, 11 Fed. R. Evid. Serv. 64

(Cite as: 682 F.2d 1018, 221 U.S.App.D.C. 69)

Page 3

Spencer, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before ROBB and BORK, Circuit Judges, and GORDON,[FN*] Senior District Judge for the Western District of Kentucky.

FN* Sitting by designation pursuant to 28 U.S.C. s 294(d).

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

Stanley Harley appeals his conviction for distribution of a controlled substance, heroin, in violation of 21 U.S.C. s 841(a)(1) (1976), and the district court's denial of his motion for a new trial. We affirm.

## BACKGROUND

During the mid-morning hours of October 29, 1980, Metropolitan Police Detective George F. Clannigan, assigned as an undercover narcotics officer, drove to 3930 Wheeler Road, S.E., Washington, D.C., to attempt a heroin purchase. Clannigan parked in a parking lot in front of that address and walked towards the house. Harley, whom Clannigan did not know, came down the steps from that address, walked twenty feet towards Clannigan, stopped the detective, and asked him what he wanted. Clannigan then negotiated the purchase of $50 worth of heroin and gave Harley that amount in cash. Harley re-entered 3930 Wheeler Road and was out of Clannigan's sight momentarily. Returning to the courtyard, Harley gave Clannigan a small plastic bag containing white powder. Clannigan took the package and left. These two encounters lasted approximately a total of 17 seconds.

From a nearby surveillance post, Officer George Taylor and Detectives George Green *1020 **71 and John Goodspeed watched the entire transaction, Taylor using binoculars part of the time. Goodspeed filmed the transaction with a camera equipped with a zoom lens.

After the purchase, Clannigan returned to the stationhouse. Investigator David Hayes performed a field test of the powder and received a positive reaction, indicating that the powder was heroin. Hayes also showed Clannigan 10 to 12 photographs of black males in their twenties and thirties known by the police to frequent the 3930 Wheeler Road area. Clannigan identified Harley as the person who had sold him the powder.

Harley was charged in a two-count indictment with the distribution of, and the possession with intent to distribute, heroin. At trial, the government introduced the videotape and the testimony of Clannigan, Hayes, Taylor, and Goodspeed. Harley, the only witness for the defense, maintained that he had not sold the heroin. The trial court instructed the jury to consider the distribution charge first and to consider the possession charge as a lesser included offense only if it should vote to acquit Harley of distributing heroin. After deliberating, the jury found Harley guilty of distribution.

We turn next to the legal issues raised on this appeal.

## THE SURVEILLANCE LOCATION PRIVILEGE AND THE CONFRONTATION CLAUSE

[1] During his cross-examination of Investigator Hayes, Harley asked the location of the apartment used for the police surveillance post. The district court sustained the government's objection to this inquiry. Harley claims here that this ruling violated his rights under the Sixth Amendment's Confrontation Clause because the information would have shown the difficulties the officers using the post

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

682 F.2d 1018
682 F.2d 1018, 221 U.S.App.D.C. 69, 11 Fed. R. Evid. Serv. 64
**(Cite as: 682 F.2d 1018, 221 U.S.App.D.C. 69)**

Page 4

would have had in accurately identifying the seller from their vantage point. We hold that the district court did not err by sustaining the government's objection.

[2] In United States v. Green, 670 F.2d 1148 (D.C.Cir.1981), this court, relying upon an analogy to the well-established informer's privilege, adopted a qualified surveillance location privilege. Green approved the withholding of the location of a police surveillance post at a suppression hearing but reserved the question of the privilege's existence at trial. Id. at 1157 n.14. We now hold that the surveillance location privilege, like the informer's privilege, applies at trials and that it, too, is to be applied through a balancing test controlled by "the fundamental requirements of fairness." Roviaro v. United States, 353 U.S. 53, 60, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957).

[3] A defendant seeking to learn the location of a police surveillance post should ordinarily show that he needs the evidence to conduct his defense and that there are no adequate alternative means of getting at the same point. The degree of the handicap he establishes must then be weighed by the trial judge against the policies underlying the privilege. This is necessarily a somewhat ad hoc balancing process so that, as Roviaro said, "no fixed rule with respect to disclosure is justifiable." Id. at 62, 77 S.Ct. at 628.

We have no difficulty in concluding that such a balancing test sustains the application of the surveillance location privilege here. Whether or not use of this particular surveillance post has been abandoned, as Harley suggests, so that the safety of the police officers using it is not involved, the safety of the cooperating apartment owner or tenant remains a relevant consideration as does the willingness of other citizens to cooperate with the police in this fashion in the future. These, as Green pointed out, are weighty considerations supporting the privilege.

Harley, on the other hand, made no attempt to demonstrate a need for the evidence or that alternative methods were unavailable.

The only issue at trial was identification. Detective Clannigan, the government's first witness, positively identified Harley as the man who sold him heroin. The second witness, *1021 **72 Investigator Hayes, had never been in the apartment used for observation but knew the area. On cross-examination, Harley elicited from Hayes the facts that the surveillance post was between 20 and 30 yards from the courtyard at 3930 Wheeler Road and was approximately 10 to 12 feet above street level. The government objected, and was sustained, only when Hayes was asked to state the floor on which the apartment was located. Harley offered no reason why that information might be important. Officer Taylor and Detective Goodspeed, who had observed the transaction from the apartment, were not asked by Harley about their ability to see.

This would be sufficient to sustain the trial judge's ruling. But there is an additional factor.

The government showed the jury the videotape Goodspeed made of the heroin purchase. Harley complains that the tape was unclear so that identification of the participants in the transaction was difficult. However that may be, the tape indisputably shows the view the officers in the surveillance post had, the distance, the angle, and the existence or nonexistence of obstructions in the line of sight. It is difficult to believe that Harley could have gained anything more by learning the number of the apartment from which the police observed him.

This case, therefore, is not governed by Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), upon which Harley relies. The Supreme Court held, on the facts of that case, that a defendant's Sixth Amendment right to confront the witnesses against him overcame the State's policy of preserving the anonymity of persons adjudged ju-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

682 F.2d 1018
682 F.2d 1018, 221 U.S.App.D.C. 69, 11 Fed. R. Evid. Serv. 64
**(Cite as: 682 F.2d 1018, 221 U.S.App.D.C. 69)**

Page 5

venile delinquents. The defendant had been denied that right by being forbidden to cross-examine the witness about his status in order to show possible bias. That case is far different from this one. The witness in Davis was crucial to the prosecution's case, not merely corroborative like Taylor and Goodspeed. More important, the defense in Davis showed there was reason to fear bias while Harley has not raised any reason to suppose that Taylor and Goodspeed could not view the heroin transaction clearly and did not even trouble to explore the question while cross-examining them. Finally, unlike the situation in Davis, where there was no alternative means of probing for bias, Harley had in the videotape a means to learn whether there was any obstruction to the witnesses' view. Davis is wholly inapposite to this case.

### OTHER ISSUES RAISED ON APPEAL

[4][5][6] A. Sufficiency of the evidence before the grand jury. Harley argues that the evidence was insufficient to support the grand jury's probable cause finding that he distributed or possessed heroin because the government failed to introduce any evidence before the grand jury that the substance he allegedly sold Clannigan was, in fact, heroin. This claim is without merit."An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for a trial of the charge on the merits. The Fifth Amendment requires nothing more." Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956) (footnote omitted); id. at 363-64, 76 S.Ct. at 408-409 (same result under Supreme Court's supervisory power). Accord Gerstein v. Pugh, 420 U.S. 103, 117 n.19, 95 S.Ct. 854, 865, n.19, 43 L.Ed.2d 54 (1975). In any event, Harley waived this challenge by failing to raise it prior to trial at the time set by the trial court.Fed.R.Crim.P. 12(b)(2). He has shown no cause why he should be relieved of that waiver. Nor does it matter that Harley has

phrased his claim as a constitutional rather than a procedural violation. Davis v. United States, 411 U.S. 233, 236-42, 93 S.Ct. 1577, 1579-1582, 36 L.Ed.2d 216 (1973).

[7] B. Jury instructions. During trial, the defense twice impeached Officer Taylor with inconsistent statements he had given to the grand jury. After final arguments, the district court instructed the jury that, if it believed any witness had been impeached *1022 **73 or discredited by a showing that he had made previous statements inconsistent with his trial testimony, the jury had the exclusive right to determine what weight to give the witness' trial testimony. The court did not instruct the jury that evidence of the fact of prior inconsistent statements could also be considered as exculpatory even though the content of those statements was not exculpatory. Although he failed to request such an instruction or object to the instructions given, Harley now claims that the district court's failure to offer an instruction of this type constitutes plain error under United States v. Bruner, 657 F.2d 1278 (D.C.Cir.1981). We disagree.

In Bruner, at the time of each impeachment, the defendants sought an immediate instruction from the district court along the lines now requested by Harley. The district court refused but did give such an instruction after each impeached witness' testimony, and in its final charge to the jury. We held that the district court's refusal to offer an immediate instruction was not error, United States v. Bruner, 657 F.2d at 1285-86, noting in passing that defendants "were, of course, entitled to these instructions at some time." Id. at 1286. That remark does not mean that the instruction must be given whether or not the defendant requests it. There was no plain error here.

The remaining points raised do not require discussion.

The judgments of the district court are

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

682 F.2d 1018
682 F.2d 1018, 221 U.S.App.D.C. 69, 11 Fed. R. Evid. Serv. 64
**(Cite as: 682 F.2d 1018, 221 U.S.App.D.C. 69)**

Affirmed.

C.A.D.C., 1982.
U.S. v. Harley
682 F.2d 1018, 221 U.S.App.D.C. 69, 11 Fed. R.
Evid. Serv. 64

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

date