Exhibit 22

| | |
|---|---|
| DISTRICT COURT, EL PASO COUNTY, COLORADO 270 S. Tejon Street Colorado Springs, Colorado 80903 | FILED IN THE DISTRICT AND COUNTY EL PASO COUNTY, COLORADO DEC 0 2 2009 MY PETTY CLERK OF COURT |
| THE PEOPLE OF THE STATE OF COLORADO, Plaintiff, v. ROBERT RODARTE, Defendant. | ▲   COURT USE ONLY   ▲ |
| Attorneys for Special Agent Robert Goffi and the FBI: DAVID M. GAOUETTE U.S. Attorney AMY L. PADDEN, 28372* Assistant U.S. Attorney 1225 Seventeenth Street, Suite 700 Denver, CO  80202 (303) 454-0100 Fax: (303) 454-0408 *Counsel of Record | Case No.:  2009CR753 Division: 15 |

## MOTION FOR RECONSIDERATION AND TO STAY

COMES NOW Robert Goffi, Special Agent, and the Federal Bureau of Investigation ("FBI"), United States Department of Justice, through the United States Attorney for the District of Colorado, and submits this Motion for Reconsideration and Motion to Stay. For the reasons set forth in its Motion and below, the FBI respectfully requests that the Court reconsider its oral ruling rendered on November 24, 2009, and stay any dissemination of the FBI's Confidential Informant file about Mr. Rodarte, which was produced to the Court for the limited purpose of conducting an *in camera* review, until this motion is resolved and until the FBI has the opportunity to seek additional relief in federal court as warranted.

## FACTUAL AND PROCEDURAL BACKGROUND

As this Court is aware, the FBI has been served with a number of subpoenas by the various Defendants in this case. In turn, this Court has held numerous hearings regarding whether Defendants are entitled to portions of the FBI's confidential informant file for Robert Rodarte. The Court has consistently held that Defendants are not entitled to the



entirety of the file.  The FBI has already released all portions of the file that relate to the incident at issue in this case and all portions that the Court has ordered released.

The FBI is not a party to these proceedings.  Nonetheless, the FBI has cooperated throughout these proceedings in an effort to ensure that Defendants receive the evidence to which they are constitutionally entitled, while, at the same time, protecting information (i) that is subject to privilege or (ii) the disclosure of which would jeopardize on-going and active investigations or may endanger the lives of other confidential informants or government agents.  In fact, on at least one occasion, this Court ordered that the FBI was not required to disclose a document that the FBI had already disclosed—*i.e.*, the FBI's disclosure exceeded that which the Court believed was warranted.  In the spirit of cooperation and in an effort to expedite the resolution of this case, the FBI submitted to the Court the entirety of Mr. Rodarte's confidential informant file for the limited purpose of allowing the Court to conduct an *in camera* review.  Both before and after reviewing that file, the Court has repeatedly ordered that the entirety of Mr. Rodarte's confidential informant file would not be disclosed in this case.

The Court seems to be under the impression that Mr. Rodarte either had access to this file or was privy to all of its contents.  This is not so.  The file is the FBI's file.  It is not a file maintained by Mr. Rodarte.  The file contains information of which Mr. Rodarte has no knowledge.  (*See* Ex. 1 ¶ 6 (decl. of S. Smith).)  He is not privy to the content of the file. (*Id.*)

The FBI obviously cannot discuss in detail the specific contents of this file in a public pleading.  However, as the attached declaration establishes, the file refers to other investigations.  (*See* Ex. 1 ¶¶ 7, 8 (decl. of S. Smith).)  It identifies by name the subject of an active investigation being conducted by another FBI office, who likely is unaware that he or she is the subject of a FBI investigation, and a symbol number for a source working on that investigation.  (*Id.* ¶ 7.)  The release of this information would frustrate the FBI's ability to continue with this investigation.  (*Id.*)

The file also discloses information about the FBI's recruitment, evaluation, use, and monitoring of informants, the disclosure of which would hamper the FBI's ability to recruit and use informants in the future.  (*Id.* ¶ 6.)  It also contains sensitive information regarding the payment of confidential informants.  Here again, release of this information would hamper the FBI's ability to recruit and use informants.  (*Id.*)

Despite the Court's repeated rulings during numerous hearings held on this issue, at the hearing on November 24, 2009, without notice, this Court changed course and ordered that it would release the nearly all of the confidential informant file to all Defendants in this case and the related cases.  (11/24/09 Tr. at 6:11-13 (Ex. 2 hereto).)  The Court found that the "records contain information known to or supplied by Mr. Rodarte."  (*Id.* at 3:15-16.)  It also

found that at least some of the investigations had been closed and one of the targets had been killed. *Id.* The Court found that because Mr. Rodarte was a confidential informant of the FBI, the FBI "cannot claim privilege or confidentiality with respect to the operations in which they placed Mr. Rodarte." (*Id.* at 5:7-9.) The Court found that "the Constitutional considerations for Mr. Rodarte outweigh the government's interest in secrecy." (*Id.* at 3:23-25.) The Court then stated that they "may be relevant also to the other defendants' potential defenses in this case." (*Id.* (emphasis added).) The Court said it could not "guess" whether Mr. Rodarte had communicated to the other Defendants any of the facts involving Mr. Rodarte's confidential informant activities. (*Id.* at 4:6-10.)

The Court ordered that the documents would be released to the District Attorney's office, who in turn would deliver them to defense counsel as discovery. The Court ordered that defense counsel would be able to show these documents to their clients, although a protective order would issue that would preclude Defendants themselves from keeping copies of the documents. (*Id.*) The Court ordered that this release would include all the information in the file, with the exceptions of documents relating to drug smuggling into a prison and the activities of a Sheriff's Department in Colorado, without any redactions. The Court did not permit any argument on this issue. The Court indicated that it would proceed in this manner on noon on December 7, 2009, unless the government undertook other actions by that date.

For the reasons that the Court has previously ordered that the entire file would not be disclosed, as well as the reasons below, the FBI moves the Court to reconsider its most recent ruling that it would release the entire CI file to all Defendants in this case. The Court's most recent ruling on this issue violates sovereign immunity and is contrary to the law regarding the privilege that exists for confidential informants and law enforcement techniques. As explained below, the disclosure of this material, even subject to a protective order, would cause irreparable harm and should be reconsidered.

## LAW AND ARGUMENT

As explained in the motion to quash filed in Case Number 09cr768, the United States Department of Justice's *Touhy* regulations, by virtue of the Supremacy Clause, prevent any state court from enforcing a subpoena against federal agencies and officers. Here, however, the discovery at issue is also covered by the confidential informant/law enforcement privilege and thus, even without consideration of the *Touhy* issues, the defense would not be entitled to discover this information. Thus, the Court should reconsider its order disclosing the FBI's confidential informant file.

### A. Sovereign Immunity Precludes the Disclosure of Contents of the File for which the FBI has not consented to Disclosure.

This Court has ruled, over the FBI's objection, that the contents of the FBI's confidential informant file will be released to the defense. This ruling by the Court is contrary to the doctrine of sovereign immunity and should be reconsidered. *See, e.g., Smith v. Cromer*, 159 F.3d 875 (4th Cir. 1998) (copy attached as Ex. 3); *United States v. Williams*, 170 F.3d 431 (4th Cir. 1999) (copy attached as Ex. 4).

*Smith v. Cromer* is particularly instructive here. In that case, the defendant had worked as a confidential informant for the Drug Enforcement Agency. 159 F.3d at 877. He was being prosecuted in state court for state narcotics changes. Id. He sought to compel the production of his own confidential informant file. *Id*. There, as here, the DEA had provided a copy of the file to the state court for an *in camera* review. The state court found the information to be discoverable and ordered it produced to the defendant. The DEA removed this issue from state to federal court and the federal district court granted a motion to quash and for protective order. *Id*.

The Fourth Circuit affirmed the orders quashing the subpoena and entering a protective order. The court first found that sovereign immunity precluded the state court from enforcing the subpoenas and disclosing the documents. *Id*. at 879. The court rejected arguments that the federal government had waived this immunity by providing partial disclosures to the defendant or by providing a copy of the file to the state court for an *in camera* review. *Id*. at 880. The court concluded that the state court lacked any authority to enforce the subpoenas. *Id*. The court noted that the criminal defendant had a remedy of seeking review of the DEA's decision not to release the file under the Administrative Procedures Act ("APA"). (The court also found that disclosure was not warranted in light of the confidential informant privilege as explained in Part B., below).

Similarly, the fact that the FBI, rather than a state agency, is in possession of information relevant to this state prosecution does not change the analysis. In *United States v. Williams*, the defendant was facing state murder charges and had served a subpoena on the FBI seeking disclosure of the FBI's file regarding the homicide. 170 F.3d at 432. The defendant argued that sovereign immunity did not bar his request for the file "because the FBI was assisting state authorities in their investigation of the state crimes for which he was ultimately indicted." *Id*. at 434. The court rejected this argument, held that the FBI could not be compelled to disclose the information, and noted that if the defendant was dissatisfied with the FBI's response, he was "not without recourse" because he could seek review of that determination under the APA. *Id*.

Sovereign immunity precludes a state court from ordering the disclosure the contents of a federal agency's file over that agency's objections pursuant to its *Touhy* regulations.

The FBI has not waived sovereign immunity and objects to this Court proceeding as indicated in its November 24, 2009, oral order. Therefore, the Court's order should be reconsidered.

**B. The Law Enforcement and Confidential Informant Privileges Prevent Disclosure of the Contents of the Confidential Informant file.**

Even setting aside issues of sovereign immunity, the FBI's confidential informant file should not be disclosed because it is privileged. The U.S. Supreme Court recognized the law enforcement privilege in *Rovario v. United States*, 353 U.S. 53 (1957). In that case, the Court found that a request for the disclosure of the identity of a confidential informant "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders non-disclosure erroneous must depend on the particular circumstance of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62.

The privilege is held by the <u>government</u>, not by the confidential informant. *Rovario*, 353 U.S. at 59. The purpose of the privilege "is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *United States v. Myerson (In re Dep't of Investigation)*, 856 F.2d 481, 484 (2d Cir. 1988). The party seeking documents protected by the law enforcement privilege has the burden to establish a sufficient need for the documents. *Collins v. Shearson/American Express, Inc.*, 112 F.R.D. 227, 228 (D.D.C. 1986). Relevance alone does not establish a need. *Id.* at 229-30. Further, Congress has expressly recognized the need to protect this type of information in the context of the Freedom of Information Act. That Act expressly exempts from disclosure information that would disclose techniques and procedures for law enforcement investigations. *See* 5 U.S.C. § 552(b)(7)(E).

Colorado courts have also recognized a law enforcement privilege under state law, and have interpreted it in a similar manner as federal courts have interpreted the federal privilege. *See, e.g., People v. District Ct. in and for County of Pueblo*, 904 P.2d 874, 877 (Colo. 1995) (en banc) (recognizing privilege "to maintain anonymity of persons who furnish law enforcement officers with information relating to crimes"; citing cases). As the Colorado Supreme Court held in the context of the informer privilege, the defendant must establish a "<u>reasonable basis in fact</u> to believe the informant is a likely source or relevant and helpful evidence <u>essential</u> to the determination of guilt or innocence" to meet his burden to overcome the privilege. *Id.* at 877 (emphasis added; internal citation omitted). The possibility that the information may be used for impeachment "does not establish the defendants' need for disclosure of the informant's identity" nor does the defendant's unsupported assertion of need. *Id.* at 877, 879. *See also People v. Martinez*, 51 P.3d 1029, 1032 (Colo. Ct. App. 2002) ("An accused is not entitled to the disclosure of the informant based upon the bare assertion that his or

her defense requires it, or upon mere speculation about the information the informant might have supplied."), *reversed in part on other grounds*, 69 P.3d 1029 (Colo. 2003) (en banc). Thus, even if the federal privilege did not apply, this information is also privileged under state law.

This Court thus must engage in the *Rovario* balancing test. Here, as the Court has repeatedly found on prior occasions, this balancing does <u>not</u> favor a wholesale disclosure of Mr. Rodarte's confidential informant file.

First, the public interest is overwhelmingly against public disclosure. As is found in *United States v. Myerson (In re Dep't of Investigation)*, these interests include preventing disclosure of law enforcement techniques and procedures, preserving the confidentiality of sources, to protect witness and law enforcement personnel, safeguarding the privacy of individuals involved in an investigation, and otherwise preventing interference with an investigation." 856 F.2d at 484. Here, <u>all</u> of these factors weigh <u>against</u> disclosure. As the attached declaration shows, disclosure of this file would reveal sensitive law enforcement techniques and procedures, would identify a confidential informant, would reveal the subject of another investigation, and would interfere with an active investigation being conducted by the FBI in another state, as well as interfere with future investigations and future recruitment and use of confidential informants.

Second, this public interest does not remotely begin to be outweighed by the Defendants' rights to prepare their defense. Defendants have not met their burdens of showing a sufficient need for these documents. All documents from the file relating to the incident at issue in this case have been released. Defendants have provided the Court with nothing more than hypothetical arguments from their counsel that the file might possibly contain exculpatory information or some information about which they may conceivably be able to cross-examine law enforcement witnesses. Here, this factor is even stronger against disclosure because the Court has been able to review the file to see if it contains any such information that might be helpful to the defense. The Court has already ruled on prior occasions that it does not.

Moreover, **the FBI holds this privilege; Mr. Rodarte does not**. The Court seems to be swayed by the fact that Mr. Rodarte is both the confidential informant and one of the Defendants. However, that fact does <u>not</u> change this analysis or entitle him, much less his co-defendants, to the contents of the file. In fact, whether or not the confidential informant has become a defendant who is being prosecuted is not one of the factors to be weighed by the Court. The confidential informant file is the <u>FBI's file</u>, and not a file maintained by, or for the benefit of, Mr. Rodarte. The file contains documents and information to which Mr. Rodarte has not been, and could not be, privy to, regardless of whether he had later been prosecuted. (Ex. 1 ¶ 6.) Thus, courts have denied access to confidential informant files <u>even where the confidential informant himself was being prosecuted</u>. *See, e.g.*, *Smith*, 159 F.3d at 879-80.

Here again, *Smith v. Cromer* is very instructive.  In that case, the defendant argued that he was acting as a federal informant during the time that he allegedly committed the state narcotics charges—*i.e.*, if true, this information would have provided a <u>complete defense</u> to the crime, not just some potential information for cross-examination—and that his constitutional rights would be violated if he was not provided access to the DEA's confidential informant file about him.  The Fourth Circuit disagreed.  The Fourth Circuit affirmed the district court's determination that—as is the case here—the defendant "did not provide the court with specific facts that would likely be in his informant file that would establish that he was acting as a federal cooperating individual at the time of his alleged violation." *Id.* at 882.  The court also noted that the district court found that the defendant's desire to introduce evidence of his other cooperating activities—as Mr. Rodarte seeks to do here—was not sufficient to compel disclosure. *Id.* Further—as is also the case here—the district court noted that the defendant would have the opportunity to cross examine the DEA agent about his confidential informant activities. *Id.* Finally, the court found that the defendant's Sixth Amendment right to compulsory process would not be violated by quashing the subpoenas issued to Department of Justice officials. *Id.* at 882-83.

Still further, there is no basis for the Court to disclose the entirety of the file to Mr. Rodarte's co-defendants.  The other Defendants have set forth no right at all to the contents of that file.  Their case has been severed from Mr. Rodarte's case.  All relevant documents about the incident at issue, the amounts that Mr. Rodarte had been paid, and his agreement with the FBI have been disclosed.  At the hearing on November 24, the Court expressed some speculation that Mr. Rodarte may have informed the co-defendants of his confidential informant activities.  However, it noted that it could not "guess" whether that had occurred, and the FBI is unaware of any information in the record indicating that it did.  Further, the fact that Mr. Rodarte might know the identity of another confidential informant discussed in the FBI's confidential informant file does not mean that his co-defendants do.  There is no basis for allowing the disclosure of this information to the co-defendants.

The use of a protective order in an effort to mitigate the harm that would result from the release of this information is inadequate to address the concerns set forth by the FBI.  It would still allow criminal defendants themselves—two of whom are not in custody at this time—access to this information, which could potentially be used for improper purposes, such as to inform targets of the existence of the investigation or endanger the safety of other confidential informants or law enforcement officers.  As the Court noted, the trial in this case will be open to the public and, if the contents of the file are disclosed in open court, the protective order will be meaningless.  Further, this case has received press attention.  Release of this information into the public domain, even if inadvertent, would cause irreparable harm to the FBI.  <u>The FBI does not consent to the release of this information, even subject to a protective order.</u>

The FBI understands the Court's desire to move this matter to a resolution and to preserve the rights of Defendants. The U.S. Supreme Court's test for applicability of the confidential informant privilege expressly acknowledges these concerns. This Court has skillfully and appropriately addressed the concerns of all parties involved in its prior rulings on this issue. However, the Court's decision last week that a full-scale disclosure of the entire file to all Defendants is not warranted under the privilege.

## C.   The Court Should Consider Other Less-Intrusive Alternatives.

As several courts have noted, preventing disclosure of the confidential informant file does not leave Defendants without a remedy. Defendants can bring an action under the Administrative Procedures Act. Here, despite the facts that Defendants have been on notice for several months that the FBI was not going to turn over the confidential informant file in its entirety and that the trial in this matter has been continued, to undersigned counsel's knowledge, none of the Defendants has pursued this avenue of relief.

The FBI respectfully submits that several alternatives exist that would preserve the privilege, meet the standards set forth by the U.S. Supreme Court for determining when disclosure is warranted, and preserve the rights of Defendants to present their defense to the jury.

a.   First, the Court has already reviewed the entire confidential informant file. If the Court believes that any other portions of that file potentially meet the *Rovario* test for disclosure, it could hold a hearing on that issue and determine whether to produce those portions only.

b.   Second, to the extent that the Court believes that Mr. Rodarte is entitled to portions of the file regarding out-of-state activities, the FBI respectfully requests that it follow the procedure that it outlined during the hearing held with Mr. Rodarte's counsel, which would allow the FBI to set forth specific objections prior to the release of any such information.

c.   Third, the FBI could prepare a redacted form of the confidential informant file and produce it to the Court for *in camera* review. The Court could then determine if the confidential informant file, as redacted, meets the balancing test set forth in *Rovario*. If it does, then the Court can simply release the redacted file.

d.   To the extent that Mr. Rodarte believes there are specific facts in his file that he plans to use in his defense, he could propose a stipulation regarding those facts or submit those facts to the FBI, who could then confirm or deny in writing whether they are contained in the file, thereby allowing Mr. Rodarte to question or cross-examine FBI agents about that

information at his trial.

e.   Finally, as mentioned above, Defendants have the alternative remedy of bringing an action under the Administrative Procedures Act, which they have apparently declined to pursue to date.

The FBI respectfully submits that the Court's proposed course of action—to produce the file without any redactions—violates sovereign immunity, does not comply with Supreme Court precedent, and could seriously endanger on-going and active investigations, as well as the safety of individuals involved in those investigations. As the Court is aware, the file has references to serious threats of violence and murder. Releasing the file could result in danger to law enforcement personnel and confidential informants. The FBI urges the Court not to cause irreparable harm by releasing these documents, to which Defendants are not entitled.

If the Court denies this motion, the FBI reserves the right to remove the issue to federal court pursuant to 28 U.S.C. § 1442, and move to quash the subpoenas and for a protective order. *See Smith*, 159 F.3d at 879 (explaining removal procedure). In that event, the federal court will determine whether the subpoenas should be quashed and the confidential informant file should be released. Once that decision is made, the issue will be remanded and the state prosecution will remain pending before this Court. It will remain up to this Court how to proceed in this matter after the federal court issues its decision on the motion to quash. For this reason, the FBI requests that the Court stay any release of the contents of the file until at least one week after it rules on the motion to reconsider. If the Court denies the motion to reconsider, the FBI will then have one week to decide whether to seek relief in federal court. **Again, the FBI does not consent to the Court releasing a copy of its file that was provided to the Court for the limited purpose of allowing the Court to conduct an *in camera* review**. Therefore, in the event that the Court denies the motion to reconsider, the FBI respectfully requests that the Court stay the disclosure of the file until the FBI can determine whether to remove this issue to federal court to obtain an order quashing the subpoenas and prohibiting the release in whole or in part.

## CONCLUSION

For the reasons set forth above, the defense is not entitled to discover the entire CI file of Mr. Rodarte. Discovery of this information is barred by sovereign immunity, the Department of Justice's *Touhy* regulations, and by privilege. The Court should reconsider its order that the file will be released and, if it declines to reconsider the order, should stay any dissemination of the file in order to allow the FBI to pursue alternative relief as appropriate.

WHEREFORE, the FBI and SA Goffi respectfully request that this Court reconsider its oral ruling from November 24, 2009, and stay any dissemination of the CI file for seven days after an order on the motion to reconsider.

DATED:  December 2, 2009        DAVID M. GAOUETTE

U.S. Attorney


Amy L. Padden, Colo. Bar No. 28372
Assistant U.S. Attorney

Attorneys for SA Robert Goffi and the FBI

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2009, I served a copy of the foregoing by U.S. Mail and by fax (without exhibits) to the following:

Counsel for Plaintiff:

Terry Sample
El Paso District Attorney's Office
105 E. Vermigo
Colorado Springs, CO 80903

Counsel for Defendant Rodarte:

Cynthia McKedy
Anaya, Foley & McKedy, P.C.
615 S. Weber Street
Colorado Springs, CO 80903

U.S. Attorney's Office

11

Exhibit 1

DECLARATION OF STEVEN M. SMITH, SUPERVISORY SPECIAL AGENT,
FEDERAL BUREAU OF INVESTIGATION

I, Steven M. Smith, declare, pursuant to 28 U.S.C. § 1746, the following:

1.   I am a Supervisory Special Agent (SSA) for the Federal Bureau of Investigation (FBI).  I am assigned to the Colorado Springs Resident Agency in the Denver Division.  The information provided herein is based upon my personal knowledge, and my review of and consideration of information available to me in my official capacity, including information furnished to me by Special Agents and other employees of the FBI in the course of their official duties.

2.   I am familiar with the FBI's policies and practices regarding the protection of sensitive information related to confidential informants.  I am also familiar with the criminal cases pending in El Paso County District Court related to former FBI informant Robert Rodarte.

3.   The purpose of this declaration is to explain the harm that could reasonably be expected to result from the contemplated disclosure of what is essentially Rodarte's entire FBI informant file. Because this is a public declaration, I will discuss information from Rodarte's informant file only in general terms because providing details would require me to disclose the sensitive information at issue.

4.   With respect to the several subpoenas served on the FBI seeking Rodarte's informant file, the FBI's responses  have been governed  by Federal regulations set forth at 28 C.F.R. § 16.21

et *seq.*, and the principles of sovereign immunity expressed by the Supreme Court in *United States* ex *rel. Touhy v. Ragen*, 340 U.S. 462 (1951). In response to each of the subpoenas, the FBI has advised the court and the defendants of the controlling law. In accordance with the pertinent Federal regulations and without waiving sovereign immunity against any compelled disclosure of materials by the court, the FBI has provided certain materials from Rodarte's file to the parties in this case and has submitted the entire file to the court for *in camera* review.

5. The FBI is not certain which specific documents from Rodarte's file that the court is now considering for release to the defendants' attorneys. Based on the transcript from the court proceeding on November 24, 2009, the FBI's understanding is that the court intends to release, in unredacted form, all the documentation from Rodarte's file, apart from the limited information therein regarding possible drug smuggling in a prison setting and possible corruption in a Colorado local law enforcement office.

6. Rodarte's file is comprised of a main volume and four sub sections, Sub A, Sub CE, Sub OIA and Sub V. The file, as a whole, contains approximately 260 pages of documents. The FBI's concerns about disclosure extend to each section of the file.

7. The main volume of the file contains administrative paperwork regarding informants. Disclosure of this portion of the file would reveal all database checks run by the FBI for the initial evaluation of informants, all FBI investigations linked

merely to the name "Robert Rodarte", the techniques used by the FBI to task informants, the human and technical resources used by the FBI to monitor informants during operations, and the techniques used by the FBI to discretely monitor informant activity outside the context of taskings.   Rodarte does not have any prior knowledge of this type of information.  He was never privy to the contents of the informant file that the FBI maintains about him.  If the full scope of the information contained in the main volume of Rodarte's file became known, the ability of the FBI to effectively recruit and operate any informant in the future could be impaired.

8.  The Sub A section of the file essentially contains the information provided by Rodarte on various matters.   The FBI has already disclosed one document from this part of the file that describes information provided by Rodarte regarding his co-defendant James Cisneros.  Also, this part of the file appears to contain the documents regarding possible prison drug smuggling and possible law enforcement corruption which the court apparently is not considering for disclosure.  In the FBI's view, the remainder of the information in this section of the file concerns possible criminal activity unrelated to the offenses charged against Rodarte or the other defendants.  Moreover, one document in this part of the file contains singular reporting regarding a threat against Rodarte.  The confidential source reporting the threat could potentially be identified based only on the information provided.  Also, of particular concern in the Sub A section of the file are documents that relate to the out of

state activities by Rodarte.  These documents identify the subject of an ongoing investigation in another FBI office.  The documents also contain the symbol number for another source working that ongoing investigation.  If the current or potential subjects from that out of state matter become aware of the scope of the investigation and the use of sources in that investigation, these current or potential subjects could take action to frustrate the ability of the FBI to successfully conduct the investigation.

9.   With respect to the Sub CE section, that part of the file documents the payments made to Rodarte.  The FBI has already turned over a summary of Rodarte's payment history showing the amounts he was paid for his services and what he was paid for the expenses he incurred.  The CE section contains only the administrative documents regarding all requests for payments to and the receipt of payments by Rodarte.  The particularly sensitive portions of this sub section are documents which were submitted to justify the payment requests.  These documents describe in detail the investigations Rodarte worked on, including the major ongoing investigation Rodarte worked on out of state.  Rodarte was never made aware of the specific information included in these payment requests, or how the amounts he ultimately received were determined.  Disclosure of such information could be harmful to the FBI for two reasons. First, if Rodarte or any others were made aware of how informants are evaluated for purposes of compensation, the FBI's ability to recruit and operate informants in the future could be frustrated.

Second, as stated above, if Rodarte or any others became aware of the scope of the ongoing investigation out of state, the effectiveness of that investigation could be undermined.

10. The Sub OIA section of the file contains only the document required by FBI policy and Attorney General Guidelines to authorize informants to engage in "otherwise illegal activity" (OIA). The FBI has already disclosed this document to the defendants and fully explained its purpose. Disclosure of this document again seems unnecessary and potentially confusing.

11. The Sub V section of the file contains the documents utilized by the FBI to evaluate informants. Disclosure of this portion of the file would reveal how the FBI categorizes sources, where the FBI recruits sources, and how the FBI measures the effectiveness of sources. Also in this section of the file are documents describing in detail Rodarte's work on the pending out of state investigation. As with the sub sections described above, disclosure of the information in the Sub V section could harm the FBI's ability to recruit and utilize informants, and undermine the pending out of state investigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of December, 2009.

Steven M. Smith
Supervisory Special Agent
Federal Bureau of
  Investigation
Colorado Springs, Colorado

TOTAL P.06

Exhibit 2

1

1  DISTRICT COURT
   EL PASO COUNTY, COLORADO
2  270 South Tejon
   Colorado Springs, CO 80903

3

4  PEOPLE OF THE STATE OF COLORADO

5  vs.

6  JAMES CISNEROS

7  Defendant:

8                                    * FOR COURT USE ONLY *

9
                                     Case No. 09 CR 768
10                                   Division 15

11 APPEARANCES:

12 MS. JENNIFER VIEHMAN, Reg. No. 33163
   For the People
13
   MR. ROBERT GOFFI, FBI, Reg. No. 15012
14
   MR. SHIMON KOHN, Reg. No. 31710
15 For the Defendant, James Cisneros

16 MS. CYNTHIA A. MCKEDY, Reg. No. 27409 and
   MR. ERIC ANAYA, Reg. No. 35203
17 MR. DAVID FOLEY, Reg. No. 30252
   For the Defendant, Robert Rodarte
18
   MS. PAT BEHAN, Reg. No. 15893 and
19 MS. CHARLOTTE ANKENY, Reg. No. 37861
   For the Defendant, Frankie Salazar
20
   MS. VICTORIA RINGLER, Reg. No.30727
21 For the Defendant, Jose Salazar

22              REPORTER'S TRANSCRIPT

23         The following proceedings were held November 24,

24 2009, before the HONORABLE GREGORY WERNER, Judge of the

25 District Court.

2

1    THE COURT:  The Court will call 09 CR 753, People

2  versus Rodarte.  The Court will also call 09 CR 818, Jose

3  Salazar; 09 CR 748, Frankie Salazar; and 09 CR 768, James

4  Cisneros.  The record should reflect that all counsel and

5  parties are present, with the exception of James Cisneros.

6    Mr. Kohn, you waive the presence of Mr. Cisneros?

7    MS. KOHN:  Yes, your Honor.

8    THE COURT:  Start with the easy thing first.  Ms.

9  McKedy.

10    MS. MCKEDY:  Yes.

11    THE COURT:  I do have a copy for you of the parole

12  records of Mr. Rodarte, and I have one for Ms. Viehman.  All of

13  those records are available and may be released and will follow

14  the usual procedure that we have.  In this case today, which as

15  I understand the prosecution will make a copy of those records

16  and then have those records available for release to everyone

17  else in the case.

18    At the request of Ms. McKedy, and also to a certain

19  extent the government, I have gone through the records,

20  primarily of the FBI once again.  And I have also gone through,

21  I am just going to refer to it as something that Ms. McKedy

22  gave me from the Department of Corrections, and essentially it

23  details administrative regulation 250-31.  If anybody is

24  looking for that, you won't find it.  I tried and couldn't.

25  Apparently it is a regulation that is defined in DOC regulation

3

1  100-01 III M as in Mike.  A document that is restricted

2  distribution.  And that administrative regulation states,

3  "Administrative regulations, implementation, adjustments,

4  operational memorandums or executive directives that have an

5  extremely limited distribution and are not available under any

6  circumstances for public and/or offender use through offender

7  libraries or other sources."  That was the document that was

8  given to Ms. McKedy.  And it essentially sets forth the

9  circumstances under which a person who is on parole in the DOC

10  system may work as a confidential informant.

11         I reviewed all of the records and this is my ruling.

12  I hope my clerk advised that I am not accepting argument today.

13  I am just giving ruling.  I have reviewed all of the records.

14  I find them to be relevant to Mr. Rodarte's defense or

15  potential defense.  The records contain information known by or

16  supplied by Mr. Rodarte.  In addition, the Court notes that

17  this matter is set for trial I believe some time in January.

18  Trials in this state are open to the public.  The records also

19  detail investigations, some of which for certain have been

20  concluded because the records reflect that.

21         In one instance one of the individuals that was the

22  subject of an investigation was killed in a shoot-out with the

23  police.  Based on everything that I have seen in the records, I

24  believe that the Constitutional considerations for Mr. Rodarte

25  outweigh the government's interest in secrecy.  I find that

1   these records may be relevant also to the other defendants'

2   potential defenses in this case.  Certainly the government had

3   knowledge regarding Mr. Rodarte's activities in other

4   jurisdictions.  There is an indication that potentially TFO

5   Richardson may have had some involvement with Mr. Rodarte

6   during some of those activities.  The Court cannot guess at

7   this time how much of those facts or those activities may have

8   been relayed by Mr. Rodarte to the defendants in his potential

9   attempt to cause them to believe that he was someone which he

10  was not.

11           But, certainly, if the defendants gained knowledge of

12  the facts of what Mr. Rodarte was doing in other places, which

13  arguably could have occurred since his purpose was to

14  infiltrate the Surenoses, and the allegation is that in this

15  situation some of the defendants are potentially members of the

16  Surenoses.  In the Court's ruling, the Court is not ruling that

17  all of this information is ultimately admissible at trial.  But

18  I do believe it is discoverable.

19           As such, the Court will be releasing information

20  regarding potential investigation into a state and municipal

21  police organization resulting from Mr. Rodarte's activities.

22  The Court realizes that it is also giving information regarding

23  the identity of another confidential informant.  However, from

24  the records, it also appears that this information was known to

25  the criminal elements, since Mr. Rodarte was allegedly hired to

5

1   kill that confidential informant.  I understand that I could be
2   wrong.  All other investigative privilege cases which I have
3   reviewed involve actual government agents working undercover in
4   some capacity.  Mr. Rodarte was not an actual government agent.
5   He was allegedly a confidential informant who is now being
6   prosecuted by the very government who was using him.

7          As such, I find that the government cannot claim
8   privilege or confidentiality with respect to the operations in
9   which they placed Mr. Rodarte.  I understand the sensitive
10  nature of the documents that I am releasing.  Because of that
11  nature, I want to give the government an opportunity to have
12  someone else tell me that I am wrong.  As such, I am allowing
13  the government until December 7th, at noon, to file an appeal
14  of my ruling.  If not, the records will be released subject to
15  the following protection order.

16         Information contained in the documents may be
17  discussed with clients, and the clients shall have a right to
18  review the documents.  But the documents themselves shall
19  remain in the possession of the attorneys.  The District
20  Attorney will make copies and make them available to counsel
21  through discovery as has otherwise been done in this case.  No
22  other copies are permitted, except to the extent necessary to
23  provide the information to retain experts.  Information shall
24  only be used for purposes of these cases only and shall not be
25  used in other cases.  Information contained in the documents is

1    not subject to public dissemination.  The Court has reviewed a

2    number of documents which provide identifying information

3    regarding alleged associates of all of the defendants, with the

4    exception of the information related to the allegations which

5    serve as the basis for the charges in these cases, none of this

6    information is being provided.  Information regarding drug

7    smuggling into a prison is not subject to the discovery.

8    Information regarding an investigation into potentially illegal

9    activities on the part of a County Sheriff's Office of this

10   state is not subject to discovery.  Documents regarding these

11   activities are not being released.  Essentially all other

12   documents regarding the activities of the FBI and the gang task

13   force operations are being released.

14        I see that I have Mr. Goffi in the room.  This will

15   probably make more sense to the FBI than it does to anybody

16   else.  With respect to that, what it means is that files

17   designated as 270-M or start out with that number and then end

18   with the CE-2 and files that end with an SUB 0I A1 and SUB V1 I

19   think are being released.  I am not taking argument.  I will

20   take questions.

21        Ms. Viehman.

22        MS. VIEHMAN:  I would need time to confer with -- I

23   know the Court has given us until December 7 for appeal.  I

24   need to confer with counsel for the FBI, as well as the U.S.

25   Attorney's Office.

1   THE COURT:  That's fine.  I actually was asking if
2   anyone had any questions about the scope of my order primarily
3   because I have tried to be as vague as possible regarding some
4   of the information that I am not releasing.  But I also think
5   that the government in this case -- I certainly -- I know you
6   will need to confer, but they will know exactly what it is that
7   I am going to be releasing.
8        Mr. Goffi.
9        MR. GOFFI:  The records are going to be released to
10  the District Attorney's Office first, and then we will have
11  until December 7th?
12       THE COURT:  No.  No.  I am not releasing anything
13  until December 7th.
14       MR. GOFFI:  Okay.
15       THE COURT:  I understand the implications of my
16  order.  I am not sure it's right.  What I am doing is I am
17  giving the weight -- I think I am giving the Constitutional
18  Rights that the defendants have in this case greater weight
19  because of the unique circumstances in this case.  But because
20  of the import of everything that I think, Mr. Goffi, you are
21  probably in the best position of anybody in the room to
22  understand.  I am going to give the government an opportunity
23  to have somebody tell me that I am wrong.  And so I am not
24  releasing anything.  These will remain in my possession in the
25  manner that they are until noon on December 7th.  If I hear

1    that an appeal has been taken or an order has been issued, then

2    I will look at that again.  Obviously, if an appeal has been

3    taken, I lose jurisdiction.  If one has not, at that point in

4    time, the records will be released.  They will be released to

5    Ms. Viehman.  The process that we have worked out is that the

6    District Attorney's Office is assembling all of the records,

7    paginating them so that when somebody says look at Page 103,

8    everybody is on the same Page 103.  So that would be the

9    process.

10            MR. GOFFI:  Are you proposing to release them in

11   unredacted form?

12            THE COURT:  Yes.

13            MR. GOFFI:  As is?

14            THE COURT:  As is.  The only redactions that I have

15   made are with respect to the two other operations that I

16   referenced.  One involved an investigation into drug smuggling

17   into a prison.  Others involved a potential investigation into

18   the activities of a County Sheriff's Office in this state.  All

19   other records would be released in an unredacted form, except

20   to the extent that there were some documents that referenced

21   potential associates, and I don't think -- I am not going to

22   give that up.  I think that where people live, where somebody's

23   cousin lives, where a potential witness lives, I am not giving

24   up any of that.

25            MR. GOFFI:  All of the out-of-state activities?

1   THE COURT: All of the out-of-state activities, yes.

2   I am trying to be vague and I think I understand which ones

3   you're talking about. All of the out-of-state activities.

4   MR. GOFFI: Okay.

5   THE COURT: Any other questions from anyone? Mr.

6   Kohn.

7   MS. KOHN: Last week when we were in here, the Court

8   entered specific orders regarding my obligations to the Court

9   and my client. I am not sure whether we are talking about the

10   same incident at this point or we are not.

11   THE COURT: The obligations remain the same until

12   December 7th. Then come December 7th, my protective order is

13   in place for everything.

14   MS. KOHN: That supercedes the previous Court's

15   order?

16   THE COURT: Yes, it does. If we get there and the

17   documents are released, I think everybody will understand why.

18   Ms. McKedy, do you have any questions?

19   MS. MCKEDY: Not at this time, judge. Thank you.

20   THE COURT: Ms. Behan.

21   MS. BEHAN: For the protective order and I was trying

22   to take notes, was the Court --

23   THE COURT: I will issue an actual written order so

24   everybody can have it. The only reason I went through it was

25   so that the government -- I thought it was important to make a

1   record that if I do release them, I will make them subject to a

2   protective order.  I thought it was important for both the

3   government and anybody else who is looking at the transcript to

4   understand what the parameters of the protective order I was

5   going to enter would be.

6           MS. BEHAN:  Thank you, judge.

7           THE COURT:  Ms. Ringler.

8           MS. RINGLER:  None for us, your Honor.

9           THE COURT:  With that, the only other thing, Ms.

10  Viehman, it sounds like, given the nature of this and also the

11  nature of the clerk's office downstairs, I want a phone call by

12  noon on Monday.  So if there has been an appeal taken and you

13  file something downstairs, to let them know that doesn't mean

14  that I will know.

15          MS. VIEHMAN:  You mean the 30th?

16          THE COURT:  No.  The Monday is December 7.  December

17  7 is a Monday.  I need a phone call by that Monday at noon to

18  know where my jurisdiction lies.  If an appellate court has

19  decided to take it, I have lost jurisdiction and the order

20  won't enter, and the records will remain with me until I hear

21  differently from somebody else who has authority over me.  But

22  I don't want to inadvertently release the records either if an

23  appeal has been taken.  I just need a phone call to my clerk to

24  let me know.

25          The only other thing that I have is that the

1  personnel files of Mr. Richardson, I have released portions of

2  these.  I am not going to release any further portions of

3  those.

4

5                    C E R T I F I C A T E

6          I, PAMELA A CELSKE, Official Court Reporter of the

7  District Court, do hereby certify that the foregoing pages

8  numbered 2 through 11, inclusive, constitute a full, true, and

9  accurate transcript of the proceedings had in the above matter,

10 all done to the best of my skill and ability.

11         DATED this 30th day of November, 2009.

12

13

14                      _____

                            PAMELA A. CELSKE

15

16

17

18

19

20

21

22

23

24

25

Exhibit 3

Westlaw.

159 F.3d 875
(Cite as: 159 F.3d 875)

☞

United States Court of Appeals,
Fourth Circuit.
Andrea SMITH; Gregory Welsh; Larry Hornstein,
Petitioners-Appellees,
v.
James CROMER, Respondent-Appellant.
No. 97-2192.

Argued Jan. 29, 1998.
Decided Oct. 22, 1998.

Defendant in state-court prosecution subpoenaed two Assistant United States Attorneys and a special agent with Drug Enforcement Administration (DEA), seeking to compel their testimony and production of documents, including his DEA cooperating individual file. After file's production was ordered by state court, government employees removed matter and moved for protective order and to quash subpoenas. The United States District Court for the District of Maryland, William M. Nickerson, J., granted motion. Defendant appealed. The Court of Appeals, Richard L. Voorhees, J., sitting by designation, held that: (1) Justice Department regulation was valid insofar as it directed Department employees not to testify in state-court prosecution without prior approval of proper official; (2) sovereign immunity divested state court, and thus district court following removal, of jurisdiction to enforce subpoenas; (3) government did not waive its sovereign immunity against enforcement of subpoenas; (4) even if employees were amenable to state process, defendant's constitutional rights did not overcome Justice Department's claim of privilege in maintaining secrecy of its confidential informant files; and (5) district court was not required to review defendant's cooperating individual file before ruling on motion to quash subpoenas.

Affirmed.

Phillips, Senior Circuit Judge, dissented and filed a separate opinion.

West Headnotes

[1] United States 393 ⚖40

393 United States
    393I Government in General
        393k40 k. Authority and Powers of Officers and Agents and Exercise Thereof. Most Cited Cases
Justice Department regulation, promulgated under "housekeeping statute," was valid insofar as it directed Department employees not to testify in state-court prosecution without prior approval of proper Department official. 5 U.S.C.A. § 301; 28 C.F.R. § 16.22(a).

[2] Witnesses 410 ⚖4

410 Witnesses
    410I In General
        410k3 Persons Who May Be Required to Appear and Testify
            410k4 k. In General. Most Cited Cases
Justice Department employees could not be forced to comply with subpoenas issued in connection with state-court prosecution if valid regulation required them not to comply.

[3] States 360 ⚖18.93

360 States
    360I Political Status and Relations
        360I(B) Federal Supremacy; Preemption
            360k18.93 k. Immunity of Federal Government or Instrumentalities from State Regulation. Most Cited Cases

United States 393 ⚖125(28.1)

393 United States
    393IX Actions
        393k125 Liability and Consent of United States to Be Sued
            393k125(28) Particular Departments, Of-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

:cers, or Agencies, Suits Against
       393k125(28.1) k.  In General.  Most
Cited Cases
Sovereign immunity divested state court, and thus
district court following removal, of jurisdiction to
enforce subpoenas issued to Justice Department
employees in state-court prosecution of defendant
who had served as confidential informant for Drug
Enforcement Administration (DEA); valid Depart-
ment regulation prohibited employees from provid-
ing information in matter in which Department was
not party without prior approval, and employees' re-
fusal to comply with subpoenas, pursuant to superi-
ors' orders, was lawful. 28 U.S.C.A. § 1442(a)(2);
28 C.F.R. § 16.22(a).

[4] Removal of Cases 334 ⟶ 111

334 Removal of Cases
   334VIII Proceedings in Case After Removal
     334k111 k. Jurisdiction Acquired by United
States Court in General. Most Cited Cases
Federal court's jurisdiction upon removal under
statute permitting removal of actions against United
States, its agencies, and officers is derivative of the
state court jurisdiction, and when the state court
lacks jurisdiction over the subject matter or the
parties, the federal court acquires none upon re-
moval, even though in a like suit originally brought
in federal court, the court would have had jurisdic-
tion. 28 U.S.C.A. § 1442(a)(1).

[5] United States 393 ⟶ 125(24)

393 United States
   393IX Actions
     393k125 Liability and Consent of United
States to Be Sued
       393k125(24) k. What Are Suits Against
United States or Its Officers or Agents in General.
Most Cited Cases
Action seeking specific relief against a federal offi-
cial, acting within the scope of his delegated au-
thority, is an action against the United States, sub-
ject to the governmental privilege of sovereign im-
munity.

[6] United States 393 ⟶ 125(3)

393 United States
   393IX Actions
     393k125 Liability and Consent of United
States to Be Sued
       393k125(3) k. Necessity of Waiver or
Consent. Most Cited Cases
When an agency has not waived its immunity to
suit, state court, and the federal court on removal,
lacks jurisdiction to proceed against a federal em-
ployee acting pursuant to agency direction. 28
U.S.C.A. § 1442(a)(1).

[7] United States 393 ⟶ 125(1)

393 United States
   393IX Actions
     393k125 Liability and Consent of United
States to Be Sued
       393k125(1) k. Immunity from Suit in
General. Most Cited Cases
Sovereign immunity is unavailable when the statute
or order conferring power upon the officer to take
action in the sovereign's name is claimed to be un-
constitutional.

[8] United States 393 ⟶ 125(28.1)

393 United States
   393IX Actions
     393k125 Liability and Consent of United
States to Be Sued
      393k125(28) Particular Departments, Of-
ficers, or Agencies, Suits Against
       393k125(28.1) k.  In General.  Most
Cited Cases
Government did not waive its sovereign immunity
against enforcement of subpoenas issued to Justice
Department employees in state-court prosecution as
result of employees' conduct in writing letter to
state parole commission revealing state-court de-
fendant's work as confidential informant (CI) for
federal government, testifying on state's behalf at
defendant's bail hearing, and providing defendant's
CI file to state court judge for in camera review.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

159 F.3d 875
(Cite as: 159 F.3d 875)

[9] United States 393 ☞125(5)

393 United States
   393IX Actions
     393k125 Liability and Consent of United
   'tates to Be Sued
      393k125(5) k. Mode and Sufficiency of
Waiver or Consent. Most Cited Cases
Disclosure of factual information does not effect a
waiver of sovereign immunity as to other related
matters.

[10] Records 326 ☞30

326 Records
   326II Public Access
     326II(A) In General
      326k30 k. Access to Records or Files in
General. Most Cited Cases
Justice Department regulations barring employees'
disclosure of Department information, without prior
approval, in federal or state cases in which Depart-
ment is not party do not confer entitlement on
parties seeking disclosure of Department records;
regulations do not purport to grant right of access to
applicants, but rather are intended to provide guid-
ance for internal operations. 28 C.F.R. §§ 16.21(d),
16.22(a), 16.24, 16.25, 16.28.

[11] Constitutional Law 92 ☞4692

92 Constitutional Law
   92XXVII Due Process
     92XXVII(H) Criminal Law
      92XXVII(H)5 Evidence and Witnesses
       92k4692 k. Immunity and Privilege.
Most Cited Cases
   (Formerly 92k268(5))

Criminal Law 110 ☞627.10(2.1)

110 Criminal Law
   110XX Trial
     110XX(A) Preliminary Proceedings
      110k627.10 Informers or Agents, Disclos-
ure
       110k627.10(2) Particular Cases

        110k627.10(2.1)  k.  In   General.
Most Cited Cases
Even if Justice Department employees were amen-
able to state process, rights of defendant in state-
court prosecution to due process and confrontation
of witnesses did not overcome Department's claim
of privilege in maintaining secrecy of its confiden-
tial informant files, and therefore state-court sub-
poenas issued to employees were properly quashed;
defendant did not identify specific facts likely con-
tained in his informant file which would establish
that he was acting as informant at time of alleged
state violation, and desire to rely on unrelated alleg-
ations of his efforts as informant was insufficient to
compel disclosure of confidential information in vi-
olation of applicable regulations, particularly when
employees' prior disclosures provided another
means to get such information before jury.
U.S.C.A. Const.Amends. 6, 14; 28 C.F.R. § 16.22(a).

[12] Federal Courts 170B ☞776

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
     170BVIII(K)1 In General
      170Bk776 k. Trial De Novo. Most
Cited Cases
Court of Appeals applies a de novo standard of re-
view to the district court's grant of a protective or-
der, quashing state court subpoenas to federal offi-
cials, as issue is decided as a matter of law.

[13] Witnesses 410 ☞16

410 Witnesses
   410I In General
     410k16 k. Subpoena Duces Tecum. Most
Cited Cases
District court was not required to review cooperat-
ing individual file of state-court defendant before
ruling on motion to quash subpoenas which were is-
sued to Justice Department employees in defend-
ant's state-court criminal proceedings and which
sought disclosure of file; both parties participated

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

159 F.3d 875
(Cite as: 159 F.3d 875)

on motion to quash and were given ample opportunity to present their positions, and defendant failed to establish basis for claim that file contained material evidence.

[14] Constitutional Law 92 ☞4556

92 Constitutional Law
   92XXVII Due Process
      92XXVII(H) Criminal Law
         92XXVII(H)4 Proceedings and Trial
            92k4556 k. Rights to Notice, Hearing, and Defense, in General. Most Cited Cases
      (Formerly 92k268(1))

Witnesses 410 ☞2(1)

410 Witnesses
   410I In General
      410k2 Right of Accused to Compulsory Process
         410k2(1) k. In General. Most Cited Cases
There are limits upon the due process which is accorded a defendant in presenting his defense, and the right to compulsory process is not absolute. U.S.C.A. Const.Amends. 5, 6, 14.

*877 ARGUED: Nancy Susanne Forster, Office of Public Defender, Baltimore, Maryland, for Appellant. Albert David Copperthite, Assistant United States Attorney, Baltimore, Maryland, for Appellees. ON BRIEF: Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellees.

Before WILKINSON, Chief Judge, PHILLIPS, Senior Circuit Judge, and VOORHEES, United States District Judge for the Western District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge RICHARD L. VOORHEES wrote the majority opinion, in which Chief Judge WILKINSON joined. Senior Judge PHILLIPS wrote a dissenting opinion.

OPINION

RICHARD L. VOORHEES, District Judge:

In this case, employees of the United States Department of Justice were subpoenaed to testify in a state criminal prosecution in direct contravention of DOJ regulations. Appellant Cromer, the defendant in the state case, subpoenaed appellees, Assistant United States Attorneys ("AUSA's") Smith and Welsh and Drug Enforcement Administration Agent Hornstein. His purpose was to compel their testimony at trial and to compel production by the Government of his Confidential Informant file in order to facilitate preparation of his defense to state narcotics charges. The Government removed the case from Maryland state court to federal district court pursuant to 28 U.S.C. § 1442(a)(1). The district court granted the Government's motion to institute a protective order and to quash subpoenas. Cromer filed the instant appeal, seeking reversal of the district court's order. We affirm the order of the district court.

I.

Appellees Andrea Smith and Gregory Welsh are Assistant United States Attorneys for the District of Maryland, and Appellee Larry Hornstein is a special Agent with the Drug Enforcement Administration. Appellees (hereinafter, the "Government") are employees of the Department of Justice and are subject to rules and regulations promulgated by the Department of Justice regarding the release of document and provision of testimony in court actions. 28 C.F.R. § 16.21 *et seq.* Appellant Cromer (hereinafter, "Cromer") served as a DEA confidential informant ("CI") from June 1994 through November 1995, until he was indicted on two charges of delivering heroin to a state informant in November 1995.

In preparation for his criminal trial, Cromer subpoenaed Smith, Welsh, and Hornstein for their testimony at trial and also served subpoenas duces

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

59 F.3d 875
Cite as: 159 F.3d 875)

tecum for certain documents, *i.e.,* "any and all let-
ters, memorandums, and notes written in reference
to or on behalf of ... [Cromer] ... to any judge, pro-
bation officer, parole commission, attorney or pre-
trial detention service division in the federal and/or
state system" (to Smith and Welsh), and the entire
contents of his Cooperating Individual File (to
Agent Hornstein).

The state court judge, Circuit Court Judge Thomas
Waxter, Jr., performed an *in camera* review of
Cromer's Cooperating Individual File, and, finding
the information contained therein to be discover-
able pursuant to *Zaal v. Maryland,* 326 Md. 54, 602
A.2d 1247 (1992), ordered the Government to pro-
duce the file to Cromer's defense attorney. In re-
sponse, the Government removed the matter to fed-
eral district court, moved for a *878 protective or-
der and moved to quash the subpoenas.

Following a hearing, District Judge William M.
Nickerson analyzed the competing interests of the
parties and weighed Cromer's due process rights to
the evidence he sought against the Government's
prerogative to resist having its employees sub-
poenaed to testify in state court. The district court
found that Cromer had raised an insufficient basis
to compel the Government to disclose confidential
information and that Cromer had alternative access
to the information he sought. For those reasons, and
"in light of the policies underlying sovereign im-
munity," the district court granted the Govern-
ment's motion for protective order and motion to
quash the subpoenas.

## II.

The issue on appeal is whether the doctrine of sov-
ereign immunity divests the district court of juris-
diction to enforce the subpoenas. We agree with the
district court that it does.

[1][2] The Government moved to quash the sub-
poenas on the basis of Justice Department regula-
tions promulgated under the authority of the

"Housekeeping Statute," 5 U.S.C. § 301, which
provides:

The head of an Executive department ... may pre-
scribe regulations for the government of his de-
partment, the conduct of its employees, the distri-
bution and performance of its business, and the
custody, use, and preservation of its records, pa-
pers, and property. This section does not author-
ize withholding information from the public or
limiting the availability of records to the public.

Regulations applicable to the production and dis-
closure of information by the Justice Department in
federal and state proceedings are found at 28 C.F.R.
§ 16.21, *et seq.* Section 16.22(a) provides:

In any federal or state case or matter in which the
United States is not a party, no employee ... of
the Department of Justice shall, in response to a
demand, produce any material contained in the
files of the Department, or disclose any informa-
tion relating to or based upon material contained
in the files of the Department, or disclose any in-
formation or produce any material acquired as
part of the performance of that person's official
duties or because of that person's official status
without prior approval of the proper Department
official....

The Department of Justice regulations at issue here
clearly fall within the terms of the first sentence of
the Housekeeping Statute. That regulation pre-
scribes the conduct of employees, the performance
of the agency's business, and the use of its records.
*In re Boeh,* 25 F.3d 761 (9th Cir.1994). Any doubt
as to the validity of the regulation's requirement of
prior approval is foreclosed by the Supreme Court's
decision in *United States ex rel. Touhy v. Ragen,*
340 U.S. 462, 468, 71 S.Ct. 416, 95 L.Ed. 417
(1951), which upheld the validity of a predecessor
to 28 C.F.R. § 16.22(a). *Id.* Appellees may not be
forced to comply with the subpoenas if a valid reg-
ulation required them not to comply. *Ex Parte
Sackett,* 74 F.2d 922, 923 (9th Cir.1935); *Boron Oil
Co. v. Downie,* 873 F.2d 67, 69 (4th Cir.1989). We

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

159 F.3d 875
(Cite as: 159 F.3d 875)

are convinced, both by statute and precedent, that 28 C.F.R. § 16.22(a) is valid insofar as it directs Appellees not to testify without prior approval of the proper Department official.

In determining whether to provide information in response to a demand, such as the subpoenas in the instant case, the Justice Department considers, among other things, whether disclosure would reveal a confidential source, reveal investigative records compiled for law enforcement purposes, disclose investigative techniques, or interfere with enforcement proceedings. 28 C.F.R. § 16.26(b)(4) and (5). If so, disclosure is forbidden under the regulations, unless the Justice Department determines that the "administration of justice requires disclosure." 28 C.F.R. § 16.26(c). The interests to be protected present a strong policy basis supporting the Justice Department's determination not to reveal its own information which it considers to be critical to the effective operation of the agency.

*879 [3] The instant appeal originated as a motion to quash subpoenas issued in a state court action and removed to federal district court under 28 U.S.C. § 1442. In *Boron Oil Co. v. Downie,* 873 F.2d 67 (4th Cir.1989), a private litigant filed a civil action in state court, and sought the testimony of Downie, an EPA employee, regarding information Downie had obtained while investigating a gas leak. Initially, Downie agreed to testify. However, the EPA district counsel later determined that Downie would not be allowed to testify. This determination was based upon an EPA regulation, which provides, among other things, that requests for employees' testimony and production of documents will be approved "... when clearly in the interests of the EPA." 40 C.F.R. § 2.401.

The district court conducted a hearing, and enforced the subpoenas based upon findings that the information sought was not privileged, that Downie was in the best position to provide the information "which was essential to the fair administration of justice in the civil action," and that the interference and inconvenience to the EPA would be minimal.

*Boron Oil Co. v. Downie,* 873 F.2d at 68. The district court rejected the defense of sovereign immunity because neither the United States nor the EPA were named parties. This court reversed, holding that a state court, and federal court on removal, lacked jurisdiction to compel a federal employee to testify concerning information acquired during the course of his official duties, in a state court civil action to which the United States was not a party. *Boron Oil Co. v. Downie,* 873 F.2d at 69-71.

[4][5][6] It is clear that a federal court's jurisdiction upon removal under 28 U.S.C. § 1442(a)(1) is derivative of the state court jurisdiction, and where the state court lacks jurisdiction over the subject matter or the parties, the federal court acquires none upon removal, even though in a like suit originally brought in federal court, the court would have had jurisdiction. *Boron,* 873 F.2d at 70. It is also clear that an action seeking specific relief against a federal official, acting within the scope of his delegated authority, is an action against the United States, subject to the governmental privilege of sovereign immunity. *Boron,* 873 F.2d at 69. Where an agency has not waived its immunity to suit, the state court (and the federal court on removal) lacks jurisdiction to proceed against a federal employee acting pursuant to agency direction. *Id.*

In reversing the district court in *Boron,* this court reasoned that "[ *U.S. ex rel.] Touhy [v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951),] is part of an unbroken line of authority which directly supports Downie's contention that a federal employee may not be compelled to testify contrary to his federal employer's instructions under valid agency regulations." In *Touhy,* the Supreme Court had held that subordinate federal officers could not be held in contempt for failing to comply with a court order in reliance on a validly promulgated regulation to the contrary. Further, we noted in *Boron* that the doctrine of sovereign immunity precluded the state court-and the federal court on removal-from exercising jurisdiction to compel Downie to testify contrary to EPA instructions, and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

also denied it the authority to review and set aside the EPA's decision and the federal regulations under which it is made. *Boron,* 873 F.2d at 70. For a state court (or federal court exercising removal jurisdiction) to assert the power of judicial review over decisions made by federal agencies while implementing their own regulations is contrary to the Administrative Procedures Act, 5 U.S.C. § 702, which expressly limits such review authority to the federal courts. *Boron,* 873 F.2d at 71.

Other circuits which have addressed this issue likewise deny state court access to federal agency records based upon the doctrine of sovereign immunity. *See, e.g., In re Elko County Grand Jury,* 109 F.3d 554 (9th Cir.1997) (state court lacked jurisdiction to compel a forest service employee to appear and testify before grand jury in contravention of USDA regulations); *Houston Bus. Journal, Inc. v. Office of Comptroller of Currency,* 86 F.3d 1208 (D.C.Cir.1996) (state court, and federal court on removal, lacked jurisdiction to compel production of records from comptroller general when production was in violation of agency regulations); *880Edwards v. United States Dept. Of Justice,* 43 F.3d 312 (7th Cir.1994) (state court had no authority to compel discovery of FBI surveillance tapes after Justice Department denied production pursuant to 28 C.F.R. § 16.26(b)(5)); *In re Boeh,* 25 F.3d 761 (9th Cir.1994) (FBI agent cannot be held in contempt for refusing to testify absent permission of the Justice Department, pursuant to 28 C.F.R. § 16.22(a)); *Louisiana v. Sparks,* 978 F.2d 226 (5th Cir.1992) (state court subpoena issued to federal parole officer quashed on sovereign immunity grounds). These decisions, like our decision in *Boron v. Downie,* reflect the principle of federal supremacy in two ways: (1) by applying the doctrine of sovereign immunity to preclude state courts, or a federal court on removal, from reviewing federal agency action, and (2) by giving recognition to the principle that valid federal regulations have the force and effect of federal law, which state courts are bound to follow. *Boron,* 873 F.2d at 71.

The dissenting opinion argues that sovereign immunity protects a federal official only if he is not "acting unconstitutionally or in excess of his legal authority." *Post,* at 14. Thus, concludes the dissenting opinion, if Cromer has a constitutional right of access to the information he seeks, then the subpoenaed Justice Department employees act unconstitutionally by refusing to comply with the subpoenas and sovereign immunity is unavailable.

[7] The dissenting opinion is correct in identifying the principle that sovereign immunity is unavailable when "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 690, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). The error is in believing that it has any application in this case. In *Touhy,* the Supreme Court upheld as constitutionally valid the predecessor to the current Justice Department regulations which plainly preclude Smith, Welsh, and Hornstein from disclosing the requested records. 340 U.S. at 468-69, 71 S.Ct. 416. The Supreme Court also held in *Touhy* that pursuant to such regulations, which wisely centralize disclosure decisions in superior Justice Department officials, subordinate employees "may *lawfully* decline to produce [records] in response to a subpoena *duces tecum.*" *Id.* at 467, 71 S.Ct. 416 (first emphasis added). The only officials before our court are Smith, Welsh, and Hornstein-subordinate employees of the Justice Department. Under *Touhy,* their refusal to comply with Cromer's subpoenas pursuant to their superiors' orders simply cannot be termed unconstitutional. Accordingly, these subpoena proceedings against Smith, Welsh, and Hornstein are precluded by sovereign immunity.

[8][9] Cromer argues that the Government has waived sovereign immunity by engaging in partial disclosure of the information he seeks. Specifically, AUSA Smith wrote a letter to the Maryland Parole Commission which revealed that Cromer was working as a CI for the federal government; AUSA Welsh and Agent Hornstein testified on behalf of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

the state at Cromer's bail hearing. Agent Hornstein provided the CI file to the state court judge for in camera review. However, disclosure of factual information does not effect a waiver of sovereign immunity as to other related matters. *See Swett v. Schenk*, 792 F.2d 1447, 1452 (9th Cir.1986) (Permitting a federal employee to testify on certain matters which are not violative of the regulations at issue cannot be construed as an intent to waive immunity.). Cromer's argument is without merit.

[10] It is also incorrect to conclude that the Justice Department regulations, if properly "complied" with, confer some entitlement on parties seeking the disclosure of agency records. The regulations do not purport to grant any right of access to applicants. As 28 C.F.R. § 16.21(d) makes clear, the regulations are "intended only to provide guidance for the internal operations of the Department of Justice, and [are] not intended to, and [do] not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States."

Section 16.22(a), which governs proceedings in which the United States is not a party, prohibits disclosure by subordinate employees "without prior approval of the *881 proper Department official." Sections 16.24 and 16.25 establish the exact manner in which disclosure decisions must be made, including who must be involved and what factors must be considered. If the proper official determines that disclosure should not be permitted, the subordinate employee to whom the request has been made is forbidden to disclose the material. *See id.* § 16.28 ("[T]he employee or former employee upon whom the demand has been made shall, if so directed by the responsible Department official, respectfully decline to comply with the demand. See *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951)."). Issuing a subpoena to a subordinate employee, as Cromer did, merely sets this process in motion. We reject Cromer's argument that these regulations provide him any additional substantive entitlement.[FN1]

FN1. The dissent states that this procedure is "more elaborate and complicated" than its predecessor. *Post,* at 890-91. The Department's ultimate disclosure authority, however, still resides in a small number of high-level officials. *Compare* 28 C.F.R. § 16.25(c) (Deputy or Associate Attorney General) *and id.* § 16.24(g) (Attorney General) *with* Department of Justice Order No. 3229 (May 2, 1946) ("the Attorney General, The Assistant to the Attorney General, or an Assistant Attorney General acting for him") (quoted in *Touhy,* 340 U.S. at 463 n. 1, 71 S.Ct. 416). Under the current procedure, it remains safe to "assume ... that the Attorney General can be reached by legal process." *Touhy,* 340 U.S. at 472, 71 S.Ct. 416 (Frankfurter, J., concurring).

In fact, whatever complexity the dissent discerns in the current regulation results from the Department's effort to vest limited disclosure authority in local United States Attorneys. *See* 28 C.F.R. §§ 16.23 -16.24. This devolution of power should actually increase public access, at least to less sensitive information. It would be perverse to reward this effort by eliminating all means of central control.

Based upon the *Touhy* doctrine and principles of sovereign immunity, we conclude that the state court had no authority to enforce the subpoenas, and the district court acquired none on removal. Cromer's remedy, if any, for the Justice Department's actions in the instant case may be found in the Administrative Procedures Act, 5 U.S.C. § 702, which expressly limits such review authority to the federal courts. *Boron,* 873 F.2d at 71.

III.

[11] Cromer, however, contends that *Boron* is distinguishable from the instant case in that the underlying cause here is a criminal one, not civil, and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

hat his constitutional rights to due process and con- rontation of witnesses should predominate over the doctrine of sovereign immunity. This is an issue we need not decide, however, because we find that even if some federal official were amenable to state process, and the *Roviaro* analysis undertaken by the district court below were therefore the correct one, the order of the district court would have to be affirmed.

Relying on the Supreme Court's reasoning in *Pennsylvania v. Ritchie,* 480 U.S. 39, 60-61, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), the district court below determined that as a matter of equity Cromer's due process rights should be balanced against the government's right to protect its employees subpoenaed to testify in state court. (JA 94-95).

The district court relied upon *Florida v. Cohen,* 887 F.2d 1451 (11th Cir.1989), wherein the defendant was charged in state court with the murder of her husband. The defendant subpoenaed information from various federal agents and agencies regarding a confidential informant who had information on the activities of Frank Diaz, a fugitive from justice who was initially a suspect in the murder. The government filed motions to quash and sought a protective order. However, the state court ordered the Government to produce the records for an *in camera* review. When the Government failed to respond to the order, the court issued a show cause order. As in the instant case, the Government then removed the issue to federal district court pursuant to 28 U.S.C. § 1442(a)(1).

The *Cohen* court performed a balancing of interests based upon application of the factors set forth by the Supreme Court in *Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). The issue on appeal to the Eleventh Circuit was whether the district court had struck the correct balance when it determined that the Government's*882 need to protect the identity of the informant outweighed the defendant's need for the information requested. The Eleventh Circuit remanded the case

for reevaluation based upon new information that the fugitive, the initial murder suspect, already knew the identity of the confidential informant, and, therefore, the Government's concerns would need to be reevaluated. As noted by the district judge in the instant case, the *Cohen* court did not address the issue of sovereign immunity.

Finding the *Cohen* approach to be the proper one, the district court below applied the factors identified by the Supreme Court in *Roviaro v. United States,* 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (courts must consider "the particular circumstances of each case, taking into consideration the crime charged, the possible defense, the possible significance of the informer's testimony, and other relevant factors" in balancing the public interest in protecting the flow of information with the individual's right to prepare a defense). The district court concluded that even under this approach it must grant the Government's motion to quash the subpoenas.

Judge Nickerson reasoned that Cromer did not provide the court with specific facts that would likely be contained in his informant file that would establish that he was acting as a federal cooperating individual at the time of his alleged violation. The district court found that Cromer's desire to raise a question as to his guilt in the minds of the jurors, based upon unrelated allegations of his efforts as a cooperator, was an insufficient basis to compel the government to disclose confidential information in violation of applicable regulations. The district court also noted that the prior disclosures by Smith, Welsh, and Hornstein provided Cromer with another means to get the information in front of the jury. Additionally, Cromer would have the opportunity to cross examine Agent Hornstein regarding Cromer's efforts as an informer on behalf of the DEA when Hornstein is presented as a fact witness at the trial. For these reasons, and in light of the policies underlying the doctrine of sovereign immunity, the district court granted the Government's motion to quash the subpoenas. (JA 96-98).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

[12] This Court applies a *de novo* standard of review to the district court's grant of a protective order, quashing state court subpoenas to federal officials, as this issue is decided as a matter of law. *West v. Clarke, Murphy Self Employed Pension Plan,* 99 F.3d 166 (4th Cir.1996); *Boron Oil Co. v. Downie,* 873 F.2d 67 (4th Cir.1989). We find that the district court did not err in its analysis or application of the relevant statutory and case authority.

[13] Cromer argues that the district court erred by not reviewing his Cooperating Individual File, *in camera,* prior to ruling on the Government's motion. However, the record reveals that both parties participated in a hearing on the motion and were given ample opportunity to present their respective positions. (JA 51-90). Cromer's attorney offered a proffer of evidence at the hearing before Judge Nickerson (JA 51-54), as did the Government (JA 54-55). After considering these proffers, the district court found that Cromer had presented no more than "unrelated allegations of his efforts as a co-operator." (JA 96). Cromer "may not require the trial court to search through the ... file without first establishing a basis for his claim that it contains material evidence." *Ritchie,* 480 U.S. at 58 n. 15, 107 S.Ct. 989. We find that the record created at the hearing, and the proffers of both parties, along with the written submissions to the district court, provided a sufficient basis for the district court's decision.

[14] Appellant argues to this Court that his Sixth Amendment right to compulsory process will be violated if the subpoenas issued to three Department of Justice officials, which seek to compel their testimony in his state criminal proceeding, are quashed. It is clear that there are limits upon the due process which is accorded a defendant in presenting his defense, and, further, that the right to compulsory process is not absolute. *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). The district court properly*883 balanced Cromer's constitution-

al claims against the Government's claim of privilege and concluded that the rights articulated by Cromer did not override those presented by the Government.[FN2]

> FN2. We do not need to examine here the precise contours of the Government's privilege, for Cromer's "unrelated allegations," (JA 96), do not provide him *any* interest to weigh against the government's undisputed interest in maintaining the secrecy of confidential informant files. *See Roviaro,* 353 U.S. at 62, 77 S.Ct. 623 ("Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case ..."). Cromer was required to "come forward with something more than speculation as to the usefulness of ... disclosure." *United States v. Smith,* 780 F.2d 1102, 1108 (4th Cir.1985) (en banc) (interpreting the classified information privilege).

IV.

Based upon a *de novo* review of the record, we find that the district court did not err in its determination to quash the subpoenas. First, and most importantly, sovereign immunity bars state compulsory process against these federal officers. Second, even assuming it is correct to balance the federal privilege against Cromer's articulated interests, Cromer has failed to raise any claim sufficient to overcome the government's interest in protecting its confidential law enforcement investigations. Accordingly, the Order of the district court granting the Government's motion for a protective order, quashing the subpoenas, and dismissing the instant action is affirmed.

*AFFIRMED.*

PHILLIPS, Senior Circuit Judge, dissenting:
The ultimate issue in this case, though infrequently presented, is a difficult and important one: How, if

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

at all, may a defendant in a state criminal prosecution obtain from unconsenting federal officials documentary information [FN1] in their custody that may be material and favorable to his state-court defense?. That question takes on added complication where, as here, the defendant's contested invocation of state subpoena processes to obtain the information is removed, as a separate proceeding, to federal court. At that point, the issue of the sovereign immunity of the federal officials in the state's process, hence of the jurisdiction of the state court to issue it and, derivatively, of the federal removal court's jurisdiction to enforce it, is raised. And, within that sovereign immunity/jurisdictional issue, [FN2] there is the further issue of the bearing upon it of the state-defendant's assertion of constitutional entitlement to the information, countered by an assertion of governmental privilege against its disclosure.

FN1. The defendant sought both to compel the officials to testify and to produce documentary information. Because it was agreed that the officials would be available for cross-examination at trial, the only issue of consequence concerns production of the documentary information. I therefore address only that.

FN2. Though sovereign immunity to suit, being waivable, is not actually a limitation on the subject matter jurisdiction of courts, see Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997) (so noting as to Eleventh Amendment immunity of states), it has sufficient "jurisdictional" characteristics to share many of that doctrine's consequences including, for purposes of this case, two later noted in text: the concept of "derivative" jurisdiction and that of a court's jurisdiction to determine its own jurisdiction.

In those circumstances, what is the procedure by which a federal removal court should address the conflicting assertions of constitutional entitlement to the information on the one hand and both sovereign immunity and governmental privilege on the other? And, what are the substantive principles that control decision on those issues?

I believe that neither the district court nor the majority has fully and correctly identified and dealt with those and related issues that are presented in this case. In consequence of that failure, I believe the district court erred in quashing the state court subpoena for lack of state court jurisdiction to issue it. I therefore dissent from the majority opinion and would vacate the district court's judgment and remand for further proceedings.

I start with the controlling principles, then turn to their proper application in this case. In the process, my disagreement with the majority will appear.

*884 I.

1. The invocation by a defendant in a state criminal prosecution of state subpoena processes against an unconsenting federal official acting in his official capacity is effectively an action against the federal government because, though non-monetary in effect, it "interfere[s] with the public administration" by seeking to compel official action at odds with the sovereign's wishes. Boron Oil Co. v. Downie, 873 F.2d 67, 71 (4th Cir.1989) (quoting Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)).

2. As such, this separate "action" is subject to removal to federal court under the federal officials' removal statute, 28 U.S.C. § 1442. See Louisiana v. Sparks, 978 F.2d 226 (5th Cir.1992).

3. Because Congress has not waived the federal government's sovereign immunity to suit in state court, issuance of such subpoenas by state courts is barred by that immunity unless in withholding the information sought the official is acting unconstitutionally or in excess of his legal authority. See Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 689-690, 69 S.Ct. 1457, 93 L.Ed. 1628

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

1949); *cf. Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (recognizing comparable exception to States' Eleventh Amendment immunity to suit).

4. Notwithstanding that Congress has waived the federal government's sovereign immunity to such process in federal courts, *see* 5 U.S.C. § 702 (immunity waived as to suits seeking "relief other than money damages"), removal of such a state court subpoena proceeding to federal court does not confer any power upon the federal court not possessed by the state court. *See Minnesota v. United States,* 305 U.S. 382, 389, 59 S.Ct. 292, 83 L.Ed. 235 (1939) (removal court's "jurisdiction" is derivative of state court's). In consequence, the sovereign immunity issue for a federal removal court in such a situation is whether sovereign immunity barred issuance of the subpoena by the state court. And that turns on whether either the unconstitutional or *ultra vires* conduct exceptions could be shown to avoid the otherwise absolute bar of unwaived immunity in the state court. Resolution of that issue by the federal removal court is essentially an exercise of its jurisdiction to determine its own (here "derivative") jurisdiction. *See Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co.,* 270 U.S. 266, 274, 46 S.Ct. 263, 70 L.Ed. 578 (1926).

5. A state-defendant has a Sixth Amendment right of access under the compulsory process clause to documentary evidence in the custody of third persons that is shown to be material, favorable to his defense, and not merely cumulative. *See Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (recognizing compulsory process right in state-defendants to possibly exculpating testimony of third persons despite state-law privilege against disclosure).

6. Even such constitutionally-based rights [FN3] to disclosure and use of possibly exculpating evidence are not, however, absolute and may have to yield to countering claims of privilege made either by the prosecuting government or by third persons. *Compare Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (holding that Sixth Amendment confrontation right prevailed over state confidential proceedings privilege); *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (holding that right to a fair criminal trial overrode government-asserted informer's privilege and required disclosure of informer's identity and information),[FN4] *with, e.g.,* *885*United States v. Jenkins,* 4 F.3d 1338, 1340-41 (6th Cir.1993) (holding that, under circumstances, compulsory process right did not override government-asserted informer's privilege).

> FN3. Such rights may derive in essentially parallel form, depending upon the circumstances, from the compulsory process and confrontation clauses of the Sixth Amendment and the Due Process Clause of the Fifth Amendment, comprising overall what the Supreme Court has said "might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867-68, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982). Where, as in this case, materials are sought from a third person (here the federal government) rather than the prosecuting government, the access right at issue is that of compulsory process rather than of essentially congruent due process. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (noting essential congruence).

> FN4. Though *Roviaro* did not identify the source of the disclosure right it upheld over the claim of privilege, the Court later located it in the Fifth Amendment's Due Process Clause. *See United States v. Raddatz,* 447 U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

7. Whether a constitutional right of access or a countering claim of privilege prevails in a particular case must be determined by a fact-specific judi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

cial balancing of the conflicting interests. *See Roviaro*, 353 U.S. at 62, 77 S.Ct. 623 (prescribing balancing inquiry and outlining factors to be considered in balancing fair trial interests against prosecuting government's informer's privilege: "the crime charged, the possible defenses, the possible significance of the [testimony sought], and other relevant factors").

8. An accused seeking access to documentary materials believed to be material and favorable to his defense is constitutionally entitled, upon making "at least some plausible showing" of the existence, materiality, and favorable quality of the materials, to have them submitted to the trial court for an *in camera* inspection to determine if they are of that nature. *Ritchie*, 480 U.S. at 60, 107 S.Ct. 989 (recognizing such a threshold right under the Due Process Clause with respect to materials in custody of prosecuting government agency); *Love v. Johnson*, 57 F.3d 1305, 1312-13 (4th Cir.1995) (same). No more than a "plausible showing" is required to trigger the right to *in camera* judicial inspection because of the practical impossibility in the usual case that an accused can show more. *See Ritchie*, 480 J.S. at 58 n. 15, 107 S.Ct. 989. If the trial court determines that the materials are sufficiently material and favorable to meet the constitutional requirement, the accused then becomes constitutionally entitled to their production for his inspection and use. *Id.* at 58, 107 S.Ct. 989 (requiring new trial if post-conviction *in camera* review reveals constitutional right to use of withheld materials).

9. Critical to realization of this procedural right to *in camera* inspection and determination is that it be independently conducted by the court. Because "the purpose of *in camera* review inspection is to supplement the government's assessment of materiality with the impartial view provided by the trial judge," *United States v. Leung*, 40 F.3d 577, 583 (2d Cir.1994), the right is not adequately protected by the court's simply accepting the government's proffer of non-materiality without conducting its own inspection. *Id.*; *cf. United States v. Nixon*, 418

U.S. 683, 693, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973) (noting in reverse situation that in conducting *in camera* inspection of materials subpoenaed by Special Prosecutor, "the District Court is not limited to representations of the Special Prosecutor as to the evidence sought").

10. If *in camera* review reveals entitlement to a compelled disclosure to the defendant of all or portions of inspected materials, the court may then, however, consider in a *Roviaro* balancing inquiry claims of privilege barring public disclosure and use of the materials as evidence at trial. *See Ritchie*, 480 U.S. at 57 & n. 14, 107 S.Ct. 989 (recognizing propriety of such a two-stage procedure where privilege claimed is a qualified one; reserving question whether any claim of disclosure right could prevail over unqualified non-disclosure privilege). In conducting this balancing inquiry, the court may continue to protect the confidentiality of the materials from public disclosure pending decision by the court by appropriate protective orders and by excising and sealing the materials as deemed necessary. *See Nixon*, 418 U.S. at 714-16 & n. 21, 94 S.Ct. 3090 (describing proper procedure for protecting confidentiality during adversarial proceeding to determine third-person privilege claim asserted against document subpoena by Special Prosecutor).

11. To sum up. Where an accused in state court makes a claim of constitutional right to disclosure of documentary information in custody of federal officials (hence to the unconstitutionality of its withholding) and the officials counter with claims of sovereign immunity and privilege, the conflicting claims are conceptually intertwined. The sovereign immunity claim prevails, "jurisdictionally" barring access, unless the withholding is unconstitutional, which depends in turn upon whether the asserted constitutional right of *886 access overrides the privilege. Resolution of the ultimate issue whether access by legal process is "jurisdictionally" barred by sovereign immunity or is enforceable as a matter of constitutional right will therefore emerge

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

159 F.3d 875
(Cite as: 159 F.3d 875)

from the sequential determinations that are the objects of the first stage *in camera* materiality inspection and any follow-up *Roviaro* balancing inquiry. These then define the constitutionally mandated procedures for resolving the issues presented in this case.

## II.

I now turn to the way in which these principles were overlooked or misapplied by the district court and to the remedy required to set the case on proper course.

Interestingly, the state court plainly started out on the right track in applying the constitutionally-mandated procedures. At a hearing on Cromer's "Motion for Subpoena for Tangible Evidence" that specifically identified as its target Cromer's federal "Cooperating Individual File," the state trial judge ordered the Government to submit the file for his *in camera* inspection. Without any formal reservation or objection, the Government submitted the file. Having reviewed it *in camera*, the state judge, "finding information that is discoverable" under state law, ordered that the file be made available to Cromer's counsel for his eyes-alone review in the judge's chambers pending further orders of the court. JA 10.

Whether the state court would have followed through in applying the constitutionally prescribed procedures had the Government raised sovereign immunity and non-disclosure privilege objections is unknowable. For at this point, having tested state waters without any formal objection and found them wanting, the Government, as was its right, removed the proceeding to federal court under 28 U.S.C. § 1442. There, the Government moved immediately for quashal of the state subpoena and a complementary protective order, contending that enforcement of the subpoena was barred both by the government's sovereign immunity to suit in state court and by the Justice Department's exercise of its substantive right under Department regula-

tions codified at 28 C.F.R. §§ 16.21 to .29 to deny the access sought by the subpoena. *See* JA 55 (transcript of hearing).

Countering, Cromer asserted constitutional entitlement to the materials under due process and compulsory process guarantees. He contended that sovereign immunity was not available to bar the state subpoenas issuance and enforcement because compelling disclosure would not have the requisite effect of interfering with public administration. Further, he argued that the Justice Department regulations were invalid as a substantive basis for the Department's denial of access and that aside from them the Government had asserted no privilege against disclosure. On this basis, he sought enforcement of the state court subpoena.

The district court's understanding and resolution of these conflicting contentions is not too clear to me. The court rightly perceived that in view of Cromer's constitutional claims it should reject the Government's base-line contention that sovereign immunity absolutely barred issuance of the state court subpoena. *See* JA 95-96. Rather, the court thought that because Cromer's "constitutional rights are at stake," "as a matter of equity his due process rights should be balanced against the Government's immunity [sic] from having its employees subpoenaed to testify in state court." JA 95. On that view of the matter, the court then undertook what it characterized as a *Roviaro* balancing analysis. But that balancing, so far as expressed by the court, was a cursory, essentially one-sided one. It was conducted entirely on the basis of the motion papers before the court and the oral arguments of counsel. Critically, it did not involve *in camera* inspection of the materials specifically identified in Cromer's motion seeking disclosure. On one side of the matter, the court noted that Cromer "did not provide the court with specific facts that would likely be contained in his informant file that he was acting as a federal co-operating individual at the time of his alleged violation." Then, surmising that Cromer's purpose was "simply to raise a question as to his guilt ... based

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

on unrelated allegations of his efforts as a cooperator," the court noted that on the other side of the *887 matter, "the Government proffered that the file would show that [Cromer] was in violation of his plea agreement at the time of the state arrest." Without indicating how, even if that were the case, it would necessarily demonstrate that information in the file could not be material and favorable to Cromer's state-court defense, the court summarily concluded that Cromer's showing was "an insufficient basis to compel the Government to disclose confidential information." [FN5] JA 96-97.

> FN5. It is unclear what the court considered the regulations' exact legal significance to be. By purporting to balance the interests identified in the regulations against Cromer's constitutional claim, the court implicitly rejected the Government's contention that the regulations conferred on Department officials an absolute, judicially unreviewable right to deny access. Apparently-despite its cryptic use of "immunity" in describing the governmental interests-the court considered the regulations to confer mere qualified privilege subject to *Roviaro* balancing. As will appear, the court was surely right in rejecting any claim of absolute privilege, but wrong in believing that the regulations conferred even qualified privilege.

This procedure failed to accord Cromer the constitutional protections to which he was entitled under the principles summarized in Part I of this opinion. Cromer had specifically identified for the court a discrete file containing materials that by definition concerned his status as a "cooperating individual" with the federal government in matters related to drug enforcement. His suggestion that it might therefore contain evidence material to his defense in the state drug prosecution was all that was required to make the minimal "plausible showing" that triggered his right to have that file subjected to independent *in camera* inspection by the court. *See*

*Ritchie*, 480 U.S. at 59, 60, 107 S.Ct. 989. Instead of according Cromer that essential threshold right, the court first required a more specific showing of contents and their precise materiality than Cromer could as a practical matter know and, accordingly, than the relevant principle requires.[FN6] Then, compounding the matter, the court simply accepted the Government's countering proffer that the file did not contain information material to any defense available to Cromer but would instead reveal positively inculpating information.

> FN6. Furthermore, as Cromer points out, the court apparently misperceived the factual defense proffered by Cromer that might be supported by material information in the file. The record indicates that the proffer was not-as the court posited-that the file might show that Cromer was acting under direct orders in engaging in the charged drug transactions, but that they were undertaken as part of a DEA-approved process of gaining access to higher-ups in the drug enterprise being investigated. JA 52, 53. However that may be, the very fact of confusion on this score reveals the need for an actual *in camera* inspection to determine whether sufficiently identified materials contain information material and favorable to an available defense. That such an inspection might be critical is emphasized by the fact that when conducted by the state court, it resulted in a determination that disclosure was required.

This was error that deprived Cromer of his constitutional threshold entitlement to have the material in the file independently inspected "to supplement the Government's assessment of materiality with the impartial view provided by the trial judge." *Leung*, 40 F.3d at 583 (citation omitted). The district court's order quashing the state subpoena and granting the Government's complementary protective order should therefore be vacated and the matter remanded for proper proceedings. In those proceed-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

ings, the district court should first conduct an independent inspection of the file materials to determine whether any portions might be material and favorable to any defense that might be available to Cromer in the state court prosecution. This would obviously require consideration of the elements of the state offense as charged and such factual and legal defenses to it as are available under state law and are plausibly suggested as intended defenses by Cromer. *See Roviaro* 353 U.S. at 62, 77 S.Ct. 623. If on the basis of that inspection any materials were ordered disclosed to Cromer or his counsel, an appropriate order for further proceedings to consider any claims of evidentiary privilege against their use should be entered. If no information was found sufficiently material and favorable to require disclosure without regard to any claims of privilege, the protective order and that quashing the subpoena should be reinstated. In either event, the materials inspected*888 should be sealed for possible appellate review. *See Love,* 57 F.3d at 1313.

### III.

Because I would vacate and remand for further proceedings, it is necessary to address two critical points in the majority opinion that are at odds with the remedy I would order. Both rely upon the supposed authority of *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951), as recognizing and defining the substantive and procedural effects of the Department of Justice regulations upon which the Government makes its claims of immunity and privilege.

### A.

The first point, implicit in the majority's approval of the district court's *Roviaro* balancing, which accepted that the regulations established an executive non-disclosure privilege, is that the regulations could have that substantive effect. I disagree, believing that the regulations could not, under their authorizing statute, have any such substantive ef-

fect, and that *Touhy* does not hold to the contrary. Consequently, I would hold that the Justice Department regulations themselves confer no substantive power on the Department to deny access to properly demanded materials in its files, certainly not as a matter of absolute, judicially unreviewable discretion, nor even as a matter of qualified executive privilege.

The regulations at issue were promulgated pursuant to 5 U.S.C. § 301, which provides:

> The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

The critical regulation sections relied upon by the Government are § 16.22(a) [FN7] and § 16.26(b). [FN8]

> FN7. (a) In any federal or state case or matter in which the United States is not a party, no employee or former employee of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official in accordance with §§ 16.24 and 16.25 of this part.

> FN8. (b) Among the demands in response to which disclosure will not be made by any Department official are those demands with respect to which any of the following

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

159 F.3d 875
(Cite as: 159 F.3d 875)

factors exist:

(1) Disclosure would violate a statute, such as the income tax laws, 26 U.S.C. 6103 and 7213, or a rule of procedure, such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e),

(2) Disclosure would violate a specific regulation[,]

(3) Disclosure would reveal classified information, unless appropriately declassified by the originating agency,

(4) Disclosure would reveal a confidential source or informant; unless the investigative agency and the source or informant have no objection,

(5) Disclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired,

(6) Disclosure would improperly reveal trade secrets without the owner's con- sent.

The Government contends, and the majority holds, that in combination the first sentence of § 301, as implemented by §§ 16.22(a) and 16.26(b) of the regulations, confers a right in Justice Department officials to deny on the basis of any of the § 16.26(b) factors access by an accused such as Cromer to documentary material in its custody.

As earlier indicated, the Government's basic position seems to have been throughout that the right thus conferred by regulation is an absolute one whose exercise is committed to the unreviewable discretion of the appropriately designated Department official. In consequence, the Government contends, exercise of the right of denial in this case had

the effect of confirming (by refusing to waive?) the sovereign immunity of the Department officials to the state-court subpoena.*889 On that view, no *Roviaro* balancing of Cromer's constitutional claim against Government interests was warranted; the judicial door was closed by the Department's act of denying the demand. FN9 The majority seems—though it is not altogether clear-not to have accepted that extreme position. In opining that there was no error in the *Roviaro* balancing done by the district court, the majority seems to accept that the regulations conferred at most a qualified executive privilege that was subject, as any privilege, to such a balancing inquiry.

FN9. The Government, confronting the district court's rejection of its most extreme position, contends that if balancing was in order, it was properly conducted and led to the correct result. Or so the contention seems to go. *See* Appellees' Br. at 10, 11.

Whatever the Government's position and the majority's-whether of absolute right or mere qualified executive privilege deriving from these regulations-I think they are wrong.

The reason is a simple one. Section 301 was intended only to allow agencies to regulate their internal procedures for receiving and processing demands such as Cromer's for access to information in their files. It was not intended to confer on an agency or any of its officials the substantive authority either to withhold information as a matter of absolute discretion or to promulgate and assert any form of executive privilege against disclosure. While the regulations at issue may therefore validly prescribe enforceable procedures for presenting and internally processing such demands, they may not go further and lay down substantive grounds for their denial, either as a matter of unreviewable discretion or as a matter of qualified privilege. To the extent they purport to do the latter, they are invalid. This is borne out by the text and legislative history of § 301, by judicial interpretations, and by the opinion of leading commentators.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

The last sentence of § 301 speaks directly to the point: "This section does not authorize withholding information from the public or limiting the availability of records to the public." It was added by a 1958 amendment to § 301's precursor, 28 U.S.C. § 22 (1952), for the avowed purpose of counteracting perceived abuses by the executive branch which, it was believed, had "twisted [the statute] from its original purpose as a 'housekeeping' statute into a claim of authority to keep information from the public," and by interpreting the statute as a broad grant of substantive authority to withhold information, had "let every file clerk become a censor." H.R.Rep. No. 1461, 85th Cong., 2d Sess. 1 (1958).

Courts carefully attending this "Housekeeping" Statute's legislative history have so construed it, some in the process holding invalid agency regulations claimed to confer substantive non-disclosure rights or privileges. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 310, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (noting, on basis of such a review, that § 301 is not "a substantive grant of legislative power to promulgate rules"); *United States ex rel. O'Keefe v. McDonnell Douglas Corp.,* 132 F.3d 1252, 1255-56 (8th Cir.1998) (holding invalid, as not authorized by § 301, a substantive Justice Department regulation authorizing non-disclosure of information obtained in defense-contractor investigation); *United States v. Henson,* 123 F.3d 1226, 1237 (9th Cir.1997) (holding that while § 301 "does not allow an agency to refuse to disclose information, it does allow an agency to choose who may disclose the information and the procedure to be followed for such a disclosure") (citations omitted); *Houston Business Journal, Inc. v. Office of Comptroller,* 86 F.3d 1208, 1212 (D.C.Cir.1996) (holding that § 301 does not "authorize[ ] a federal agency to withhold documents from a federal court" and opining that regulations having that effect would be invalid) (citations omitted); *In re Bankers Trust Co.,* 61 F.3d 465, 470 (6th Cir.1995) (holding Federal Reserve Board regulation barring release of confidential information not authorized by § 301).

Disregarding the force of these recent decisions, the majority relies on *Touhy* as having authoritatively established that the current Department regulations do have the substantive effect of an executive privilege against document disclosure. But the *Touhy* Court, considering in 1951 the effect of a precursor Department order which simply *890 gave to the Attorney General the sole authority to release requested information in Justice Department files, expressly declined to address this very issue. *Touhy* held only that the order, as promulgated under § 301, was valid in relieving an FBI agent from liability for failing to obey a subpoena duces tecum in the absence of authorization by the Attorney General. The Court was at pains to point out that it addressed only the Department's power under § 301 so to centralize the release authority, that it was not addressing the substantive powers of the Department to determine the conditions for release. *Touhy,* 340 U.S. at 467-9, 71 S.Ct. 416.

The decided weight of judicial authority and scholarly commentary supports this understanding of *Touhy.*

As the Eighth Circuit recently pointed out, aside from the fact that *Touhy* only avowedly upheld the then-governing order in its effect upon "internal administrative procedures," it was decided before the 1958 amendment to § 301 had made it clear that agencies cannot promulgate substantive non-disclosure regulations. *See O'Keefe,* 132 F.3d at 1255, 1256; *see also NLRB v. Capitol Fish Co.,* 294 F.2d 868, 875 (5th Cir.1961) (observing that since 1958 it has been established that § 301 "cannot be construed to establish authority in the executive departments to determine whether certain papers and records are privileged"); 26 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence,* § 5682 (1992) (concluding, based upon extensive review of § 301's legislative history, cases (including *Touhy* ) and scholarly comment, that better view is that 1958 amendment, coupled with the recently enacted Federal Rules of Evidence, establish that § 301 confers no power to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
Cite as: 159 F.3d 875)

create substantive privileges by agency regulation).
FN10

FN10. The majority relies upon *Boron Oil Co. v. Downie*, 873 F.2d 67 (4th Cir.1989), as precedent in this circuit for the contrary position that, per *Touhy*, the regulations do create a substantive executive non-disclosure privilege. But *Boron*, a civil case, simply assumed this on the assumed authority of *Touhy*, and did not directly address the issue.

This does not mean of course that the Government might not in this case invoke executive privileges deriving from other legitimate sources such as the common law informant's privilege recognized and balanced in *Roviaro*. See *Nixon*, 418 U.S. at 709-10, 94 S.Ct. 3090 (noting existence and sources of various privileges, including executive). Whether any such privilege might be available in respect of the materials at issue is of course not now before this court, and indeed could only be known at this point by the Government which has so far declined to submit the materials for judicial inspection. In ordering remand, I would therefore instruct that in any *Roviaro* balancing that might be found required, Government claim of privilege could only be based on sources other than these department regulations.

### B.

Finally, in an apparent fall-back position, the majority suggests that, per *Touhy*, the subpoena could properly have been quashed because served upon officials not authorized by the regulations to release the information. Aside from the fact that the Government has not raised this issue,[FN11] it is without merit.

FN11. The Government's sole position throughout has been that the agents' refusal to produce the file information was proper on substantive grounds of sovereign immunity and an executive privilege properly exercised under the Department regulations.

*Touhy* still stands for the proposition that 5 U.S.C. § 301 confers on the Department of Justice the authority by regulation to lay down procedural rules for the making and internal processing of demands upon it to produce documentary information in its files, including the centralizing of authority finally to act on particular demands. Hence, it continues to stand as precedent for its narrow holding that a Department agent who had not been authorized to release information by the official having power to order the release could properly decline to obey a subpoena duces tecum issued to him. But, as indicated, *Touhy* did not purport to decide the issue of the substantive power of the official with authority under the then regulation to withhold the information, because he was "not before the trial court." *891 Touhy*, 340 U.S. at 467, 71 S.Ct. 416. Justice Frankfurter, specially concurring, noted the narrowness of the holding and pointed out its implication that the official *with* authority must be subject to process in order to allow an effective substantive challenge to decisions to withhold "documents within his possession that are relevant to a judicial proceeding." *Id.* at 472-73, 71 S.Ct. 416 (Frankfurter, J., concurring).

At the time *Touhy* was decided, the Department had promulgated a simple Department of Justice Order which forbade any officer or employee to produce requested information "except in the discretion of the Attorney General, the Assistant to the Attorney General, or an Assistant Attorney General Acting for him." See *Touhy*, 340 U.S. at 463 n. 1, 71 S.Ct. 416. Extrapolating from *Touhy*, and surely with Justice Frankfurter's concurrence in mind, courts since have assumed that to the extent Department regulations identify an official, or officials, with final authority, that official is the only proper, but a necessarily available, target for a subpoena duces tecum. At the time of *Touhy*, that official was identifiable as a matter of record as either the Attorney

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

159 F.3d 875
(Cite as: 159 F.3d 875)

General, or his Assistant, or a properly delegated Assistant Attorney General. And, *Touhy* warned, persons seeking information must subpoena the proper official at peril of issuing one ineffectual as substantive challenge. In *Touhy* 's immediate aftermath therefore, a person desiring to raise such a substantive challenge was able to identify the clearly identified ultimate decision-maker and thereby to lay the basis for the judicial challenge that Justice Frankfurter had pointed out must be possible.

But the simple order at issue in *Touhy* no longer exists. In its place, the present regulations promulgated in 1980 lay down a much more elaborate and complicated procedure-both for making and for internally processing demands upon the Department for documentary (or other) information. Most critically, they diffuse the final authority to release demanded information among a set of senior officials that does not, in fact, include the Attorney General, and on internal processing contingencies that make identification of the ultimate decision-maker impossible at the time a subpoena is issued.

Specifically, as they now stand, the regulations at issue provide that (1) a person such a Cromer may properly make his "demand" for documentary information by a subpoena duces tecum, *see* § 16.21(a)(2); (2) served upon an "employee" of the Department who need not be the official with final authority to determine the Department's response, *see* § 16.22(a); (3) but who is then required to "immediately notify the U.S. Attorney for the district where the issuing authority is located," *see* § 16.22(b); (4) who, in turn, is required to "follow procedures set forth in § 16.24," *see* § 16.22(b); (5) which, in summary, may result in a final decision on the Department's response being made by the U.S. Attorney alone, or in combination with the appropriate division head, or in case of disagreement between those two, by an Assistant Attorney General, *see* § 16.24; (6) with the possibility, depending upon internal developments, that decision may finally be kicked up to the Deputy Attorney General

or an Associate Attorney General, *see* § 16.25.

By these much more elaborate and detailed procedures, the current regulations effectively require no more of a demander such as Cromer than that he subpoena the presumed custodian of documents, leaving it then to internal procedures beyond his control to route the demand to the ultimate authorizer. Because under these regulations the identity of that ultimate authority is beyond the demander's control and knowledge, he could not be required to subpoena that person or indeed to reach him by any other procedural device. It therefore is no longer possible to extrapolate from *Touhy* (as some courts continue erroneously to do without taking the new regulations' regime into account) that the only proper (and an always available) target of a subpoena duces tecum is the Attorney General or his delegate of record.

Here Cromer did exactly what the current regulations required to force a response by the Department to his "demand." The only thing he was required to do beyond issuing a subpoena to the assumed custodian or controller of the files he sought was to submit, *892 upon request of the U.S. Attorney, "a summary of the information sought and its relevance to the proceeding." *See* § 16.22(d). This he did in his letter to the U.S. Attorney. (No "affidavit" was required as to the documents, in contrast to testimonial evidence, *see* § 16.22(c)).

Concurring in *Touhy*, Justice Frankfurter admonished that the Department's power by regulation to centralize its internal processes could not be taken to the point of making it impossible for one seeking information to reach some identifiable target. *Id.* at 473, 71 S.Ct. 416 (observing that this "would be to apply a fox-hunting theory of justice that ought to make Bentham's skeleton rattle").[FN12] I believe the only way to interpret the present regulations to avoid that unacceptable consequence is to treat them as having constituted any Department "employee" who is served with a subpoena as effectively the authorized process agent for the official to whom the demand is ultimately routed ac-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

159 F.3d 875
(Cite as: 159 F.3d 875)

cording to the prescribed Department procedures. That is exactly the design of the regulations which rely upon that employee to set in motion a process whose unfolding is completely beyond the knowledge of the person making his demand by subpoena. I would so hold in rejecting any claim that Cromer somehow defaulted procedurally in targeting improper Department officials.

> FN12. As an aside, perhaps to accommodate Justice Frankfurter's admonition that an effective substantive challenge to access denials must always be possible, the majority suggests that Cromer might make such a challenge by an administrative proceeding under 5 U.S.C. § 702 to declare invalid the final agency decision to deny access. No such theory was urged by the Government nor considered by the district court, and it should not be considered properly before this court. If it were, I would disagree both with the premise that such a proceeding is needed because a subpoena cannot serve and with the premise that it could properly serve the purpose. Whatever the merits of a view that such a proceeding might adequately serve in a civil action, I am satisfied that it could not constitutionally serve in a criminal case. On that, I agree with Judge Norris's demonstration of its practical infeasibility as a means for a criminal defendant to obtain exculpatory information in advance of or during a criminal proceeding. *See In re Boeh*, 25 F.3d at 770 n. 4 (Norris, J., dissenting).

C.A.4 (Md.),1998.
Smith v. Cromer
159 F.3d 875

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibit 4

Westlaw.

170 F.3d 431
(Cite as: 170 F.3d 431)

뷁

United States Court of Appeals,
Fourth Circuit.
UNITED STATES of America; Federal Bureau of
Investigation, Plaintiffs-Appellees,
v.
Scotland E. WILLIAMS, Defendant-Appellant.
No. 98-1947.

Argued Jan. 25, 1999.
Decided March 11, 1999.

Defendant in state murder prosecution attempted to
subpoena files from Federal Bureau of Investiga-
tion (FBI). FBI removed case and moved to quash
subpoena. The United States District Court for the
District of Maryland remanded, and state court is-
sued show cause order. FBI again removed case
and moved to quash subpoena and order to show
cause. The District Court, Joseph H. Young, Senior
District Judge, granted motion and denied defend-
ant's reconsideration motion. Defendant appealed.
The Court of Appeals, Traxler, Circuit Judge, held
that defendant was required to comply with Justice
Department regulation governing production of in-
formation to obtain disclosure of FBI files.

Affirmed.

West Headnotes

[1] Records 326 ☞34

326 Records
    326II Public Access
        326II(A) In General
            326k34 k. Proceedings for Access. Most
Cited Cases

United States 393 ☞125(28.1)

393 United States
    393IX Actions
        393k125 Liability and Consent of United

States to Be Sued
        393k125(28) Particular Departments, Of-
ficers, or Agencies, Suits Against
            393k125(28.1) k. In General. Most
Cited Cases
Pursuant to doctrine of sovereign immunity, which
precluded production compelled by state-court sub-
poena, state criminal defendant was required to
comply with Justice Department regulation govern-
ing production of information in proceedings in
which United States was not party to obtain disclos-
ure of Federal Bureau of Investigation (FBI) files
concerning FBI's assistance to state authorities in
investigating crimes for which defendant was in-
dicted; requiring compliance as prerequisite to ob-
taining potentially exculpatory information did not
authorize withholding of such information. 5
U.S.C.A. § 301; 28 C.F.R. §§ 16.22(a, d), 16.24-
16.29.

[2] Records 326 ☞34

326 Records
    326II Public Access
        326II(A) In General
            326k34 k. Proceedings for Access. Most
Cited Cases
State criminal defendant who seeks release of files
of federal law enforcement agency in connection
with his prosecution and who is aggrieved by
agency's response under its regulations may assert
his constitutional claim to investigative information
before district court, which possesses authority un-
der Administrative Procedure Act (APA) to compel
agency to produce requested information in appro-
priate cases. 5 U.S.C.A. § 706.
*431 ARGUED: Nancy Susanne Forster, Public
Defender's Office, Baltimore, Maryland, *432 for
Appellant. Charles Joseph Peters, Sr., Assistant
United States Attorney, Baltimore, Maryland, for
Appellees. ON BRIEF: Lynne A. Battaglia, United
States Attorney, Baltimore, Maryland, for Ap-
pellees.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

170 F.3d 431
(Cite as: 170 F.3d 431)

Before WILKINS, MICHAEL, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge TRAXLER wrote the opinion, in which Judge WILKINS and Judge MICHAEL joined.

## OPINION

TRAXLER, Circuit Judge:

This appeal arises out of appellant Scotland E. Williams'("Williams") attempt to subpoena files from the Federal Bureau of Investigation ("FBI") in connection with his prosecution by the State of Maryland for murder, and the state court's subsequent issuance of a show cause order to the FBI for its refusal to comply with the subpoena. After the matter was removed to federal court, the district court issued an order quashing the state court subpoena and show cause order. Because the state court lacked jurisdiction to compel the FBI to produce its files, we affirm.

### I.

In 1994, Williams was indicted for the murders of Jose Trias and Julie Gilbert in the Circuit Court for Anne Arundel County, Maryland. During the investigation of the murders, the FBI provided investigative assistance at the request of state officials. Williams was later tried, convicted, and sentenced to death, but the conviction was overturned on appeal. *See Williams v. State*, 342 Md. 724, 679 A.2d 1106 (1996).

In October 1997, pending his second trial on the state murder charges, Williams served a state court subpoena upon the local custodian of records for the FBI, requesting production of all FBI files relating to the state homicide investigation. Williams claimed that the FBI files contained exculpatory evidence to which he was entitled.

The FBI refused to respond to the state court subpoena because it did not comply with the federal regulations governing the production and disclosure of information by the Justice Department in federal and state court proceedings. *See* 28 C.F.R. §§ 16.21 -16.29 (1998). [FN1] Williams was advised that the subpoena had to be accompanied by a written statement identifying the specific information requested and explaining its relevance to the state proceeding at issue. *See* 28 C.F.R. § 16.22(d).

Williams then filed a motion in the state circuit court, requesting an order directing the issuance of a subpoena *duces tecum* to the custodian of records for the FBI. The state court granted the motion, directing that the custodian of records produce the requested FBI files at the office of defense counsel. The FBI removed the case to district court pursuant to 28 U.S.C.A. § 1442(a)(1) (West Supp.1998), and filed a motion to quash the subpoena. The district court, however, remanded the case, ruling that there had not been a commencement of a civil action against the FBI under § 1442(a)(1) because no "coercive power of the state court" had been exercised to enforce the subpoena.

Following remand, the state court ordered the custodian of records for the FBI to appear and show cause why he should not be held in contempt for failing to comply with the court's previous order directing production. The FBI again removed the case to the district court under § 1442(a)(1), and moved to quash the subpoena and the order to show cause. The district court summarily granted the motion to quash, and denied Williams' subsequent motion for reconsideration, ruling that the FBI had properly refused production under the applicable Justice Department regulations and that the doctrine of sovereign immunity shielded the FBI from being compelled by the state court to produce its files. [FN2] This appeal followed.

### *433 II.

This case places before the court the issue of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

170 F.3d 431
(Cite as: 170 F.3d 431)

whether a state court has jurisdiction to compel the FBI to produce documents subpoenaed by a defendant in the course of a state criminal prosecution. We conclude that it does not.

A.

Under 5 U.S.C.A. § 301 (West 1996), commonly known as the "Housekeeping Statute," federal agencies are granted authority to prescribe regulations governing the agency, including regulations for "the custody, use, and preservation of its records, papers, and property." The statute also provides that "[t]his section does not authorize withholding information from the public or limiting the availability of records to the public." *Id.*

Pursuant to this authority, the Justice Department promulgated a regulation that governs the production of information in the course of a proceeding in which the United States is not a party:

In any federal or state case or matter in which the United States is not a party, no employee or former employee of the Department of Justice shall, in response to a demand, produce any material contained in the files of the Department, or disclose any information relating to or based upon material contained in the files of the Department, or disclose any information or produce any material acquired as part of the performance of that person's official duties or because of that person's official status without prior approval of the proper Department official....

28 C.F.R. § 16.22(a). In addition to imposing this prohibition on the disclosure of information without prior approval, the regulations outline the manner in which Justice Department information must be requested, specify the officials charged with making the decision whether to disclose information, and identify the factors to be considered by the officials in making that decision. *See* 28 C.F.R. §§ 16.24-16.29.

In *United States ex. rel. Touhy v. Ragen,* 340 U.S.

462, 71 S.Ct. 416, 95 L.Ed. 417 (1951), the United States Supreme Court recognized the validity of a Justice Department order-a predecessor to 28 C.F.R. § 16.22(a)-which restricted the disclosure of information pursuant to the Housekeeping Statute, noting that "[w]hen one considers the variety of information contained in the files of any government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious," *id.* at 468, 71 S.Ct. 416. Relying upon *Touhy,* we recently recognized the validity of 28 C.F.R. § 16.22 in *Smith v. Cromer,* 159 F.3d 875, 878(4th Cir.1998).

The issue of a state court's jurisdiction to compel federal officials to produce documents is also not new to us. In *Smith,* we held that an order of a state court seeking to compel a federal official to comply with a state court subpoena is "an action against the United States, subject to the governmental privilege of sovereign immunity." *Smith,* 159 F.3d at 879. Unless such immunity is waived, the state court "lacks jurisdiction to proceed against a federal employee acting pursuant to agency direction." *Id.* And because "a federal court's jurisdiction upon removal under 28 U.S.C. § 1442(a)(1) is derivative of the state court jurisdiction," the federal court can acquire no jurisdiction to enforce a state court subpoena or order upon removal. *Id.; see also Boron Oil Co. v. Downie,* 873 F.2d 67, 70 (4th Cir.1989) (holding that *Touhy* authorizes federal agencies to control the dissemination of information, and that "[t]he doctrine of sovereign immunity precludes the state court-and the federal court which gained limited jurisdiction upon removal-from exercising jurisdiction to compel [a federal officer] to testify contrary to [the agency's] instructions").

*434 B.

[1] Despite these precedents, Williams now seeks to have us carve out an exception to the doctrine of sovereign immunity, and rule that he need not have

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

170 F.3d 431
(Cite as: 170 F.3d 431)

complied with the Justice Department's regulations, because the FBI was assisting state authorities in their investigation of the state crimes for which he was ultimately indicted. Under these circumstances, Williams argues, the FBI should not be allowed to require compliance with the regulations or claim the defense of sovereign immunity to ignore a state court subpoena. Williams also contends that requiring his compliance with the regulations would be tantamount to sanctioning a federal agency's decision to withhold potentially exculpatory evidence from a state criminal defendant. We disagree.

By requiring that a state criminal defendant comply with the Justice Department's regulations as a prerequisite to obtaining potentially exculpatory information, we in no way authorize the FBI to withhold such information where it has participated in the investigation of the alleged crimes at issue. [FN3] Nor do we deprive the state criminal defendant of meaningful judicial review of the FBI's response to such a request.

[2] Under the Justice Department regulations, a state criminal defendant is simply required to serve upon agency officials, in addition to his state court subpoena or other demand for information, a response to the United States Attorney's request for a summary of the information sought and its relevance to the proceeding. See 28 C.F.R. § 16.22(d). If dissatisfied with the agency's response to the request, the defendant is not without recourse. The proper method for judicial review of the agency's final decision pursuant to its regulations is through the Administrative Procedure Act ("APA"). See 5 U.S.C.A. §§ 701-706 (West 1996). See Smith, 159 F.3d at 881 (noting that defendant's "remedy, if any, for the Justice Department's actions in the instant case may be found in the [APA] ... which expressly limits such review authority to the federal courts"). [FN4] On review, district courts have jurisdiction to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," including action that is "contrary to constitutional right, power, privilege,

or immunity." 5 U.S.C.A. § 706(2)(A)-(B). In addition, the APA vests the district court with authority to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.A. § 706(1). Therefore, a state criminal defendant, aggrieved by the response of a federal law enforcement agency made under its regulations, may assert his constitutional claim to the investigative information before the district court, which possesses authority under the APA to compel the law enforcement agency to produce the requested information in appropriate cases.

III.

For the foregoing reasons, the order of the district court is affirmed.

AFFIRMED

FN1. The FBI also advised Williams that the subpoena would not be honored because it failed to comply with the Privacy Act. See 5 U.S.C.A. § 552a(b)(West 1996 & Supp.1998).

FN2. On March 27, 1998, Williams made a separate request for information pursuant to the Justice Department regulations, listing the specific information sought. The FBI responded to this request on April 24, 1998. There is no indication that Williams appealed the agency's decision to the district court pursuant to the Administrative Procedure Act. See 5 U.S.C.A. § 702 (West 1996). On May 28, 1998, Williams was again convicted of the Trias/Gilbert murders and received a sentence of life imprisonment without the possibility of parole.

FN3. Indeed, although the FBI contests that exculpatory evidence existed in the files requested by Williams, it does not contend that it may withhold such information in general. Because Williams failed to follow the proper procedure to obtain the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

170 F.3d 431
(Cite as: 170 F.3d 431)

FBI files, the district court lacked jurisdiction to review the files or compel their production, and we likewise express no opinion on whether Williams was deprived of exculpatory information in his state criminal trial.

FN4. Under the regulations, state subpoenas are referred to the United States Attorney for the district where the state court is located. *See* 28 C.F.R. §§ 16.21-16.22. At oral argument, the government asserted and Williams did not dispute that the United States Attorney's response to a subpoena constitutes final agency action for purposes of the APA.

C.A.4 (Md.),1999.
U.S. v. Williams
170 F.3d 431

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.