Exhibit 25

DISTRICT COURT
EL PASO COUNTY, COLORADO
270 South Tejon
Colorado Springs, CO 80903


PEOPLE OF THE STATE OF COLORADO

vs.


JAMES CISNEROS
Defendant:

                                    * FOR COURT USE ONLY *


                                     Case No. 09 CR 768

                                     Division 15



APPEARANCES:


MS. TERRY SAMPLE, Reg. No. 33919
For the People

MS. AMY PADDEN, U.S. Attorney's Office, 28372
MR. ROBERT GOFFI, FBI, Reg. No. 15012


MR. SHIMON KOHN, Reg. No. 31710
For the Defendant


                      REPORTER'S TRANSCRIPT


        The following proceedings were held July 23, 2009,

before the HONORABLE GREGORY WERNER, Judge of the District

Court.

1          THE COURT:  09 CR 768, James Cisneros.  We are here

2    today for, it is looking like, a return on a subpoena duces

3    tecum.  Mr. Kohn, I did get, just yesterday I got it faxed, I

4    guess, the motion to quash from the Justice Department

5          MS. SAMPLE:  Judge, for your information, I do have

6    Amy Padden here and Bob Goffi.

7          MR. KOHN:  Before we go any further, I apologize for

8    interrupting, does the Court have a record of me waiving my

9    client's appearance for this?

10          THE COURT:  I thought I did.

11          MR. KOHN:  It wouldn't be unusual for me to do that.

12    I don't have a record in my files.  I am just concerned.

13          THE COURT:  I think probably what happened here, I am

14    looking at the last minute order, and it does not reflect in

15    the last minute order that you waived.  But I think probably

16    what would have occurred here is that you called Ms. Jones for

17    a return date, and she gave you this, and so it would not be a

18    bond return date.  I am not considering this as a bond return

19    date.

20          If you want to waive his appearance, that's fine.

21          MR. KOHN:  He is in custody, judge.

22          THE COURT:  That's right.  He is still in custody on

23    the parole hold.

24          MR. KOHN:  I certainly don't mean to complicate

25    things.  This is a critical stage.  This may be the most

1    critical motions hearing we have in front of the Court on this

2    case.  I am not comfortable waiving his appearance, if I

3    haven't already received his permission to do so.  I am

4    wondering maybe I can track down the sheriff's office right

5    here on this floor and see how long it would take them to bring

6    him over here.

7            THE COURT:  We could get him here this afternoon at

8    1:30 for sure.

9            MR. KOHN:  I have a hearing at 2:00 o'clock in

10   Division 16, but I am sure I can explain to them that I will be

11   running late.

12           THE COURT:  Or everybody can be succinct and we can

13   get it done in a half hour.

14           MR. KOHN:  We could definitely shoot for that, judge.

15           MS. SAMPLE:  Judge, if I could ask Ms. Padden.

16           Ms. Padden and Mr. Goffi would be available, judge.

17           THE COURT:  Let's do it at 1:30 then.

18           MR. KOHN:  Thank you, judge.  I apologize.

19           THE COURT:  That's all right.  I thought this was

20   going to take some time.

21           (Brief recess.)

22           THE COURT:  Court will call 09 CR 768, People vs.

23   Cisneros.  And we are here on a number of things.  There are a

24   number of things pending.  Let's deal with the easiest first.

25   There is a motion for separate trials and Counts 2 and 3 which

1    are possession of a weapon by a previous offender, and I will

2    grant those, unless there is an objection by the People or

3    argument by the People as to why it should be denied.  I

4    believe we are here on the SDT return today.

5           MR. KOHN:  I agree, judge.

6           THE COURT:  Let me take a look at my -- you may be

7    right.  I may have gotten ahead of myself here.  My mistake.

8    You would be right.  I have reviewed the motion to quash, and

9    we have a representative from the Justice Department here.

10           MS. PADDEN:  Good afternoon.  Bob Goffi and Amy

11    Padden from the U.S. Attorney's Office, P-a-d-d-e-n.

12           THE COURT:  I have reviewed the motion to quash the

13    subpoena that was filed by the U.S. Attorney's Office.  I had a

14    couple of questions.  There were a number of things that were

15    requested that I can't make heads or tails of.

16           It says, "All information in the possession of FBI

17    regarding confidential informant DN 5797."  Is that allegedly

18    Mr. Rodarte?

19           MR. KOHN:  It is, your Honor.  That's Mr. Rodarte.

20           THE COURT:  Then there are, "All audio recordings

21    made during the course of the investigation of FBI case number

22    281 DDN 66929.  Is that this case or is it something else?

23           MR. KOHN:  That is the case where Mr. Cisneros and

24    the Salazars are investigated, your Honor.

25           MS. SAMPLE:  Judge, that's the case number for the

1    FBI.  That's where all the reports --

2                THE COURT:  I thought that was the case.  Since it

3    referenced a number, I thought probably it was this one, but I

4    needed to make the record clear as to, in fact, that it was

5    this one.

6                MS. SAMPLE:  Your Honor, just to clarify, my

7    understanding is that that case number does not just relate to

8    Mr. Cisneros.  It's a larger gang investigation that is

9    currently ongoing by the FBI.

10               THE COURT:  As I understand it, the FBI has agreed to

11   produce and has produced requested documents in its possession

12   relating to defendant James Cisneros.

13               MS. PADDEN:  That's correct, your Honor.

14               THE COURT:  You have produced some information

15   regarding Mr. Rodarte but have not produced information which

16   you believe was unrelated to the charges against the defendant.

17               MS. PADDEN:  That's correct.

18               MR. KOHN:  If we can clarify that, the information

19   that I have received is a one-page handwritten spreadsheet

20   which is outdated regarding expenses and money paid to Mr.

21   Rodarte with no further information as to who drafted it, who

22   could lay a foundation for it, where the money actually went,

23   what the money was for.

24               So as far as Mr. Rodarte goes, we have received one

25   page out of all the information I requested for Mr. Rodarte

1    with the government.

2              THE COURT:  Okay.

3              MS. PADDEN:  Your Honor, I have with me Special Agent

4    Robert Goffi who actually did a search of the files.

5              MR. GOFFI:  I am the chief division counsel with the

6    FBI.  I prepared a response on what we turned over on Mr.

7    Rodarte.

8              THE COURT:  Are you talking this response or the page

9    that he just talked about?

10             MR. GOFFI:  The page he just talked about.  What we

11   turned over in response to the subpoena out of Mr. Rodarte's

12   informant file was a document that showed the financial

13   authorization for Mr. Rodarte.  That document shows he was paid

14   by the FBI for his informant services.  The other document that

15   we turned over from his informant file is one document that

16   purports information provided by Mr. Rodarte on James Cisneros.

17   The remainder of the file we didn't turn over.

18             MR. KOHN:  Judge, I do have to admit, I haven't

19   viewed all of the discovery that's been released pursuant to

20   the SDT.  I have not reviewed any information as provided by

21   Rodarte on Mr. Cisneros.

22             THE COURT:  As I see this, the way I am going to do

23   this, I am going to ask some questions primarily of Ms. Sample.

24   And it may require some input from Ms. Padden and Mr. Goffi.

25   But let me ask these questions of Ms. Sample, since she is the

1    one that's trying the case.

2    With respect to the Rule 16 A1 information, and I am

3    sort of familiar with everything that's gone on, but with

4    respect to Rule 16 A1 information under Part 1, has all of that

5    information been produced?

6    MS. SAMPLE:  Judge, I apologize to your Honor.  I had

7    my statute book this morning.  I forgot to bring it over with

8    me.

9    THE COURT:  I have an extra.  Do you want to use

10   mine?  However you want to do it.

11   MS. SAMPLE:  16 A1, judge.

12   THE COURT:  Under Part 1, that deals with police

13   arrest, crime or offense reports, statements of all witnesses,

14   reports, statement of experts, books, paper, documents,

15   photographs.  Basically all the Rule 16 information, has all

16   that been produced?

17   MS. SAMPLE:  Everything that the People have in their

18   possession, that we have gotten permission from the FBI to have

19   in our possession, has been turned over.

20   THE COURT:  All right.  Then this question probably

21   will -- I am going to direct it to Ms. Padden.  You can answer

22   it.

23   Let me ask you first, are you familiar with the State

24   Rule 16?

25   MS. PADDEN:  Vaguely.  But I typically practice in

1    Federal court.

2           THE COURT:  I can't imagine there is a huge

3    difference.  Let me try it anyway, with respect to the evidence

4    that the FBI and U.S. Attorney's Office has provided to the

5    prosecution, is all of that evidence, evidence which would

6    normally be -- try it this way.

7           Is all of that evidence, evidence which would

8    normally be provided to the defense in this case were it lodged

9    in Federal court?

10          MS. PADDEN:  I can't speak to that because I didn't

11   personally review the FBI files, Mr. Goffi did.

12          THE COURT:  Mr. Goffi, you are an attorney, if I

13   caught that right, is that right?

14          MR. GOFFI:  Yes, yes.  The answer to that question

15   would be yes.

16          THE COURT:  With respect to the specifics, let me ask

17   the specifics of Mr. Kohn, and that is -- that's all right, you

18   can have a seat.  I am trying to do this informally.  I am also

19   trying to get a better understanding of what it is that had

20   been produced.  I think I have a good idea about that.  I think

21   I have a rough idea of what it is that hasn't been produced.

22          Mr. Kohn, let me ask you, you have requested

23   information under your subpoena.  I am going to refer to that

24   first full paragraph.  It's the one that really refers to what

25   you are requesting.  You are asking for, "The entire

1   confidential informant file for Robert Rodarte.  It requires

2   the above agent or agency to provide any and all reports

3   involving Mr. Rodarte's participation and/or involvement in any

4   investigation either as a suspect or as a confidential

5   informant, to include any compensation or consideration

6   received by Mr. Rodarte."

7           I would tell you, I think that you are entitled to

8   know what compensation or consideration any law enforcement

9   agency may have given to Mr. Rodarte.  That I think is

10  relevant.  The remainder, however, any information, for

11  instance, and I have no idea what this is, I am just making

12  this up, for instance, Mr. Rodarte may have worked as a

13  confidential informant in some other case where he obtained

14  some information regarding somebody else that has something to

15  do with some other charge against someone else.

16          Why would that be discoverable here?

17          MR. KOHN:  We have endorsed the defense of

18  entrapment.  We also endorsed the defense of choice of evils,

19  judge, in addition to general denial.  This goes directly to

20  the heart of our defense of entrapment and choice of evils.

21  What we have is the government and agent of the government Mr.

22  Rodarte going in, pretending he is going to go through

23  everything, judge.  The Court sat through, I am sure, more than

24  one lengthy preliminary hearing on this.

25          THE COURT:  More than one.

1          MR. KOHN:  What the government is doing, through an

2    agent, is going into a group of people in this situation, I

3    imagine in others as well, he represents himself as somebody

4    who is speaking for the higher ups in a gang.  I don't think

5    that the Court needs expert witnesses to testify as to what

6    happens if you don't follow through on what the higher ups in a

7    gang are requesting.  And at that point he is the one who

8    actually commits the crime.  He is the one who was actually

9    attempting to set up a drug distribution network.

10          Now that after the SDT is released or some of the

11   information was released, I was shocked to find out the

12   un-Godly amount of money that he is receiving.  We are talking

13   about advances of $14,000 before the dates where any

14   investigations are done in a total authorization of $100,000

15   for him to provide information.  That gives him a truckload of

16   incentive to entrap, to threaten, to do whatever is necessary

17   to make his handlers in the government happy.

18          THE COURT:  Based on the one sheet of information

19   that you were provided, I think, by Mr. Goffi, that would

20   indicate that money was paid in cases other than this one.

21          MR. KOHN:  No, judge.  I don't know what it was paid

22   in.  It just indicates November 5, 2008, $7,000 paid to him.

23   And then another payment of November 5, 2008, $7,000 paid to

24   him.

25          THE COURT:  Here is what we are going to do, I am

1    going to require that the FBI or the Justice Department define

2    what he was paid in this case.  By that you will know what he

3    has been paid in some other cases.  You will be able to -- I

4    don't even know if you are going to be able to get in this or

5    exactly how you are going to get this in if he doesn't take the

6    stand necessarily.  I suppose you can cross-examine law

7    enforcement about it.

8            What you would be able to say is that he has been

9    paid in other cases a hundred thousand dollars.  You paid him

10    14 in this.  The reason why you know it's a hundred thousand

11    dollars in other cases is they are going to tell you how much

12    it was in this case.  They are not going to have to separate

13    out what each other case was.  I don't think that that's

14    appropriate.  I think that you still obtain the benefit that

15    you are seeking, which is essentially this was a guy that was

16    hired by the government to go out and set these people up and

17    that's what he did.

18            I also am concerned that if we start getting into

19    questioning of someone on the witness stand, and let's assume

20    for an easy case to resolve is that it's an investigation

21    that's already been concluded.  The questioning that would

22    bother me and I think would not be permitted would be, "Well,

23    isn't it true Mr. Rodarte worked in some other case?  That case

24    involved him doing X, Y and Z.  And for that he got paid X

25    amount of dollars."  Then we are ending up having a trial

1    within a trial within a trial.  I don't think that that's

2    appropriate.  I do think it's appropriate for you to be able to

3    know what he got paid in this case and what he has received

4    overall.  That would allow you to say he got all this money.

5    He had an incentive to set these people up.  He wanted to keep

6    his government handlers happy because look at all the money he

7    got before this case and so that's what he was doing.

8              MR. KOHN:  If I may respond.  We already have all of

9    that based on this information.  We are certainly requesting

10   additional information.  I think that we are entitled to have

11   the agreement that's signed, whether it's called a contract or

12   agreement of the defendant.  We are entitled to have that to

13   see what the contractual agreement was between the Federal

14   government and Mr. Rodarte.

15             THE COURT:  That's a different matter.

16             MR. KOHN:  I understand.  Getting back to the issue

17   of the different investigations that he had provided

18   information in.  What we are trying to do, judge, is more of a

19   reverse 404(b) argument.  We are trying to show that Mr.

20   Rodarte, with the assistance of the Federal government, has a

21   history.  If he does -- we don't know if he does or not -- has

22   a history of receiving large amounts of money.  And based on

23   that, he goes in and does what he needs to do in order to earn

24   that large amount of money so there is another big pot of money

25   waiting for him at the end of that particular investigation.

1   That's why I believe we are entitled to all of that

2   information.  I think that we should have it as a right of

3   confrontation, a right of due process, both under the state and

4   Federal Constitution, as well as Rule 16 in the statutes for

5   the Rules of Criminal Procedure in Colorado.

6           THE COURT:  You made your argument.  I have made my

7   record.  I think we get into collateral matters.  I think that

8   it is important for you to know what he got paid overall and

9   what he got paid in this case.

10          Let me ask, first of all, Mr. Goffi, can that be

11  separated out that way?

12          MR. GOFFI:  Yes.  We could do that.

13          THE COURT:  I will order that to be done.  I am not

14  going to order any other -- or any documentation regarding any

15  other investigation he was involved in to be disclosed.  I

16  don't think that's appropriate in this particular case.

17          In addition, I am concerned about this matter

18  dissolving into trials of collateral issues.  There is some

19  concern about hampering conceivably ongoing investigations.

20  Although I admit that is small at this point in time, seeing

21  how Mr. Rodarte most likely is not -- I know he is not working

22  on anything on the outside.  He is not on the outside.  And so

23  I can't see that turning over documentation in other files,

24  aside from what I have indicated, is going to help with that

25  issue.

1            Let's turn then to the second issue of, "Any and all

2    information in the possession of FBI regarding confidential

3    informant DN 5797," that's Mr. Rodarte, right?

4            MR. KOHN:  Correct.

5            THE COURT:  Again, it sounds like I may have already

6    addressed this.  But I want to make sure.  So the FBI has a

7    file about Mr. Rodarte that contains information on all of his

8    involvement in all sorts of things, is that fair?

9            MR. GOFFI:  Yes.

10            THE COURT:  What you have done is turned over

11    everything that has to deal with his involvement in this

12    particular action affecting Mr. Cisneros and the other

13    co-defendants?

14            MR. GOFFI:  Well, we are talking about his informant

15    file.  We have turned over everything out of Mr. Rodarte's

16    informant file that relates to reporting he gave us on Mr.

17    Cisneros.

18            THE COURT:  I think I have already covered that.

19    What else is in his file, aside from what was on Mr. Cisneros?

20    I mean, in general terms, is it other investigations he worked

21    on?

22            MR. GOFFI:  Yes.

23            THE COURT:  I think I have answered the second

24    paragraph.  It sounds as though that has been turned over.  I

25    am not going to require production of the entire file, again,

1  for the reasons that I stated before.  And Mr. Kohn's objection

2  to this part I think was also stated previously.

3         MR. KOHN:  Judge, it was just a couple other issues

4  as far as the confidential informant file.  We are entitled to

5  have information as to whether there was any consideration with

6  any criminal cases.  For example, was he arrested and then at

7  that point he started working for the government?  There was

8  consideration regarding criminal cases as well.

9         THE COURT:  Consideration that Rodarte got?

10        MR. KOHN:  Correct.  I am sorry, judge, I didn't

11 state that very well.  At this point I think it might be a good

12 time for me to get back to the issue of the contract that he

13 has working with the Federal government.  I think it's clear we

14 are entitled to that.  I think we are entitled to that in order

15 to show the motivation and what the level of motivation is and

16 the purpose of his communication with what the FBI calls a

17 Salazar drug organization.

18        THE COURT:  Let's deal with those issues separately.

19 Has information been given or been released to the prosecution

20 so that it can be released to defense regarding any -- I am

21 going to refer to it as deals -- that Mr. Rodarte would have

22 gotten from or any consideration that Mr. Rodarte would have

23 gotten from the government for pending criminal cases that he

24 has?

25        MS. SAMPLE:  I am not aware of any of that

1    information, judge.  The information I have of any

2    consideration is the financial that I received at the same time

3    as Mr. Kohn.

4          THE COURT:  It sounds to me like what he is looking

5    for, aside from monetary consideration is, "We will cut down

6    your years or have some charges dismissed or something," has

7    that been released?

8          MR. GOFFI:  Based on my review of the file, and I

9    wasn't the agent that handled that informant, there is nothing

10    in the file to indicate there is any consideration of that

11    sort.

12          THE COURT:  You have reviewed the file?

13          MR. GOFFI:  Yes.

14          MR. KOHN:  Can we have an order of the Court?  I

15    understand that there is no order that the Court has

16    jurisdiction over Mr. Goffi.  Perhaps a request of the People

17    that Mr. Goffi make efforts to determine whether there was any

18    type of consideration as far as criminal cases as well as

19    financial?

20          THE COURT:  He already reviewed the file.  Tell me

21    what other efforts you have in mind.

22          MR. KOHN:  Talking to the case agent to see if the

23    case agent knows of something.

24          MR. GOFFI:  I will speak with the agent that handled

25    Rodarte as the informant and find out the circumstances he came

1    to us as an informant.

2            THE COURT:  All right.  Then let me ask about this

3    because Mr. Kohn keeps referring to a contract with the Federal

4    government.

5            Does Mr. Rodarte have a contract with the Federal

6    government?

7            MR. GOFFI:  No.  There was no service agreement.

8            THE COURT:  I would have been surprised if there

9    would have been.  This is sort of a kind of, "You do this and

10   we will pay you so much amount of money," that kind of stuff.

11   That's all been disclosed?

12           MR. GOFFI:  Yes.

13           THE COURT:  As opposed to, "We are hiring you to go

14   into five different criminal organizations at the rate of $80

15   an hour," something like that, nothing like that?

16           MR. KOHN:  Hold on a second.  There has to be some

17   documentation.  And I don't know the form number or the terms

18   used in the FBI or the Department of Justice.  There has to be

19   some documentation that outlines what the government expects of

20   Mr. Rodarte, what Mr. Rodarte can and can't do, and how much

21   Mr. Rodarte is going to be compensated.  They didn't sit in a

22   room one day and say, "Mr. Rodarte, we are going to write you a

23   check for $14,000."

24           THE COURT:  Now, wait a minute.  You heard testimony

25   and I have heard it several times, you are looking for a

1    document.  I don't necessarily know that there is a document.

2    Mr. Goffi says that there isn't.  He says he is going to check

3    with the agent.  Everything that the agent has testified said,

4    "This is what we talked about.  This is what we agreed to."

5    That doesn't necessarily mean there is a written document.  If

6    there is a principal document about he is supposed to do

7    certain things, I will order that to be produced.  I would be

8    surprised if there is one.  I think it's sort of, as we run

9    into in all of the cases, that somebody is trying to get a

10   confidential informant to do something, and they are making an

11   offer to them and saying, "You do this, and I will do this."  I

12   am not sure that that necessarily means that it has to be in

13   writing.

14           MR. KOHN:  I will just tell the Court, based on my

15   experience with EPSO and CSPD, which I understand is not the

16   Federal government, the task forces that originate out of those

17   two organizations, they have a written agreement which at least

18   describes what, even in general terms, what the purpose of it

19   is.  Then it describes the consideration as to what they are

20   going to get.  A lot of times the District Attorney is involved

21   in that, as far as what the consideration is going to be.  I

22   haven't seen one for a financial consideration.

23           But certainly for cases, for working for

24   consideration on the case, then it goes into sections that

25   include understanding the responsibilities, what they can and

1    can't do, putting their life in danger, that the government

2    can't be held accountable, things to that effect.  With all of

3    the paperwork that's done in the Federal system, I would just

4    find it hard to believe that none of that documentation exists,

5    that that is just relayed to Mr. Rodarte.  Because in the

6    discovery it discusses a couple of times, "We told Mr. Rodarte

7    that he can have guns.  He can have drugs but he can only have

8    them if he is given them as a gift," things to that effect.

9          THE COURT:  "We told him," as opposed to, "He signed

10    this and knew."

11          MR. KOHN:  Okay.

12          THE COURT:  I will order -- I agree with you that if

13    such document exists, that document needs to be produced.  I

14    agree with that.  I think that I will be surprised if one does.

15    I have been surprised before.

16          MR. GOFFI:  There is not a service agreement per se

17    within Mr. Rodarte's file.  There is an administrative process

18    for opening a person as an informant.  We do have documentation

19    that would describe the admonishments Mr. Rodarte had been

20    given.  He can't engage in violence.  He can't engage in

21    illegal activity, without prior authorization.  I believe the

22    process is Mr. Rodarte signs that in front of the agent.

23          THE COURT:  I think that would be appropriate to

24    produce.  I think what they are going after is either he was

25    acting within what he was supposed to do, or he was just going

1    above and beyond in his theatrical desire to please everybody

2    else in sucking all of these other people in.  That's what the

3    defense is going for here.

4           If that does exist, then that needs to be produced as

5    well.

6           MR. KOHN:  One final issue regarding those two

7    paragraphs, judge.  I am wondering if Mr. Goffi can let us know

8    if there is any additional documentation as to the $7,000

9    amounts, whether there is another form that is sent off for

10   approval, or anything that describes why the service or expense

11   is being paid.  More than just -- if I can approach with this

12   so the Court can see it.

13          THE COURT:  Yes.

14          MR. KOHN:  That describes the expenses being paid,

15   who it's being paid to.  The only information it has on there

16   is the letter D.  I imagine that the government is not going to

17   write out checks for -- actually, they might.  I imagine there

18   has got to be some kind of paperwork trail, more than that, in

19   order to request that a check be written or that cash be given

20   out.  And I would request that additionally, judge, just for

21   the purposes of being able to lay a foundation at trial, I

22   would request that either the District Attorney stipulate that

23   this is a government document and as to what it is, or that Mr.

24   Goffi provide us a name and information as to the person who

25   drafted that document.

1    THE COURT:  I think that's probably fair.  I think

2    it's an either/or as I see it.  Either the DA or the

3    prosecution or the other side, the law enforcement side, has to

4    provide enough information so that this document can be

5    authenticated or say, "Yes.  That's authentic.  That's a

6    government document.  This is what he said."  If it is, it

7    renders everything else moot.

8    MR. KOHN:  Judge, --

9    THE COURT:  Do you want to take a minute and think

10   about that?

11   MS. SAMPLE:  Judge, one of my concerns that comes off

12   the top of my head, are you asking me to stipulate to this as a

13   piece of evidence or just as that is a government document?

14   THE COURT:  It may necessarily be -- ultimately it's

15   going to be as a piece of evidence.  As I see it, ultimately

16   what Mr. Kohn is going to do is say, "Isn't it true" -- he is

17   going to ask somebody that was involved with the

18   investigation -- "isn't it true that he was paid $7,000 here,

19   $7,000 there, $2500 there.  Overall he had been paid $93,000

20   or, no, there was -- he had been paid $17,000.  It has been

21   disbursed in those four months."

22   And the person says, "No."  He has got to have

23   something to approach him with and say, "Well, isn't this the

24   government document?  Didn't this indicate that, yes, in fact

25   he did get paid that amount?"

1          MS. SAMPLE:  That's different than stipulating to it

2     into evidence at this point in time.

3          THE COURT:  You are right.  That's true.

4          MS. SAMPLE:  I am clarifying, are you asking for me

5     to stipulate that it is true and, in fact, a government

6     document?  Or am I stipulating to that whole foundation, and

7     Mr. Kohn can introduce it into evidence without laying that

8     foundation?

9          THE COURT:  I think ultimately it's going to have to

10     be the second one because if he takes this and shows it to this

11     person and this person, whoever the witness is, and says, "I

12     don't know what that is.  I have never seen it before.  I can't

13     verify that, in fact, he had been paid that and I don't know

14     that he had been paid that," then Mr. Kohn is left with nothing

15     to, in fact, prove that he had been paid these amounts because

16     there wouldn't be any way for him to authenticate it because

17     the government doesn't want to give the foundational documents.

18     So it seems to me that the government either agrees that this

19     document can be admitted without foundation or is going to have

20     to say, "All right.  We will give you the foundational stuff,"

21     if you want to go that route.

22          You can have a couple of moments if you like.  You

23     don't have to answer this right now, if you don't want to.  We

24     can go on to some other things.  You can talk about all of them

25     together, however you want to do it.

1          MR. KOHN:  Two further issues with that document,

2     judge.

3          THE COURT:  Let's get an answer back from Mr. Sample

4     as to how she wants to proceed first.

5          MR. KOHN:  Yes, sir.

6          MS. SAMPLE:  Judge, after speaking with Mr. Goffi,

7     the People's concern for stipulating to any foundation, at this

8     time the People would object to that process because of these

9     reasons:  It's my understanding that this consideration came

10    from numerous different cases and not this case --

11         THE COURT:  I know that.

12         MS. SAMPLE:  -- in particular.  And any information

13    that Mr. Kohn would like to find out about this case,

14    particularly the case agent on this case could answer those

15    questions.  And this form was not even filled out by case

16    agents.  It was filled out by support staff.

17         THE COURT:  No.  Let me put it to you differently

18    because I understand your concern.  That's not going to the

19    issue that I have.  Maybe I didn't set it forth very clearly.

20         Mr. Kohn -- let's assume that we are at trial and Mr.

21    Kohn's position is that Mr. Rodarte is a paid informant that

22    will say anything because he gets paid for it and he sets

23    people up.  Suppose that that's his defense.  He has a witness

24    on the stand that says, "Well, I don't know if that's true or

25    not.  I worked with him on this case and this case only."  And

1    Mr. Kohn says, "Well, isn't it true that the Federal government

2    had been authorized to pay either to him or on his behalf a

3    hundred thousand dollars?"  The agent says, "I don't know

4    that."  Mr. Kohn comes up and says, "Well, here is the document

5    that was given to us by the Federal government that shows that

6    there was a balance of a hundred thousand dollars, and it shows

7    payouts and this money went to -- isn't it true that this money

8    went to Mr. Rodarte or on his behalf?"

9           The agent says, "I don't know.  I don't know where

10   those numbers came from."

11          THE COURT:  Are you with me so far?

12          MS. SAMPLE:  Yes, judge.

13          THE COURT:  The problem then is if the agent says, "I

14   don't know.  I don't know where the numbers came from," and Mr.

15   Kohn wants to show by competent evidence, he has got the

16   argument in there, no question.  But if he wants to show by

17   competent evidence that, yes, in fact, the government paid Mr.

18   Rodarte or was authorized to pay Mr. Rodarte this amount of

19   money, he has either got to call another agent or he has got to

20   have the government stipulate to the admission of this document

21   and say, "Yeah, this is a government document.  It applies to

22   Mr. Rodarte.  This is the amount of money that they were

23   authorized to spend.  This is what they spent."  Not

24   necessarily on this case because that doesn't have anything to

25   do with Mr. Kohn's point.

1          Mr. Kohn's point is, he gets paid a lot of money to

2     set people up.  So, unless the government stipulates that, yes,

3     this is a government document, yes, it is accurate, and no

4     further foundation needs to be laid, Mr. Kohn is going to have

5     to be able to be in a position to call the people who put this

6     document together so he can lay the foundation for it.

7          MS. SAMPLE:  I understand what the Court is asking.

8     I have numerous concerns for that.  One, then the jury gets to

9     see basically, for lack of a better term, free evidence,

10    without having to lay the foundation for that.  And they get

11    their eyes on information that is not even relevant to this

12    case.  If we go on Mr. Kohn's theory of setting people up, we

13    do not know, and it is irrelevant to this case, whether he has

14    done that in the past.  So basically there is just an

15    assumption that he is getting paid to set people up, and they

16    can further that assumption into this case if we just give up

17    this document into evidence.

18          One suggestion I may have, and ask for the Court's

19    guidance on this, what would be the thoughts of if we came up

20    with some stipulation to the amount of money that was given to

21    Mr. Rodarte in all of the cases without the document?

22          THE COURT:  I thought that's what this was.

23          MS. SAMPLE:  Without the use of the document.

24          THE COURT:  Without the use of the document.  Enter

25    into a stipulation as to, "We paid Mr. Rodarte a hundred

1   thousand dollars over the past five years, and in addition to

2   that we paid him $14,000 for this case."

3            MS. SAMPLE:  Correct.

4            THE COURT:  Something like that.  I don't have a

5   problem with that.  It seems to me to accomplish the same --

6   that stipulation seems to me to accomplish the same thing that

7   the documentary evidence would.

8            MR. KOHN:  Except that the jury wouldn't have it in

9   their hands to review when they go back there.  I think that

10  that's important.  I think that is the cornerstone of our

11  defense is that when -- I went through that before.  I am not

12  going to go through this.

13            The cornerstone of our defense is this money that's

14  being paid out.  And that's clearly something we are going to

15  bring up more than one time at trial, we would want the jury to

16  be able to have that and hold it, look at it, talk about it, do

17  what they need to, just as any other exhibit.

18            I understand Ms. Sample's position.  I understand the

19  government's position.  I am not implying there is bad faith on

20  anybody's part on anything we have talked about today.  My only

21  concern here is representing Mr. Cisneros.  Mr. Cisneros has a

22  right, not withstanding the Touhy Regulations, and this Court

23  not having jurisdiction over a Federal agency to cross-examine,

24  to investigate all of the evidence that he would in a regular

25  state case.

1      Just because there is a separate entity here, the

2  government can't state, "We have these rules, so we can't do

3  it.  So we are going to get a different type of treatment

4  rather than if it were just a state case."

5      THE COURT:  First of all, I am not treating it that

6  way primarily because I understand I don't have jurisdiction

7  over the Federal government or any of its Federal agencies.

8  But as I advised Ms. Sample and Ms. Viehman when we started

9  this, I have jurisdiction over the prosecution's office, and I

10  have jurisdiction over this case.

11      If it appears to me that the Federal agencies are

12  choosing not to cooperate in discovery, I have sanctions that I

13  can enter, including up to saying, we are not going to have any

14  evidence of any kind of Mr. Rodarte nor anything that he did,

15  which would create some problems for the prosecution.  But

16  that's their problem.  Not mine.  I am not concerned about

17  that.  I don't believe I am treating this any differently than

18  any other case.

19      In fact, if I were to see this as this were a state

20  informant, I am still having difficulty understanding why all

21  of this -- why all of these other cases and the facts of those

22  cases would be relevant.  I do think that it is relevant that

23  you are to be provided with the amount of money that he was

24  paid before this transaction.  And the great thing about this

25  is the way that it's done is you get to argue however you want

1    to argue out of it.  You get to argue that he got paid that

2    amount of money because he was paid to set people up.  Ms.

3    Sample gets to say, "There is not evidence of that.  He just

4    got money.  We don't know what it was for."  You both get to

5    argue whatever you want to argue about it.

6         But it seems to me at this point in time I am

7    inclined to side with Ms. Sample's approach, but I want to see

8    it in concrete terms.  You were saying, "We could tell him what

9    the amounts are."  Once I know what the specific stipulation

10   is, then I would be inclined to give that much more thought

11   because I understand that you want them to have the piece of

12   paper.  You can write it up on the easel as many times as you

13   want.  But I think just giving them this piece of paper is not

14   much different than actually -- it's not any different than the

15   testimony and the stipulation which would be, "This is the

16   amount."  I am inclined to go that way.  I would do that

17   whether it was a state case or Federal case.

18        MR. KOHN:  I certainly didn't mean to imply the Court

19   is ruling any differently because it's Federal level.

20        THE COURT:  You are making your argument.  I

21   understand.

22        MR. KOHN:  Judge, the other issue, this is something

23   that we brought up before, is whether there is any further

24   documentation as to the dollar amount on that sheet, another

25   sheet request for a check to be filled out.

1          THE COURT:  I am denying that.

2          MR. KOHN:  Judge, the only other issue is that is

3     obviously not an up-to-date spreadsheet.  We know that

4     February 14th --

5          THE COURT:  That's true.  It does not look like --

6          MR. KOHN:  We know the money was spent February 14th,

7     a considerable amount.

8          THE COURT:  All right.  That just needs to be

9     updated.  It looks like it probably won't be that hard.  The

10    last entry I see is April -- February 9th.  Then the next

11    paragraph is, "Any and all audio recordings made during the

12    course of the investigation of the FBI case" -- I have

13    established that that number is this case -- "to include all

14    audio recordings between any Federal or state agent and Robert

15    Rodarte."

16         Are you asking for something different than the video

17    and audio tapes which were introduced in evidence in the

18    prelim?

19         MS. SAMPLE:  Judge, I believe there is also something

20    else out there that we have not introduced but has been

21    released in discovery.  That is phone calls between Officer

22    Richardson and Rodarte.

23         THE COURT:  Those were recorded as well or some of

24    them were?

25         MS. SAMPLE:  And released, yes, judge.

1    THE COURT:  What else do you believe is there that

2    hasn't been produced, Mr. Kohn?

3    MR. KOHN:  I don't have any reason to believe there

4    is anything that hasn't been produced as far as that goes.

5    THE COURT:  All right.  I looked at that.  I thought

6    everything had been.

7    MR. KOHN:  I just didn't know whether they had any

8    other recordings.

9    THE COURT:  That's fair.  "Any and all reports for

10   FBI case number, Mr. Rodarte, including any and all internal

11   agency FBI memos and notes of any internal meetings."

12   What is that exactly?

13   MR. KOHN:  Judge, I guess that could really be

14   integrated into either Paragraph 1 or 2.  The information I am

15   requesting is considerably broader than they are willing to

16   offer.  I already made my record as to the Constitutional

17   Rights, statutory rights, that are indicated.

18   THE COURT:  "Any and all DOC records, incoming or

19   outgoing phone calls that involve or relate in any way to FBI

20   case number Mr. Rodarte."  I assume you are talking about since

21   the date this occurred?  You are talking about what were the

22   recorded phone calls from DOC?

23   MR. KOHN:  No, sir.  The purpose of that

24   particular -- I got some phone calls of Mr. Cisneros, and I got

25   some phone calls of another gentleman named Edgar something.  I

1    can't remember, Jeradas, I believe it was.  But there was

2    somewhere in the discovery it states that the reason the

3    introduction was made between Mr. Rodarte and allegedly Mr.

4    Cisneros --

5              THE COURT:  The introduction way back at the

6    beginning?

7              MR. KOHN:  That's my understanding.  That there was

8    somebody that Mr. Rodarte called up, somebody in prison, and

9    based on the representation from this person in prison,

10   apparently who was a higher up or a big homie as they call it,

11   that's why Mr. Rodarte had the type of credibility and respect

12   that he did because of that introductory phone call.  And I

13   don't know whether -- I haven't listened to all of the

14   recordings.  I have listened to a few of the calls from Mr.

15   Jerada's phone, phone calls.  I don't think that he would be

16   the one -- in the last few calls I don't think he would be the

17   one that would actually do the introduction.  It seems like it

18   would have to be somebody higher up in the Surenos gang.

19             Let me tell the Court kind of where I am going with

20   this.

21             THE COURT:  I am having a hard time figuring out why

22   a conversation between Mr. Rodarte and somebody who is not

23   involved and not named as a defendant in this case or going to

24   be a witness in this case, I am trying to figure out why that's

25   important.

1          MR. KOHN:  Let me explain that, judge.  I apologize.

2    I failed to find anywhere in the discovery the link between

3    Rodarte and Cisneros.  I can't understand why it is that they

4    decided to target Mr. Cisneros, the Salazars and Dydell,

5    whoever else was there.  There is a lot of information missing

6    as far as that goes.  For some reason, somewhere, somehow,

7    someone decided that this was the person that they wanted

8    Rodarte to target.

9          Now, when Detective Richardson or TFO Richardson was

10   testifying, I specifically asked him.  Because as far back as

11   October of '08 there was surveillance being conducted on Mr.

12   Cisneros; photos of him, a report that says he is being

13   followed.  It doesn't indicate any information whatsoever as to

14   why he is being followed, why they believe that he is -- that

15   Mr. Cisneros is involved in any type of drug dealing, firearms,

16   anything that they would be concerned with.

17         I want to know why.  I think that we are entitled to

18   those, especially with the theories of defense that we have

19   endorsed; why it is, when it is that Rodarte was asked to make

20   contact with Mr. Cisneros and the Salazars, Dydell and the rest

21   of the co-defendants.

22         THE COURT:  Essentially it was when, I am going from

23   memory here, I had so many prelims on it, I may be bleeding

24   them back and forth, I remember a question to TFO Richardson

25   saying, "How did this come about?"  He said something about,

1   "He became a person of interest."  Explain how it was he became

2   a person of interest, something like that.  Is that what you

3   want to know, how did he become --

4          MR. KOHN:  That's correct.  Exactly, judge.  I

5   reviewed parts of the transcript.  TFO Richardson could not

6   recall why it was that he was being surveilled in October of

7   2008.

8          THE COURT:  All right.  I am not sure the

9   surveillance in 2008 is relevant.  I understand the more

10  general question.

11         Let me get a response from Ms. Sample first.

12         MS. SAMPLE:  Judge, if I could have just one moment.

13         THE COURT:  Sure.  I will also ask for a response

14  from the Federal agencies as well.

15         MS. SAMPLE:  Judge, I guess my response, going back

16  to Mr. Kohn's phone calls, it's my understanding that Mr. Goffi

17  received it as part of the case file for the FBI and DOC turned

18  over those phone calls.  But if he is looking for any more

19  phone calls, that he would have to ask DOC for those.

20         THE COURT:  Hold on.  Run that by me again.  The

21  phone calls that -- he had already gotten some phone calls from

22  DOC?

23         MS. SAMPLE:  Correct.  To the FBI.

24         THE COURT:  DOC gave some to them?

25         MS. SAMPLE:  Yes.

1    THE COURT:  They gave them over?

2    MS. SAMPLE:  Yes.

3    THE COURT:  They have given over all of the DOC phone

4    calls that they have?

5    MS. SAMPLE:  Yes.  If he is looking for any more

6    background to these phone conversations, if they are not on

7    these DOC phone calls, I would think that he would then need to

8    ask DOC.

9    THE COURT:  What you are saying essentially is that

10   the phone calls that we have been talking about, this one that

11   I forget who it was --

12   MS. SAMPLE:  Set everything up.

13   THE COURT:  The one that the series of phone calls or

14   a phone call that set everything up, that wasn't turned over by

15   DOC to the Justice Department or the FBI.  The FBI doesn't have

16   it to produce?

17   MS. SAMPLE:  Judge, I have not listened to all of the

18   DOC phone calls.  I don't know the answer to that.

19   THE COURT:  What you are saying is that whatever they

20   had, they gave us.

21   MS. SAMPLE:  Correct.  My other comment would be, I

22   remember from the prelims, and I am not sure if it was during

23   Mr. Cisneros' prelim or a different prelim, that TFO Richardson

24   did state that there was some interest in the Salazar family

25   due to some methamphetamines being found here.

 1           THE COURT:  I remember a real general --

 2           MS. SAMPLE:  And associated with the Salazar family.

 3   That's where the interest came.

 4           THE COURT:  Mr. Kohn.

 5           MR. KOHN:  Respectfully, I have no idea how I am

 6   supposed to SDT a phone call, which I don't have a name as to

 7   the contact person.  There is somebody Rodarte contacted at

 8   DOC, a higher up, a senior member of the Surenos, that carries

 9   the type of weight that a phone call from him is law in the

10   culture.  I can't SDT every single phone call at DOC and listen

11   to them until I find where Rodarte is asking for introduction

12   from an inmate.

13           THE COURT:  We get back to the problem of, they are

14   not going to do your investigation for you either.

15           MR. KOHN:  If they know who it is, of course they do.

16           THE COURT:  That's what you are assuming though,

17   right?

18           MR. KOHN:  Well, I think that -- sure.  Assuming,

19   educated guess.  I find it hard to believe that the Federal

20   government or any law enforcement, competent law enforcement

21   agency, would, without knowing the type of context Mr. Rodarte

22   has and without knowing -- following through on who he is

23   contacting and what he is doing, would just release him and pay

24   the type of money they paid him.

25           If they don't know, they don't know.  But I would

1   like an affirmative representation from either Mr. Goffi, the

2   case agent or both, that they don't know who this person who

3   made the connection is.

4          THE COURT:  Let's do this, let's try this first, I

5   will have Mr. Goffi speak with whoever the handling agent is.

6   I don't know if that's Mr. Richardson or TFO Richardson,

7   whoever the handling agent was, to determine whether or not

8   they know who it was that Mr. Rodarte called at DOC who

9   originally set up the meeting.  I am sorry, not to set up the

10  meeting, to set up his --

11         MR. KOHN:  Introduction.

12         THE COURT:  Yes.  His introduction, to set up his

13  sort of air of legitimacy.  I am not going to order that to be

14  released just yet.  What I want to do is find out whether or

15  not that can be determined.  If it can be determined before

16  it's released, we need to have another hearing because there

17  are some other issues that I see coming up, if that can be

18  determined.  I am not yet convinced.  I am not yet convinced

19  that that's entirely relevant in the proceedings because,

20  frankly, he could have contacted a leprechaun as long as he was

21  able to -- as long as he was able to set himself up as a higher

22  up in the Surenos, conceivably he could have said he didn't

23  talk with anybody.

24         MR. KOHN:  I agree, judge.  The discovery is

25  completely absent of any reports that indicate how it was that

1   the Salazar drug organization became the target of Mr. Rodarte

2   and the Federal government.  I am having a really hard time

3   with that.  The reason is --

4           THE COURT:  That part, I don't think it is relevant.

5   I don't think you get that part.  I don't think you get that

6   part under any circumstances.

7           MR. KOHN:  If I can make a record on that as well,

8   judge.

9           MS. SAMPLE:  Before Mr. Kohn goes into that, judge,

10  if I could make a record based on the -- going back to the DOC

11  phone calls.  I remember in discovery, and I don't have my big

12  binder with me today, I can't give an exact section, but I

13  remember there is a section in a report by either Joe Hunt or

14  TFO Richardson stating the chain of events that happened with

15  individual's names of who contacted who, who contacted who to

16  get Rodarte into this situation.

17          THE COURT:  All he is looking at is, who did Rodarte

18  call in the prison, the name of the guy that Rodarte called in

19  the prison to set him up with this air of legitimacy.  I think

20  that's it.

21          MS. SAMPLE:  That's information that's in discovery.

22          MR. KOHN:  If it is, I missed it, judge.  I combed

23  through it pretty carefully.

24          THE COURT:  Mr. Kohn, you wanted to make a record as

25  to what?

1          MR. KOHN:  I do.  All of our requests are being made

2    pursuant to the Sixth Amendment Due Process Laws relating to

3    confrontation, Rule 16, and all of those in both the state and

4    Federal Constitution.  We have two defenses:  Entrapment and

5    choice of evils defense that require us to investigate and find

6    out certain information.  For example, has this happened

7    before?  Does Mr. Rodarte do this as a professional?  Is this

8    how he makes his living?  How often has he done this?

9          And also as part of the entrapment defense, how is it

10   that this organization, this alleged criminal organization, the

11   Salazar organization, became the target.  Why were they the

12   target and how much was the Federal government willing to pay

13   or provide to Mr. Rodarte, consideration of any kind, in order

14   to gather information and make sure it is a prosecutable case

15   on members of the Salazar criminal organization.

16         THE COURT:  All right.  For purposes of the record, I

17   disagree.  I don't know and I don't believe that the issue, has

18   this happened before and how or why did the Salazars become the

19   target of this investigation, I don't believe is relevant to

20   either one of those.  The question of entrapment is going to be

21   on this specific day, on this specific occasion, with this

22   specific offense were they duped into it?  Were they goaded

23   into it?  Were they just brought along for the ride?  No pun

24   intended.  That's really what it has to deal with.

25         Again, the Court is concerned about getting into too

1    many collateral matters of, well, let's talk about the case

2    that happened a year before with Mr. Rodarte where he set up

3    some other organization, this is what he did.  Even if he did

4    exactly the same thing in that case, I don't believe it would

5    be relevant or admissible in this case.

6         In addition, with respect to the how or why the

7    Salazars became the target, again, the only issue that we are

8    dealing with here, this isn't a RICO claim.  This is a claim

9    for conspiracy to commit murder.  How or why they became the

10   target of any investigation by any law enforcement agency I

11   don't believe is relevant.  The only thing that is relevant is

12   what occurred on that particular day and what Mr. Rodarte did

13   to set them up.  You made your record.  I have made mine.

14        The next issue is a rough draft of a transcript from

15   a DVD in the hotel.  Is that the DVD that we saw that you are

16   looking for?

17        MR. KOHN:  Correct, judge.  I did receive that.

18        THE COURT:  I was going to say, if there is a rough

19   draft of the transcript, that needs to be produced.  That is

20   almost unintelligible in spots.

21        "Provide identification information for any

22   surveillance equipment used by agents in the adjoining hotel

23   room to monitor the activity of Mr. Rodarte's room."  What you

24   are asking for is essentially the equipment that TFO Richardson

25   was using in the room next door?

1         MR. KOHN:  Correct.

2         THE COURT:  Why do you believe that would be

3    discoverable or relevant?

4         MR. KOHN:  What we have, judge, is the conversation

5    going on in the room and then in the adjoining room they are

6    monitoring both video and audio.  They should be monitoring

7    both video and audio.  They said there was no audio.  Somebody

8    forgot the headphones for speakers, something to that effect.

9    A lot was discussed during that meeting and a lot of threats

10   were made by Mr. Rodarte as far as getting even, tasting blood,

11   things to that effect.  If the government knew about those

12   threats and knew exactly what the extent of those threats were

13   and yet let them go out when they were drinking, and it was

14   pretty clear they were intoxicated when leaving the room, the

15   government was clearly complicit in that.  Again, it goes to

16   the entrapment defense that the government knew what was going

17   to happen.

18        THE COURT:  All right.  Ms. Sample, or actually, Ms.

19   Padden.

20        MS. PADDEN:  Your Honor, this is sensitive

21   information.  The type of surveillance equipment that the FBI

22   is using, that the FBI continues to use, the surveillance

23   equipment obviously, releasing information about the make and

24   model of the specific equipment the FBI uses could result in

25   other individuals engaging in criminal activity from, for

1    example, bringing devices to scramble the signals from that

2    equipment, knowing where to look for that equipment that might

3    be hidden in a hotel room.  Therefore, that information is very

4    sensitive.

5              MR. KOHN:  If anybody ever watched TV, they look in

6    the adjoining hotel room.  Just a little brevity.

7              MS. PADDEN:  I am obviously not involved in the

8    criminal side of this case.  I don't see how the information

9    about the make and model is relevant.  I don't think the

10   specific information about the specific devices that the FBI

11   was using and is currently using is relevant in this case.

12   It's a very serious security issue for the FBI.

13             THE COURT:  Here is the problem that I have, that I

14   sort of have with both sides.  I am trying to figure out some

15   sort of solution.  I am guessing that Mr. Kohn may intend to

16   argue that Mr. Rodarte is the one that set all this up.  He had

17   to goad them into it.  He suggested that they need to get even

18   with this guy for the robbery that occurred some months

19   earlier.  I forget what it was.  I think it was in October,

20   something like that.  All of this went and took place in the

21   hotel room.  And what we have from TFO Richardson is that there

22   was not contemporaneous monitoring of the equipment because it

23   was either missing headphones or speakers or something.

24             MS. SAMPLE:  Judge, I believe the answer to that, TFO

25   Richardson gave -- they didn't want to risk listening at the

1   same time due to feedback which would alert the adjoining room.

2             THE COURT:  That could be.  Let me get all the way

3   through it.

4             MR. KOHN:  Yes, sir.

5             THE COURT:  Then they go there to come up with a

6   deal.  They start driving to the location.  And the testimony

7   from officer or TFO Richardson was he had a conversation on the

8   cell phone with Mr. Rodarte during the time that they were

9   driving to the scene and said he went back through some of that

10  advisement, that he understands you can do no violence, those

11  sorts of things.

12            The argument from Mr. Kohn is going to be, "Well,

13  this is entrapment.  And, look, they didn't even monitor.  Even

14  though the equipment would have allowed them to monitor, they

15  didn't even monitor this or they did monitor it and they didn't

16  do anything about it."

17            If the argument is going to be that there was

18  feedback from this equipment or the concern was that there

19  might be feedback from this equipment which would alert the

20  Salazars and Mr. Rodarte and everything of everybody else that

21  was in the room, that something was amiss, not necessarily

22  surveillance, but something was going on, then the equipment --

23  in fact, suppose that he gets the model number and asks the

24  manufacturer and says, "If you are doing this, is there

25  feedback?"  The manufacturer says, "No.  Absolutely not."  I

 1   think Mr. Kohn may have a point.  I am going to have to think

 2   about that one because it could be that you could also

 3   establish that point by the evidence that we have, which is

 4   they didn't.  They didn't monitor it.

 5           MR. KOHN:  That's the question, judge.  I don't

 6   recall the feedback issue.  Certainly I am sure that that's

 7   what he said.  I was focusing on other issues.  I didn't view

 8   that part of the transcript.

 9           I will tell the Court that in discovery a report

10   dated in February 23, 2009, by TFO Storey, S-t-o-r-e-y, TFO

11   Richardson and Special Agent Schirmer, S-c-h-i-r-m-e-r in the

12   discovery it states, "An audio review of the events and

13   conferences held in room 520 could not be reviewed live due to

14   the lack of speakers or headphones attached to the audio

15   system."  There is two things I am looking for, judge.

16           I am looking for, is there a built-in speaker system?

17   I am sorry, I can't take the government's word for it.  I have

18   the duty to investigate.  Is there a built-in speaker system?

19   And if there isn't a built-in speaker system, is it just your

20   standard plug-in like an IPOD type of speaker?  I lived right

21   next to that hotel.  There is a Walgreens less than a

22   three-minute drive from there.  There is a Safeway a minute

23   from there.  This went on for four hours.

24           If there is information that these are super special

25   secret FBI headphones that you can't buy at Safeway or the

1   Walgreens, that's the information I am looking for.  Otherwise,

2   I think I am entitled to have that information.

3        MS. SAMPLE:  Judge, I think that he could ask those

4   specific questions of TFO Richardson, Storey or Special Agent

5   Schirmer when they are on the stand.

6        THE COURT:  Except he is stuck with whatever answer

7   he gets which he is -- that's not right.  I don't believe that

8   passes Constitutional muster either.  That's sort of like

9   saying, well, you ask him whatever you want, you are stuck with

10  whatever answer you get.  If you don't like it, it's too bad.

11  I don't think the law is in that fashion.  I have to tell you

12  that I am a little perplexed, and I asked some other judges

13  about this, they were unaware of any law on point.  I did

14  review the Federal regulation somewhere that's in here, 28 CFR

15  16.26,(b)5 which prohibits or it says, "In deciding whether to

16  make disclosures pursuant to a demand, the department

17  officials" -- this is referring to the Department of Justice --

18  "the department officials and attorneys should consider whether

19  disclosure would reveal investigatory records compiled for law

20  enforcement purposes and would interfere with enforcement

21  proceedings or disclose investigative techniques and

22  procedures.  The effectiveness of which would thereby be

23  impaired."

24        As I understand the argument from the motion to quash

25  that was submitted by the Department of Justice, and from Ms.

1   Padden as well, the argument essentially is that this

2   disclosure, this information, may impede further investigations

3   because it may lead to essentially defeat of the surveillance

4   method, is that correct?

5            MS. PADDEN:  That's correct, your Honor.

6            THE COURT:  I have got to tell you, I am not sure

7   that that trumps the Constitution.  I am not sure it doesn't.

8   I don't know.  That part I am going to have to take under

9   advisement.

10           Let me ask Ms. Padden because probably you have a

11  better answer than anybody else, I understand Code of Federal

12  Regulations, are you aware of any recorded appellate cases on

13  that issue?

14           MS. PADDEN:  Your Honor, I am not.  I did not do that

15  thorough of a search.  I can do that and file a supplement with

16  the Court.

17           THE COURT:  Yes.  I would like that within ten days.

18  Mr. Kohn, I am going to give you the same opportunity.  I took

19  a brief look.  I couldn't find anything.  If you can find

20  something that says that, yeah, they have a recording technique

21  that they have to give up and submit that to me within ten

22  days, I am happy to take a look at it.  I don't know the

23  answer.

24           MR. KOHN:  Judge, I think that Davis vs. Alaska, 415

25  U.S. 308, I think it's on point.  Clearly the facts are

1   different.  It's on point.  What we have in Davis vs. Alaska is

2   Alaska had stated an administrative rule similar to the Touhy

3   Regulations.  And the administrative rule was that juvenile

4   criminal histories are not released.  There was a trial.  Mr.

5   Davis was a defendant in the trial, the respondent in the

6   trial.  And they could not -- they didn't have any of the

7   information on the main witness against Mr. Davis about his

8   prior juvenile history.

9          In that decision the United States Supreme Court

10   held, number one, "The partiality of a witness is subject to

11   exploration at trial, and is always relevant as discrediting

12   the witness and affecting the weight of his testimony."  More

13   important in the holding is, "Petitioner's right" -- this is a

14   Supreme Court holding -- "petitioner's right of confrontation

15   is paramount to the state's policy of protecting juvenile

16   offenders, and any temporary embarrassment to Green by

17   disclosure of his juvenile court record and probation status is

18   outweighed by petitioner's right effectively to cross-examine a

19   witness."

20          I think it's directly applicable to the Touhy

21   Regulations.  That is what we are looking at here.  I

22   understood that the position of the government is that they

23   need to protect this information for ongoing investigation

24   purposes.  But Mr. Cisneros' Constitutional Right to

25   effectively cross-examine the witnesses and to investigate the

1    evidence against him trumps the Touhy Regulations.

2         THE COURT:  Well, I am not saying that it doesn't.  I

3    am also not saying that it does.  The problem that I have with

4    reliance on what you reviewed to me about the facts and

5    circumstances of Davis vs. Alaska is I have to tell you, I am

6    not that concerned about this Regulation either because I don't

7    know that the regulation trumps the Constitution.  I don't

8    believe it does.  The question that I have and the concern that

9    I have is when you have a security issue dealing with law

10   enforcement investigatory techniques that would be nullified or

11   hampered in the event those techniques were released.

12        Does that trump the Constitution, I don't know the

13   answer to that.

14        MR. KOHN:  The Court can also issue a protective

15   order, judge.  I would have no problem with that.

16        THE COURT:  I could.  That may be one solution.  It

17   could be that it has to be produced but that there is going to

18   be a protective order.  For instance, I know what the

19   surveillance device was that was used because during one of the

20   hearings it came out.  I had issued a protective order at that

21   point in time.  It was during Mr. Rodarte's preliminary

22   hearing, and I issued a protective order that that was not to

23   be disclosed without further order of the Court.  So that may

24   be an answer.  I am not sure it's the answer.  I am not

25   comfortable ruling today on that issue.  I am not going to rule

1   on that issue today.

2           What I want to do is, I want to see some case law

3   that has to deal with either surveillance equipment by a law

4   enforcement agency or some other law enforcement investigatory

5   technique that is placed at issue in a criminal case because

6   that's the issue for me.  I do have a concern that this

7   potentially could be the position of the People is that it

8   could be compromised in the future investigations.  I

9   understand that.  I don't know how that weighs in.  It may be

10  that it has to be produced.  It may be that part of it has to

11  be produced.  It may be that some of it or all of it has to be

12  produced.  Such a protective order, I need a little bit more

13  guidance than what I have here today.  So I am not going to

14  issue a ruling with respect to that.

15          I think with respect to, without making a formal

16  ruling on the motion to quash itself, I think the orders that I

17  have entered today address and answer all of the issues that

18  were raised in the motion to quash.

19          Ms. Padden, since it was your motion, I will

20  certainly allow you to make a record if you disagree with me

21  about that or if there is something that I am not addressing

22  that you want me to address.

23          MS. PADDEN:  I believe you have addressed it, your

24  Honor, and we will follow-up.  Two points of clarification, one

25  issue is, going back to the device, and I need to check with

1    the FBI for authority, perhaps what we could do is provide

2    information as to what type of headphones were used with that

3    device.

4         THE COURT:  That might be a way out of it.

5    Essentially, you know, I got to tell you, in this jurisdiction

6    jurors do ask questions.  I got to tell you, I am going to

7    be -- I am going to fall out of my chair if during one of these

8    trials some juror somewhere doesn't say, "How come you didn't

9    have headphones or why didn't you go get some headphones?"  I

10   think that question probably is going to come up somewhere

11   along the way.  If it's not asked by Mr. Kohn himself, "Well,

12   you could have gone down and gotten these."  It may be that --

13   addressing Mr. Kohn's argument, although he is not limited to

14   that argument, but addressing it of saying, "Yes.  You have to

15   have super special headphones that are sold by a secret

16   organization, half a world away, then they come in a brown

17   paper envelope, all of that stuff.  Those are the only kinds of

18   headphones that will work," that's why you couldn't go get them

19   or, "No.  You can go get any kind of headphones or any kind of

20   speakers.  It does have an internal speaker device that could

21   have been used or anything of that nature."  That might be a

22   way to resolve that issue.

23        It does not, however, reach the issue of whether or

24   not it is constitutional to prohibit production of that.  I

25   haven't reached that.  That's part of the thing that I still

1    have to figure out.

2         MS. PADDEN:  The other request, your Honor, I am

3    scheduled to be on vacation next week.  I come back on the

4    fourth.  I have until August 7th to file something?

5         THE COURT:  Absolutely.  Why don't you make it

6    until -- I am scheduled to be on vacation on August 3rd through

7    August 7th.  Why don't you make it through August 14th.  And,

8    Mr. Kohn, you will have the same amount of time.  Really what I

9    am looking for is just -- you don't have to give me argument or

10   anything like that.  If you want to give me citations, I am

11   happy to agree on that.  Even if you give me argument, I am

12   probably going to read the cases any way.  Unless there is one

13   that would look like it would have to be from the Supreme

14   Court, the United States Supreme Court, which I can't imagine

15   there is, that says, "In all cases you can never ever discover

16   a listening device."  If you find one of those, cite that to me

17   because it would make my job easier.  I need some guidance on

18   that issue.

19        Have I addressed everybody's concerns, Mr. Kohn?

20        MR. KOHN:  Yes, judge.  If I could just relay a

21   concern to the Court, the People as well, that I have, I

22   brushed up on the Touhy Regulations last night.  I am really

23   concerned about how this is going to work.

24        THE COURT:  You referred to the Touhy Regulation.  I

25   am not sure what the Touhy Regulations are.

1      MR. KOHN:  I am sorry, judge.  The Touhy Regulations

2  are regulations as to what the procedure is, what the

3  government is allowed, what government's procedure is releasing

4  anything to a subpoena when the government is not a party.

5      THE COURT:  All right.

6      MR. KOHN:  Ms. Padden, correct me if I am wrong --

7  spelled T-o-u-h-y -- Touhy Regulations require that in order

8  for us to subpoena a Federal agent or anybody who works

9  associated with the Department of Justice, in order to subpoena

10 them for them to provide testimony in their official capacity,

11 we have to go through a procedure.  I will tell the Court that

12 the easiest way to brush up on this is a March 24th issue of

13 the Colorado Lawyer.  There really is an interesting article

14 about that which cites --

15     THE COURT:  This year?

16     MR. KOHN:  I am sorry, March 2004.  Not March 24th.

17 March 2004 issue.  It is really just in three or four pages it

18 kind of tells everything you need to know about it.  So what it

19 says is, that what the Touhy Regulations require, is that in

20 order for us to subpoena a government witness, they need to

21 make themselves available.  Meaning that they need to agree

22 they are going to testify.  The decision is ultimately with the

23 office head of the FBI locally, I believe.  It could be someone

24 else.  He can decline to testify saying, "The Court doesn't

25 have jurisdiction, it would respectfully decline."  But we also

1    have to include a summary of what we want them to testify on.

2              There also could be Ms. Padden in this case,

3    Assistant U.S. Attorney, that sits in the courtroom while they

4    are testifying.  If we ask questions outside of that area of

5    testimony, which they are preauthorized to discuss, they are

6    advised not to answer.  Again, the Court has no jurisdiction

7    and can't order them to answer according to the cases and the

8    case law provided under Touhy and that I read in this article.

9              So we have a couple of issues.  The first issue is,

10   what happens when they come in willingly on Ms. Sample's

11   subpoena.  They sit here and testify and then at that point I

12   Cross.

13             THE COURT:  Sit down.  I will give you a chance.

14             MR. KOHN:  Then on Cross-Examination I asked a

15   question which is outside of what they are authorized to

16   testify about and the Court believes that it's an appropriate

17   question.  Obviously if it's an objectionable question, it's

18   not an issue.  If the Court feels it's an appropriate question

19   and at the same time they are ordered not to testify about it,

20   we are going to have a real problem.  I see that coming up

21   based on some of the testimony that came up in the preliminary

22   hearing.  There are some problems that we are having just

23   getting to this stage.  We are still a couple months outside of

24   trial.

25             First of all, I object to having to tell or to advise

1    a witness as to what I expect that their testimony is going to

2    encompass.  We don't have that obligation.  We have an

3    obligation to serve our client, and it's not in my client's

4    interest to let a Federal officer know what it is he is going

5    to testify to.

6            The bigger problem is going to come in when we have a

7    witness who is testifying, and there is a question that

8    comes -- either question that comes up that's outside of what

9    they are permitted to testify about, and the Court's going to

10   be faced with a decision of either a mistrial or a limiting

11   instruction.

12           Our position is going to be there isn't a limiting

13   instruction that could limit the testimony of a Federal agent.

14           THE COURT:  I will give Ms. Sample an opportunity to

15   respond.  But you, again, are missing the -- or forgetting the

16   admonition I gave to the People at the very beginning, which is

17   if the Federal agencies choose to behave in a certain manner,

18   then there may be consequences that occur as a result of that

19   choice.

20           MR. KOHN:  I understand, judge.

21           THE COURT:  Including not in this trial but dismissal

22   or, "All right.  This agent that you have just heard

23   testify" -- I instruct the jury as he leaves, I say -- "you

24   forget everything."  Or I declare a mistrial and bar that agent

25   from testifying in subsequent trials.  Those are options as

1   well.  Your concern, and I understand it is that you don't

2   think you should have to tell them what it is that you want to

3   ask them about, I understand that.  There are Federal

4   regulations that require it.  Whether or not that's

5   Constitutional is a whole other avenue.  The Federal

6   regulations require it.  It seems to me if you were to say, "I

7   am going to question you about anything that has anything to do

8   with this case," then that's fair enough notice.

9           MR. KOHN:  Okay.

10          MS. SAMPLE:  Judge, the things that Mr. Kohn just

11  talked about, the People have to jump through those same hoops

12  with the Federal government and the FBI.  Just for the record,

13  with your Honor's statement about declaring to the jury not to

14  listen to anything that this FBI agent just said, I have no

15  control over them either.  It is putting our case at jeopardy

16  based on something I cannot force them to talk about because

17  they were ordered not to talk about it.  I have no control over

18  that.  That is a concern of the People.

19          Just so that your Honor is aware that the People have

20  to jump through the same hoops.  We have to write the letters.

21  We have to send them to special people.  We have to tell them

22  exactly what we are going to question them about and then they

23  send us a letter back.  "Okay.  You can subpoena this

24  individual.  But they can only talk about this stuff.  This

25  stuff was denied, they can't talk about it."

1          THE COURT:  I am saying that, look -- with the

2     exception of Mr. Cisneros, and I don't mean in a bad way to

3     you, Mr. Cisneros.  It may be a very good way -- everybody in

4     this room is a lawyer.  Everybody is pretty well educated.  I

5     have the utmost faith that this much intelligence can come up

6     with a really good solution about how to resolve this without

7     me having to say TFO Richardson does not get to testify in this

8     trial or any other.

9          Now, if the FBI wants to take the position that,

10    well, he is going to testify about these certain things, and

11    not these other things, they can take that position.  I full

12    well admit, I have no jurisdiction over them.  I understand

13    that you don't have any control over them either.  I do,

14    however, have control over this case.  I have control over

15    what's going to happen in this case.  And my job is to make

16    sure that the defendant's Constitutional Rights are preserved.

17    If it turns out that a witness, a key witness for the

18    prosecution, does something along those lines, there is lots of

19    remedies.

20         Now, I have every expectation that because of all of

21    the intelligence in this room, we are not ever going to reach

22    that point.  I don't want to talk about this any further.

23    That's a big "if" that I think probably we are not going to get

24    to.

25         MR. KOHN:  Judge, procedurally, could the Court order

1    all of those documents released in discovery that Ms. Sample is

2    going to write the letters, write the responses they are going

3    to get as far as the testimony?

4                THE COURT:  I think that may be work product.  Are

5    you talking about the letters that she is sending to -- the

6    letters she is sending to the FBI to jump through all the

7    hoops?

8                MR. KOHN:  Correct.  The letters that correspond with

9    the Regulations, what it is she expects that they will be

10   testifying about.  I don't think it's work product, judge.

11               THE COURT:  Ms. Sample.

12               MS. SAMPLE:  Judge, I will just tell your Honor, Mr.

13   Kohn, I do the same thing that the judge suggested.  I say

14   everything relevant to FBI case number 281, whatever the number

15   is.

16               THE COURT:  There we go.

17               MR. KOHN:  Judge, I think I am requesting a deadline

18   for the government, the Federal government, to respond to the

19   subpoenas that we are going to issue so I have an idea of

20   whether they are going to be contesting some of the testimony

21   or whether it is going to be agreeable to the testimony.  I

22   will follow the Touhy Regulations, judge.  Our position is that

23   we shouldn't have to.  I made the record on that.  But I will

24   issue the subpoenas --

25               THE COURT:  September 24, 2009, 9:00 a.m.

1          MS. SAMPLE:  Judge --

2          THE COURT:  That's the pretrial readiness date.  Ms.

3    Padden, I have absolutely no authority to issue an order for

4    you to be here at that time.  I will tell you, I think it

5    probably would be in the Federal government's best interest to

6    have you here.

7          MS. PADDEN:  I will plan to attend, if I am

8    available.  If not, I will send someone.

9          THE COURT:  That is the pretrial readiness date for

10   when we can deal with all of that for everybody, I think.

11   Except Mr. Rodarte.  There is an issue with his case any way.

12         MS. SAMPLE:  All I was going to inform Mr. Kohn, to

13   speed the process along, Barbara Klein, the individual who you

14   have to send all of the subpoenas through, she is the one who

15   then sends the letters back.

16         MS. PADDEN:  She is based up in Denver.

17         THE COURT:  Okay.  It sounds like a lot of problems

18   that we are having can be resolved with some heightened level

19   of communication.  And I have every belief that that will

20   occur.

21         Mr. Kohn, let me return this to you.  I don't need

22   that in the file.

23         MR. KOHN:  Thank you.

24         THE COURT:  It sounds like there are only two issues

25   that are left.  One is with respect to figuring out the amount

1  of money that he was paid here versus the amount of money he

2  was paid elsewhere and the briefs on the surveillance issues.

3  And we can take that all up at a later date.

4          Actually, I think the stipulation would be Ms.

5  Sample's, she can propose that.  Then we have the briefs.  And

6  probably what I will do is, after I receive the briefs, then I

7  will issue an order.  I will likely issue an order.  If I think

8  I need some further argument or there is something that's just

9  not clear, I will let everybody know and we can bring it back

10  in.

11          Mr. Kohn, it was your subpoena.  We were here for

12  your subpoena.  Is there anything that I have not addressed

13  that you wish me to address?

14          MR. KOHN:  No, sir.  Not regarding that.  I have one

15  other issue I wish to bring up to the Court.  Judge, I request

16  permission to file the motion in limine before -- after the

17  pretrial readiness some time before the trial.  Here is my

18  concern.  The way that I generally prepare a trial is I go

19  through everything within a couple of weeks of the trial, and

20  at that time I have a separate sheet for anything that I want

21  to bring up in the motion in limine.  Generally those hearings

22  last less than a half hour.  They are just procedural.  They

23  are more Constitutional issues.  There is just evidentiary

24  issues.  I don't know.  If I prepare that case that far in

25  advance, it seems to me like I am going to have to reread it

1    all again.

2              THE COURT:  Let me give you this guidance.  That is

3    that I require it 15 days prior to the time of the pretrial

4    readiness date, essentially so I have time to read them.  I can

5    rule on them when everybody is here.  It is not my practice and

6    I have discussions with attorneys more often that I know I

7    think I need to, it is not my practice to deal with motions on

8    the date of trial.  If we are going to trial, we are going to

9    trial.  Get the jury up here, let's go.  We are not dealing

10   with anything else.  So, generally I don't allow that.

11             If you can convince me that there is a pretty good

12   reason why this motion was not filed earlier than the pretrial

13   readiness, I may hear the motion.  I may not.  I will also tell

14   you, however, that generally I can't rule on probably

15   95 percent of the motions in limine that I get until trial

16   simply because I don't have enough context to put them in.

17   Essentially you are doing a 403 analysis.  I am looking at it.

18   I don't know what all of the surrounding facts are and what the

19   testimony is so I can put it in context to determine whether or

20   not the probative value outweighs or doesn't outweigh the

21   prejudicial impact.  I am going to leave my order stand as it

22   is.  If it's an issue, we will have to take that up when they

23   get there.

24             MR. KOHN:  Yes, sir.  Thank you.

25             THE COURT:  Ms. Sample, is there anything that I have

1   not addressed that you wish for me to address?

2               MS. SAMPLE:  No, judge.

3               THE COURT:  Ms. Padden, anything that I have not

4   addressed that you wish for me to address?

5               MS. PADDEN:  No, your Honor.  Thank you.

6               THE COURT:  Mr. Goffi, anything that I have not

7   addressed that you wish for me to address?

8               MR. GOFFI:  No, your Honor.

9               THE COURT:  With that, I will see everybody back at

10  the time of the pretrial readiness.  Thank you.  Court will be

11  in recess.

12

13               C E R T I F I C A T E

14          I, PAMELA A CELSKE, Official Court Reporter of the

15  District Court, do hereby certify that the foregoing pages

16  numbered 2 through 60, inclusive, constitute a full, true, and

17  accurate transcript of the proceedings had in the above matter,

18  all done to the best of my skill and ability.

19  DATED this 13th day of August, 2009.

20

21

22          _____

23                  PAMELA A. CELSKE

24

25