Exhibit 26

1   DISTRICT COURT
    EL PASO COUNTY, COLORADO
2   270 South Tejon
    Colorado Springs, CO 80903

3

4   PEOPLE OF THE STATE OF COLORADO

5   vs.

6   JAMES CISNEROS

7   Defendant:

8                                    * FOR COURT USE ONLY *

9
                                     Case No. 09 CR 768
10
                                     Division 15
11
    APPEARANCES:
12
    MS. TERRY SAMPLE, Reg. No. 33919
13  MS. JENNIFER VIEHMAN, Reg. No. 33163
    For the People
14
    MR. ROBERT GOFFI, FBI, Reg. No. 15012
15  MS. AMY PADDEN, U.S. Attorney's Office, Reg. No. 28372

16  MR. SHIMON KOHN, Reg. No. 31710
    For the Defendant, James Cisneros
17
    MS. CYNTHIA A. MCKEDY, Reg. 27409 and
18  MR. ERIC ANAYA, Reg. 35203
    For the Defendant, Robert Rodarte
19
    MS. PAT BEHAN, Reg. 15893 and
20  MS. CHARLOTTE ANKENY, Reg. 37861
    For the Defendant, Frankie Salazar
21

22                  REPORTER'S TRANSCRIPT

23        The following proceedings were held September 9,

24  2009, before the HONORABLE GREGORY WERNER, Judge of the

25  District Court.

1          THE COURT:  09 CR 768, James Cisneros.

2          MR. KOHN:  Shimon Kohn appearing with Mr. Cisneros.

3    Mr. Cisneros appears in custody.

4          MS. SAMPLE:  Terry Sample and Jennifer Viehman on

5    behalf of the People.  Judge, there is also Bob Goffi and Amy

6    Padden from the U.S. Attorney's Office and from FBI.

7          MR. KOHN:  Judge, there are two co-defendants that

8    were here for the most part on the same issues this afternoon,

9    Mr. Salazar.  And Mr. Rodarte is not here.  However, he is here

10   with counsel, Ms. McKedy.

11         THE COURT:  I seem to recall the last time Ms. McKedy

12   waived his presence.

13         MS. MCKEDY:  I waived his presence, yes.

14         THE COURT:  Well, is it the same subpoena?

15         MR. KOHN:  No, judge.  We have three different

16   subpoenas.

17         THE COURT:  Let's deal with them one at time.  We

18   will deal with the Cisneros' subpoena first.

19         MS. KOHN:  Judge, we were going to -- Ms. Behan was

20   representing Mr. Salazar.  We are going to request to wait

21   until she got back.

22         THE COURT:  Let's have everybody have a seat.  We

23   will figure out how we are going to proceed.  We will wait for

24   Ms. Behan to come back.

25         Is there anyone else we can resolve quickly?

3

1           (Brief recess.)

2           THE COURT:  09 CR 768, James Cisneros.  Mr. Kohn, I

3   leave it up to you.  It looks like you already have your stuff

4   spread out there.  Leave it out there.  Have Mr. Cisneros sit

5   next to you.  That may be most comfortable for him in any

6   event.  We have Ms. Behan back.  We have Ms. McKedy and Mr.

7   Anaya.  We have Ms. Viehman and Ms. Sample.  Ms. Padden and Mr.

8   Goffi.  Did I miss anybody?

9           MR. BAIN:  Will Bain.

10          THE COURT:  Why are you here, Mr. Bain?

11          MR. BAIN:  I heard we are going to have a good time

12  this afternoon.

13          Ms. Behan SDT'd some city records, judge.

14          THE COURT:  Let's wade in.  I have got Mr. Cisneros.

15  And where are we on that?

16          MR. KOHN:  Judge, I don't think the Court has a copy

17  of the SDT that was served on the Department of Justice, FBI.

18  Does the Court?  If I may approach, judge?

19          THE COURT:  All right.

20          MR. KOHN:  It attaches also the Response.  I

21  apologize for the iced tea stain on it.  I looked for a clean

22  copy.

23          THE COURT:  That's all right.

24          MR. KOHN:  Judge, my preference would be to begin by

25  calling Special Agent Hunt.

4

1              THE COURT:  Hold on a minute.

2              MS. MCKEDY:  I guess, while we are doing that, if I

3     could approach with the subpoenas that I served and their

4     Response as well.

5              THE COURT:  Sure.

6              MS. ANKENY:  On behalf of Mr. Salazar, I e-mailed the

7     Court copies of our subpoena.

8              THE COURT:  Yes.

9              MS. ANKENY:  I do have those --

10             THE COURT:  I don't know if I have the subpoenas.  I

11    have what was produced.  I am assuming the subpoenas were in

12    with it.  I have not had the copies of the subpoenas, Ms.

13    Ankeny.  But I do have -- hold on.  Maybe it's in this

14    envelope.  I found it.

15             MS. ANKENY:  The Court has them?

16             THE COURT:  Hold on.

17             MS. BEHAN:  We have copies if the Court --

18             THE COURT:  I think I need a copy.  Is this the

19    amended subpoena dated August 11th?

20             MS. BEHAN:  I don't know if it's titled Amended

21    Subpoena.

22             THE COURT:  Let me see what you have got.

23             MS. BEHAN:  The two that I think that we have

24    outstanding.

25             THE COURT:  Okay.  I am set.  Mr. Kohn, you're

1   driving the bus here.

2           MR. KOHN:  We would call Agent Hunt, Joseph Hunt,

3   forward.

4           MS. PADDEN:  Agent Hunt is here.  We are not quite

5   sure why Agent Hunt has been subpoenaed to testify.  We are

6   here on a subpoena return date on the documents.  The FBI has

7   responded to the subpoena and produced the documents that are

8   not protected.

9           THE COURT:  For the record this is Ms. Padden that is

10  speaking.

11          MS. PADDEN:  Yes, your Honor.

12          THE COURT:  Mr. Kohn.

13          MR. KOHN:  Judge, their response was nonresponsive.

14  Basically I got a, "Well, you can have this and you can have

15  the name of the transcriptionist."  By this I mean the CI

16  manual.  But everything else is privileged.  There is no

17  indication of why it's privileged, how it's privileged, how it

18  would affect any ongoing investigation, especially considering

19  Mr. Rodarte has been in custody for the better part of

20  six months.

21           In any event, that's not why Mr. Hunt is being

22  called.  Mr. Hunt is being called to follow-up on the SDT

23  hearing we had last time, if the Court recalls.  It was

24  specific information that neither Ms. Padden or Goffi nor the

25  District Attorney here knew the answer to.  That's how the

6

1  compensation was calculated for Mr. Rodarte.  The issue was his

2  $14,000 that's shown as being paid out November some time.  And

3  then in February is the date of the alleged attempted murder

4  that my client was implicated in.

5          My question, and nobody seems to know the answer to,

6  was, how do we get to that $14,000?  Specifically what part of

7  that was attributed to the investigation that Mr. Cisneros was

8  caught up in and how is that calculated?  I think we have a

9  right to know that under Giglio, under Brady, and under Rule

10  16.

11          MS. SAMPLE:  Judge, if I may address your Honor.

12          THE COURT:  Hold on a minute.  I am not sure -- go

13  ahead.

14          MS. SAMPLE:  Judge, I did have an investigator talk

15  to Mr. Goffi.  He got the breakdown on that information, and

16  that information was released in discovery approximately, I

17  would say, two to three weeks ago.

18          MR. KOHN:  Judge, I received that information.  That

19  information shows how much money was provided, based on this

20  investigation, to Mr. Rodarte, as opposed to any other

21  investigations he may have been working on.  That doesn't

22  answer the question as to what was his compensation, what was

23  his motivation to do this case, to work for the FBI and the

24  Department of Justice, and in the case that we are here in the

25  court:  Mr. Cisneros, the Salazars.  Mr. Dydell has been

1    dismissed and Mr. Rodarte himself.

2            So, we are certainly entitled to have information

3    about all compensation received by a witness, all favorable

4    treatment that's received by a witness.  This is part of

5    compensation received.  We have, especially under our theories

6    of defense that we have endorsed, we have a right to find out

7    how it is that these numbers come about.  There is no

8    indication in any of the discovery how $2,342 comes about as

9    remuneration for this operation as opposed to anything else.

10           These numbers just don't make sense.  They don't add

11   up.  We have a right to test the reliability of the

12   government's witnesses, as well as potentially Mr. Rodarte's

13   statements, if they were introduced as hearsay statements or

14   nonhearsay statements.

15           THE COURT:  Except I am not sure this is the vehicle

16   for that.  This is a subpoena duces tecum to have certain

17   information produced.

18           MR. KOHN:  Judge, they are telling me, and this is

19   why I called Agent Hunt, my response last time from both the

20   government -- from the Department of Justice and FBI is they

21   don't know.  If such a document exists, they will turn it over.

22   However, he hadn't turned it over, meaning such a document

23   doesn't exist.  Clearly there is some type of breakdown.  There

24   is a way that the financial was calculated.

25           Additionally, judge, there is also case right on

1   point as far as contingency fees, that we have a right to know

2   whether he is paid on a contingency, depending on what

3   information he delivers.  That was cited in my brief for

4   outrageous government conduct on a motion to dismiss.  We have

5   a right to know that as well.

6          The government turning over information, just how

7   much of the breakdown of the $14,000 goes to Mr. Rodarte based

8   on his investigation with what we call the Salazar

9   organization, or I should say, what they call the Salazar drug

10  organization, and how much goes to any unknown investigation

11  that's going on at the same time.

12         THE COURT:  Before we go any further, I am going to

13  ask a question of Agent Hunt.  That is, can Agent Hunt answer

14  those questions?  Would you be able to give a breakdown as to

15  what was owed or what was paid to this person as related to

16  this operation as opposed any other operation?

17         AGENT HUNT:  Yes, your Honor.  I believe I can give a

18  specific breakdown.

19         THE COURT:  All right.

20         MS. PADDEN:  Your Honor, it's my understanding that

21  information is contained within the informant file.  It's

22  already been produced to defense.

23         THE COURT:  I am not inclined to go down that road.

24  I think that we have gotten about as far as we can go.  I think

25  that those questions may be fair questions, perhaps, for trial.

1   But I am not inclined to allow questioning along -- this isn't

2   a discovery proceeding as I see it.  It's not a discovery

3   deposition of a Federal agent.  What I understand is that the

4   Federal government has said that the document that the defense

5   desires to have, which is why -- it doesn't exist, it just flat

6   doesn't.

7           Do I have that about right?

8           MR. GOFFI:  I am not -- we are not entirely clear on

9   what document he is looking for.  We have given a breakdown of

10  how he was paid, what he was paid for.

11          MR. KOHN:  First of all, Ms. Padden made a

12  representation to the Court that that's contained in the CI

13  file that was turned over to us.  I don't know if Ms. Padden

14  knows this or not, I am certainly not accusing her of

15  intentionally misleading the Court, that was not turned over to

16  us.  The only part that the government saw fit to turn over to

17  us of the CI file was something titled Federal Bureau of

18  Investigation that has maybe six or seven pages of just stock

19  language that's involved with that.

20          This is the financial information the Court saw the

21  last time.  This shows payouts made to Mr. Rodarte November 5,

22  7,000, 7,000; on January 5th, $2500, a total of $16,500 was

23  paid to Mr. Rodarte.  That's more than one investigation.  We

24  don't know how many investigations.  The Court already ruled on

25  that we are not entitled to know how many investigations that

1   is.  That's not what we are contesting, judge.

2          What we are saying is, we have a right to know how

3   his remuneration was calculated in this particular case.  How

4   did they figure out that based on whatever information he

5   provided, the value of that information was 2500 some odd

6   dollars?  I don't remember the exact amount, somewhere in that

7   vicinity.  16,500 how much, judge?  Again, I would state is

8   that under both the State constitution, Federal constitution,

9   the right to confrontation, due process, as well as Brady,

10  Giglio and I have a case that I have read here recently, United

11  States vs. Blanco, 392 frd 3d 382.

12          And, judge, this is a case where -- first of all, we

13  are not going find a case that's on point any way.  This is

14  very unique circumstances of where an agent of the government

15  gets a gun and shoots up a house.  We are not going to find

16  that.  What we do have in Blanco is where the CI received, in

17  addition to financial compensation, something that I never

18  heard of called the parole visa, meaning he was paroled to the

19  DEA, and part of the benefit that he received was that he was

20  allowed to stay in the country rather than --

21          THE COURT:  Hold on a second.  Agent, you can have a

22  seat.  You don't have to stand for all of this.  I am sorry.

23  Go ahead.

24          MR. KOHN:  And in that case the Court actually stated

25  that defendant was entitled to all of the records for the

1   confidential informant.  Our position, as we will argue later

2   today, we are entitled to all of those records as well.  But

3   specifically the issue of the specific compensation that Mr.

4   Rodarte was expecting or did actually receive direct

5   information for impeachment for reliability falls squarely

6   within Brady and Giglio and also Blanco, which I just cited to

7   the Court.

8        THE COURT:  Here is the problem, maybe I am being

9   thick-headed, here is the problem that I am having difficulty

10  understanding, I saw the document that was given to you by the

11  Federal government.  That shows what the breakdown is.  It

12  seems to me that what you have is, I am going for memory, it

13  seems to me it's like 2500 bucks for this transaction and

14  whatever amount for whatever other transactions.

15       So, what you have is 2500 bucks to this transaction,

16  whatever it costs, and other stuff that they had and that's

17  what you have.  What you're asking, I am just having a

18  difficult time understanding, you're asking what other

19  compensation would he have gotten.  I don't think you are

20  entitled to say, all right, how is that $2500 broken down.

21       What you have for confrontation and for credibility

22  is to say, yeah, but on this you got paid 2500 bucks.  You got

23  paid, I forget what number you got paid, whatever it was in

24  these other operations.  This one you got 2500 bucks.  What

25  other incentive or what other compensation did you get.  First

1   of all, that's only going to become an issue if Mr. Rodarte

2   testifies.  And that's not up to her.  She is going to have

3   some input into it.

4          As I understand the Federal government's position,

5   they are saying there was no other incentive.  He got paid this

6   amount of money.  There wasn't a parole visa.  There wasn't a

7   promise in any other case or if that's my understanding.  I am

8   not sure what you are hoping to get.

9          MR. KOHN:  What I am hoping to get is to find out

10  exactly how the compensation was calculated.  And the reason

11  for that is, number one, it's against the FBI's own CI policies

12  to have any kind of contingency.  They have in their

13  guidelines, "Under no circumstances shall any payment to a

14  confidential human source be contingent upon the conviction or

15  punishment of any individual."  So we have a right to know

16  whether it was a contingency agreement.

17          Under this and under state law, granted it's Florida,

18  but it's still a case that's supported by case law and our

19  motion to dismiss for outrageous government conduct, we have a

20  right to know how it is that it came about that Mr. Rodarte

21  received a certain amount of money.  We have a right to know

22  that not only for impeachment but also substantive evidence for

23  the information that Mr. Rodarte did provide.  We are entitled

24  to know that in order to be able to properly impeach all of the

25  witnesses that testify and also find out about the further

1    motivations that the government had in setting up this

2    operation.

3              I guess my point is, judge, it all gets rolled into

4    the same defense, whether it's duress, whether it's entrapment,

5    whether it's outrageous government conduct.  All of this gets

6    wrapped up in the same defense.

7              THE COURT:  I don't disagree with that part.  The

8    problem that I am having here is that you are saying you are

9    entitled to know how the compensation was calculated.  I am not

10   sure that's accurate because the government could have said,

11   well, we think this service is only worth five bucks.  We

12   think it's worth five million.  What you have here is they

13   determined that this was worth 2500 bucks, if I remember right.

14             You can cross-examine the Federal agents to your

15   heart's content about whether they did or didn't comply with

16   something else, but I don't think that's the purpose of this

17   subpoena, SDT, or hearing on a subpoena duces tecum.  The issue

18   on the subpoena duces tecum is I want the documents.  I want

19   the physical evidence.  That's not what you are trying to do

20   here.

21             MR. KOHN:  I agree, judge.  If the Court can think of

22   an alternate vehicle for me to get this information, I will

23   follow any of the Court's suggestions.  We now have three

24   representatives of the Federal government.  We have Ms. Padden,

25   with the Department of Justice.  We have Mr. Goffi, with

1   general counsel for FBI, and we have the lead case agent on Mr.

2   Rodarte's case, Joseph Hunt IV.  From these three people

3   together we are getting the same answer.  Nobody knows how it

4   is that Mr. Rodarte received the amount of money that he

5   received.

6            THE COURT:  Maybe that's the answer.

7            MR. KOHN:  Judge, respectfully, I don't think the

8   number just popped out of nowhere.  Somehow this number was

9   calculated by somebody.  There are methods in order to get

10  checks approved that are in the guidelines for the CI.  CI

11  guidelines that have to go through certain steps.  These

12  numbers, they didn't just decide 16,500 over a one and a half

13  month period was a nice round number.  Mr. Rodarte didn't just

14  say, "Thank you.  I was expecting a hundred dollars but I will

15  take this."  There is something somewhere that led them to

16  believe that $14,000 was the value of the initial information

17  and $2500 was the value of additional information.

18           THE COURT:  That's different though.  The something

19  somewhere is different than, "I want them to produce the

20  document."

21           MR. KOHN:  That's what I am trying to get to today,

22  judge.

23           THE COURT:  But, here is the other possibility is

24  that, I am just making this stuff up as I go, suppose Agent

25  Hunt is talking with Mr. Rodarte and says "Well, all right, it

1  would be worth something to us."  Agent Hunt has some certain

2  discretionary authority.  I have no clue what that is.  Agent

3  Hunt says, "Well, this is what we need to do."  He cuts a deal

4  with Mr. Rodarte and says, "I will tell you what, this is what

5  we will pay you."  All this is a verbal conversation.  Then you

6  have the payment to Mr. Rodarte, which is the piece of paper

7  that is subject to subpoena duces tecum.

8          This isn't a discovery proceeding where you put

9  anybody, Federal agent or otherwise, on the stand to say, "I

10  want to know what you are going to tell me at trial."  That's

11  not what we are here for.  The issue is what was he

12  compensated, and they have produced the documents that show

13  what compensation he got.

14          MR. KOHN:  I think that's how it was worded in my SDT

15  last time, judge.  I think it was so broad it would have

16  encompassed all of that.  I can find my SDT.

17          THE COURT:  It's not an issue of whether your SDT

18  covers it or not.  It's just I see it as you want to put Agent

19  Hunt on the stand to say, "I want to know what you talked to

20  Mr. Rodarte about."  That's what you want to do.  That's not

21  going to happen.

22          MR. KOHN:  Judge, the last time I asked specifically

23  for the supporting documentation for the $14,000 and $2500 and

24  the Court denied that request.  So I guess I am at a loss as to

25  how we are supposed to effectively cross-examine the government

1    and Mr. Rodarte's statement if they are coming to trial or Mr.

2    Rodarte without having that information specifically whether he

3    was paid for performance, whether he was paid on contingency.

4    That information is critical.  That is the incentive of the CI

5    to set up everything that went down that culminated in the

6    shooting of eight bullets into a house in Colorado Springs.

7         THE COURT:  Except that we still get back to, in my

8    mind, not an issue of documentation.  It's an issue of what was

9    said between parties.  That's not going to be the subject of

10   the subpoena duces tecum.

11        MR. KOHN:  Judge, that's fine.  Could I request of

12   the Court to set this for deposition?  I understand it's

13   unusual, considering Mr. Hunt is going to be present.  However,

14   I think that going into this trial blind-sided, when my client

15   is looking at the rest of his life in prison, I don't think

16   that's due process or fair in any way.

17        THE COURT:  Over on this side, anyone, Ms. Padden,

18   Mr. Goffi?

19        MS. VIEHMAN:  Does Shimon -- does Mr. Kohn have a

20   rule that would allow a deposition in a civil type proceeding

21   like that?

22        THE COURT:  Let's not get there.  I am not aware of

23   one.  I guess that the question comes down to primarily from

24   Federal authorities the issue of whether or not there is some

25   piece of paper which exists, presumably it's like Mr. Rodarte's

1    CI file, that would indicate whether or not payment was made or

2    what the terms of the payment were going to be, not the amount,

3    but, "You have to do X, Y, and Z before you get any money."

4    Let's try that.

5              Mr. Goffi, are you aware of anything like that?

6              MR. GOFFI:  I am sorry?

7              THE COURT:  That's, okay.  Let me go through it

8    again.  Let me have everybody's attention.  This is a question

9    that is going to go to everybody; Ms. Viehman, Ms. Sample.  If

10   I can have everybody's attention, please.

11             Here is the question for everyone on this side of the

12   room.  That is, is anyone aware of anything that would

13   presumably be in Mr. Rodarte's CI file saying, and I forget

14   what the amount is, I think it was 2500 bucks, "We are going to

15   pay you 'X' amount of dollars for services, but you only get

16   paid if some contingency occurs such as these people are

17   arrested, it leads to something else."

18             Is there anything like that that is written in any

19   document?

20             MR. GOFFI:  No, your Honor.  No.

21             THE COURT:  I will leave it there.  The next issue

22   is, in that event, I am not going to require the Federal

23   government to produce a piece of paper which they have advised

24   me does not exist.  I am not going to require the Federal

25   government to create a document based on oral conversations

1   which may have occurred between Mr. Rodarte and the Federal

2   government.

3          The next question then is, can you take the

4   deposition of Mr. Hunt, and what's the authority for that?

5          MR. KOHN:  Judge, there is a rule of criminal

6   procedure for depositions, if somebody is unavailable or likely

7   to be unavailable.  That's why I prefaced it with saying, I

8   understand that Mr. Hunt is going to be available for trial.

9   However, I think that, given the layers of insulation that the

10   District Attorney has between themselves and the actual

11   evidence in the case, I think that it will be fair and just and

12   appropriate for the Court to allow me to depose Mr. Hunt to

13   find out about the financial information.  I understood --

14          THE COURT:  Run that part by me, the layers of

15   insulation.

16          MR. KOHN:  Well --

17          THE COURT:  How does it figure?

18          MR. KOHN:  We have three layers.  We have four layers

19   of insulation here.  We still don't have answers.  We have the

20   District Attorney here of El Paso County stating, "I don't have

21   the answer.  That's stuff held with FBI."  We have the

22   Department of Justice, who represents the FBI, saying that she

23   doesn't have the answer.  "It might be in the FBI CI file."

24   That's controlled by Mr. Goffi here.  Mr. Goffi has reviewed

25   the file but he doesn't know anything, outside of what's

1    actually in the file because he has never been the case agent.

2         Now we have the case agent here, who, in addition to

3    all of these people still is saying that he doesn't know how

4    the money was calculated, if I understand correctly.

5         So, who does?

6         THE COURT:  We will take one last shot at this.

7    Agent Hunt, you have heard the conversation that's been going

8    on.  Are you aware of any piece of paper that presumably would

9    be in Mr. Rodarte's CI file which would indicate, not the

10   amount of money that he was getting, but how he was to be

11   compensated and whether that was contingent upon anything?

12        AGENT HUNT:  No, sir.  I am not aware of any piece of

13   paper or contingency.

14        THE COURT:  Well, in that event --

15        MR. GOFFI:  Your Honor, Mr. Hunt doesn't have

16   authority to just decide for himself how to pay Mr. Rodarte.

17   He had to submit a request.  This is where all this is leading

18   to.  He has to submit a request to get --

19        THE COURT:  You can have a seat, Agent Hunt.

20        MR. GOFFI:  -- for Mr. Rodarte to get paid.  In the

21   process of submitting that request, he has to show what Mr.

22   Rodarte has done as far as informant services.  That's the

23   document that, as we indicated on our letter, response, the

24   subpoenas, is sensitive information.  We can't disclose the

25   specific information provided by Mr. Rodarte.

1          When that request is submitted, a person at a

2    supervisory level decides, "Okay.  We can pay this amount of

3    money."

4          THE COURT:  So, let me make sure I understand.

5          MR. GOFFI:  There was nothing written in advance of

6    Mr. Rodarte's providing information saying, "You will get this

7    amount."

8          THE COURT:  That's what I am looking for.  I

9    understand, believe me, I understand bureaucracy.  So,

10   essentially what had to occur was when Agent Hunt asked for

11   authorization, Agent Hunt had to get authorization to disburse

12   the funds based on, "This is what I think is going to occur."

13         MR. GOFFI:  No.  Mr. Hunt submits a request to get

14   Mr. Rodarte paid, after Mr. Rodarte has provided this

15   information that we consider valuable.  Mr. Hunt in that

16   request documents exactly what Mr. Rodarte has done to estimate

17   the value of it.  And then at a level, above Agent Hunt,

18   approval is granted or denied.

19         MR. KOHN:  Judge, after a half hour, that's what I am

20   getting at is, there is some documentation as to how that money

21   was earned.  And that's what we are entitled to.  I understand

22   that they are claiming there is some type of secrecy or ongoing

23   investigation and it's very -- and they claim that just and

24   they claim carte blanche, without any type of documentation or

25   evidence to support that.

1   All we know right now is that Mr. Rodarte is at CJC.

2   He is not bondable and he is not working on any investigation

3   with them.  So, the amount of money that they paid him, while

4   they may claim some type of immunity to protect that, we have a

5   due process right to cross-examine the government witnesses and

6   Mr. Rodarte.

7   THE COURT:  You do.  But it's not unlimited.  And the

8   cases that have been cited both by the Federal government, and

9   I did my own research on the issue, unfortunately, I left it

10   back in my chambers.  It is not an unfettered right when there

11   is privilege such as this, law enforcement investigation

12   privilege.

13   Based on what I have heard here, I am not convinced

14   that the privilege should be waived.  Privilege is not entirely

15   bullet proof.  There are ways to discover the information.  But

16   at this point in time I believe that the privilege that is

17   being asserted by the government in this case should be upheld.

18   I think that there is information hereby which you can say,

19   "This is the amount of money that Mr. Rodarte got in this

20   operation."  And you can leave it up to the jury as to what

21   their imaginations can take them, what they should read into

22   that.

23   I am not limiting your argument as to what you can or

24   can't say.  So, but I don't believe that you get to go any

25   further than where we are.

1          MR. KOHN:  The problem is, my Cross-Examination is

2    going to be limited.  Not by the Court but by the agents.  I am

3    going to file a motion to strike all the government agents.  I

4    can't see how I can effectively represent my client and not get

5    into the actual monetary amount that Mr. Rodarte was paid in

6    order to put Mr. Cisneros where he is today.

7          THE COURT:  I understand.  That's something that I

8    will have to rule on when I get it.

9          MR. KOHN:  Okay.  Judge, finally, I would ask for an

10   in camera review.  We ask the Department of Justice to turn

11   that over to the Court and have the Court review the

12   documentation to see whether there is information in there

13   that -- and we are not waiving any privilege objections, judge.

14   But as kind of a fallback position, we ask that the Court to

15   review it in camera to see if the Court believes, after its

16   review, that there is information there that should be released

17   pursuant to state and Federal constitutions, as well as case

18   law.

19         THE COURT:  We are going to take about a 60 second

20   break so I can run back and get these cases that I was looking

21   at.

22             (Brief recess.)

23         THE COURT:  The Court has reviewed a number of cases

24   including:  Collins versus Shearson, American Express,

25   Incorporated 112 FRD 227 1986, United States versus Van Horn

1   789 Federal 2d 1492, also 1986.  Commonwealth of Puerto Rico

2   versus United States 490 Federal 3d 50, which was a 2007 case.

3   Also what appears to be the seminal case that I could discover

4   is United States versus Cintolo 818 Federal 2d 980, a first

5   circuit 1987 case.  That does recognize a qualified privilege

6   for certain information related to law enforcement activities.

7   I believe that this information would fall within that

8   privilege.  And the cases generally hold that the Court must

9   conduct a balancing test and must balance the Federal

10   government's interest in preserving confidentiality of

11   sensitive law enforcement techniques against the requesting

12   party's interest in disclosure.

13          Based on what I hear at this point in time, I do not

14   see that the balance weighs in favor of the defendant.  I

15   understand the defendant's arguments.  And please don't take my

16   disagreement with the arguments as a failure to understand

17   them.  But I disagree with the arguments that at this point in

18   time that this information outweighs the government's privilege

19   to hold onto that.

20          It appears to me though that what I will do is order

21   only that -- Mr. Goffi, help me out if I fail to misunderstand

22   the chain of events.  It appears that what I do want to have

23   submitted for in camera review is it would be Agent Hunt's

24   request, by someone above him, the supporting documentation

25   that he submitted for compensation for the check to be cut

1    for -- or the funds to be issued to Mr. Rodarte.  As I

2    understand that there is something there.  Agent Hunt filed

3    something with somebody saying, "This is what we got.  We want

4    to pay him 'x' amount."  Somebody else signed off on that.

5            MR. GOFFI:  Yes.  Based upon what I disclosed, we

6    paid a number of times.  There are separate requests submitted

7    for those payments.

8            THE COURT:  All I want is those few pages of what it

9    was, Agent Hunt's request, to be submitted for in camera

10   review.  It will not be subject to review by anyone without

11   further order from the Court or, perhaps, input by the parties.

12           MR. GOFFI:  Yes.  Fine, your Honor.  We are

13   requesting just from Agent Hunt.  There were requests from

14   other agents and other cases.

15           THE COURT:  The only ones that I am interested in, I

16   am not interested in what Mr. Rodarte was doing in some other

17   case.  It's only this case and the compensation related to the

18   Salazars, Mr. Cisneros, or Mr. Dydell.

19           MR. GOFFI:  Okay.  I understand.

20           THE COURT:  If you can submit that within 20 days.

21           MR. GOFFI:  Yes, your Honor.

22           MR. KOHN:  One final issue and we will move on.  That

23   is that as far as the balancing test, you have heard the

24   argument of Mr. Cisneros.  I haven't heard argument of the

25   government, other than to say they are immune, that there is

1    some type of secrecy that would be violated or operation would

2    be compromised.

3            I would ask for an offer of proof from the government

4    as to exactly what it is they believe would be compromised by

5    releasing financial records of an investigation that, as far as

6    we all know, and couldn't possibly still be ongoing, is dead.

7    I don't understand what their privacy interest is in that,

8    other than just claiming general government immunity.

9            THE COURT:  I am not sure I agree with that.  In

10   large part because you know, everybody in this room knows, that

11   Mr. Rodarte was involved with a lot of people besides just the

12   people who have been charged in this case.  And, as a result of

13   that, I think that whether there is an ongoing investigation or

14   not, that will be relevant.

15           The other issue is that the cases, as nearly as I can

16   determine, do not draw the distinction or draw the line at when

17   charges were filed because it is conceivable or possible that

18   whatever method that was used in this case would be used in

19   some other case.  Unless I am failing to understand the

20   government's position.

21           MR. KOHN:  All we would ask for is an offer of proof

22   from the government as to Mr. Rodarte's involvement in this

23   case in El Paso County.  Why the funds -- why the information

24   on the funds that were distributed to Mr. Rodarte couldn't be

25   released with the privileges.  What the Federal national

1    security interest is.  Why it is that their right to keep that

2    private and confidential outweighs my client's right to

3    confront his accusers.

4              THE COURT:  We have already heard argument about some

5    other individuals that may have been involved in this before

6    Mr. Rodarte ever showed up in Colorado.  I think we need to --

7    I don't think we need to go through that again.

8              Any further offer of proof, Ms. Padden or Mr. Goffi?

9              MR. GOFFI:  No, your Honor.

10             THE COURT:  My ruling stands.  Next issue.

11             MR. KOHN:  You want to me go again, judge?  Are you

12   sick and tired of hearing me yet?

13             THE COURT:  I am trying to figure out where we are.

14   We have the subpoena duces tecum that has resolved, as near as

15   I can determine.

16             What's the next issue?

17             MS. PADDEN:  May Agent Hunt be excused?

18             THE COURT:  As far as I am concerned.  Is Agent

19   Hunt -- are you under subpoena by anyone else, aside from Mr.

20   Kohn?

21             MR. HUNT:  No, your Honor.

22             THE COURT:  Mr. Kohn.

23             MR. KOHN:  No, judge.  That's fine.

24             MS. ANKENY:  I am, sorry.  Judge, we would just ask

25   that we can subpoena him and serve him again.  We are going to

1   be asking that Agent Hunt be present for the motions hearing on

2   I believe it's the 24th.

3               MR. KOHN:  I have subpoenaed him for that day, judge.

4               THE COURT:  All right.  Agent Hunt, do you agree to

5   return on September 24th?

6               AGENT HUNT:  Yes, your Honor.

7               THE COURT:  You may be released.

8               MR. KOHN:  Actually, we haven't even started my SDT

9   yet.  Number 1, the government complied with -- I received a

10  copy yesterday of the confidential informant guidelines.

11  Number 2, confidential human source policy manual.  This is a

12  manual, in addition to Federal guidelines, that the FBI uses.

13              THE COURT:  Stop there.  What is it?

14              MR. KOHN:  What is it?  To the best I can tell,

15  without reviewing it, it's a supplement to the guidelines.

16  It's more specification as to the amount that -- potentially

17  the amount that somebody has paid, what they need to do and how

18  they must run confidential informants, what they can do with

19  them, what they can't do with them.

20              THE COURT:  Mr. Goffi.

21              MR. GOFFI:  That's correct.  That document implements

22  the confidential human source policy manual.  It implements the

23  guidelines prior to the use of --

24              THE COURT:  Do you intend to produce that or --

25              MR. GOFFI:  That's a classified document.  Classified

1  at the secret level.

2           THE COURT:  Forget my ignorance, who classifies it at

3  the secret level?  Who does that exactly?  Who has that stamp?

4           MR. GOFFI:  A person with original classification

5  authority that is not in the Denver field office.

6           THE COURT:  That's Number 2.  Number 1 has been

7  produced.

8           Mr. Kohn.

9           MR. KOHN:  Judge, I understand it's confidential.

10  However, I think -- I don't think, I know FBI violated numerous

11  policies that they have in place under the CI guidelines and I

12  believe also under the confidential human source policy.

13           THE COURT:  I think you missed the issue.  It's not

14  confidential.  It's classified.  Unless you can show me a way

15  to have a state court get around a Federal classification of a

16  Federal document.

17           MR. KOHN:  Judge, if the Court believes that we are

18  entitled to it, the Court orders it released.  If they

19  respectfully decline, then there is sanctions.  Otherwise, they

20  can file the case in Federal court where they are more apt to

21  deal with this.  These issues come up on a daily basis.  Rather

22  than throwing this on a state prosecutor, without giving the

23  state prosecutor all of the evidence that's required and all

24  the exculpatory information.

25           THE COURT:  The issue of whether or not the Federal

1     government ultimately can proceed or not because of their

2     failure to produce certain evidence is up to me.  The question

3     still gets back to if this is classified, I have to be frank, I

4     don't even think I have the authority to order that it be

5     produced to me for in camera review to determine whether or not

6     it should be classified.

7              MR. KOHN:  I agree, judge.  But you do have authority

8     to state that our clients -- my client's specifically due

9     process right to confront his accuser, especially under the

10    theory of outrageous government conduct, requires that we have

11    an opportunity to review what their procedures are, to know

12    which procedures were violated, and how many of them were

13    violated, how egregious the violations are.

14             At that point if we don't have that, then the Court

15    can impose sanctions.

16             THE COURT:  Here is the problem that I am having, I

17    understand the zealous representation.  I don't have a problem

18    with it, frankly.  The problem that I have in this case is you

19    are looking, it appears to me at this point, that you are

20    looking for something which you hope is in there, thinking that

21    maybe there is a violation.  Which would result in an argument

22    of outrageous government conduct.  All of it has to deal with

23    Mr. Rodarte.

24             None of the evidence that I see or none of the

25    requests for evidence has to deal with substantive evidence

1    that pertains directly to Mr. Cisneros.  I suppose Ms. McKedy

2    may have a different view point because this may impact her

3    client.  I have no clue.  From Mr. Cisneros' standpoint, we are

4    not looking at anything that has to do with substantive

5    evidence that would be introduced to substantiate guilt or

6    innocence of Mr. Cisneros.

7            MR. KOHN:  That's not what we are looking for, judge.

8    We are looking for the outrageous government conduct offense

9    that focuses attention on the government's conduct, not on my

10   client --

11           THE COURT:  I understand that.

12           MR. KOHN:  We know that there were violations.  First

13   of all, we have some in the CI guidelines.  I will tell the

14   Court, frankly, that Mr. Rodarte, to the best of my knowledge,

15   and I have called his parole officer to confirm, was on state

16   parole at the time that he was recruited by the Federal

17   government.  And there is a specific subsection here that

18   requires prior -- I am not going read all of it under

19   subsection D1, "State or local prisoners, probationers,

20   parolees or supervised releases."  Basically it requires the

21   Federal government to get authorization from either the parole

22   officer, the state parole officer, or the Court or somebody

23   that's in charge of that that has the authority to give that

24   type of information.

25               And rather than doing that, they put a parolee on the

1    streets with lots of money, with guns, and drugs, and he ended

2    up shooting up a house.  We know there is a violation of

3    policies which rise to the level of outrageous government

4    conduct.  The question then becomes what other policies are

5    violated.  Were they supposed to monitor him after the

6    conversations that they heard, or that they saw, I guess,

7    without the headphone?

8            THE COURT:  That's a whole different --

9            MR. KOHN:  Should they have been monitoring them

10   closer?  What are the government's policies in monitoring?  And

11   were they lax in their supervision of their CI, a violent

12   convicted felon on state parole with access to guns, drugs and

13   lots of government money?

14           MS. PADDEN:  If I may, Mr. Kohn makes all of these

15   arguments without the specific guidelines.  He can argue that

16   the government acted in whatever way he wanted without the

17   specific guidelines.  These are secret documents.  They are

18   even a higher level of classification than other documents.

19   The defendant's right to discover these documents is not

20   unfettered.  He doesn't have an unfettered due process to

21   discover any documents out there.  He certainly does not have a

22   right to discover documents classified as secret by the Federal

23   government.

24           THE COURT:  The problem -- I disagree with your

25   argument.  Suppose, for instance, that there was a Federal

1   guideline, and again I am making this up, suppose there was a

2   Federal guideline that says, "One thing that you do not do is

3   send somebody out while wearing a body wire and you don't send

4   them out unless they are monitored."  If you set up a meeting

5   or if your CI sets up a meeting with someone else and they are

6   wired, then that is to be monitored on a -- that's to be

7   monitored on a live basis so that you know what's going on.

8   You can determine if anything is being planned there that

9   should not be planned.

10        Unless, let's suppose, that's a Federal guideline.

11  In fact, we all know, based on the facts, based on the

12  preliminary hearing, that didn't occur in this case.  Then Mr.

13  Kohn would be up there, instead of making a argument, he would

14  be up there going, "See, see in this Federal guideline, that is

15  the one they didn't follow.  What else didn't they do?  They

16  are not telling you about that.  We don't know about it."

17  That's what I see being different.

18        I am not sure, however, that it does get past the

19  secret classification of the document.  But I certainly

20  understand Mr. Kohn's argument, and frankly, I have to give it

21  a little bit more thought before I can rule.  I think, again,

22  probably we are going to come down to, it is not a sufficient

23  showing, under the Federal cases that I cited, that would get

24  past the privilege.  That's the problem.  The privilege is

25  there.  The question is, is there a sufficient showing to get

```
 1    past the privilege?  This one is even further past the
 2    privilege because it's a secret document.
 3              I will mull that over.  Move to the next one.
 4              MR. KOHN:  Judge, to respond to Ms. Padden.  The
 5    outrageous government conduct is the totality of the
 6    circumstances.
 7              THE COURT:  I understand.
 8              MR. KOHN:  The more information I have --
 9              THE COURT:  I understand.
10              MR. KOHN:  I want to make a record on that.
11              THE COURT:  I understand.
12              MR. KOHN:  I have a few other things.  I have a total
13    of 11.  What I would like to do is turn it over to one of the
14    other attorneys.  I am sick and tired of being up here for a
15    few minutes, if that's okay with the Court.  I will turn it
16    over to either of the other attorneys.
17              THE COURT:  Hold on a second.
18              (Brief recess.)
19              THE COURT:  Let's re-call 09 CR 768, 09 CR 753, 09 CR
20    748 in no particular order.  That would be Mr. Cisneros, Mr.
21    Salazar and Mr. Rodarte.  It looks like we have everybody back
22    in place.
23              Next.
24              MS. BEHAN:  I think I have been nominated, judge.
25              THE COURT:  All right.
```

1          MS. BEHAN:  So I think there is one party that we

2     have not addressed.  So I wanted to try to do that and see if

3     we can at least let one individual go.  That is on the City

4     subpoena.

5          THE COURT:  Let's see where we are.  Is that the one

6     to the chief of police?

7          MS. BEHAN:  Yes, judge.  We had filed a motion

8     because in this joint task force that investigated this case

9     there was a huge component of that that was the City police

10    that had previously been with the COMMIT Team and who were now

11    working with the FBI under this joint task force.  We had

12    requested the underlying information that deals with that.

13         It's my understanding, and I just got this as we were

14    adjourning, there was a motion to quash the subpoena from the

15    City.

16         THE COURT:  Okay.

17         MS. BEHAN:  Although there is an individual who

18    stands, I believe, ready and has information or documents.  I

19    have subpoenaed them.  There is a response and what I would ask

20    is that maybe the Court could address that response and see

21    what we need to do with those records.

22         THE COURT:  Let me see what we have.  First of all,

23    where did Mr. Bain go?  You are hiding over there.  Step out,

24    Mr. Bain.  You have got a lot of stuff there.  It looks like

25    you are producing stuff over objection.

1         MR. BAIN:  Well, it was kind of a shotgun subpoena

2    duces tecum.  They have asked for a lot of police reports that

3    are already public records.  So we don't have an objection to

4    turning over those.  There is an MOU between the City and

5    whoever these other agencies that are involved.

6         THE COURT:  MOU.  What's that?

7         MR. BAIN:  Memorandum of understanding, which is also

8    pretty much a public record.  The only thing that's mildly

9    sensitive in here, we just ask the Court to go ahead and order

10   me to turn it over to Ms. Behan, are the criminal histories of

11   these various people.  They contain arrests that are not

12   normally falling under Rule 16.

13        THE COURT:  Would they be -- you say criminal

14   histories.  Is that something off of NCIC, something like that?

15        MR. BAIN:  The City's own database.  It is called

16   MNI.

17        THE COURT:  I will order that to be produced.

18        MR. BAIN:  I am turning those over to Ms. Behan.  She

19   can, perhaps, copy them.

20        MR. KOHN:  For the record on behalf of Mr. Cisneros,

21   we join in both Mr. Salazar's and Mr. Rodarte's subpoenas for

22   that.

23        THE COURT:  I figured that was coming.  Ms. McKedy.

24        MS. MCKEDY:  Mr. Rodarte joins in all of the

25   subpoenas that have been issued up to this point, judge.

1          THE COURT:  That's what I had thought.  Okay.  You

2     need to make however many copies.

3          MS. BEHAN:  I assume it would be -- does the Court

4     need a copy so the Court knows what is turned over as an

5     ongoing record?

6          THE COURT:  No.  No.  No.  As a matter of fact, the

7     records department would kill me if I did that.  No.  That's a

8     bad idea.  If it becomes an issue about something -- real

9     technically, the City had turned over what they think they

10    have.  The issue is not going to be about what they turned

11    over.  It's going to be an argument somewhere of, well, this

12    references some other document that they didn't turn over.  I

13    don't think I need to keep any of that record.

14          Is there anything that Mr. Bain -- is there anything

15    that was subpoenaed that the City objected to or did not

16    produce?

17          MR. BAIN:  Yes.  Does the Court have my motion to

18    quash?

19          THE COURT:  I do.

20          MR. BAIN:  Ms. Behan also SDT'd some information from

21    the gang database that CSPD keeps.  We are objecting to the

22    release of that.  I have got that material in a packet here.

23          THE COURT:  Let me start with grabbing that.  That

24    doesn't look near as bad as the last envelope.

25          MR. BAIN:  No.  Again, we are objecting for all the

1  reasons that are stated in my motion to quash.  We would just

2  ask the Court to, in particular, to look at the date of the

3  materials in there and consider how relevant they are to Ms.

4  Behan's client.

5          THE COURT:  What is the basis of the objection?

6  First of all, I am going to refer to this as gang database

7  material.

8          MR. BAIN:  That's fine.

9          THE COURT:  What's the basis of the objection?

10         MR. BAIN:  Well, as we state in our motion to quash,

11 judge, this is intelligence information that's gathered.

12         THE COURT:  This is Number 2, Paragraph Number 2?

13         MR. BAIN:  Of my motion, yes, two.  Essentially they

14 all deal with that.  Whatever may be helpful to Ms. Behan is

15 far outweighed by the importance of CSPD keeping their

16 intelligence information secret.  One other thing I mentioned

17 in my motion, this is Paragraph 10 and 11.

18         THE COURT:  Let me get there.

19         MR. BAIN:  Was to ask for either me to approach the

20 bench or to ask for the courtroom to be cleared to share some

21 other critical information with your Honor in making a decision

22 on releasing the records.

23         THE COURT:  Hold on a second.  On behalf of CSPD,

24 that's with respect to this information or something different?

25         MR. BAIN:  Something a little different.

1          THE COURT:  I am sorry.

2          MR. BAIN:  It's this and something else.

3          THE COURT:  This and something else.

4          MS. BEHAN:  Is this addressing 9 and 10 of my request

5  or 9 and 10 of his response for clarification, 10 and 11 of

6  your motion.

7          THE COURT:  It looks like it's addressing gang

8  database materials, as well as something else which is based on

9  number 11 may be the identity of the CI.  Ms. Behan.

10         MS. BEHAN:  Before I respond, is the Court asking us

11  to approach?

12         THE COURT:  No.  I am asking what your position is

13  with respect to the City's request for in camera hearing.  I am

14  having a hard time understanding exactly -- I am going to have

15  to take a look at these obviously.  You want to address

16  something else?

17         MR. BAIN:  Yes.  The cases that I cite, judge, deal

18  with the government wanting to share information with the Court

19  that the government doesn't want to share with any of the other

20  parties in the courtroom.  The City is not a party to this

21  case.

22         THE COURT:  That's why I am confused.

23         MR. BAIN:  I would like to tell the Court something,

24  but I don't want to tell anybody else in the courtroom to know

25  what that is.  It's not --

1          THE COURT:  That's novel.

2          MR. BAIN:  I am asking that the people leave the

3    courtroom.  From the Daley case, the government has -- the U.S.

4    Supreme Court basically said if the government has sensitive

5    information that it would like to share with the judge to help

6    the judge reach a decision, it may do so outside the presence

7    of the defendant and the defense attorneys.

8          THE COURT:  Once more we will start over on this side

9    of the room.  Ms. Viehman, Ms. Sample, we will start with the

10   lowly state folks first.  What's your position?

11         MS. VIEHMAN:  We are happy to leave the courtroom.

12         THE COURT:  Ms. Padden?

13         MS. PATTEN:  We have no objection, your Honor.

14         THE COURT:  Mr. Goffi?

15         MR. GOFFI:  No objection.

16         THE COURT:  Ms. Behan.

17         MS. BEHAN:  Judge, I object.  But will

18   respectfully -- I need the Court to address the issue.  But

19   it's hard to respond.  Here is my concern --

20         THE COURT:  Try it from this side.

21         MS. BEHAN:  I understand.  I believe that unless that

22   has been provided and the case suggests that there is another

23   CI that hasn't been provided, and I believe that the City's

24   request to approach is to provide information that confirms

25   that this information has been withheld and a request to

1    continue to do so.

2              THE COURT:  Okay.  I am going to wait on you.  You

3    just sat down.  Ms. McKedy.

4              MS. MCKEDY:  I am in a little bit of a different

5    position, I think, than some of the other defendants.  I too am

6    unclear as to how to respond based on Mr. Bain's comments to

7    the Court.  I think Ms. Behan may be on to something.  That may

8    be what Mr. Bain needs to talk to the Court about.  If the

9    Court asks me to step out of the courtroom, I will do so.

10             THE COURT:  Mr. Kohn.

11             MR. KOHN:  Judge, this decision must have been handed

12   down during the Bush Administration, I imagine.  In all

13   seriousness, judge, I would object to any ex parte or private,

14   secretive proceedings where my client who will -- neither me or

15   my client are not present for.  I am not familiar with the

16   case.  I will tell the Court --

17             THE COURT:  Neither am I.

18             MR. KOHN:  I have not heard of this before.  It goes

19   against fundamental principles of an open -- fair trial, open

20   to everybody to come in and watch and observe and hear that

21   nothing is held secret.  I am not familiar with the specific

22   case.

23             THE COURT:  I will tell you what I am going to do, I

24   am not going to do anything until I look at this case.  We are

25   going to take about a ten-minute break.  That will give Pam a

1    chance to stretch and rest her fingers.  And I will tell you

2    the biggest concern that I have is I don't want to be in the

3    position -- on the other hand, I suppose there is some benefit

4    to me potentially being called as a witness and having to

5    recuse.  I don't want to be in that position.  Sometimes my job

6    is difficult.  Sometimes there are other days.  I don't want to

7    be in a position of having to force this off on someone else

8    and also derailing all kinds of trial schedules that are

9    already set.

10              MR. BAIN:  Judge --

11              THE COURT:  I will go back and look at this case.

12              MR. BAIN:  Another suggestion I can make is kind of

13   like getting conflict free counsel, bringing in another judge.

14   I think if the Court hears what I have to say, the Court will

15   say, "I get it."

16              THE COURT:  I don't know.  You may be over estimating

17   my ability, especially in this circumstance.  Let me go read

18   this case.  Then we will figure out where we are going to

19   proceed from there.

20              Let me ask this before I go though, assuming we get

21   past this, are we done with Mr. Bain?

22              MS. BEHAN:  He already provided gang files that we

23   had asked for.

24              THE COURT:  He has got the gang database materials, I

25   still got that.  And see this will be, presumably, the last

1    thing and assuming we got by that, then the subpoena duces

2    tecum to the City, we are done.

3              MS. BEHAN:  I think so.  Court will take ten.

4              THE COURT:  Court will take a ten-minute break.

5              One of the things I wanted to check on, Mr. Cisneros,

6    are you doing okay?

7              MR. CISNEROS:  Fine.  Thank you.

8              (Brief recess.)

9              THE COURT:  Before we took a break, Mr. Bain had

10   asked, on behalf of the City, to have an in camera discussion

11   with the Court.  I have reviewed People vs. Daley and People

12   vs. Martinez.  And I don't believe either one of those cases

13   support the procedure that Mr. Bain is proposing in this case.

14   They are generally on -- I am aware of what both of those cases

15   are about.  They deal with the identity of the confidential

16   informant.

17             Generally those cases are dealt with either by

18   affidavit or by testimony, but I am not aware of either case or

19   any case actually that would allow the process of excusing

20   everybody in the courtroom, except for someone who potentially

21   is a witness to the case to have a discussion with the judge.

22   This Court is particularly sensitive to issues of ex parte

23   communication, and I am frankly not going to allow it.  I don't

24   know what position that puts the City in at this point in time.

25             MR. BAIN:  A very bad one.  Essentially I have --

1    okay, if the Court is formally denying our request for in

2    camera review, I need that because I will have to explore my

3    options.

4              THE COURT:  You need a written order?

5              MR. BAIN:  I may need a written order.  I don't know

6    what my avenue would be other than our Rule 23.

7              THE COURT:  If you can find some other guidance.  I

8    looked at both People versus Daley and People versus Martinez

9    which was cited in Paragraph 11.  In one case they had a

10   hearing in which testimony was presented in the other case.

11   The issue was not exactly the same because it had to deal with

12   a collateral attack on a warrant and whether or not -- and the

13   warrant was based on information from a CI, and the question

14   was whether or not the information that was given to the

15   officer to complete the warrant was reliable or not or should

16   the officer have known it wasn't reliable.  That was done sort

17   of like they looked at the affidavit.

18             MR. BAIN:  In that case the CI testified or at least

19   the Supreme Court condoned the CI testifying with the DA

20   present but the defendant and the defense attorney absent.  I

21   am not even proposing that.  I am just asking to have an ex

22   parte communication between myself and your Honor to share

23   information that when I share with the Court, the Court will

24   understand why I am wanting to share it the way I am wanting to

25   share testimony.  If the Court is denying that request, I would

 1   need a written order.  It's obviously kind of a first

 2   impression type of deal.

 3            THE COURT:  It is to me too.  I have to tell you, I

 4   am looking at it.  I am going -- I can't imagine that that

 5   overrides due process in some fashion.  The way that I have

 6   always seen it done before is usually the law enforcement

 7   agency, whoever that is, brings somebody in to say, Yes.  I

 8   know this person.  I have had these contacts, worked on

 9   multiple cases.  He has done this, he has done that."  I have

10   not ever had it in the method that you are proposing.

11            MR. BAIN:  I can also have somebody testify.  I have

12   got that person here to testify, if the Court would rather hear

13   what I have to say through testimony.  The Supreme Court

14   condones a CI on a particular drug case testifying outside the

15   presence of the defendant surely.

16            THE COURT:  Maybe I missed that part.  Where is that?

17   Which case is that in?

18            MR. BAIN:  Actually, that recommends to a Court, it

19   says the trial court, "The trial court, the one thing you can

20   do in determining whether to release the CI information is to

21   have the CI testify with the DA present outside the presence of

22   the defendant and the defense attorney and decide it that way."

23   I believe Martinez follows up a year later and echoes that same

24   suggested procedure to trial courts.

25            THE COURT:  Where are you getting -- is this Footnote

1   11?

2           MR. BAIN:  I believe so.  I didn't bring a case,

3   judge.

4           THE COURT:  Wow.

5           MR. BAIN:  As an officer of the court, I think I can

6   also represent it, your Honor, that what I have to say won't

7   affect due process of the defendant's rights.  If it does, you

8   can appeal.

9           MS. MCKEDY:  Thank you, Mr. Bain.

10          THE COURT:  Except that the footnote, the footnote

11  that talks about the process though says, "The Court has the

12  alternative of conducting an in camera hearing at which the

13  prosecution is required to present the informant for judicial

14  interrogation."  And I suppose in this sense it wouldn't be the

15  prosecution.  It would be the City.  It would be through an

16  offer of proof.

17          MR. BAIN:  Yes.

18          THE COURT:  "If such a hearing is ordered, the

19  defendant should have an opportunity to submit questions he

20  desires the judge to ask at that proceeding."  Are you guys

21  writing anything down?  Hold on.  I haven't gotten there yet.

22  "A summary report of such proceedings should be made available

23  to the defendant and a transcript of the proceedings should be

24  sealed and preserved for use in case of appellate review.  The

25  in camera hearing should not be reviewed as a substitute for

1    disclosure in all cases and an ex parte proceeding can never

2    supply the full equivalent of independent research and direct

3    confrontation by the accused."

4            Here is what I am having difficulty with.  See if you

5    can help me out with this, without going too far down into the

6    stables.  What I am having difficulty with, you are telling me,

7    I am not disbelieving you, but you are telling me that there is

8    information that you need to impart to me that's not in the

9    documents.  That that's not the subject of a subpoena duces

10   tecum.  But it relates to one or all of these cases.

11           MR. BAIN:  Yes.  It relates to the SDT.

12           THE COURT:  Just to the subpoena duces tecum.

13           MR. BAIN:  All of my information has to deal with the

14   subpoena duces tecum.  I am not here to offer some information

15   about this case that these folks don't know.

16           THE COURT:  This has to deal with the SDT?

17           MR. BAIN:  I would suggest, your Honor, maybe the

18   thing to do is to call in an outside judge whom I could explain

19   it to.  That I way your Honor would be insulated to at least

20   initially hear whether it was appropriate for your Honor to

21   have to say.

22           THE COURT:  See if we can get somebody to get a

23   pseudo conflict hearing.  See if there is somebody that can do

24   a conflict hearing.  That will at least insulate me.  See what

25   we can do.  If we can find somebody, we will try that approach.

1          MR. BAIN:  Thank you, judge.

2          THE COURT:  Again, the case that I was referring to

3     is People vs. Daley 639 P.2d 1068 which is a Colorado Supreme

4     Court Case.  I am always somewhat hesitant to rely on a

5     procedure that even was put in a footnote instead of a case

6     itself.  It's novel.  Let's pass that part for now.

7          Ms. Behan.  Next.

8          MS. BEHAN:  I am just reorganizing.  I had given the

9     Court my only copy.  I just got another copy of our subpoena

10    that's in question for today.

11         THE COURT:  On the City?

12         MS. BEHAN:  I think the last issue for the City was

13    the in camera ex parte hearing.

14         THE COURT:  Yes.

15         MS. BEHAN:  Am I incorrect?

16         THE COURT:  No.  That's right.  Right.  You have

17    documents that they agree are public.  I have the documents

18    that they claim are sensitive and may be subject to -- it looks

19    like it's a code of Federal regulation.  It may have something

20    to do with that.  I will review those materials.  The thing

21    that we discussed is entirely separate.  So that's a different

22    issue.  This I haven't resolved yet.  I can certainly review

23    those in camera and determine whether or not it is subject to

24    the privilege or not.

25         MS. BEHAN:  I did want to add to the record, after we

1  had taken a break, Mr. Bain had provided me a specific name and

2  contact number in response to my Request Number 3.  But that

3  wasn't written down or provided in documentation.  So I just

4  wanted to provide it to the other parties so they had what I

5  have.  In response to the contact individual on my Request

6  Number 3, it was Larry Dyer, D-y-e-r.  The contact number was

7  329-7314.

8          Judge, on the subpoena duces tecum for the Federal or

9  FBI information --

10          THE COURT:  Hold on.  So we are done with the City?

11          MS. BEHAN:  I think so.

12          THE COURT:  Go ahead.

13          MS. BEHAN:  I had received documentation directly

14  sent to me on my subpoena request.  And I am under strict

15  orders that I am not to receive personally subpoenaed

16  documents.

17          THE COURT:  Yep.  That's fine.

18          MS. BEHAN:  I did open them.  I saw that they related

19  to the subpoena.

20          THE COURT:  Yes.

21          MS. BEHAN:  I did not review them to see what has

22  been provided in connection with my subpoena because I didn't

23  believe that I had authority to do that.

24          THE COURT:  All right.  I have all of that stuff.

25  The record should reflect that we got an envelope from

1    somebody -- from the Public Defender's Office dropped off a

2    huge envelope.  I opened it up to look and see what it was,

3    whether I was supposed to take some action to it.  It looks

4    like this is documents that is responsive to the subpoena duces

5    tecum.  I will give those to you and leave that to your

6    determination, I suppose.

7            MS. BEHAN:  I am asking for guidance from the Court.

8    I don't know what has been answered because I haven't had a

9    chance to look at this.

10           THE COURT:  That's fair.

11           MS. BEHAN:  My concern is what the Court has ruled,

12   before I sit down, is that I am trying to figure out what set

13   of rules are being applied on the discovery process for my

14   client so that I can address my questions not redundantly.  I

15   am not trying to be sarcastic.  I am really confused.  I have

16   individuals who are from the Department of Justice and the

17   Federal Bureau of Investigation and the individuals that I was

18   dealing with under Rule 16 and who I am told are responsible

19   for the subpoena duces tecum and my request are the District

20   Attorneys.

21           THE COURT:  Right.

22           MS. BEHAN:  I am concerned that in all of that we

23   have had defense counsel desperately trying to get the

24   information to address and defend our clients and under Rule 16

25   Subsection B4, it imposes on the prosecuting attorney to ensure

1    that a flow of information is maintained.  And I haven't seen

2    any efforts on their part to expedite this.  And so I am

3    concerned about that.  In my efforts, and there are specific

4    sections that talk about in materials are believed to be held

5    by other government personnel, and obligations that are again

6    imposed on the local District Attorney, and again, I haven't

7    seen any efforts.  The only efforts that I have seen in trying

8    to get the due process and the discovery issues met are defense

9    counsel's.

10            So can the Court give me guidance on if it's Rule 16

11   and the issues on confrontation and what is relevant are

12   different than what might be admissible at trial and so they

13   would be broader.  The discovery process is an investigative

14   issue also.  So I am requesting not just what would be

15   admissible in court on confrontation, I believe most of this

16   will be.  But on the scope that Colorado state law says I am

17   entitled to under Rule 16.

18            THE COURT:  I can short circuit this argument because

19   I issued an order long ago that indicated that this case was

20   going to be governed by Rule 16.  I understand it is being

21   prosecuted by the State.  And all of the State's witnesses or

22   nearly all of the State's witnesses are Federal agents or

23   Federal personnel who are not subject to my jurisdiction.  That

24   doesn't make any difference to me.  I have jurisdiction over

25   the door.  Which means that if they don't do what they are

1  supposed to do under Rule 16, they don't have to worry about

2  coming through that door because they won't.

3         Now, that may mean that the People have witnesses

4  that won't be able to testify.  But that's the People's

5  problem.  But it's not any different than any other case.

6  Except that there are some privileges that apply in this case

7  which may not necessarily apply to the State case such as one

8  of the documents was referenced as being classified as secret.

9  As far as I understand, and we have had more than one

10  proceeding on this, and forgive me, I am confused because I

11  have had more on others than just Mr. Salazar, but the

12  conversation went along the lines of, if the Federal government

13  wants this case prosecuted and wants their people to testify,

14  they have to abide by Rule 16 as nearly as they can, within the

15  structures of complying also with Federal law, taking out

16  Federal law issues as we get there.

17         MS. BEHAN:  Okay.

18         THE COURT:  My thought is to deal with the subpoena

19  duces tecum.  I don't think it's appropriate to put you in the

20  position of arguing whether or not -- can I have your

21  attention, please?  I don't think it's important or I don't

22  think it's appropriate to require you to argue whether or not

23  you have produced the things that you requested from the

24  Federal government now because you haven't seen them.  I think

25  that we are back on the 24th, 23rd, whatever it is.

1          MS. BEHAN:  We are set for most of the day on the

2     24th.

3          THE COURT:  I remember it's a Thursday.  Whenever we

4     come back, then we have issues then.  Once we made it through

5     them --

6          MS. BEHAN:  Again for guidance, on the request we had

7     received documentation but not what items we were requesting

8     they deem privilege and what privilege they are relying on.

9     Could we get an order from the Court as to what's been provided

10    I believe what they believe has been needed to be provided.  I

11    am assuming is what was sent to me, if I had to guess, there

12    are issues that deal with -- that they are claiming they did

13    not provide.  And what I was asking is if we could be provided

14    for the 24th an itemization on what items they specifically did

15    not provide because they believe it's privileged and the

16    privilege they are relying on.  We can respond instead of

17    learning for the first time.

18         THE COURT:  I assume that's possibly coming.

19         MS. PADDEN:  There is a cover letter with the

20    documents from Mr. Goffi that explains what documents are being

21    produced, what request numbers there were.  No responsive

22    documents then what documents are not being produced.

23         THE COURT:  That should be fine.  That should be

24    enough.

25         MS. BEHAN:  On the documents that they are saying are

1    not being produced, I haven't looked at the letter.  Maybe it's

2    addressed.  Does it reference what they are relying on for the

3    reason that it's not their authority?

4              THE COURT:  Citation of authority.

5              MS. PADDEN:  There is a citation CFR.

6              MS. BEHAN:  We can address it on the 24th.  Thank

7    you.

8              THE COURT:  I don't have a copy of that.  Can I get a

9    copy of the letter?

10             MR. GOFFI:  We mailed copies of our letter and

11   responses to the Court and to the defense that issued the

12   subpoena.

13             THE COURT:  To me.

14             MR. GOFFI:  We addressed letters to the clerk of El

15   Paso County, Division 15.

16             THE COURT:  When did you send them?

17             MR. GOFFI:  Fed Ex'd them out Friday afternoon.

18             THE COURT:  It probably isn't in the file yet.

19             MS. BEHAN:  I think, judge, I think it's the letter

20   that was attached to the discovery but mailed to me and then

21   the cover letter does start with the Clerk of the El Paso

22   County Court.

23             THE COURT:  I will look for that.

24             MS. BEHAN:  Is the Court ordering us to -- so I know

25   my obligations -- to make sure that there is copies for all

1    parties?

2          THE COURT:  Yes.  Whoever gets the subpoena, if

3    someone else requests that, we will need to make copies for

4    them.

5          MS. ANKENY:  As far as what's been happening, Mr.

6    Kohn, has subpoenaed and it has been released to us in

7    discovery that's what's going to continue to happen then.  We

8    don't need to make copies on ourself to go through discovery if

9    the DA has already received it.

10          MR. KOHN:  The Federal government sends everything to

11    the DA, to me.  That's why it's been released in discovery.  My

12    concern, the City -- when the City provided a copy to the

13    District Attorney --

14          MS. ANKENY:  We can do that for the Federal one.

15          THE COURT:  Ms. McKedy, what's your preference?

16          MS. MCKEDY:  I want it all, judge.

17          THE COURT:  That part I understand.

18          MS. ANKENY:  We need to take care of the City.

19          MS. MCKEDY:  I thought everything that was coming was

20    going to the DA and Mr. Kohn and I was getting copies of that

21    up to this point.

22          THE COURT:  It sounds like the City is the only one

23    that hasn't done it.  Make a copy of whatever the City gave you

24    and make that available to everybody else.  It sounds like all

25    of the stuff that the Federal government has done was sent to

1     the DA which is available for you.  Is that right?

2            MS. SAMPLE:  Yes, judge.

3            THE COURT:  Are we done with Mr. Salazar?

4            MS. ANKENY:  We are waiting for the judge to do the

5     conflict hearing.

6            THE COURT:  Aside from that?  Mr. Kohn, are you

7     taking lessons here?

8            MR. KOHN:  No.  I am trying to.

9            THE COURT:  Court will call 09 CR 753 which is People

10    vs. Rodarte.

11           MS. MCKEDY:  Thank you, judge.

12           THE COURT:  I think we have the same issue because I

13    have a whole lot of stuff.

14           MS. MCKEDY:  I would like to start first with the

15    easiest one.  Did you receive anything from T Mobile?  I

16    subpoenaed Mr. Rodarte's phone records.

17           THE COURT:  From T Mobile.

18           MS. VIEHMAN:  I actually have all of that.  It has

19    not been released in discovery.  It is phone records from T

20    Mobile from January 1st, 2009, to February 25, 2009.

21           THE COURT:  I have nothing from T Mobile.

22           MS. MCKEDY:  They were personally served at their

23    corporate headquarters.  I am anticipating that I will receive

24    that information from the DA.

25           MS. VIEHMAN:  Yes.

1          THE COURT:  The date that she gave you, does that

2     sound like the dates you were looking for?

3          MS. MCKEDY:  Yes.

4          MS. VIEHMAN:  More than she was asking for.

5          MS. MCKEDY:  More than actually I was looking for,

6     judge.  That takes us to the next phone records.  I did

7     subpoena to the Federal government requesting the phone records

8     of TFO Richardson.  Who throughout the discovery reports that

9     he has several phone conversations with Mr. Rodarte during this

10    event and after this event and the following day.

11         The response I get back is, this is not a Federally

12    issued cell phone.  They are not going to provide that

13    information.  I am asking their court to order the DA to find

14    out the phone number, find out the provider, and provide that

15    information to me so I can subpoena it.  I have no other way of

16    obtaining that information, judge.

17         THE COURT:  Say that again.  It's not a Federally

18    issued cell phone?

19         MS. MCKEDY:  Not issued by the Department of Justice.

20    It's not.

21         THE COURT:  They don't know who it is that it's

22    through.

23         MS. PADDEN:  TFO Richardson is not a Federal

24    employee.  It's my understanding.

25         THE COURT:  That's right.

1          MS. PADDEN:  FBI has nothing.

2          MS. MCKEDY:  That's where the confusion is.  This is

3    a joint task force with the Federal government working.

4          THE COURT:  He was CSPD.

5          MS. MCKEDY:  I am asking that information be

6    provided.

7          THE COURT:  He was not CSPD.

8          MS. SAMPLE:  He is a task force officer assigned to

9    the Safe Streets Task Force.  He actually works for the

10   Department of Corrections, Inspector General's Office.  They

11   could go that route.

12         MS. MCKEDY:  Here is the issue, they are going to

13   rely on him testifying about phone calls that come in and are

14   made by him and made to him by my client.

15         THE COURT:  I am not saying you don't get that.  I

16   think that is relevant.

17         MS. MCKEDY:  They are saying, "You get it, Ms.

18   McKedy."  They want to bring the information about the phone

19   calls in.  They are hiding behind layers of government here,

20   judge.  I am asking you to order them to provide me who the

21   provider is, what the cell phone number is.  I will be glad to

22   subpoena it.  This is a round about multi-step, multi-layers of

23   the government making a mockery of the state system here.

24   Hiding behind, oh, it's Federal when they are the ones

25   prosecuting the case.

1          THE COURT:  Ms. Sample.

2          MS. SAMPLE:  Judge, we don't have that information.

3    She has Mr. Rodarte's phone calls that were made on that time

4    and date.  So she will have that information of how many times

5    Mr. Rodarte called Mr. Richardson's phone and how many times

6    Task Force Officer Richardson called Rodarte's phone.  She has

7    that information without getting Officer Richardson's phone

8    records.

9          MS. MCKEDY:  That's not true.  I don't know what his

10   phone number is.  I don't know who the provider is.  I think

11   that is very important.  How am I to correlate the phone call

12   on Mr. Rodarte's records without having who he is calling?

13          THE COURT:  No.  I think that's fair.

14          MS. SAMPLE:  If I may, I know I received an e-mail

15   from Mr. Richardson regarding this SDT.  He has great concern

16   with your Honor releasing his information regarding his phone

17   number because, it's my understanding, that through his job he

18   can pay a little extra money, and this phone now becomes his

19   personal cell phone.  So he is concerned about releasing his

20   wife's number, his home number, his children's number, things

21   like that.

22          MS. MCKEDY:  I don't want anything but his phone

23   number of the phone he was using that day, the day before, and

24   during this investigation.

25          THE COURT:  The critical testimony here, I recall it

1    vividly, the critical testimony here was that during the time

2    that they are driving to the house Officer Richardson says that

3    he is talking with Mr. Rodarte on the cell phone and he says he

4    initiates the call.  And there is also testimony from Officer

5    Richardson that if he had a conversation with Mr. Rodarte, that

6    he couldn't be engaging in certain types of activity and those

7    kinds of things.  I think that that's discoverable.

8            MS. SAMPLE:  I guess, judge, my question would be, if

9    Ms. McKedy had the phone number of Mr. Richardson how she could

10   not then deduct which phone calls came from Mr. Richardson.

11           THE COURT:  That's what she is asking for, she

12   doesn't have the phone number.

13           MS. SAMPLE:  She wants to SDT his phone records.

14           MS. MCKEDY:  Phone records.  I need his phone record,

15   who the provider is, and how he is registered to use that

16   phone.

17           THE COURT:  Wait a minute.  How he is registered.

18   How does that --

19           MS. MCKEDY:  If I ask for that phone number, I have

20   to see who the person who owns that phone is.  That's how I

21   have to subpoena those phone records.

22           THE COURT:  Okay.

23           MS. SAMPLE:  My argument, judge, would be if she just

24   has the phone number she can go off Robert Rodarte's phone

25   records on when those phone calls were made, incoming and

1    outgoing.

2          MS. MCKEDY:  Judge, Mr. Rodarte's phone records may

3    have other phone calls that are made on there that I won't know

4    who they are.  If Mr. Rodarte is making phone calls to other

5    agents involved in this case, then those are going to be listed

6    there as well.  Is Mr. Richardson making phone calls elsewhere

7    in response to the phone calls that Mr. Rodarte is making to

8    continue the investigation?

9          If the Court recalls, or maybe this didn't come up in

10    all the preliminary hearings, there is authorization to use the

11    line for two more hours.  That call was made by Mr. Richardson.

12    I think if he is going to get up there and testify about phone

13    calls and we are supposed to take his word for it, there is

14    impeachment value, if those phone calls actually weren't made

15    or if he is making other phone calls along the same lines.

16         THE COURT:  Let's start with the easy question.  I

17    think that the DA does have the obligation in this case to

18    determine the phone number for Officer Richardson and to

19    provide that phone number to the defense.

20         Now, the other issues about whether or not Officer

21    Richardson was making other phone calls, I am not inclined to

22    go there.  I think that request is denied.  I am going to

23    allow -- you are going to have to get Officer Richardson's

24    phone number and give that to Ms. McKedy.  And I think so long

25    as the phone records that Ms. McKedy gets for Mr. Rodarte's

1  phone can show both his outgoing calls and to what number and

2  his incoming calls and from what number, that's all you have to

3  produce.

4          MS. MCKEDY:  Based on the information I received, I

5  assume I can file continued SDTs.

6          THE COURT:  I am not limiting it.  That's what I am

7  doing it for now.  If it goes somewhere else or bleeds

8  somewhere else, we will have to take that up when and if we get

9  there.

10          MS. SAMPLE:  For the record, the records that will be

11  going to Ms. McKedy and all other parties does state the phone

12  number that is incoming or outgoing and the duration of that

13  phone call.

14          THE COURT:  That's Rodarte's phone records?

15          MS. SAMPLE:  Yes, judge.

16          THE COURT:  Okay.  All you need to do then is

17  identify which of those numbers is Officer Richardson's.

18          MS. SAMPLE:  Yes.

19          MS. MCKEDY:  I asked that the actual recording device

20  and all documentation pertaining to the operation of that

21  recording device, including reporting parameters and operating

22  instructions be provided to me.  Again, the government has said

23  that this is privileged information.

24          Relying on the cases that the Court cited earlier,

25  with regard to the balancing test, Mr. Rodarte is in a

1    different position than the rest of the defendants with regard

2    to this issue.  The identity of Mr. Rodarte, the government is

3    going to seek to establish his identity through this listening

4    device.  I think it is imperative to his defense and his due

5    process rights and his rights of confrontation to be able to

6    know how this device operates.

7            THE COURT:  Back up a moment because at the scene of

8    the shooting --

9            MS. MCKEDY:  Yes.  I don't know if the Court recalls,

10   but one of the witnesses says that there is one suspect and

11   there is a second suspect.  And they are going to try to

12   establish through the listening device the identity of my

13   client.  Judge, additionally, they are going to testify, I

14   believe, as they have in their discovery, that this was a

15   recording device and not capable of transmission, live

16   transmission.  And they are going to testify that Mr. Rodarte

17   knew that.  How they are going to bring that out, I don't know.

18   The argument is that he believed that it was a live recording,

19   and this kind of dovetails into another issue relating to his

20   CI file that I subpoenaed as well.

21           THE COURT:  Let me back up to make sure I understand

22   your argument.  Your argument is that the government is saying

23   that it was only a recording device and he knew that.

24   Conceivably the defendant could argue, no.  I thought it was a

25   live transmission device.

1          MS. MCKEDY:  Right.  They are going to testify, no,

2     it's a recording device.  I am stuck with that answer.  I don't

3     get to have an expert examine that.  I don't get to have any

4     information at this point to rebut that.  I think that's

5     incredible impeaching information.  I think it definitely goes

6     to Mr. Rodarte's state of mind and some of the lack of

7     government follow-through and activity that should have

8     occurred in this case.

9          MS. PADDEN:  Your Honor, this is what actually went

10    back to when Mr. Cisneros' counsel requested this listening

11    device that was used in the hotel room.  This device is what is

12    currently being used by the FBI and other agencies and active

13    law enforcement.  And giving one of those devices, making

14    that -- disclosing that would greatly enable criminal

15    defendants to thwart the use of that device.  They would know

16    how the device works, things like that.

17         Mr. Rodarte was actually wearing the device.  He

18    knows information about the device because he was actually

19    wearing it.  He can testify about what he believed the device

20    could and couldn't do.  There is no reason why he couldn't

21    provide that testimony.

22         MS. MCKEDY:  He has a Fifth Amendment Right not

23    incriminate himself.  I think I have the right to

24    cross-examine.

25         THE COURT:  Your issue is you want to be able to

1    cross-examine somebody without having to put your guy on the

2    stand.

3              MS. MCKEDY:  Exactly.

4              MS. PADDEN:  That goes back to sensitive law

5    enforcement.  That I think is privileged.

6              THE COURT:  I am there.

7              MS. MCKEDY:  It is a balancing test, judge.  I have

8    no other way to get that information.  I have no other way to

9    confront this information.  I basically have to take the answer

10   they give me because they are the only ones that have the

11   information.

12             THE COURT:  Motion is denied for a number of reasons.

13   First of all, I am relying upon United States versus Van Horn

14   789 F.2d 1492 and also Commonwealth of Puerto Rico vs. United

15   States 490 F.3d 50.  And United States vs. Cintolo,

16   C-i-n-t-o-l-o, 818 F.2d 980.  As I understand the defense

17   argument, the issue is not what you knew, not actually what was

18   the case, but what the defendant believed.

19             In this instance the defense argument would be that

20   the defendant believed that the device acted in such a fashion.

21   Whether it actually acted in a fashion or not is not

22   necessarily relevant to the defendant's belief because the

23   device could, in fact, be that it was a recording device and

24   not a live listening device.  And the defendant could still

25   take the position that, "I believed it was a live listening

1    device."  It would not change that circumstance.

2           In addition, I don't believe that looking at or

3    weighing the balance -- I am sorry, I don't believe balancing

4    the need for the information in this case outweighs the

5    privilege.  I do understand in this case that there may be an

6    issue as to ultimate identification of the defendant when the

7    trigger was pulled because that's really sort of the issue.

8    But the ultimate -- as in United States versus Van Horn, the

9    ultimate question that whether the voice identifications of the

10   defendant were correct, was given to the jury and appellants

11   were allowed to explore and argue the possibility of

12   misidentification in front of the jury, this would be similar

13   to that.

14          The defendant in this case, Mr. Rodarte, who has

15   unique knowledge of the particular device, he himself was

16   wearing and activating it would be able to make all of those

17   arguments in front of the jury.  I don't believe it overcomes

18   the privilege.  That motion is denied.

19          MS. MCKEDY:  Does the Court's ruling on that issue

20   prohibit my Cross-Examination of the agents in this case with

21   regard to operation of that device?

22          THE COURT:  I think we are going to have to take that

23   on a question by question basis.  I have issued an order before

24   that the device is to be identified only as a body listening or

25   body wire device.  I think that you weren't here for the

1    prelim.

2            MS. MCKEDY:  I wasn't.  The Court said they were

3    going to issue a written ruling.  I have not received that.

4            THE COURT:  That's my fault.  I apologize for that.

5            MS. MCKEDY:  I will be following up with that.  I

6    think body listening device is very misleading and will be

7    misleading to the jury.  I want some further clarification in

8    how I can describe that device.

9            THE COURT:  There were some questions that I allowed

10   because, if I recall correctly, Mr. Griffin asked some

11   questions generally along the lines of could this device be

12   activated in front of somebody without that person knowing.

13   Could recording start, something like that.  I thought those

14   questions were fair.  I still think those questions are fair.

15   I think I am going to take it on a case by case or a question

16   by question basis.  I guess the long and short is, I don't

17   know.

18           MS. MCKEDY:  I will file some additional motions with

19   regard to that, judge.  The last subpoena that I issued was for

20   the confidential informant file of Mr. Rodarte.  If the Court

21   is not inclined to grant that, based on my subpoena, then I am

22   going to ask to reset this out of the presence of the

23   co-defendants because I think that I have information that

24   could sway the Court's decision with regard to that.

25           THE COURT:  All right.  First of all, Ms. McKedy, one

1   of the things that -- I wanted to make sure.  I have a lot of

2   stuff that I can't tell if this is what it was that you

3   subpoenaed and were looking for.  I am going to give that to

4   you.  I am going to give that to you.  I am going to put you in

5   the same position that I did Ms. Behan.  I don't think it's

6   fair to require you to tell me whether it is or not right this

7   minute.

8           MS. MCKEDY:  Okay.

9           THE COURT:  If you think there is something that you

10  subpoenaed that they haven't produced, we can take it up on the

11  24th.

12          MS. MCKEDY:  I think they produced the CI file.

13          THE COURT:  I didn't look at that.  I don't know what

14  that is.  Is that the CI file?

15          MS. MCKEDY:  No.

16          THE COURT:  What's the position of the People with

17  respect to the -- I am sorry, somebody over here, the FBI or

18  the Department of Justice with respect to the CI file?

19          MR. GOFFI:  Your Honor, this is sensitive information

20  that we can't disclose at this proceeding.  She subpoenaed it

21  in its entirety.  We have gone with other defendants, document

22  by document, through that file.  And, if the Court desires, we

23  can do an in camera review of portions of the file.

24          MS. MCKEDY:  As I said, judge, I think there is

25  information in that file that I would not like to disclose in

1    front of the co-defendants at this point in time that I think

2    is imperative to the state of mind of the FBI agents on this

3    case and Mr. Rodarte during this event.

4            THE COURT:  Yes.  I see you being in a different

5    position because depending how he may have felt, in some other

6    case doing something else for somebody else, that may have some

7    impact on what he was doing here.  That's why I think you are

8    in a little bit of a different position.  To that extent I

9    don't know that that's going to be all that confidential

10   information because what you are saying is you don't want to

11   give up is what he gave you.  That's the hard part.

12           MS. MCKEDY:  I disagree.

13           THE COURT:  What I am saying is, if they are saying

14   that it's confidential because it has to do with investigation

15   that they are doing, let's assume that your guy is helping out

16   in some other investigation, he is a CI in some other

17   investigation, your guy knows that.  It's not giving up

18   something to you that you don't already know.

19           MS. MCKEDY:  Judge, I understand that.  But what I am

20   saying is that if this information goes directly to Mr.

21   Rodarte's state of mind, the agent's state of mind, their

22   actions --

23           MS. ANKENY:  He is agreeing.

24           THE COURT:  No.  I am agreeing.

25           MS. MCKEDY:  I know that eventually the co-defendants

1   will get this information.  I don't want this information out

2   while they are going back to the jail and this case is ongoing

3   and being I am six months from trial.

4           MS. SAMPLE:  So Ms. McKedy is aware of all your

5   Honor's orders, one of the orders was everything that we

6   receive, we must release to all parties.  So if Ms. McKedy

7   receives that information, we still have to release it to all

8   the co-defendants.

9           MS. MCKEDY:  That's why I am saying, I don't want to

10  make my argument and tell you what I am specifically looking

11  for in front of these co-defendants in case you deny it.

12          THE COURT:  I am with you.  Here is what we will do,

13  we will give you your own hearing date on that issue.  That's

14  appropriate.  The thing that all of us are going to have to

15  think about at some point in time though is that eventually,

16  likely, a lot of this is going to be public record as part of

17  the transcript somewhere.

18          MS. MCKEDY:  I understand that, judge.

19          THE COURT:  I think you are in a unique situation.  I

20  understand that.

21          MR. KOHN:  The Court is precluding other parties from

22  being present at that hearing because the way --

23          THE COURT:  We haven't gotten there yet.  I haven't

24  had a request from the defense or the prosecution.

25          MS. MCKEDY:  I am asking that, requesting that.  If

1  you deny the release of this information, and I have argued

2  with you I believe I know what it is, but I don't have the FBI

3  side of it, I believe I know what that information is, if you

4  deny that, then that's not discoverable information.  If you

5  allow it, then it is discoverable information.  So I am asking

6  for a closed hearing.  We are not joined, judge.  We are not

7  joined at this point.

8          THE COURT:  I am inclined to grant that.

9          MR. KOHN:  For the record, Mr. Cisneros would object.

10 He has the right to be present at all public hearings and all

11 hearings in a criminal case should be made public.  Other than

12 what is in camera review, which is going on in a few of the

13 sensitive areas that were covered here today.  On behalf of Mr.

14 Cisneros we would lodge an objection.

15         MS. BEHAN:  We would join in that objection.

16         THE COURT:  All right.

17         MS. BEHAN:  On behalf of Mr. Salazar.

18         THE COURT:  Right.  We are done.

19         MS. MCKEDY:  I need a date on that.

20         THE COURT:  Mr. Kohn, I think that's your cue.

21         MS. SAMPLE:  Could we get a date for Ms. McKedy when

22 it's going to be rescheduled for?

23         THE COURT:  Yes.  If you want -- the defendants are

24 not joined.  Frankly, I have had a number of hearings,

25 including this one, where all defendants are present simply for

1   convenience of the parties.  I have got a lot of lawyers and a

2   lot of other people.  If you want, we can try and do that.  We

3   are not going to be able to do it next week.  We have the 24th

4   which is already set aside.  I can do it at that time with just

5   Mr. Rodarte.

6              MS. MCKEDY:  What time, judge?

7              THE COURT:  It would be on the 24th.  We could do it

8   either some time in the morning or probably in the afternoon

9   like 1:30.

10             MS. MCKEDY:  I could do that, knowing it would be a

11  closed hearing.  I would again waive Mr. Rodarte's presence.

12             THE COURT:  All right.  Everybody else is going to be

13  here anyway.  That's convenient for everybody I think on this

14  side any way.

15             Mr. Kohn.

16             MR. KOHN:  A couple of minor issues before we get

17  back into this.  I have requested discovery from my client's 93

18  CR case which is a criminally negligent homicide.  I know the

19  District Attorney doesn't want to turn it over.  I don't have a

20  problem with them not turning it over.  But as long as we get a

21  stipulation that that case is not going to be used or any of

22  his prior cases are not going to be used as any of the elements

23  of predisposition for the entrapment defense.  That's my

24  concern.

25             The only reason I bring it up now on the motions date

1   is because if they are planning on using that, there are

2   further motions that need to be filed.  I need to review

3   discovery on it immediately.

4           THE COURT:  You look confused.  I am too.

5           MS. SAMPLE:  Judge, the reason I am confused is I

6   thought we were going to address this at the motions hearing.

7   I am not prepared to address this.

8           THE COURT:  That's fine.  Okay.  We will decide it at

9   the motions hearing.

10           MR. KOHN:  Okay.  Judge, the next thing that I am

11   requesting is complete unedited, unredacted copies of initial

12   suitability reports and recommendations, and abbreviated ISRR,

13   for Mr. Rodarte, including all suitability reviews, all

14   continuing suitability records or reports and recommendations,

15   abbreviated ISRR, all documentation regarding Rodarte's

16   suitability inquiry status.

17           Now, I put the request consistent pursuant to CI

18   guidelines as far as section and chapter.  However, apparently

19   guidelines have changed.  However, they still have the same

20   requirements.  My understanding is they may not have the same

21   names and might not be someplace in the guidelines.  What I am

22   asking for, judge, is the Federal government at some point

23   before they sign up a CI, they do a search, a background

24   search.  They look at all the information.  They kind of weigh

25   the pros and the cons.  Then they make a decision as to whether

1    they are going to use this person as a CI.

2            This is all information that we are entitled to as

3    far as the confidential informant.  It's direct substantive

4    evidence for the entrapment defense and outrageous government

5    conduct.  And it's impeachment evidence of what I imagine FBI

6    agents, special agents, the TFO will be testifying to.

7            THE COURT:  Has that been produced, Mr. Goffi?

8            MR. GOFFI:  No, your Honor.

9            THE COURT:  Is there an objection to producing it?

10           MR. GOFFI:  Your Honor, the current guidelines in

11   place require -- we call it administrative documentation

12   regarding the opening of informants.  That documentation

13   discloses what we consider important to know about informants,

14   the course of evaluating them and tasking them.  There is also

15   required documentation about periodically evaluating

16   informants.  That's all covered by the subpoena.

17           Again, we view that as sensitive information that we

18   wouldn't want to be made public because then people who want to

19   come to us as possible informants, would mislead us with what

20   they are capable of doing.  In our letter in response to his

21   subpoena we did propose presenting that to the Court in camera

22   for your review to determine if there was anything relevant or

23   exculpatory in that administrative documentation.

24           THE COURT:  Start there.  Just submit that for an in

25   camera review.  I will take a look at that.  I am somewhat

74

1    inclined to believe that you just submit this for in camera

2    review.  I will figure out what I am going to do there.

3         Next.

4         MR. KOHN:  I have one more point on that.  I

5    understand the Court is going to review it.  My preference is

6    for them to release directly the discovery to us.  One of the

7    issues, I don't even know what the report is, if I could ask

8    Mr. Goffi what the title of this report is so I can

9    appropriately address it on the record.

10        MR. GOFFI:  This is an SAC authorization for Rodarte

11   as an informant to engage in otherwise illegal activity.  This

12   was turned over in response to a statement by the Court at the

13   previous hearing saying that the defendant was entitled to a

14   quote, unquote service agreement.  There was no such -- we

15   don't have a service agreement per se form file.  On the last

16   four pages of that document are admonishments that were read to

17   Mr. Rodarte that he signed off on.

18        THE COURT:  That was an issue that we have had here a

19   lot.

20        MR. GOFFI:  With respect to when we have what could

21   possibly be considered a service agreement where we go into

22   that with Mr. Rodarte, what our mutual understandings are about

23   what he can and can't do, that's why that document was

24   produced.

25        THE COURT:  Okay.

```
 1            MR. KOHN:  Judge, if I may suggest, and I am not sure
 2    if the Court already did this with Ms. McKedy or Ms. Viehman,
 3    but if they can turn over the entire CI file to the Court.
 4    This has been going, with the various hearings that we have
 5    been having, it's like pulling teeth.  The government denies
 6    that any such document exists.  Then when some information
 7    turns up that such documents do exist, they are like, well,
 8    yeah, they do exist but they are privileged.  I don't know what
 9    I need to ask for without going through old guidelines.
10            THE COURT:  I disagree with counsel's framing of the
11    argument.  I don't think that that's the way that it's gone.
12    Let me ask, first of all, how thick is the file?
13            MR. GOFFI:  I think you can -- you could review the
14    file in 45 minutes.
15            THE COURT:  Let's do that.  Let's have the file
16    produced.  I will look at it in camera.  It will not be
17    available to anyone else.  Then I will take a look at it and we
18    can --
19            MR. GOFFI:  Can I produce it myself and/or Agent
20    Hunt?
21            THE COURT:  I am sorry?
22            MR. GOFFI:  Can I propose myself or Agent Hunt be
23    with you?  I don't know that you would be able to understand
24    our bureauese or bureaucratic paperwork.  Maybe I could offer
25    an explanation on why this is sensitive.  If it's not --
```

1          THE COURT:  I am not inclined to do that for the same

2     reason that I wasn't inclined to allow Mr. Bain to talk to me

3     ex parte either.  What I will do is, I will allow that if there

4     are issues though, if there are issues about whether I think a

5     document should be -- here is what I am going to do.  If there

6     are issues, what I will do is, I will look at the file.  I will

7     try to make a determination as to what should be released, what

8     usually -- when I review this stuff there is some you go,

9     "Yeah, that should be."  There is other stuff clearly that

10    shouldn't be.  Then there is stuff that you look at, you go, "I

11    don't know."

12          What I will do, I will issue an order.  Bate's stamp

13    the file when you send it down to me -- and hold on.  Let me

14    get all the way through.  If you Bate's stamp the file when you

15    send it down to me, I can say I am going to release these pages

16    or these portions of these pages.  I will issue that in an

17    order.  You will have an opportunity to say, this is why we

18    don't think we should release those pages or those portions.

19    Go ahead.

20          MR. GOFFI:  You envision a photocopy of the entire

21    file being submitted to you?

22          THE COURT:  Right.

23          MR. GOFFI:  I was thinking in terms of I would hand

24    deliver it and wait outside in another room while you did this.

25          THE COURT:  No.  No.  Because I have to maintain part

1    of the file for the appellate record.  I don't have a choice

2    because I have to see, like with these, if I say this is stuff

3    that was given by Mr. Bain if I say, "Okay.  Nobody gets any of

4    this," it gets put in a file folder which is labeled,

5    "Restricted access.  Opened by court order only."  It's not

6    given to anybody but another judge.  But it is maintained for

7    purposes of appeal.

8           So that if anybody here says that in my infinite

9    wisdom I got it wrong, the appellate court can look at what it

10   was that I looked at and say, "Yeah, he got it right."  I don't

11   have a choice but to maintain a record for purposes of appeal.

12   You can't just bring something down to me and I say, "Okay, I

13   am looking at this.  No.  I am not giving that."  Then the

14   Court of Appeals said, "What was it that you didn't give?  We

15   don't have a copy of what it was that you didn't give."  They

16   say they should have gotten it.

17          MR. GOFFI:  Okay.

18          THE COURT:  Does that make sense?

19          MR. GOFFI:  Yes.

20          MR. KOHN:  Judge, I want to make further record on

21   that.  Again, I already cited all parties refer to directly one

22   of the findings in proving Mr. Rodarte as a CI is -- this is

23   under Page 4, or Page 4 of 3 of the agreement that was just

24   referenced by Mr. Goffi, the following points were considered

25   in making that determination.  It lists issues that were

1    considered in allowing Rodarte to work as a CI.  And one of

2    those is the risk that the confidential human source might

3    misunderstand or exceed the scope of his or her authorization.

4    Obviously at some point the government considered the fact that

5    he may go well beyond what he is authorized to do and

6    authorized legal conduct rather than unauthorized legal

7    conduct.  I think that based on the specific facts and defenses

8    in this case, we are entitled to all the information that

9    relates to that.

10            Next thing, judge, any and all written admonitions

11   provided to Rodarte consistent with and pursuant to FBI

12   guidelines.  The guidelines -- I guess I have a question for

13   Mr. Goffi.  If the Court would ask of him when Mr. Rodarte was

14   signed up, which guidelines were in place.

15            THE COURT:  I see I need to be provided with a copy

16   of whatever guidelines were in effect at the time he was signed

17   up.  That's the ones that were --

18            MR. GOFFI:  Guidelines that were in effect as of

19   December 13, 2006.  In response to this subpoena, we did mail

20   copies of those guidelines to the Court.

21            THE COURT:  Okay.

22            MR. KOHN:  Judge, we believe we are entitled to any

23   and all written admonitions provided to Rodarte.

24            THE COURT:  And have admonitions been provided,

25   copies of admonitions, if there were any?

1          MR. GOFFI:  The only documented admonitions provided

2     to Mr. Rodarte were provided in that document.

3          THE COURT:  All right.  It sounds like this stuff has

4     been produced then.

5          MR. KOHN:  What's that?

6          THE COURT:  It sounds like this stuff was produced.

7     This is stuff he gave you earlier.

8          MR. KOHN:  This one thing had been produced.  All of

9     the reports that I am looking for, all of the documents that

10    take into account what the Federal government considered in

11    allowing him to work as a CI are completely absent.

12         THE COURT:  All right.

13         MR. KOHN:  Any and all reports submitted -- I skipped

14    one number.  "Any and all documentation of instructions

15    provided to Rodarte consistent with FBI guidelines."  If there

16    are any instructions that are written as far as what he is

17    supposed to do, not supposed to do, other than what's been

18    provided, we are requesting that.

19         THE COURT:  Those are the guidelines that we talked

20    about that you are going to submit in camera.

21         MR. GOFFI:  Whatever documentation that could fit

22    under those descriptions in the subpoena will be in the file.

23         THE COURT:  All right.  This is all in the CI file.

24    All right.  I am with you.

25         MR. KOHN:  "Any and all reports submitted by FBI

originating from the field office, FBI's human intelligence

unit regarding unauthorized illegal activity by Robert

Rodarte."

Judge, this is an important report that was sent.  At

some point a report had to be sent out listing certain

information pursuant to FBI guidelines that one of their agents

exceeded the scope of what he was authorized to do as far as

illegal activity.  That is just as relevant as any incident

report, if not more so.  Which is clearly exculpatory.  My

client is not the person who fired the weapon and nobody is

alleging he is the person who fired the weapon.

THE COURT:  So, essentially it sounds then, except

for Paragraph 10, it sounds like all of this stuff is something

that's in the CI file that's going to be produced to me.  Am I

understanding that right?

MR. GOFFI:  Yes, your Honor.  Anything potentially

responsive to what he has just read off would be in the CI

file.

THE COURT:  All right.  It looks like Number 10 and

Number 11 are different.  I don't even know what statistical

accomplishments is.

MR. KOHN:  FBI keeps records of arrests, convictions,

things to that effect.  It was at some point called an FD 209

form.  There should be one for Mr. Rodarte.  I guess I should

probably expand my request, not just for Mr. Rodarte's CI file

1  at the time that he worked for the FBI or any government

2  agency, but if he had worked in the past, that they provide all

3  of that information because I think that there is conflicting

4  information regarding Mr. Rodarte's prior conduct.

5       I will tell the Court why that's important.  If Mr.

6  Rodarte had worked for the Federal government in the past, and

7  was not renewed as a CI, the reason he was not renewed as a CI

8  is very important to our defense, to all of our defenses, but

9  especially the outrageous government conduct defense.  If he

10  exceeded his scope of authority previously, then he is retained

11  by the government and paid 16,500 in a couple months and the

12  same thing happens again, that's clearly exculpatory

13  information.

14       THE COURT:  That specific information may be

15  exculpatory.  That does not necessarily mean that all of the

16  information contained in any other operation Mr. Rodarte was

17  involved in is discoverable.  It seems to me that a reasonable

18  balance is, and I thought I had already ordered this, that the

19  Federal government has to disclose what they had paid him in

20  all other cases and what they paid him in this case.

21       If they have to disclose that if he was fired, for

22  lack of a better word, as a CI at some prior point, they have

23  to disclose at what point that was.  But I don't think that

24  makes all of those other operations -- I don't think it opens

25  the door to all those other operations.

1    MR. KOHN:  If we can at least get at this point

2    whether he worked as a CI before.  That way we are not spinning

3    our wheels on things that don't exist.  If Mr. Goffi can make a

4    representation to the Court as to whether he has worked as a CI

5    before, then we know that that's not an issue that needs to be

6    even addressed or waste any more time on it.

7        THE COURT:  Start here first.  Ms. Padden, what's

8    your position?

9        MS. PADDEN:  I don't know whether Mr. Rodarte has

10   worked as a CI before.  I think your Honor already ruled on

11   this at the last hearing that it was limited to these

12   particular defendants.  I think you already excluded all other

13   investigations of Mr. Rodarte.

14       MR. KOHN:  We have an additional theory of defense,

15   judge.  It necessitates us having that information.

16       THE COURT:  I am not sure that I agree it

17   necessitates it.  Mr. Goffi, I am asking you to address the

18   legal argument, not answer the question.

19       MR. GOFFI:  I don't understand.  Whether he has been

20   a CI before, for when?

21       MR. KOHN:  Was he on October 21st?

22       THE COURT:  Here is what he wants to know.  I don't

23   know if you get the pleadings or not because it's a state case.

24       MR. GOFFI:  No.

25       THE COURT:  He filed a motion to dismiss the case

1    based on outrageous governmental conduct.  Part of the theory

2    that he would have as a basis for dismissal of the case under

3    outrageous governmental conduct is suppose that he had gone out

4    before, ten years before, and had worked as a CI, and you gave

5    him all of these rules and told him to follow all of these

6    rules.  He went out and did exactly the same thing in another

7    case ten years ago and was, I don't know what they call it, but

8    he was fired.  They said, "We are not going to have you as a

9    confidential informant anymore.  We are not going to use you

10   because you don't do what we tell you to do.  You don't follow

11   guidelines that we tell you to follow."  Then all of a sudden

12   whatever it was that happened, happened and Mr. Rodarte is

13   coming to the attention of the FBI again.  And the FBI says,

14   "You know what, now that we think about it, we think we can use

15   you as a CI."  His argument would be, "You know what, he did

16   this before.  They did it again."  Therefore, this is even more

17   outrageous because it wasn't just once, it was twice.  The case

18   should be dismissed.

19          His question is, before this had Mr. Rodarte ever

20   been terminated as a CI before for violation of rules?  I am

21   not asking you to answer that question.

22          MR. GOFFI:  I can answer that question.  I can answer

23   that question.

24          THE COURT:  Okay.

25          MR. GOFFI:  He has only been terminated once.  That

84

1   was as a result of --

2              THE COURT:  This incident.

3              MR. GOFFI:  -- this incident.  He was never an

4   informant prior to when he first went to work for us when he

5   became involved in this incident.

6              MR. KOHN:  That settles it.

7              THE COURT:  There we go.

8              MR. KOHN:  Judge, I guess the last thing that may not

9   arguably be included in the file, the CI file that's going to

10  be turned over is Number 9 which is, "Any and all

11  documentation, receipts, memos, funds, requests, canceled

12  checks for any payment made to, on behalf of or for the benefit

13  of Robert Rodarte and/or FBI case number," then just the case

14  number.  The reason that I went to such --

15             THE COURT:  I already addressed this, didn't I?

16  Didn't we have this before?

17             MR. KOHN:  You did address it.  Then it came up that

18  the government separates their expenses and expenditures and

19  receipts in a way that it appears that they didn't spend any

20  money after February 9 I believe it was.  We know that they

21  spent money on a limousine for February 14th, a hotel for

22  February 14th, alcohol for February 14th, a strip bar for

23  February 14th.  We know that the government spent money.  We

24  don't have that information.

25             I know that based on the report that I obtained if

1    the District Attorney's investigator, who spoke with somebody

2    at this FBI's office, they just categorized the expenses

3    differently.  I don't care how they are categorized.  I believe

4    that we are entitled to all of them.

5              THE COURT:  This is an argument that I have heard

6    before.  I have ruled in your favor.  I said, it does not

7    matter how the expenses are categorized if it has nothing to do

8    with this investigation.

9              MR. KOHN:  I agree, judge.  They have not complied.

10             THE COURT:  Then we will have an issue as to whether

11   or not somebody is going to be able to testify as to a lot of

12   issues.  But the question that I have is, is there a reason why

13   it hasn't been produced?  Is there a reason why Mr. Kohn is

14   suggesting or arguing that Section Number 9 or Request Number

15   9, whether it's receipts, whether it's checks, whatever it is,

16   hasn't been produced?  It has to do with this case.  He is

17   drawing the distinction between February 9th.  He says no money

18   was spent after that when, in fact, this case arose as a result

19   of incidents which occurred on February 14th.

20             MR. GOFFI:  Mr. Rodarte wasn't paid any money for his

21   services or expenses after February 9th.  There was money

22   incurred, expenses incurred, as part of this investigation,

23   purchases of alcohol, hotel room.

24             THE COURT:  Has that been produced?

25             MR. GOFFI:  We can create a report that document

1    those expenses.

2              THE COURT:  All right.  Let's do that.  So any money

3    that was paid to him on his behalf or anything that had

4    anything to do with this case, that's what we need to produce.

5              I ask, with some trepidation, if we have concluded,

6    except for Mr. Bain.

7              MR. KOHN:  Judge, I guess I ask for another SDT

8    return date.  I subpoenaed TF0 Matt Richardson's file from the

9    Department of Justice.  They said they didn't have a file for

10   him.  It's an agency task force.  I want to get that from DOC.

11   That remains also Number 7 on mine.  I requested a copy of

12   Joseph Hunt's file, Special Agent Joseph Hunt's employee file.

13             Judge, all I would ask is that they provide that to

14   the Court for in camera review to see if there have been

15   previous issues regarding Mr. Hunt's being admonished.  Mr.

16   Hunt being disciplined.  Anything else that involves -- that

17   reflects negatively on Mr. Hunt as far as an operation or a CI

18   exceeding the scope of their authority.

19             THE COURT:  Start over here.  Prosecution, let's

20   assume this were a state case and you were asking for a file on

21   a CSPD officer.

22             MS. VIEHMAN:  We would be asking Mr. Bain to step

23   forward on that.

24             THE COURT:  That didn't help me any.

25             MS. SAMPLE:  Judge, we would ask Mr. Bain to argue

1    that.  But if you are just asking for what our response would

2    be at this moment, we would be objecting.  I understand, I

3    think, why Mr. Kohn wants that.  But we would be objecting.

4              THE COURT:  Yes.  I know that there is a delaying

5    test.  There is an issue of whether the Open Records Act of

6    employee files are not subject to open records.  I have no clue

7    whether the Federal government has the same thing.  My guess is

8    yes but ten times as thick.

9              MS. PADDEN:  We also have a privacy issue.  My

10   understanding what would happen, I don't practice on the civil

11   side, my understanding on the criminal side is the Federal

12   system is that the agency would review the employee's file for

13   any sort of rating material and exculpatory material about the

14   defendant, anything that would impact adversely on the agent's

15   credibility and turn that material over.  That has happened in

16   this case.  Agent Hunt's file has been reviewed.  That

17   material, there is no Brady material or other such material

18   that would be disclosed in his file.  We would submit there is

19   no reason to submit it for in camera review.

20             THE COURT:  All right.

21             MR. KOHN:  I disagree, judge.  I think that my

22   responsibility to my client goes beyond taking the FBI's word

23   for their investigation or what their agents have or have not

24   done that has been -- that has incurred potential for

25   discipline or actual discipline.  While I am not asking for the

1    file myself, I am asking for an in camera review of the file.

2          THE COURT:  I am going to take that one under

3    advisement.  I am inclined not to grant that, but I know there

4    had been certain circumstances in which it has been granted.

5    It has to deal with certain very limited instances involving

6    specific CSPD officers.

7          MR. KOHN:  Ms. Ankeny brought up a good point.  When

8    we are dealing with a CSPD case, we get a list of officers

9    there has been disciplinary proceedings against.  We don't have

10   that in this situation.

11         THE COURT:  That's because they are telling you that

12   there weren't any disciplinary proceedings.

13         MR. KOHN:  But it's investigated outside of CSPD.

14   It's investigated by our District Attorney's Office.  They are

15   the ones that compile a list of exculpatory information.

16         THE COURT:  I see what you are saying.  You are

17   saying here the agency that you are requesting it from is the

18   one that's saying they did it.  They are not giving you

19   anything.

20         MR. KOHN:  Correct.

21         THE COURT:  I have to think about that one.

22         MR. KOHN:  What's the Court's procedure as far as

23   once there is an in camera review, I would request that -- I

24   know the Court probably turned over some documentation.  If

25   there is documentation the Court doesn't turn over, I request a

1    record be made as far as what is in the file that's being

2    sealed and that the Court did review it, not subject to

3    release, so we at least know what there is and isn't in the

4    file.

5         THE COURT:  I don't do that.  The reason for that is

6    if I have determined that something that is contained in the

7    file that you are not -- and this gets back to the conversation

8    I had with Mr. Goffi -- I issue an order that says I have

9    reviewed all of these documents, you get the documents 2, 3, 7

10   and 9 and nothing else, and I put the rest in an envelope that

11   is sealed and it is restricted access, it may only be opened by

12   another judge.  Another judge further up the road conducts that

13   review de novo, which is why I don't say I am giving you all of

14   the stuff that has to deal with Mr. Cisneros but all of this

15   stuff where Mr. Rodarte did all of these other bad things, and

16   I explain what the bad things are, I am not giving those to

17   you.  I don't do that.

18        That's why the in camera review is done so that I can

19   look at it and say, 'It is not discoverable.  It is not subject

20   to the subpoena."  And a judge who is higher up in the food

21   chain can take a look at it and say whether I made the right

22   call or not.

23        What you will get is an order that essentially says,

24   like in this case, "I have reviewed the gang database

25   materials.  These are the documents that I am releasing.  The

1    remainder of the documents will remain in an envelope and shall

2    be sealed."  That's it.

3              MR. KOHN:  There is just a couple issues from the

4    last SDT hearing that I have in my notes.  I sent an e-mail to

5    Ms. Sample regarding this on August 13th.  I think that the

6    Court requested that Mr. Goffi find out -- an affirmative

7    gesture to find out from any of the case agents whether there

8    was any documents that memorialized the agreement, expectations

9    of what Mr. Rodarte would do for the FBI, Department of

10   Justice, and how he would get paid and/or the administrative

11   paperwork provided and signed by Rodarte.  I understand the

12   Court addressed part of that today with the receipts that are

13   signed for the 7,000, 7,000.  But I am wondering if the Court

14   can inquire as to whether Mr. Goffi found out definitely

15   whether there is anything that memorialized the agreement quid

16   pro quo.  You did this, we will do this.

17             THE COURT:  I want to say that he already answered

18   that question.  If there is something like that, it's in the CI

19   file or it's contained in whatever guideline doohickey, things

20   you talked about earlier.  If I am misstating that, jump right

21   in.

22             MR. GOFFI:  The only document that we reviewed

23   memorializing the understanding between the parties is when I

24   turned over that agreement, SAC authorization, for otherwise

25   illegal activity.

1          THE COURT:  Where?

2          MR. GOFFI:  A document I signed off on.

3          THE COURT:  That's what I thought I heard.  Anything

4    else?

5          MR. KOHN:  Scheduling, judge.  I anticipate that the

6    motion of outrageous government conduct is going to take quite

7    a while.  I subpoenaed all of the agents involved, as well as a

8    couple CSPD officers.  I don't know how much time the Court has

9    set aside for that.  I have a problem with the 23rd.  I don't

10   know how I did this -- I am sorry, the 24th.  I somehow set up

11   a doctor's appointment for that afternoon at 3:15.  I am trying

12   to reschedule it, but the doctor can't see me for another month

13   after that.  I have an issue with that.

14         THE COURT:  Here is the issue.  I have at last

15   count six or seven trials still set for the 21st, something

16   like that.

17         MS. ANKENY:  Dilger went away today.

18         THE COURT:  We are down to about five.  I don't think

19   anybody -- I think she was the last in custody, if I remember

20   correctly.

21         MS. ANKENY:  For the 21st.

22         THE COURT:  I have two in custodies that are set for

23   trial on the 21st.

24         MS. ANKENY:  I got a new offer on Thompson.  I think

25   it's going to go away.

1          THE COURT:  Thompson is involved.  As you know I have

2    my docket on the 23rd.  Generally I have my criminal docket

3    also the morning of the 24th on Thursday mornings.  If the 24th

4    is going to take all day, it's going to wreak havoc with some

5    of the trials that are set on the 21st.  You need to be aware

6    of that.  We are going to get this done in one day.  That is

7    not a question.  It is a statement.

8          MS. ANKENY:  All parties?

9          THE COURT:  Everybody.  We will be done on the 24th.

10   It will be done in one day.

11         THE CLERK:  What time?

12         THE COURT:  We are set to start at 8:30

13   September 24th.

14         MS. ANKENY:  I have 9:00.  Did you move it up to

15   8:30?

16         THE COURT:  I always thought it was 8:30.  I know we

17   started early on that day simply because here we are ten

18   minutes to 5:00.

19         MS. ANKENY:  8:30.

20         THE COURT:  We are starting at 8:30.  We are going to

21   roll.  We are going to go.

22         MS. MCKEDY:  That includes the hearing that I set

23   regarding the CI file issue on Mr. Rodarte?

24         THE COURT:  It does.  But we may -- that one I am

25   less concerned about.  I see that one as taking not very long.

1    I think we can schedule it at another time for like 1:30 and

2    take ten minutes, unless I am misreading it.

3                MS. MCKEDY:  No.  You are not.

4                THE COURT:  These issues are really pretty similar.

5    The issues of law are the same.  I understand.  And I

6    understand the defense arguments.  Really, when you get down to

7    it, it really still comes down to what is the evidence of what

8    anybody did on a particular day.  That's where we will be.  We

9    will hear them at the same time.

10               MS. ANKENY:  We are going to get a new SDT return

11   date.  Then we are not getting a separate date for outrageous

12   governmental conduct?

13               THE COURT:  I am sorry?

14               MS. ANKENY:  Are we getting a separate hearing date

15   for that or no?

16               THE COURT:  I am not even sure I am going to give you

17   a hearing on that.  As I see that, that can be ruled on based

18   on the motions.  It's the law applied to the facts.  I either

19   make the call right or I make that wrong.  I don't know that

20   there is going to be a hearing on that.  That's why I don't

21   think this motions hearing -- we are not hearing every motion.

22   I want you to understand that.  I will rule and we will be

23   done.  I am not accepting argument from anybody -- and here is

24   how I see this, when I get a motion that is 12 pages long,

25   15 pages long, something like that, I expect the People,

everybody, to put in what they mean.  I don't expect somebody

to file a 15 or 20 page motion and then say, judge, I want to

tell you something.

If there is something that you have that's really

important to say, it better be in the motion.  You are not

going to get a chance to sit up there and say, "I want to argue

this motion."  It is no.  Don't cite the U.S. Constitution.

That's why this case should be dismissed, the U.S.

Constitution.  You give me facts.  You give me law on the

point.  Otherwise, the only motions that we are dealing with

are evidentiary motions.  I will rule on the motions as they

are submitted.

Are we clear?

MR. KOHN:  We still have to present evidence.  I

understand the Court's position.  But we are entitled to have a

hearing on the outrageous government conduct.  The Court -- we

can't -- at this point what we have made is averments in our

motions as to what we believe the evidence will show.  And this

discovery process and all SDTs that we are getting is to gather

continuing information on that.  And we have a right to present

evidence to the Court so the Court can make an informed

decision as to outrageous government conduct, not to decide

based on the preliminary hearing, which is a very limited scope

as far as the evidence presented.

THE COURT:  I don't know that I agree with that.  I

1    don't know that I see that any differently than any other

2    motion.  There could be a number of options that I could take.

3    One of the options that I could take is, you know what, Mr.

4    Kohn, everything that you say, I am going to say is true.  And

5    I am going to accept it as true.  Your motion fails.  In that

6    event I don't need any sort of evidentiary hearing.  I could

7    also say, "I can't decide this based on the motion.  I need to

8    hear something."  But if I need to do that, that's my decision.

9    I will let you know.

10            But primarily all of these motions, as I see it at

11   this point in time, should be able to be ruled on simply by

12   looking at the motions.  We are not looking at an -- I don't

13   have -- I haven't seen whether or not the suppression motion

14   has been filed.  That's different because I have to look at

15   that.  Those are somewhat different.  That is an evidentiary

16   motion.

17            MS. ANKENY:  There will be two from us.

18            THE COURT:  Certainly that could be the case.  Those

19   are different.  Don't expect that you are going to get an

20   evidentiary hearing on every single motion that has been filed.

21   It will not happen.  I understand that you disagree with that.

22   The Court of Appeals or somebody farther up the chain may say

23   that you are right.

24            MR. KOHN:  Judge, what I would like to do is file a

25   supplemental motion.  My motion wasn't exhaustive as far as the

1    outrageous government conduct.  It was sufficient to give the

2    Court notice of the defense.  It's a recognized defense in the

3    State of Colorado.  It is sufficient information for the

4    government to be able to represent their interests in the case.

5         THE COURT:  That's why we are having this

6    conversation now.  We don't need evidentiary hearings on every

7    single motion.  It's not going to happen.  If there is

8    something important -- let me explain it to you this way, it

9    sometimes happens in criminal cases.  It always happens in

10   civil cases that someone files an 80-page motion or a 30-page

11   motion with a hundred pages of amendments.  Then they say, "I

12   want to argue this motion."  My question to them always is the

13   same, is there something you are going to tell me now that you

14   feel is really important that I need to know that you didn't

15   feel was so important that you needed to put in all of this?  I

16   hold up the motion that I have.  The answer is no.  That is the

17   same standard that applies to you.

18        If you think there is something that I need to know,

19   put it in the paper, put it in the motion.  That goes for every

20   counsel in this case because there are a lot of things that we

21   could have dealt with here that I could have dealt with this

22   afternoon without having to take all afternoon on it.  It could

23   have been fleshed out better in the motions.  It wasn't.  I

24   understand there is also a lot of people here.  I understand

25   that.  But I am telling you, I will decide whether or not we

1   are having evidence presented on any motion.  Don't expect that

2   just because you file a motion and you think that's noticed

3   that you are going to get a hearing on it.  You may not.

4        I understand that your position is you may think I am

5   wrong in that.  It may be that the Court of Appeals is going to

6   agree with you.  It may be that they won't.  We are going to

7   proceed on.  We are going to be done in a day.  We have had

8   more hearings on this case than I can count.  It's going to be

9   done.

10        MS. ANKENY:  May I ask a question, judge?

11        MS. SAMPLE:  Can I ask?  I have been standing up for

12   some time now.

13        THE COURT:  I missed you.

14        MS. SAMPLE:  Thank you, judge.  Can I get defense

15   counsel -- to get a date on their deadlines because it sounds

16   like if the People want to respond in writing to help your

17   Honor --

18        THE COURT:  You don't need a date from them because I

19   have already given one.  All motions -- everyone write this

20   down.  I can't tell you the number of times I said it.  All

21   motions, every motion will be filed no later than 15 days prior

22   to the time of hearing.

23        MS. ANKENY:  The problem is, that's today.  If the

24   Court is taking supplements to the motion, my question was,

25   will the Court grant until Friday to write these supplements to

1    motions, if that's what the Court would like?

2            MS. SAMPLE:  We have only received one motion.

3            MS. ANKENY:  They were filed today.  I put them --

4            THE COURT:  Today would be 15 days.  That's possibly

5    why you haven't received the motions.  I will grant until

6    Friday.  There will be no further extensions in order for

7    everybody to be prepared.  It is not in any client's best

8    interests here.  It is not in any lawyer's best interest here

9    to ambush anybody.  It doesn't matter whether it's from

10   prosecution to defense, defense to prosecution.  All it does is

11   create problems for everybody.  What everybody needs to do here

12   is for the lawyers to do their jobs, put it together in a

13   timely fashion so everyone gets a fair trial.  That's the goal.

14   All motions, supplemental or otherwise, all motions, will be

15   done and submitted by 10:00 o'clock Friday.

16           MS. MCKEDY:  Except for Mr. Rodarte who is not set

17   until January, correct?

18           THE COURT:  Except for Mr. Rodarte.  It only applies

19   to people who have the trial dates.  Then I need to have some

20   sort of written response from People no later than five days.

21           MS. SAMPLE:  We do have the conference.

22           THE COURT:  No later than September 21st.  Those need

23   to be hand delivered to chambers.  If you file them downstairs,

24   I won't get them in time.

25           MS. SAMPLE:  My other concerns were, did your Honor

```
 1    receive all of the habituals that were filed of the
 2    co-defendants?
 3              THE COURT:  Sure.  I don't know.  I honestly don't
 4    know.  It could be that they have been filed but they haven't
 5    made it into the file yet.  I don't know the answer to that to
 6    be honest.
 7              MS. SAMPLE:  The same answer might be applied to the
 8    Rule 16 for photographs of any tattoos that the defendants'
 9    have.
10              THE COURT:  The only one that I remember is one from
11    Ms. McKedy.  The only reason I remember is because you said --
12              MS. MCKEDY:  I filed an objection to all of his
13    tattoos.
14              THE COURT:  You said they can take one tattoo.
15              MS. MCKEDY:  He is identified through DOC by piaso
16    being on his arm.  That's their issue in this case.  No other
17    tattoos are identified in the course of this case.  I see no
18    relevance for photographing his entire body and his tattoos.
19              THE COURT:  That's the only motion.
20              MS. SAMPLE:  I haven't received that.
21              THE COURT:  That's the only motion that I recall
22    seeing for identification.  I don't recall seeing any others.
23              MS. SAMPLE:  We filed motions on all co-defendants.
24    I believe we have it signed on some of them.
25              THE COURT:  I know I have in some instances.  I
```

1    remember doing that when we first started out.

2              MS. ANKENY:  There is another motion that's been

3    filed regarding tattoos.  We were dealing with the ones before

4    regarding fingerprints and something else and the Court

5    reserved ruling on part of that.  That was --

6              THE COURT:  I said you could have fingerprints but --

7              MS. ANKENY:  DNA.

8              THE COURT:  You can have fingerprints.  I mean --

9              MS. ANKENY:  This is new.

10             MS. SAMPLE:  This is a new one filed about two weeks

11   ago, I believe.

12             THE COURT:  I have to check the files.  I have to

13   say, I don't know.

14             MS. SAMPLE:  My last issue, judge, I did speak with

15   Mr. Kohn last week regarding TF0 Richardson being unavailable

16   on September 24th.  I informed Mr. Kohn that he would be

17   responsible for flying Mr. Richardson back from Quantico.  He

18   informed me that he served him here in the courtroom when the

19   date was set.  I received an e-mail from Mr. Richardson that

20   states that he did not receive a subpoena here in the

21   courtroom.  That he received the subpoena through fax down in

22   Quantico on August 27th.

23             Therefore, I believe that Mr. Kohn then would be

24   responsible for flying Officer Richardson back, if he wants him

25   here for the hearing, because Mr. Kohn is the one who

1    subpoenaed him.

2            THE COURT:  This is for a motion or a hearing on the

3    24th.  What's he doing in Quantico?

4            MS. SAMPLE:  He is at a special training.

5            THE COURT:  It's part of his job.  Where is he

6    formally?

7            MS. SAMPLE:  Department of Corrections, inspector

8    general's office.  He will be back on the 29th.  On the 24th he

9    will not be.

10           THE COURT:  Mr. Kohn.

11           MR. KOHN:  Judge, I think that must have been a

12   misunderstanding between myself and Ms. Sample.  I didn't tell

13   them I served him here.  I followed the procedures that were

14   ordered by the Court, and he was here when that motions date

15   was set.  He is one of the two principal case officers on this

16   case.  He is the only one who was on the phone with Mr. Rodarte

17   as they were driving over to the alleged victim's house.  We

18   shouldn't have to pay to fly him back.  He should know that he

19   is going to be required for motions hearings on an attempted

20   murder case with five co-defendants.

21           I understand that he wants to go to the training.

22   ADC is not going to approve me requesting funds to fly him back

23   with the budget crisis.  We have received numerous e-mails

24   about what they will and won't do at this point.  He wanted to

25   go out there for training.  He is part of this case.  He knew

1   the date it was going to be.  It's his responsibility to be

2   here.

3          THE COURT:  Calm down.  Calm down.  Can you get me a

4   transcript of that?

5          MR. KOHN:  What hearing date was that?

6          THE COURT:  Not a transcript.  If you can give me the

7   date.

8          MR. KOHN:  I do have that, judge.

9          MS. SAMPLE:  I believe he was here.  I will admit to

10  that.  I believe, if we did not say it on the record, we did

11  inform everybody in the room that Mr. Richardson was gone on

12  that date.  He would not be back until the 29th.

13         THE COURT:  All I am going to do, if you give me the

14  date, I am going to see if my court reporter can give me a copy

15  of the transcript of what was said because if I ordered him to

16  be here and he is not, that is a whole other problem.  If I

17  didn't order him to be here, then it's a different issue.  We

18  will have to take that up.  If I didn't order him to be here,

19  he is not under subpoena.

20         MR. KOHN:  He is under subpoena.  We followed

21  protocol that was ordered by the Court.

22         THE COURT:  I don't have proof of that.  I am not

23  saying it wasn't.  Before I can make a determination, I have to

24  figure that part out.

25         MR. KOHN:  We have.

1        THE COURT:  Advanced problem solving.  The issue with

2   advanced problem solving would be get ahold of Officer

3   Richardson now before he goes to Quantico and have him

4   reschedule Quantico.

5        MS. SAMPLE:  He is at Quantico.  He has been in

6   Quantico since I believe July, middle of July.  Even if we were

7   to subpoena him, we would have to pay to fly him back.  That's

8   why I am stating that.

9        THE COURT:  I will have to figure that out.

10       MR. KOHN:  May 27th and May 28.  Those are the dates

11   of the preliminary hearing.

12       MS. BEHAN:  So the District Attorney is aware, I know

13   she hasn't received our motion, but we had filed a motion.  It

14   was filed today.  Hopefully they will receive it shortly.  It's

15   a voluntariness issue and which would be --

16       THE COURT:  This is on a suppression.

17       MS. BEHAN:  A suppression that's scheduled to be

18   here.  I believe that they would be required for that.

19       THE COURT:  I agree.  I need evidence for that.

20   There may be some issues that we can't resolve entirely on the

21   24th.  If that turns out to be the case, that turns out to be

22   the case.  We will have to deal with that as it happens.

23       MS. ANKENY:  SDT return date, judge.

24       THE COURT:  Mr. Bain, I think probably you are out of

25   luck.  Here is what I am willing to do, plus you are requesting

 1    a hearing in front of a different judge, essentially we can do

 2    that whenever.  It's just going to be you and the other judge.

 3    Why don't we contact you when we can get a judge who is going

 4    to hear that.  If you can come over in a few minutes and tell

 5    them whatever they are going to do, that judge can tell me

 6    whatever that judge is going to tell me.  Then I can make a

 7    determination as to how we are going to proceed, whether I need

 8    to issue a written order or not.  That's probably the easiest

 9    way, rather than have you sit around and listening to

10    everybody, including me.

11            MR. BAIN:  I would appreciate that very much, judge.

12            THE COURT:  We need to get -- they need a return

13    date.  And possibly the easiest return date is going to be the

14    24th.  Everybody is going to be here then any way.

15            THE CLERK:  Do you want the same time or later?

16            THE COURT:  Anything.  The biggest problem for the

17    24th is going to be going into the afternoon.  What time do you

18    want to schedule?

19            THE COURT:  Thompson is like two days, if I remember

20    right.

21            MS. ANKENY:  Thompson has three that are being tried

22    back to back.

23            THE COURT:  If we only get one tried that week, we

24    will try the next one the next week.

25            MS. ANKENY:  I believe two of them should be two-day

1    trials.

2            THE COURT:  That's what I was recalling.  One of them

3    the evidence is pretty clear.  There were only two or three

4    people that was going to be here.

5            MS. ANKENY:  One involves the intimidation of a

6    witness.  It might take an extra day.

7            THE CLERK:  You want morning or afternoon?

8            THE COURT:  9:00 o'clock on the 24th.  Everybody is

9    going to be here at 8:30 on the 24th.

10           THE CLERK:  All right, sir.  September 24th at

11   9:00 o'clock.

12           MR. KOHN:  Thank you.

13

14                    C E R T I F I C A T E

15           I, PAMELA A CELSKE, Official Court Reporter of the

16   District Court, do hereby certify that the foregoing pages

17   numbered 2 through 105, inclusive, constitute a full, true, and

18   accurate transcript of the proceedings had in the above matter,

19   all done to the best of my skill and ability.

20           DATED this 18th day of September, 2009.

21

22

23                          _____

24                               PAMELA A. CELSKE

25